# EXHIBIT A





# European Convention on Human Rights

as amended by Protocols Nos. 11 and 14

supplemented by Protocols Nos. 1, 4, 6, 7, 12 and 13

# CONTENTS

Convention for the Protection of Human Rights and Fundamental Freedoms ...................... 5

Protocol .................................................................. 31

Protocol No. 4 ........................................................ 34

Protocol No. 6 ........................................................ 38

Protocol No. 7 ........................................................ 42

Protocol No. 12 ...................................................... 48

Protocol No. 13 ...................................................... 52

The text of the Convention is presented as amended by the provisions of Protocol No. 14 (CETS no. 194) as from its entry into force on 1 June 2010. The text of the Convention had previously been amended according to the provisions of Protocol No. 3 (ETS no. 45), which entered into force on 21 September 1970, of Protocol No. 5 (ETS no. 55), which entered into force on 20 December 1971, and of Protocol No. 8 (ETS no. 118), which entered into force on 1 January 1990, and comprised also the text of Protocol No. 2 (ETS no. 44) which, in accordance with Article 5 § 3 thereof, had been an integral part of the Convention since its entry into force on 21 September 1970. All provisions which had been amended or added by these Protocols were replaced by Protocol No. 11 (ETS no. 155), as from the date of its entry into force on 1 November 1998. As from that date, Protocol No. 9 (ETS no. 140), which entered into force on 1 October 1994, was repealed and Protocol No. 10 (ETS no. 146) lost its purpose.

The current state of signatures and ratifications of the Convention and its Protocols as well as the complete list of declarations and reservations are available at www.conventions.coe.int.

Only the English and French versions of the Convention are authentic.

European Court of Human Rights
Council of Europe
F-67075 Strasbourg cedex
www.echr.coe.int

3

# Convention for the Protection of Human Rights and Fundamental Freedoms

Rome, 4.XI.1950

THE GOVERNMENTS SIGNATORY HERETO, being members of the Council of Europe,

Considering the Universal Declaration of Human Rights proclaimed by the General Assembly of the United Nations on 10th December 1948;

Considering that this Declaration aims at securing the universal and effective recognition and observance of the Rights therein declared;

Considering that the aim of the Council of Europe is the achievement of greater unity between its members and that one of the methods by which that aim is to be pursued is the maintenance and further realisation of Human Rights and Fundamental Freedoms;

Reaffirming their profound belief in those fundamental freedoms which are the foundation of justice and peace in the world and are best maintained on the one hand by an effective political democracy and on the other by a common understanding and observance of the Human Rights upon which they depend;

Being resolved, as the governments of European countries which are likeminded and have a common heritage of political traditions, ideals, freedom and the rule of law, to take the first steps for the collective enforcement of certain of the rights stated in the Universal Declaration,

Have agreed as follows:

5

## ARTICLE 1

### Obligation to respect Human Rights

The High Contracting Parties shall secure to everyone within their jurisdiction the rights and freedoms defined in Section I of this Convention.

## SECTION I
## RIGHTS AND FREEDOMS

### ARTICLE 2

### Right to life

1. Everyone's right to life shall be protected by law. No one shall be deprived of his life intentionally save in the execution of a sentence of a court following his conviction of a crime for which this penalty is provided by law.

2. Deprivation of life shall not be regarded as inflicted in contravention of this Article when it results from the use of force which is no more than absolutely necessary:

(a) in defence of any person from unlawful violence;

(b) in order to effect a lawful arrest or to prevent the escape of a person lawfully detained;

(c) in action lawfully taken for the purpose of quelling a riot or insurrection.

### ARTICLE 3

### Prohibition of torture

No one shall be subjected to torture or to inhuman or degrading treatment or punishment.

6

## ARTICLE 4

### Prohibition of slavery and forced labour

1. No one shall be held in slavery or servitude.

2. No one shall be required to perform forced or compulsory labour.

3. For the purpose of this Article the term "forced or compulsory labour" shall not include:

(a) any work required to be done in the ordinary course of detention imposed according to the provisions of Article 5 of this Convention or during conditional release from such detention;

(b) any service of a military character or, in case of conscientious objectors in countries where they are recognised, service exacted instead of compulsory military service;

(c) any service exacted in case of an emergency or calamity threatening the life or wellbeing of the community;

(d) any work or service which forms part of normal civic obligations.

### ARTICLE 5

### Right to liberty and security

1. Everyone has the right to liberty and security of person. No one shall be deprived of his liberty save in the following cases and in accordance with a procedure prescribed by law:

(a) the lawful detention of a person after conviction by a competent court;

(b) the lawful arrest or detention of a person for noncompliance with the lawful order of a court or in order to secure the fulfilment of any obligation prescribed by law;

7

## ARTICLE 6

### Right to a fair trial

1.  In the determination of his civil rights and obligations or of any criminal charge against him, everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law. Judgment shall be pronounced publicly but the press and public may be excluded from all or part of the trial in the interests of morals, public order or national security in a democratic society, where the interests of juveniles or the protection of the private life of the parties so require, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice.

2.  Everyone charged with a criminal offence shall be presumed innocent until proved guilty according to law.

3.  Everyone charged with a criminal offence has the following minimum rights:

    (a)  to be informed promptly, in a language which he understands and in detail, of the nature and cause of the accusation against him;

    (b)  to have adequate time and facilities for the preparation of his defence;

    (c)  to defend himself in person or through legal assistance of his own choosing or, if he has not sufficient means to pay for legal assistance, to be given it free when the interests of justice so require;

    (d)  to examine or have examined witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him;

    (e)  to have the free assistance of an interpreter if he cannot understand or speak the language used in court.

9

    (c)  the lawful arrest or detention of a person effected for the purpose of bringing him before the competent legal authority on reasonable suspicion of having committed an offence or when it is reasonably considered necessary to prevent his committing an offence or fleeing after having done so;

    (d)  the detention of a minor by lawful order for the purpose of educational supervision or his lawful detention for the purpose of bringing him before the competent legal authority;

    (e)  the lawful detention of persons for the prevention of the spreading of infectious diseases, of persons of unsound mind, alcoholics or drug addicts or vagrants;

    (f)  the lawful arrest or detention of a person to prevent his effecting an unauthorised entry into the country or of a person against whom action is being taken with a view to deportation or extradition.

2.  Everyone who is arrested shall be informed promptly, in a language which he understands, of the reasons for his arrest and of any charge against him.

3.  Everyone arrested or detained in accordance with the provisions of paragraph 1 (c) of this Article shall be brought promptly before a judge or other officer authorised by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release pending trial. Release may be conditioned by guarantees to appear for trial.

4.  Everyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings by which the lawfulness of his detention shall be decided speedily by a court and his release ordered if the detention is not lawful.

5.  Everyone who has been the victim of arrest or detention in contravention of the provisions of this Article shall have an enforceable right to compensation.

8

## ARTICLE 7

### No punishment without law

1. No one shall be held guilty of any criminal offence on account of any act or omission which did not constitute a criminal offence under national or international law at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time the criminal offence was committed.

2. This Article shall not prejudice the trial and punishment of any person for any act or omission which, at the time when it was committed, was criminal according to the general principles of law recognised by civilised nations.

## ARTICLE 8

### Right to respect for private and family life

1. Everyone has the right to respect for his private and family life, his home and his correspondence.

2. There shall be no interference by a public authority with the exercise of this right except such as is in accordance with the law and is necessary in a democratic society in the interests of national security, public safety or the economic wellbeing of the country, for the prevention of disorder or crime, for the protection of health or morals, or for the protection of the rights and freedoms of others.

## ARTICLE 9

### Freedom of thought, conscience and religion

1. Everyone has the right to freedom of thought, conscience and religion; this right includes freedom to change his religion or belief and freedom, either alone or in community with others and

10

in public or private, to manifest his religion or belief, in worship, teaching, practice and observance.

2. Freedom to manifest one's religion or beliefs shall be subject only to such limitations as are prescribed by law and are necessary in a democratic society in the interests of public safety, for the protection of public order, health or morals, or for the protection of the rights and freedoms of others.

## ARTICLE 10

### Freedom of expression

1. Everyone has the right to freedom of expression. This right shall include freedom to hold opinions and to receive and impart information and ideas without interference by public authority and regardless of frontiers. This Article shall not prevent States from requiring the licensing of broadcasting, television or cinema enterprises.

2. The exercise of these freedoms, since it carries with it duties and responsibilities, may be subject to such formalities, conditions, restrictions or penalties as are prescribed by law and are necessary in a democratic society, in the interests of national security, territorial integrity or public safety, for the prevention of disorder or crime, for the protection of health or morals, for the protection of the reputation or rights of others, for preventing the disclosure of information received in confidence, or for maintaining the authority and impartiality of the judiciary.

## ARTICLE 11

### Freedom of assembly and association

1. Everyone has the right to freedom of peaceful assembly and to freedom of association with others, including the right to form and to join trade unions for the protection of his interests.

11

## ARTICLE 15

### Derogation in time of emergency

1. In time of war or other public emergency threatening the life of the nation any High Contracting Party may take measures derogating from its obligations under this Convention to the extent strictly required by the exigencies of the situation, provided that such measures are not inconsistent with its other obligations under international law.

2. No derogation from Article 2, except in respect of deaths resulting from lawful acts of war, or from Articles 3, 4 (paragraph 1) and 7 shall be made under this provision.

3. Any High Contracting Party availing itself of this right of derogation shall keep the Secretary General of the Council of Europe fully informed of the measures which it has taken and the reasons therefor. It shall also inform the Secretary General of the Council of Europe when such measures have ceased to operate and the provisions of the Convention are again being fully executed.

## ARTICLE 16

### Restrictions on political activity of aliens

Nothing in Articles 10, 11 and 14 shall be regarded as preventing the High Contracting Parties from imposing restrictions on the political activity of aliens.

## ARTICLE 17

### Prohibition of abuse of rights

Nothing in this Convention may be interpreted as implying for any State, group or person any right to engage in any activity or perform any act aimed at the destruction of any of the rights and

13

---

2. No restrictions shall be placed on the exercise of these rights other than such as are prescribed by law and are necessary in a democratic society in the interests of national security or public safety, for the prevention of disorder or crime, for the protection of health or morals or for the protection of the rights and freedoms of others. This Article shall not prevent the imposition of lawful restrictions on the exercise of these rights by members of the armed forces, of the police or of the administration of the State.

## ARTICLE 12

### Right to marry

Men and women of marriageable age have the right to marry and to found a family, according to the national laws governing the exercise of this right.

## ARTICLE 13

### Right to an effective remedy

Everyone whose rights and freedoms as set forth in this Convention are violated shall have an effective remedy before a national authority notwithstanding that the violation has been committed by persons acting in an official capacity.

## ARTICLE 14

### Prohibition of discrimination

The enjoyment of the rights and freedoms set forth in this Convention shall be secured without discrimination on any ground such as sex, race, colour, language, religion, political or other opinion, national or social origin, association with a national minority, property, birth or other status.

12

freedoms set forth herein or at their limitation to a greater extent than is provided for in the Convention.

## ARTICLE 18

### Limitation on use of restrictions on rights

The restrictions permitted under this Convention to the said rights and freedoms shall not be applied for any purpose other than those for which they have been prescribed.

## SECTION II
# EUROPEAN COURT OF HUMAN RIGHTS

## ARTICLE 19

### Establishment of the Court

To ensure the observance of the engagements undertaken by the High Contracting Parties in the Convention and the Protocols thereto, there shall be set up a European Court of Human Rights, hereinafter referred to as "the Court". It shall function on a permanent basis.

## ARTICLE 20

### Number of judges

The Court shall consist of a number of judges equal to that of the High Contracting Parties.

14

## ARTICLE 21

### Criteria for office

1.  The judges shall be of high moral character and must either possess the qualifications required for appointment to high judicial office or be jurisconsults of recognised competence.

2.  The judges shall sit on the Court in their individual capacity.

3.  During their term of office the judges shall not engage in any activity which is incompatible with their independence, impartiality or with the demands of a full-time office; all questions arising from the application of this paragraph shall be decided by the Court.

## ARTICLE 22

### Election of judges

The judges shall be elected by the Parliamentary Assembly with respect to each High Contracting Party by a majority of votes cast from a list of three candidates nominated by the High Contracting Party.

## ARTICLE 23

### Terms of office and dismissal

1.  The judges shall be elected for a period of nine years. They may not be re-elected.

2.  The terms of office of judges shall expire when they reach the age of 70.

3.  The judges shall hold office until replaced. They shall, however, continue to deal with such cases as they already have under consideration.

15

4. No judge may be dismissed from office unless the other judges decide by a majority of two-thirds that that judge has ceased to fulfil the required conditions.

## ARTICLE 24

### Registry and rapporteurs

1. The Court shall have a Registry, the functions and organisation of which shall be laid down in the rules of the Court.

2. When sitting in a single-judge formation, the Court shall be assisted by rapporteurs who shall function under the authority of the President of the Court. They shall form part of the Court's Registry.

## ARTICLE 25

### Plenary Court

The plenary Court shall

(a) elect its President and one or two Vice-Presidents for a period of three years; they may be re-elected;

(b) set up Chambers, constituted for a fixed period of time;

(c) elect the Presidents of the Chambers of the Court; they may be re-elected;

(d) adopt the rules of the Court;

(e) elect the Registrar and one or more Deputy Registrars;

(f) make any request under Article 26, paragraph 2.

## ARTICLE 26

### Single-judge formation, Committees, Chambers and Grand Chamber

1. To consider cases brought before it, the Court shall sit in a single-judge formation, in committees of three judges, in

16

Chambers of seven judges and in a Grand Chamber of seventeen judges. The Court's Chambers shall set up committees for a fixed period of time.

2. At the request of the plenary Court, the Committee of Ministers may, by a unanimous decision and for a fixed period, reduce to five the number of judges of the Chambers.

3. When sitting as a single judge, a judge shall not examine any application against the High Contracting Party in respect of which that judge has been elected.

4. There shall sit as an ex officio member of the Chamber and the Grand Chamber the judge elected in respect of the High Contracting Party concerned. If there is none or if that judge is unable to sit, a person chosen by the President of the Court from a list submitted in advance by that Party shall sit in the capacity of judge.

5. The Grand Chamber shall also include the President of the Court, the Vice-Presidents, the Presidents of the Chambers and other judges chosen in accordance with the rules of the Court. When a case is referred to the Grand Chamber under Article 43, no judge from the Chamber which rendered the judgment shall sit in the Grand Chamber, with the exception of the President of the Chamber and the judge who sat in respect of the High Contracting Party concerned.

## ARTICLE 27

### Competence of single judges

1. A single judge may declare inadmissible or strike out of the Court's list of cases an application submitted under Article 34, where such a decision can be taken without further examination.

2. The decision shall be final.

17

3. If the single judge does not declare an application inadmissible or strike it out, that judge shall forward it to a committee or to a Chamber for further examination.

## ARTICLE 28

### Competence of Committees

1. In respect of an application submitted under Article 34, a committee may, by a unanimous vote,

   (a) declare it inadmissible or strike it out of its list of cases, where such decision can be taken without further examination; or

   (b) declare it admissible and render at the same time a judgment on the merits, if the underlying question in the case, concerning the interpretation or the application of the Convention or the Protocols thereto, is already the subject of well-established caselaw of the Court.

2. Decisions and judgments under paragraph 1 shall be final.

3. If the judge elected in respect of the High Contracting Party concerned is not a member of the committee, the committee may at any stage of the proceedings invite that judge to take the place of one of the members of the committee, having regard to all relevant factors, including whether that Party has contested the application of the procedure under paragraph 1.(b).

## ARTICLE 29

### Decisions by Chambers on admissibility and merits

1. If no decision is taken under Article 27 or 28, or no judgment rendered under Article 28, a Chamber shall decide on the admissibility and merits of individual applications submitted under Article 34. The decision on admissibility may be taken separately.

18

2. A Chamber shall decide on the admissibility and merits of inter-State applications submitted under Article 33. The decision on admissibility shall be taken separately unless the Court, in exceptional cases, decides otherwise.

## ARTICLE 30

### Relinquishment of jurisdiction to the Grand Chamber

Where a case pending before a Chamber raises a serious question affecting the interpretation of the Convention or the Protocols thereto, or where the resolution of a question before the Chamber might have a result inconsistent with a judgment previously delivered by the Court, the Chamber may, at any time before it has rendered its judgment, relinquish jurisdiction in favour of the Grand Chamber, unless one of the parties to the case objects.

## ARTICLE 31

### Powers of the Grand Chamber

The Grand Chamber shall

   (a) determine applications submitted either under Article 33 or Article 34 when a Chamber has relinquished jurisdiction under Article 30 or when the case has been referred to it under Article 43;

   (b) decide on issues referred to the Court by the Committee of Ministers in accordance with Article 46, paragraph 4; and

   (c) consider requests for advisory opinions submitted under Article 47.

19

## ARTICLE 32

### Jurisdiction of the Court

1. The jurisdiction of the Court shall extend to all matters concerning the interpretation and application of the Convention and the Protocols thereto which are referred to it as provided in Articles 33, 34, 46 and 47.

2. In the event of dispute as to whether the Court has jurisdiction, the Court shall decide.

## ARTICLE 33

### Inter-State cases

Any High Contracting Party may refer to the Court any alleged breach of the provisions of the Convention and the Protocols thereto by another High Contracting Party.

## ARTICLE 34

### Individual applications

The Court may receive applications from any person, nongovernmental organisation or group of individuals claiming to be the victim of a violation by one of the High Contracting Parties of the rights set forth in the Convention or the Protocols thereto. The High Contracting Parties undertake not to hinder in any way the effective exercise of this right.

## ARTICLE 35

### Admissibility criteria

1. The Court may only deal with the matter after all domestic remedies have been exhausted, according to the generally recognised rules of international law, and within a period of six months from the date on which the final decision was taken.

20

2. The Court shall not deal with any application submitted under Article 34 that

(a) is anonymous; or

(b) is substantially the same as a matter that has already been examined by the Court or has already been submitted to another procedure of international investigation or settlement and contains no relevant new information.

3. The Court shall declare inadmissible any individual application submitted under Article 34 if it considers that:

(a) the application is incompatible with the provisions of the Convention or the Protocols thereto, manifestly ill-founded, or an abuse of the right of individual application; or

(b) the applicant has not suffered a significant disadvantage, unless respect for human rights as defined in the Convention and the Protocols thereto requires an examination of the application on the merits and provided that no case may be rejected on this ground which has not been duly considered by a domestic tribunal.

4. The Court shall reject any application which it considers inadmissible under this Article. It may do so at any stage of the proceedings.

## ARTICLE 36

### Third party intervention

1. In all cases before a Chamber or the Grand Chamber, a High Contracting Party one of whose nationals is an applicant shall have the right to submit written comments and to take part in hearings.

2. The President of the Court may, in the interest of the proper administration of justice, invite any High Contracting Party which is not a party to the proceedings or any person concerned who

21

is not the applicant to submit written comments or take part in hearings.

3. In all cases before a Chamber or the Grand Chamber, the Council of Europe Commissioner for Human Rights may submit written comments and take part in hearings.

## ARTICLE 37

### Striking out applications

1. The Court may at any stage of the proceedings decide to strike an application out of its list of cases where the circumstances lead to the conclusion that

(a) the applicant does not intend to pursue his application; or

(b) the matter has been resolved; or

(c) for any other reason established by the Court, it is no longer justified to continue the examination of the application.

However, the Court shall continue the examination of the application if respect for human rights as defined in the Convention and the Protocols thereto so requires.

2. The Court may decide to restore an application to its list of cases if it considers that the circumstances justify such a course.

## ARTICLE 38

### Examination of the case

The Court shall examine the case together with the representatives of the parties and, if need be, undertake an investigation, for the effective conduct of which the High Contracting Parties concerned shall furnish all necessary facilities.

## ARTICLE 39

### Friendly settlements

1. At any stage of the proceedings, the Court may place itself at the disposal of the parties concerned with a view to securing a friendly settlement of the matter on the basis of respect for human rights as defined in the Convention and the Protocols thereto.

2. Proceedings conducted under paragraph 1 shall be confidential.

3. If a friendly settlement is effected, the Court shall strike the case out of its list by means of a decision which shall be confined to a brief statement of the facts and of the solution reached.

4. This decision shall be transmitted to the Committee of Ministers, which shall supervise the execution of the terms of the friendly settlement as set out in the decision.

## ARTICLE 40

### Public hearings and access to documents

1. Hearings shall be in public unless the Court in exceptional circumstances decides otherwise.

2. Documents deposited with the Registrar shall be accessible to the public unless the President of the Court decides otherwise.

## ARTICLE 41

### Just satisfaction

If the Court finds that there has been a violation of the Convention or the Protocols thereto, and if the internal law of the High Contracting Party concerned allows only partial reparation to be made, the Court shall, if necessary, afford just satisfaction to the injured party.

## ARTICLE 42

### Judgments of Chambers

Judgments of Chambers shall become final in accordance with the provisions of Article 44, paragraph 2.

## ARTICLE 43

### Referral to the Grand Chamber

1. Within a period of three months from the date of the judgment of the Chamber, any party to the case may, in exceptional cases, request that the case be referred to the Grand Chamber.

2. A panel of five judges of the Grand Chamber shall accept the request if the case raises a serious question affecting the interpretation or application of the Convention or the Protocols thereto, or a serious issue of general importance.

3. If the panel accepts the request, the Grand Chamber shall decide the case by means of a judgment.

## ARTICLE 44

### Final judgments

1. The judgment of the Grand Chamber shall be final.

2. The judgment of a Chamber shall become final

   (a) when the parties declare that they will not request that the case be referred to the Grand Chamber; or

   (b) three months after the date of the judgment, if reference of the case to the Grand Chamber has not been requested; or

   (c) when the panel of the Grand Chamber rejects the request to refer under Article 43.

3. The final judgment shall be published.

24

## ARTICLE 45

### Reasons for judgments and decisions

1. Reasons shall be given for judgments as well as for decisions declaring applications admissible or inadmissible.

2. If a judgment does not represent, in whole or in part, the unanimous opinion of the judges, any judge shall be entitled to deliver a separate opinion.

## ARTICLE 46

### Binding force and execution of judgments

1. The High Contracting Parties undertake to abide by the final judgment of the Court in any case to which they are parties.

2. The final judgment of the Court shall be transmitted to the Committee of Ministers, which shall supervise its execution.

3. If the Committee of Ministers considers that the supervision of the execution of a final judgment is hindered by a problem of interpretation of the judgment, it may refer the matter to the Court for a ruling on the question of interpretation. A referral decision shall require a majority vote of two thirds of the representatives entitled to sit on the committee.

4. If the Committee of Ministers considers that a High Contracting Party refuses to abide by a final judgment in a case to which it is a party, it may, after serving formal notice on that Party and by decision adopted by a majority vote of two thirds of the representatives entitled to sit on the committee, refer to the Court the question whether that Party has failed to fulfil its obligation under paragraph 1.

5. If the Court finds a violation of paragraph 1, it shall refer the case to the Committee of Ministers for consideration of the measures to be taken. If the Court finds no violation of

25

paragraph 1, it shall refer the case to the Committee of Ministers, which shall close its examination of the case.

## ARTICLE 47

### Advisory opinions

1. The Court may, at the request of the Committee of Ministers, give advisory opinions on legal questions concerning the interpretation of the Convention and the Protocols thereto.

2. Such opinions shall not deal with any question relating to the content or scope of the rights or freedoms defined in Section I of the Convention and the Protocols thereto, or with any other question which the Court or the Committee of Ministers might have to consider in consequence of any such proceedings as could be instituted in accordance with the Convention.

3. Decisions of the Committee of Ministers to request an advisory opinion of the Court shall require a majority vote of the representatives entitled to sit on the committee.

## ARTICLE 48

### Advisory jurisdiction of the Court

The Court shall decide whether a request for an advisory opinion submitted by the Committee of Ministers is within its competence as defined in Article 47.

## ARTICLE 49

### Reasons for advisory opinions

1. Reasons shall be given for advisory opinions of the Court.

2. If the advisory opinion does not represent, in whole or in part, the unanimous opinion of the judges, any judge shall be entitled to deliver a separate opinion.

26

3. Advisory opinions of the Court shall be communicated to the Committee of Ministers.

## ARTICLE 50

### Expenditure on the Court

The expenditure on the Court shall be borne by the Council of Europe.

## ARTICLE 51

### Privileges and immunities of judges

The judges shall be entitled, during the exercise of their functions, to the privileges and immunities provided for in Article 40 of the Statute of the Council of Europe and in the agreements made thereunder.

## SECTION III
## MISCELLANEOUS PROVISIONS

## ARTICLE 52

### Inquiries by the Secretary General

On receipt of a request from the Secretary General of the Council of Europe any High Contracting Party shall furnish an explanation of the manner in which its internal law ensures the effective implementation of any of the provisions of the Convention.

## ARTICLE 53

### Safeguard for existing human rights

Nothing in this Convention shall be construed as limiting or derogating from any of the human rights and fundamental

27

freedoms which may be ensured under the laws of any High Contracting Party or under any other agreement to which it is a party.

## ARTICLE 54

### Powers of the Committee of Ministers

Nothing in this Convention shall prejudice the powers conferred on the Committee of Ministers by the Statute of the Council of Europe.

## ARTICLE 55

### Exclusion of other means of dispute settlement

The High Contracting Parties agree that, except by special agreement, they will not avail themselves of treaties, conventions or declarations in force between them for the purpose of submitting, by way of petition, a dispute arising out of the interpretation or application of this Convention to a means of settlement other than those provided for in this Convention.

## ARTICLE 56

### Territorial application

1.  Any State may at the time of its ratification or at any time thereafter declare by notification addressed to the Secretary General of the Council of Europe that the present Convention shall, subject to paragraph 4 of this Article, extend to all or any of the territories for whose international relations it is responsible.

2.  The Convention shall extend to the territory or territories named in the notification as from the thirtieth day after the receipt of this notification by the Secretary General of the Council of Europe.

28

3.  The provisions of this Convention shall be applied in such territories with due regard, however, to local requirements.

4.  Any State which has made a declaration in accordance with paragraph 1 of this Article may at any time thereafter declare on behalf of one or more of the territories to which the declaration relates that it accepts the competence of the Court to receive applications from individuals, nongovernmental organisations or groups of individuals as provided by Article 34 of the Convention.

## ARTICLE 57

### Reservations

1.  Any State may, when signing this Convention or when depositing its instrument of ratification, make a reservation in respect of any particular provision of the Convention to the extent that any law then in force in its territory is not in conformity with the provision. Reservations of a general character shall not be permitted under this Article.

2.  Any reservation made under this Article shall contain a brief statement of the law concerned.

## ARTICLE 58

### Denunciation

1.  A High Contracting Party may denounce the present Convention only after the expiry of five years from the date on which it became a party to it and after six months' notice contained in a notification addressed to the Secretary General of the Council of Europe, who shall inform the other High Contracting Parties.

2.  Such a denunciation shall not have the effect of releasing the High Contracting Party concerned from its obligations under this Convention in respect of any act which, being capable of constituting a violation of such obligations, may have been

29

# Protocol

## to the Convention
## for the Protection of Human Rights
## and Fundamental Freedoms

Paris, 20.III.1952

THE GOVERNMENTS SIGNATORY HERETO, being members of the Council of Europe,

Being resolved to take steps to ensure the collective enforcement of certain rights and freedoms other than those already included in Section I of the Convention for the Protection of Human Rights and Fundamental Freedoms signed at Rome on 4 November 1950 (hereinafter referred to as "the Convention"),

Have agreed as follows:

### ARTICLE 1

#### Protection of property

Every natural or legal person is entitled to the peaceful enjoyment of his possessions. No one shall be deprived of his possessions except in the public interest and subject to the conditions provided for by law and by the general principles of international law.

The preceding provisions shall not, however, in any way impair the right of a State to enforce such laws as it deems necessary to control the use of property in accordance with the general interest or to secure the payment of taxes or other contributions or penalties.

31

---

performed by it before the date at which the denunciation became effective.

3. Any High Contracting Party which shall cease to be a member of the Council of Europe shall cease to be a Party to this Convention under the same conditions.

4. The Convention may be denounced in accordance with the provisions of the preceding paragraphs in respect of any territory to which it has been declared to extend under the terms of Article 56.

### ARTICLE 59

#### Signature and ratification

1. This Convention shall be open to the signature of the members of the Council of Europe. It shall be ratified. Ratifications shall be deposited with the Secretary General of the Council of Europe.

2. The European Union may accede to this Convention.

3. The present Convention shall come into force after the deposit of ten instruments of ratification.

4. As regards any signatory ratifying subsequently, the Convention shall come into force at the date of the deposit of its instrument of ratification.

5. The Secretary General of the Council of Europe shall notify all the members of the Council of Europe of the entry into force of the Convention, the names of the High Contracting Parties who have ratified it, and the deposit of all instruments of ratification which may be effected subsequently.

DONE AT ROME THIS 4TH DAY OF NOVEMBER 1950, in English and French, both texts being equally authentic, in a single copy which shall remain deposited in the archives of the Council of Europe. The Secretary General shall transmit certified copies to each of the signatories.

30

## ARTICLE 2

### Right to education

No person shall be denied the right to education. In the exercise of any functions which it assumes in relation to education and to teaching, the State shall respect the right of parents to ensure such education and teaching in conformity with their own religious and philosophical convictions.

## ARTICLE 3

### Right to free elections

The High Contracting Parties undertake to hold free elections at reasonable intervals by secret ballot, under conditions which will ensure the free expression of the opinion of the people in the choice of the legislature.

## ARTICLE 4

### Territorial application

Any High Contracting Party may at the time of signature or ratification or at any time thereafter communicate to the Secretary General of the Council of Europe a declaration stating the extent to which it undertakes that the provisions of the present Protocol shall apply to such of the territories for the international relations of which it is responsible as are named therein.

Any High Contracting Party which has communicated a declaration in virtue of the preceding paragraph may from time to time communicate a further declaration modifying the terms of any former declaration or terminating the application of the provisions of this Protocol in respect of any territory.

32

A declaration made in accordance with this Article shall be deemed to have been made in accordance with paragraph 1 of Article 56 of the Convention.

## ARTICLE 5

### Relationship to the Convention

As between the High Contracting Parties the provisions of Articles 1, 2, 3 and 4 of this Protocol shall be regarded as additional Articles to the Convention and all the provisions of the Convention shall apply accordingly.

## ARTICLE 6

### Signature and ratification

This Protocol shall be open for signature by the members of the Council of Europe, who are the signatories of the Convention; it shall be ratified at the same time as or after the ratification of the Convention. It shall enter into force after the deposit of ten instruments of ratification. As regards any signatory ratifying subsequently, the Protocol shall enter into force at the date of the deposit of its instrument of ratification.

The instruments of ratification shall be deposited with the Secretary General of the Council of Europe, who will notify all members of the Council of Europe of the names of those who have ratified.

DONE AT PARIS ON THE 20TH DAY OF MARCH 1952, in English and French, both texts being equally authentic, in a single copy which shall remain deposited in the archives of the Council of Europe. The Secretary General shall transmit certified copies to each of the signatory governments.

33

# Protocol No. 4

## to the Convention
## for the Protection of Human Rights and Fundamental Freedoms securing certain rights and freedoms other than those already included in the Convention and in the First Protocol thereto

Strasbourg, 16.IX.1963

THE GOVERNMENTS SIGNATORY HERETO, being members of the Council of Europe,

Being resolved to take steps to ensure the collective enforcement of certain rights and freedoms other than those already included in Section I of the Convention for the Protection of Human Rights and Fundamental Freedoms signed at Rome on 4th November 1950 (hereinafter referred to as the "Convention") and in Articles 1 to 3 of the First Protocol to the Convention, signed at Paris on 20th March 1952,

Have agreed as follows:

### ARTICLE 1

#### Prohibition of imprisonment for debt

No one shall be deprived of his liberty merely on the ground of inability to fulfil a contractual obligation.

34

### ARTICLE 2

#### Freedom of movement

1.  Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence.

2.  Everyone shall be free to leave any country, including his own.

3.  No restrictions shall be placed on the exercise of these rights other than such as are in accordance with law and are necessary in a democratic society in the interests of national security or public safety, for the maintenance of ordre public, for the prevention of crime, for the protection of health or morals, or for the protection of the rights and freedoms of others.

4.  The rights set forth in paragraph 1 may also be subject, in particular areas, to restrictions imposed in accordance with law and justified by the public interest in a democratic society.

### ARTICLE 3

#### Prohibition of expulsion of nationals

1.  No one shall be expelled, by means either of an individual or of a collective measure, from the territory of the State of which he is a national.

2.  No one shall be deprived of the right to enter the territory of the State of which he is a national.

### ARTICLE 4

#### Prohibition of collective expulsion of aliens

Collective expulsion of aliens is prohibited.

35

## ARTICLE 5

### Territorial application

1.  Any High Contracting Party may, at the time of signature or ratification of this Protocol, or at any time thereafter, communicate to the Secretary General of the Council of Europe a declaration stating the extent to which it undertakes that the provisions of this Protocol shall apply to such of the territories for the international relations of which it is responsible as are named therein.

2.  Any High Contracting Party which has communicated a declaration in virtue of the preceding paragraph may, from time to time, communicate a further declaration modifying the terms of any former declaration or terminating the application of the provisions of this Protocol in respect of any territory.

3.  A declaration made in accordance with this Article shall be deemed to have been made in accordance with paragraph 1 of Article 56 of the Convention.

4.  The territory of any State to which this Protocol applies by virtue of ratification or acceptance by that State, and each territory to which this Protocol is applied by virtue of a declaration by that State under this Article, shall be treated as separate territories for the purpose of the references in Articles 2 and 3 to the territory of a State.

5.  Any State which has made a declaration in accordance with paragraph 1 or 2 of this Article may at any time thereafter declare on behalf of one or more of the territories to which the declaration relates that it accepts the competence of the Court to receive applications from individuals, nongovernmental organisations or groups of individuals as provided in Article 34 of the Convention in respect of all or any of Articles 1 to 4 of this Protocol.

36

## ARTICLE 6

### Relationship to the Convention

As between the High Contracting Parties the provisions of Articles 1 to 5 of this Protocol shall be regarded as additional Articles to the Convention, and all the provisions of the Convention shall apply accordingly.

## ARTICLE 7

### Signature and ratification

1.  This Protocol shall be open for signature by the members of the Council of Europe who are the signatories of the Convention; it shall be ratified at the same time as or after the ratification of the Convention. It shall enter into force after the deposit of five instruments of ratification. As regards any signatory ratifying subsequently, the Protocol shall enter into force at the date of the deposit of its instrument of ratification.

2.  The instruments of ratification shall be deposited with the Secretary General of the Council of Europe, who will notify all members of those who have ratified.

In witness whereof the undersigned, being duly authorised thereto, have signed this Protocol.

DONE AT STRASBOURG, THIS 16TH DAY OF SEPTEMBER 1963, in English and in French, both texts being equally authoritative, in a single copy which shall remain deposited in the archives of the Council of Europe. The Secretary General shall transmit certified copies to each of the signatory states.

37

# Protocol No. 6

## to the Convention for the Protection of Human Rights and Fundamental Freedoms concerning the Abolition of the Death Penalty

Strasbourg, 28.IV.1983

THE MEMBER STATES OF THE COUNCIL OF EUROPE, signatory to this Protocol to the Convention for the Protection of Human Rights and Fundamental Freedoms, signed at Rome on 4 November 1950 (hereinafter referred to as "the Convention"),

Considering that the evolution that has occurred in several member States of the Council of Europe expresses a general tendency in favour of abolition of the death penalty;

Have agreed as follows:

### ARTICLE 1

#### Abolition of the death penalty

The death penalty shall be abolished. No one shall be condemned to such penalty or executed.

### ARTICLE 2

#### Death penalty in time of war

A State may make provision in its law for the death penalty in respect of acts committed in time of war or of imminent threat of war; such penalty shall be applied only in the instances laid down in the law and in accordance with its provisions. The State shall communicate to the Secretary General of the Council of Europe the relevant provisions of that law.

### ARTICLE 3

#### Prohibition of derogations

No derogation from the provisions of this Protocol shall be made under Article 15 of the Convention.

### ARTICLE 4

#### Prohibition of reservations

No reservation may be made under Article 57 of the Convention in respect of the provisions of this Protocol.

### ARTICLE 5

#### Territorial application

1.  Any State may at the time of signature or when depositing its instrument of ratification, acceptance or approval, specify the territory or territories to which this Protocol shall apply.

2.  Any State may at any later date, by a declaration addressed to the Secretary General of the Council of Europe, extend the application of this Protocol to any other territory specified in the declaration. In respect of such territory the Protocol shall enter into

38

39

Notice of Intent, Exhibit A

force on the first day of the month following the date of receipt of such declaration by the Secretary General.

3.   Any declaration made under the two preceding paragraphs may, in respect of any territory specified in such declaration, be withdrawn by a notification addressed to the Secretary General. The withdrawal shall become effective on the first day of the month following the date of receipt of such notification by the Secretary General.

## ARTICLE 6

### Relationship to the Convention

As between the States Parties the provisions of Articles 1 to 5 of this Protocol shall be regarded as additional Articles to the Convention and all the provisions of the Convention shall apply accordingly.

## ARTICLE 7

### Signature and ratification

The Protocol shall be open for signature by the member States of the Council of Europe, signatories to the Convention. It shall be subject to ratification, acceptance or approval. A member State of the Council of Europe may not ratify, accept or approve this Protocol unless it has, simultaneously or previously, ratified the Convention. Instruments of ratification, acceptance or approval shall be deposited with the Secretary General of the Council of Europe.

## ARTICLE 8

### Entry into force

1.   This Protocol shall enter into force on the first day of the month following the date on which five member States of the Council of

Europe have expressed their consent to be bound by the Protocol in accordance with the provisions of Article 7.

2.   In respect of any member State which subsequently expresses its consent to be bound by it, the Protocol shall enter into force on the first day of the month following the date of the deposit of the instrument of ratification, acceptance or approval.

## ARTICLE 9

### Depositary functions

The Secretary General of the Council of Europe shall notify the member States of the Council of:

(a) any signature;

(b) the deposit of any instrument of ratification, acceptance or approval;

(c) any date of entry into force of this Protocol in accordance with Articles 5 and 8;

(d) any other act, notification or communication relating to this Protocol.

In witness whereof the undersigned, being duly authorised thereto, have signed this Protocol.

DONE AT STRASBOURG, THIS 28TH DAY OF APRIL 1983, in English and in French, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Council of Europe. The Secretary General of the Council of Europe shall transmit certified copies to each member State of the Council of Europe.

40

41

# Protocol No. 7

## to the Convention
## for the Protection of Human Rights
## and Fundamental Freedoms

Strasbourg, 22.XI.1984

THE MEMBER STATES OF THE COUNCIL OF EUROPE, signatory hereto,

Being resolved to take further steps to ensure the collective enforcement of certain rights and freedoms by means of the Convention for the Protection of Human Rights and Fundamental Freedoms signed at Rome on 4 November 1950 (hereinafter referred to as "the Convention"),

Have agreed as follows:

### ARTICLE 1

#### Procedural safeguards relating to expulsion of aliens

1.  An alien lawfully resident in the territory of a State shall not be expelled therefrom except in pursuance of a decision reached in accordance with law and shall be allowed:

(a) to submit reasons against his expulsion,

(b) to have his case reviewed, and

(c) to be represented for these purposes before the competent authority or a person or persons designated by that authority.

2.  An alien may be expelled before the exercise of his rights under paragraph 1.(a), (b) and (c) of this Article, when such

42

expulsion is necessary in the interests of public order or is grounded on reasons of national security.

### ARTICLE 2

#### Right of appeal in criminal matters

1.  Everyone convicted of a criminal offence by a tribunal shall have the right to have his conviction or sentence reviewed by a higher tribunal. The exercise of this right, including the grounds on which it may be exercised, shall be governed by law.

2.  This right may be subject to exceptions in regard to offences of a minor character, as prescribed by law, or in cases in which the person concerned was tried in the first instance by the highest tribunal or was convicted following an appeal against acquittal.

### ARTICLE 3

#### Compensation for wrongful conviction

When a person has by a final decision been convicted of a criminal offence and when subsequently his conviction has been reversed, or he has been pardoned, on the ground that a new or newly discovered fact shows conclusively that there has been a miscarriage of justice, the person who has suffered punishment as a result of such conviction shall be compensated according to the law or the practice of the State concerned, unless it is proved that the nondisclosure of the unknown fact in time is wholly or partly attributable to him.

### ARTICLE 4

#### Right not to be tried or punished twice

1.  No one shall be liable to be tried or punished again in criminal proceedings under the jurisdiction of the same State for an offence for which he has already been finally acquitted or

43

convicted in accordance with the law and penal procedure of that State.

2. The provisions of the preceding paragraph shall not prevent the reopening of the case in accordance with the law and penal procedure of the State concerned, if there is evidence of new or newly discovered facts, or if there has been a fundamental defect in the previous proceedings, which could affect the outcome of the case.

3. No derogation from this Article shall be made under Article 15 of the Convention.

## ARTICLE 5

### Equality between spouses

Spouses shall enjoy equality of rights and responsibilities of a private law character between them, and in their relations with their children, as to marriage, during marriage and in the event of its dissolution. This Article shall not prevent States from taking such measures as are necessary in the interests of the children.

## ARTICLE 6

### Territorial application

1. Any State may at the time of signature or when depositing its instrument of ratification, acceptance or approval, specify the territory or territories to which the Protocol shall apply and State the extent to which it undertakes that the provisions of this Protocol shall apply to such territory or territories.

2. Any State may at any later date, by a declaration addressed to the Secretary General of the Council of Europe, extend the application of this Protocol to any other territory specified in the declaration. In respect of such territory the Protocol shall enter into force on the first day of the month following the expiration of

44

a period of two months after the date of receipt by the Secretary General of such declaration.

3. Any declaration made under the two preceding paragraphs may, in respect of any territory specified in such declaration, be withdrawn or modified by a notification addressed to the Secretary General. The withdrawal or modification shall become effective on the first day of the month following the expiration of a period of two months after the date of receipt of such notification by the Secretary General.

4. A declaration made in accordance with this Article shall be deemed to have been made in accordance with paragraph 1 of Article 56 of the Convention.

5. The territory of any State to which this Protocol applies by virtue of ratification, acceptance or approval by that State, and each territory to which this Protocol is applied by virtue of a declaration by that State under this Article, may be treated as separate territories for the purpose of the reference in Article 1 to the territory of a State.

6. Any State which has made a declaration in accordance with paragraph 1 or 2 of this Article may at any time thereafter declare on behalf of one or more of the territories to which the declaration relates that it accepts the competence of the Court to receive applications from individuals, nongovernmental organisations or groups of individuals as provided in Article 34 of the Convention in respect of Articles 1 to 5 of this Protocol.

## ARTICLE 7

### Relationship to the Convention

As between the States Parties, the provisions of Article 1 to 6 of this Protocol shall be regarded as additional Articles to the

45

Convention, and all the provisions of the Convention shall apply accordingly.

**ARTICLE 8**

**Signature and ratification**

This Protocol shall be open for signature by member States of the Council of Europe which have signed the Convention. It is subject to ratification, acceptance or approval. A member State of the Council of Europe may not ratify, accept or approve this Protocol without previously or simultaneously ratifying the Convention. Instruments of ratification, acceptance or approval shall be deposited with the Secretary General of the Council of Europe.

**ARTICLE 9**

**Entry into force**

1. This Protocol shall enter into force on the first day of the month following the expiration of a period of two months after the date on which seven member States of the Council of Europe have expressed their consent to be bound by the Protocol in accordance with the provisions of Article 8.

2. In respect of any member State which subsequently expresses its consent to be bound by it, the Protocol shall enter into force on the first day of the month following the expiration of a period of two months after the date of the deposit of the instrument of ratification, acceptance or approval.

**ARTICLE 10**

**Depositary functions**

The Secretary General of the Council of Europe shall notify all the member States of the Council of Europe of:

46

(a) any signature;

(b) the deposit of any instrument of ratification, acceptance or approval;

(c) any date of entry into force of this Protocol in accordance with Articles 6 and 9;

(d) any other act, notification or declaration relating to this Protocol.

In witness whereof the undersigned, being duly authorised thereto, have signed this Protocol.

DONE AT STRASBOURG, THIS 22ND DAY OF NOVEMBER 1984, in English and French, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Council of Europe. The Secretary General of the Council of Europe shall transmit certified copies to each member State of the Council of Europe.

47

# Protocol No. 12

## to the Convention
## for the Protection of Human Rights and Fundamental Freedoms

Rome, 4.XI.2000

THE MEMBER STATES OF THE COUNCIL OF EUROPE, signatory hereto,

Having regard to the fundamental principle according to which all persons are equal before the law and are entitled to the equal protection of the law;

Being resolved to take further steps to promote the equality of all persons through the collective enforcement of a general prohibition of discrimination by means of the Convention for the Protection of Human Rights and Fundamental Freedoms signed at Rome on 4 November 1950 (hereinafter referred to as "the Convention");

Reaffirming that the principle of nondiscrimination does not prevent States Parties from taking measures in order to promote full and effective equality, provided that there is an objective and reasonable justification for those measures,

Have agreed as follows:

### ARTICLE 1

### General prohibition of discrimination

1. The enjoyment of any right set forth by law shall be secured without discrimination on any ground such as sex, race, colour, language, religion, political or other opinion, national or social origin, association with a national minority, property, birth or other status.

2. No one shall be discriminated against by any public authority on any ground such as those mentioned in paragraph 1.

### ARTICLE 2

### Territorial application

1. Any State may, at the time of signature or when depositing its instrument of ratification, acceptance or approval, specify the territory or territories to which this Protocol shall apply.

2. Any State may at any later date, by a declaration addressed to the Secretary General of the Council of Europe, extend the application of this Protocol to any other territory specified in the declaration. In respect of such territory the Protocol shall enter into force on the first day of the month following the expiration of a period of three months after the date of receipt by the Secretary General of such declaration.

3. Any declaration made under the two preceding paragraphs may, in respect of any territory specified in such declaration, be withdrawn or modified by a notification addressed to the Secretary General of the Council of Europe. The withdrawal or modification shall become effective on the first day of the month following the expiration of a period of three months after the date of receipt of such notification by the Secretary General.

4. A declaration made in accordance with this Article shall be deemed to have been made in accordance with paragraph 1 of Article 56 of the Convention.

5. Any State which has made a declaration in accordance with paragraph 1 or 2 of this Article may at any time thereafter declare on behalf of one or more of the territories to which the declaration relates that it accepts the competence of the Court to receive applications from individuals, nongovernmental organisations or

48

49

groups of individuals as provided by Article 34 of the Convention in respect of Article 1 of this Protocol.

## ARTICLE 3

### Relationship to the Convention

As between the States Parties, the provisions of Articles 1 and 2 of this Protocol shall be regarded as additional Articles to the Convention, and all the provisions of the Convention shall apply accordingly.

## ARTICLE 4

### Signature and ratification

This Protocol shall be open for signature by member States of the Council of Europe which have signed the Convention. It is subject to ratification, acceptance or approval. A member State of the Council of Europe may not ratify, accept or approve this Protocol without previously or simultaneously ratifying the Convention. Instruments of ratification, acceptance or approval shall be deposited with the Secretary General of the Council of Europe.

## ARTICLE 5

### Entry into force

1. This Protocol shall enter into force on the first day of the month following the expiration of a period of three months after the date on which ten member States of the Council of Europe have expressed their consent to be bound by the Protocol in accordance with the provisions of Article 4.

2. In respect of any member State which subsequently expresses its consent to be bound by it, the Protocol shall enter into force on the first day of the month following the expiration of a period

50

of three months after the date of the deposit of the instrument of ratification, acceptance or approval.

## ARTICLE 6

### Depositary functions

The Secretary General of the Council of Europe shall notify all the member States of the Council of Europe of:

(a) any signature;

(b) the deposit of any instrument of ratification, acceptance or approval;

(c) any date of entry into force of this Protocol in accordance with Articles 2 and 5;

(d) any other act, notification or communication relating to this Protocol.

In witness whereof the undersigned, being duly authorised thereto, have signed this Protocol.

DONE AT ROME, THIS 4TH DAY OF NOVEMBER 2000, in English and in French, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Council of Europe. The Secretary General of the Council of Europe shall transmit certified copies to each member State of the Council of Europe.

51

# Protocol No. 13

## to the Convention for the Protection of Human Rights and Fundamental Freedoms concerning the abolition of the death penalty in all circumstances

Vilnius, 3.V.2002

THE MEMBER STATES OF THE COUNCIL OF EUROPE, signatory hereto,

Convinced that everyone's right to life is a basic value in a democratic society and that the abolition of the death penalty is essential for the protection of this right and for the full recognition of the inherent dignity of all human beings;

Wishing to strengthen the protection of the right to life guaranteed by the Convention for the Protection of Human Rights and Fundamental Freedoms signed at Rome on 4 November 1950 (hereinafter referred to as "the Convention");

Noting that Protocol No. 6 to the Convention, concerning the Abolition of the Death Penalty, signed at Strasbourg on 28 April 1983, does not exclude the death penalty in respect of acts committed in time of war or of imminent threat of war;

Being resolved to take the final step in order to abolish the death penalty in all circumstances,

Have agreed as follows:

52

## ARTICLE 1

### Abolition of the death penalty

The death penalty shall be abolished. No one shall be condemned to such penalty or executed.

## ARTICLE 2

### Prohibition of derogations

No derogation from the provisions of this Protocol shall be made under Article 15 of the Convention.

## ARTICLE 3

### Prohibition of reservations

No reservation may be made under Article 57 of the Convention in respect of the provisions of this Protocol.

## ARTICLE 4

### Territorial application

1. Any State may, at the time of signature or when depositing its instrument of ratification, acceptance or approval, specify the territory or territories to which this Protocol shall apply.

2. Any State may at any later date, by a declaration addressed to the Secretary General of the Council of Europe, extend the application of this Protocol to any other territory specified in the declaration. In respect of such territory the Protocol shall enter into force on the first day of the month following the expiration of a period of three months after the date of receipt by the Secretary General of such declaration.

3. Any declaration made under the two preceding paragraphs may, in respect of any territory specified in such declaration,

53

be withdrawn or modified by a notification addressed to the Secretary General. The withdrawal or modification shall become effective on the first day of the month following the expiration of a period of three months after the date of receipt of such notification by the Secretary General.

## ARTICLE 5

### Relationship to the Convention

As between the States Parties the provisions of Articles 1 to 4 of this Protocol shall be regarded as additional Articles to the Convention, and all the provisions of the Convention shall apply accordingly.

## ARTICLE 6

### Signature and ratification

This Protocol shall be open for signature by member States of the Council of Europe which have signed the Convention. It is subject to ratification, acceptance or approval. A member State of the Council of Europe may not ratify, accept or approve this Protocol without previously or simultaneously ratifying the Convention. Instruments of ratification, acceptance or approval shall be deposited with the Secretary General of the Council of Europe.

## ARTICLE 7

### Entry into force

1. This Protocol shall enter into force on the first day of the month following the expiration of a period of three months after the date on which ten member States of the Council of Europe have expressed their consent to be bound by the Protocol in accordance with the provisions of Article 6.

54

2. In respect of any member State which subsequently expresses its consent to be bound by it, the Protocol shall enter into force on the first day of the month following the expiration of a period of three months after the date of the deposit of the instrument of ratification, acceptance or approval.

## ARTICLE 8

### Depositary functions

The Secretary General of the Council of Europe shall notify all the member States of the Council of Europe of:

(a) any signature;

(b) the deposit of any instrument of ratification, acceptance or approval;

(c) any date of entry into force of this Protocol in accordance with Articles 4 and 7;

(d) any other act, notification or communication relating to this Protocol.

In witness whereof the undersigned, being duly authorised thereto, have signed this Protocol.

DONE AT VILNIUS, THIS 3RD DAY OF MAY 2002, in English and in French, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Council of Europe. The Secretary General of the Council of Europe shall transmit certified copies to each member State of the Council of Europe.

55



# **EXHIBIT B**



EUROPEAN COURT OF HUMAN RIGHTS
COUR EUROPÉENNE DES DROITS DE L'HOMME

GRAND CHAMBER

**CASE OF J.A. PYE (OXFORD) LTD AND
J.A. PYE (OXFORD) LAND LTD
v. THE UNITED KINGDOM**

*(Application no.* 44302/02 *(/sites/eng/pages/search.aspx#{"appno":["44302/02"]}))*

JUDGMENT

STRASBOURG

30 August 2007

**In the case of J.A. Pye (Oxford) Ltd and J.A. Pye (Oxford) Land Ltd v. the United Kingdom,**
The European Court of Human Rights, sitting as a Grand Chamber composed of:
      Jean-Paul Costa, *President*,
      Christos Rozakis,
      Nicolas Bratza,
      Boštjan M. Zupančič,

Notice of Intent, Exhibit B

Peer Lorenzen,
Loukis Loucaides,
Ireneu Cabral Barreto,
Volodymyr Butkevych,
Margarita Tsatsa-Nikolovska,
András Baka,
Anatoly Kovler,
Vladimiro Zagrebelsky,
Antonella Mularoni,
Alvina Gyulumyan,
Renate Jaeger,
Ján Šikuta,
Ineta Ziemele, judges,
and Michael O'Boyle, Registrar,

Having deliberated in private on 8 November 2006 and on 20 June 2007,

Delivers the following judgment, which was adopted on the last-mentioned date:


# PROCEDURE

1.  The case originated in an application (no. 44302/02 (/sites/eng/pages/search.aspx#{"appno": ["44302/02"]})) against the United Kingdom of Great Britain and Northern Ireland lodged with the Court under Article 34 of the Convention for the Protection of Human Rights and Fundamental Freedoms ("the Convention") by J.A. Pye (Oxford) Ltd and J.A. Pye (Oxford) Land Ltd, companies incorporated in the United Kingdom ("the applicant companies"), on 17 December 2002.

2.  The applicant companies were represented by Mr P. Lowe, a lawyer practising in Oxford with Darbys Solicitors. The United Kingdom Government ("the Government") were represented by their Agent, Ms K. Jones, of the Foreign and Commonwealth Office.

3.  The applicant companies alleged that the United Kingdom law on adverse possession, by which they lost land with development potential to a neighbouring landowner, operated in violation of Article 1 of Protocol No. 1 in their case.

4.  The application was allocated to the Fourth Section of the Court (Rule 52 § 1 of the Rules of Court). Within that Section, the Chamber that would consider the case (Article 27 § 1 of the Convention) was constituted as provided in Rule 26 § 1.

5.  By a decision of 8 June 2004 the Chamber, following a hearing on admissibility and the merits (Rule 54 § 3), declared the application admissible.

On 15 November 2005 a Chamber of that Section composed of Matti Pellonpää, President, Nicolas Bratza, Viera Strážnická, Rait Maruste, Stanislav Pavlovschi, Lech Garlicki and Javier Borrego Borrego, judges, and Michael O'Boyle, Section Registrar, delivered a judgment in which it held by four votes to three that there had been a violation of Article 1 of Protocol No. 1 and, unanimously, that the question of the application of Article 41 was not ready for decision. A joint dissenting opinion of Judges Maruste, Garlicki and Borrego Borrego was appended to the judgment.

6.  On 2 February 2006 the Government requested the referral of the case to the Grand Chamber in accordance with Article 43 of the Convention. A panel of the Grand Chamber granted that request on 12 April 2006.

7.  The composition of the Grand Chamber was determined according to the provisions of Article 27 §§ 2 and 3 of the Convention and Rule 24. On 19 January 2007 Luzius Wildhaber's term as President of the Court came to an end. Jean-Paul Costa succeeded him in that capacity and took over the presidency of the Grand Chamber in the present case (Rule 9 § 2).

8. The Irish Government submitted comments on the case, leave having been granted by the President of the Grand Chamber pursuant to Rule 44 § 2.

9. The applicant companies and the Government each filed observations on the merits (Rule 59 § 1). A hearing took place in public in the Human Rights Building, Strasbourg, on 8 November 2006 (Rule 59 § 3). Erik Fribergh, the Registrar of the Court, took part in the hearing on 8 November 2006. Thereafter Michael O'Boyle, Deputy Registrar, took over as registrar in the case.

There appeared before the Court:

(a) for the Government
Ms         K. JONES,          Agent,
Mr         J. CROW QC,          Counsel,
Mr         J. HODGES, Department for Constitutional Affairs,
Mr         P. HUGHES, Her Majesty's Courts Services, DCA,          Advisers;


(b) *for the applicant companies*
Mr         D. PANNICK QC,          Counsel,
Mr         P. LOWE,          Solicitor,
Ms         V. WRIGHT,          *Trainee Solicitor*,
Mr and Mrs G. PYE,          Applicants.

The Court heard addresses by Mr Pannick and Mr Crow and their answers to questions put by the judges.


# THE FACTS

## I. THE CIRCUMSTANCES OF THE CASE

10. The second applicant company is the registered owner of a plot of 23 ha of agricultural land in Berkshire. The first applicant company acquired the land by a series of transactions between 1975 and 1977 and owned it until April 1986, when it transferred the land to the second applicant company subject to an option to repurchase. The owners of a property adjacent to the land, Mr and Mrs Graham ("the Grahams") occupied the land under a grazing agreement until 31 December 1983. On 30 December 1983 a chartered surveyor acting for the applicant companies wrote to the Grahams noting that the grazing agreement was about to expire and requiring them to vacate the land. In January 1984 the applicant companies refused a request for a further grazing agreement for 1984 because they anticipated seeking planning permission for the development of all or part of the land and considered that continued grazing might damage the prospects of obtaining such permission.

11. Notwithstanding the requirement to vacate the land at the expiry of the 1983 agreement, the Grahams remained in occupation at all times, continuing to use it for grazing. No request to vacate the land or to pay for the grazing which was taking place was made. If it had been, the evidence was that the Grahams would happily have paid.

12. In June 1984 an agreement was reached whereby the applicant companies agreed to sell to the Grahams the standing crop of grass on the land for 1,100 pounds sterling (GBP). The cut was completed by 31 August 1984. In December 1984 an inquiry was made of the applicant companies as to whether the Grahams could take another cut of hay or be granted a further grazing agreement.

No reply to this letter or to subsequent letters sent in May 1985 was received from the applicant companies and thereafter the Grahams made no further attempt to contact the applicant companies. From September 1984 onwards until 1999 the Grahams continued to use the whole of the disputed land for farming without the permission of the applicant companies.

13.   In 1997 Mr Graham registered cautions at the Land Registry against the applicant companies' title on the ground that he had obtained title by adverse possession.

14.   On 30 April 1998 the applicant companies issued an originating summons in the High Court seeking cancellation of the cautions. On 20 January 1999 the applicant companies issued further proceedings seeking possession of the disputed land.

15.   The Grahams challenged the applicant companies' claims under the Limitation Act 1980 ("the 1980 Act"), which provides that a person cannot bring an action to recover any land after the expiration of twelve years of adverse possession by another. They also relied on the Land Registration Act 1925, which applied at the relevant time and which provided that, after the expiry of the twelve-year period, the registered proprietor was deemed to hold the land in trust for the squatter.

16.   Judgment was given in favour of the Grahams on 4 February 2000 ([2000] Ch 676). Mr Justice Neuberger held that since the Grahams had enjoyed factual possession of the land from January 1984, and adverse possession took effect from September 1984, the applicant companies' title was extinguished pursuant to the 1980 Act, and the Grahams were entitled to be registered as proprietors of the land. At the conclusion of his thirty-page judgment, Neuberger J remarked that the result he had reached did not accord with justice and could not be justified by practical considerations: the justification advanced for the right to acquire title to land by adverse possession – namely the avoidance of uncertainty – had in his view little relevance to the use of registered land where the owner was readily identifiable by inspecting the register of the relevant title at the Land Registry. The fact that an owner who had sat on his rights for twelve years should be deprived of the land was in his view "illogical and disproportionate".

17.   The applicant companies appealed and on 6 February 2001 the Court of Appeal reversed the High Court decision on the ground that the Grahams did not have the necessary intention to possess the land, and the applicant companies were therefore not "dispossessed" of it within the meaning of the 1980 Act ([2001] EWCA Civ 117, [2001] Ch 804). Although this conclusion was sufficient to dispose of the appeal, two members of the Court of Appeal went on to address the question whether the applicant companies' loss of title to the land could also have given rise to a violation of Article 1 of Protocol No. 1 as applied in domestic law by the Human Rights Act 1998.

18.   Lord Justice Mummery, giving the judgment of the court, held that Article 1 of Protocol No. 1 did not impinge on the relevant provisions of the Limitation Act 1980, which did not deprive a person of his possessions or interfere with his peaceful enjoyment of them but only deprived a person of his right of access to the courts for the purpose of recovering property if he had delayed the institution of his legal proceedings for twelve years or more after being dispossessed by another. The extinction of the applicant companies' title was not, in his view, a deprivation of possessions nor a confiscatory measure for which payment of compensation would be appropriate, but simply a logical and pragmatic consequence of the barring of the right to bring an action after the expiration of the limitation period. In the alternative, Mummery LJ found that any deprivation was justified in the public interest, the conditions laid down in the 1980 Act being reasonably required to avoid the risk of injustice in the adjudication of stale claims and as ensuring certainty of title: those conditions were not disproportionate, the period of twelve years being reasonable and not imposing an excessively difficult burden on the landowner.

19.   Lord Justice Keene took as his starting-point that limitation periods were in principle not incompatible with the Convention and that the process whereby a person would be barred from enforcing rights by the passage of time was clearly acknowledged by the Convention. This position obtained, in his view, even though limitation periods both limited the right of access to the courts and

in some circumstances had the effect of depriving persons of property rights, whether real or personal, or of damages: there was thus nothing inherently incompatible as between the 1980 Act and Article 1 of Protocol No. 1.

20.   The Grahams appealed to the House of Lords, which, on 4 July 2002, allowed their appeal and restored the order of the High Court ([2002] UKHL 30, [2002] 3 All ER 865). Lord Browne-Wilkinson, with whom Lord Mackay of Clashfern and Lord Hutton agreed, held that the Grahams did have "possession" of the land in the ordinary sense of the word, and therefore the applicant companies had been "dispossessed" of it within the meaning of the 1980 Act. There was no inconsistency between a squatter being willing to pay the paper owner if asked and his being in possession in the meantime. Concluding, Lord Browne-Wilkinson held as follows:

"... Despite Pye's notification to quit the land in December 1983, its peremptory refusal of a further grazing licence in 1984 and the totally ignored later requests for a grazing licence, after 31 December 1983 the Grahams stayed in occupation of the disputed land using it for what purposes they thought fit. Some of those purposes (i.e., the grazing) would have fallen within a hypothetical grazing agreement. But the rest are only consistent with an intention, verified by Mr Michael Graham, to use the land as they thought best. That approach was adopted from the outset. In my judgment, when the Grahams remained in factual possession of the fully enclosed land after the expiry of the mowing licence they manifestly intended to assert their possession against Pye.

... Before your Lordships' House, it was conceded that the Human Rights Act [incorporating the European Convention on Human Rights] did not have a retrospective effect. But Pye submitted that, even under the common-law principles of construction applicable before the Human Rights Act came into effect, the court should seek to apply the law so as to make it consistent with the [Convention]. Any such old principle of construction only applied where there was an ambiguity in the language of a statute. No such ambiguity in the Act of 1980 was demonstrated to your Lordships."

21.   Lord Bingham of Cornhill, agreeing with Lord Browne-Wilkinson, made the following statement in the course of his judgment:

"The Grahams have acted honourably throughout. They sought rights to graze or cut grass on the land after the summer of 1984, and were quite prepared to pay. When Pye failed to respond they did what any other farmer in their position would have done: they continued to farm the land. They were not at fault. But the result of Pye's inaction was that they enjoyed the full use of the land without payment for 12 years. As if that were not gain enough, they are then rewarded by obtaining title to this considerable area of valuable land without any obligation to compensate the former owner in any way at all. In the case of unregistered land, and in the days before registration became the norm, such a result could no doubt be justified as avoiding protracted uncertainty where the title to land lay. But where land is registered it is difficult to see any justification for a legal rule which compels such an apparently unjust result, and even harder to see why the party gaining title should not be required to pay some compensation at least to the party losing it. It is reassuring to learn that the Land Registration Act 2002 has addressed the risk that a registered owner may lose his title through inadvertence. But the main provisions of that Act have not yet been brought into effect, and even if they had it would not assist Pye, whose title had been lost before the passing of the Act. While I am satisfied that the appeal must be allowed for the reasons given by my noble and learned friend, this is a conclusion which I (like the judge [Neuberger J] ...) 'arrive at with no enthusiasm'." (JA Pye (Oxford) Ltd and Others v. Graham and Another [2002] 3 All ER 865, at 867)

22.   As noted above, the question whether the result was incompatible with the applicant companies' rights under Article 1 of Protocol No. 1 was not pursued before the House of Lords. However, in his judgment Lord Hope of Craighead, who also agreed with Lord Browne-Wilkinson on the reasons for dismissing the appeal, observed that the question under the Convention

"... is not an easy one, as one might have expected the law in the context of a statutory regime where compensation is not available – to lean in favour of the protection of a registered proprietor against the actions of persons who cannot show a competing title on the register. Fortunately ... a much more rigorous regime has now been enacted in Schedule 6 to the Land Registration Act 2002. Its effect will be to make it much harder for a squatter who is in possession of registered land to obtain a title to it against the wishes of the proprietor. The unfairness in the old regime which this case has demonstrated lies not in the absence of compensation, although that is an important factor, but in the lack of safeguards against oversight or inadvertence on the part of the registered proprietor."

23.  The value of the land in issue is disputed between the parties. The applicant companies put their pecuniary loss at over GBP 10 million. The Government put the value of the land in 1996 (when the twelve-year limitation period expired) at GBP 785,000, and in July 2002 (when the House of Lords judgment was delivered) at GBP 2.5 million.

## II.  RELEVANT DOMESTIC LAW AND PRACTICE

24.  At the relevant time, section 15 of the Limitation Act 1980, a consolidating Act, provided:

"(1)  No action shall be brought by any person to recover any land after the expiration of twelve years from the date on which the right of action accrued to him or, if it first accrued to some person through whom he claims, to that person.

...

(6)  Part I of Schedule 1 to this Act contains provisions for determining the date of accrual of rights of action to recover land in the cases there mentioned."

25.  Paragraph 1 of Schedule 1 provided:

"Where the person bringing an action to recover land, or some person through whom he claims, has been in possession of the land, and has while entitled to the land been dispossessed or discontinued his possession, the right of action shall be treated as having accrued on the date of the dispossession or discontinuance."

26.  The same limitation provisions therefore applied to both registered and unregistered land. In the case of unregistered land, section 17 of the 1980 Act provided that, on the expiration of the limitation period regulating the recovery of land, the title of the paper owner was extinguished. In the case of registered land, section 75(1) of the Land Registration Act 1925 provided that on the expiry of the limitation period the title was not extinguished but the registered proprietor was deemed to hold the land thereafter in trust for the squatter.

27.  *Halsbury's Laws of* England (Fourth Edition, Reissue 1998) sets out the law in the following terms:

"258.  When the owner of land has been out of possession, and a stranger has been in possession, for a period sufficient to bar the owner's right to re-enter or to recover possession by action, the owner's title is extinguished, and the stranger acquires a title which is good against all the world, including the former owner.

The Limitation Act 1980 operates negatively to bar the right and extinguish the title of the true owner, and does not effect a transfer of his estate to the stranger; the new title depends on the principle that possession gives title, coupled with the extinction of the rights of the former owner, and is subject to any easements [etc.] which remain unextinguished."

28.  The Law Reform Committee considered the law on limitation periods in its report of 1977 (Cmnd 6923). It commented negatively on the courts' practice of granting an implied licence to the would-be adverse possessor, which had the effect of stopping time running against the owner, and

proposed no change to the existing limitation periods, and agreed that the expiration of the limitation period should serve to extinguish the claimant's title.

29.  A Law Commission Consultation Paper on Limitation of Actions of 1998 (Consultation Paper No. 151) gave a number of general policy aims of the law on limitations. The Consultation Paper noted that defendants have a legitimate interest in having cases brought to court reasonably promptly as evidence may not be available indefinitely and because defendants should be able to rely on their assumed entitlement to enjoy an unchallenged right. The State, too, has an interest in ensuring that claims are made and determined within a reasonable time in order to deliver a fair trial, and as guarantor of legal certainty. Finally, limitation periods were seen to have a salutary effect on plaintiffs in encouraging them to bring claims reasonably promptly.

30.  A separate Law Commission Consultative Document on land registration in 1998 (prepared with the Land Registry; Law Com No. 254) noted that, although the original intention of the system of land registration was to apply the principles of unregistered land to a registered format, there were certain areas where this was not wholly true. One example given was the position of the rights of adverse possessors (section 75(1) of the Land Registration Act 1925 was referred to). The Consultative Document set out and commented on four particularly cogent reasons often given for the law on adverse possession:

(i)  Because it is part of the law on limitation of actions. It noted:

"... because adverse possession is an aspect of the law of limitation, it is of course customary to account for it, in part at least, in terms of the policy of limitation statutes generally, namely to protect defendants from stale claims and to encourage plaintiffs not to sleep on their rights. However, adverse possession does not merely bar claims. Its effect is positive: 'a squatter does in the end get a title by his possession and the indirect operation of the [Limitation Act] ...' This can only be justified by factors over and above those which explain the law on limitation. In this context it should be noted that a landowner may be barred even where he or she is quite blameless. As we have explained above, adverse possession can take place without it being readily detectable. In any event, this particular justification has much greater force in relation to unregistered land than it does for land with registered title. Unregistered title ultimately depends upon possession. It therefore behoves a landowner to be vigilant to protect that possession and not to sleep on his or her rights. ... [w]here title is registered, ... the basis of title is primarily the fact of registration rather than possession. Registration confers title because the registration of a person as proprietor of land of itself vests in him or her the relevant legal estate ..."

(ii)  Because if land and its ownership are out of kilter, the land may become unmarketable. Where the registered owner has disappeared, and cannot be traced, and a squatter takes possession, the doctrine of adverse possession "does at least ensure that in such cases land remains in commerce and is not rendered sterile". Where there have been dealings "off the register", such as where a farmer agrees to a land swap with a neighbour under a "gentleman's agreement" but does not register the change, "adverse possession fulfils a useful function".

(iii)  Because in case of mistake the innocent but mistaken squatter of land may have incurred expenditure. In such circumstances adverse possession can be justified on grounds of hardship, and there are parallels with the principles of proprietary estoppel.

(iv)  Because it facilitates and cheapens investigation of title to land. The Law Commission accepted this last reason as being very strong for unregistered land, but considered that for registered land, where title depends on the contents of the register rather than possession, it was not applicable.

31.  The Law Commission proposed, provisionally, that the system of adverse possession as it applied to registered land should be recast to reflect the principles of title registration, and that it should be limited to very few, exceptional cases.

32.  A Report on Limitation of Actions (Law Com No. 270) and one on registered land (Law Com No. 271) followed the Consultation Papers, and were published in July 2001.

33.   The Law Commission Report on Limitation of Actions recommended that the general limitation period for actions in respect of land should be ten years. It added that if the proposals made on registered land in Law Com No. 254 were accepted, the proposal would relate only to interests in unregistered land (and unregistrable interests in registered land[1]).

34.   As a result of the various criticisms, including those made by a number of the judges in the present case and the Report on registered land (Law Com No. 271), the Land Registration Act 2002 made a number of changes to the law as it related to registered land. It provided that adverse possession, for however long, would not of itself bar the owner's title to a registered estate. A squatter was entitled to apply to be registered as proprietor after ten years, and would be so registered if application was not opposed. If the application was opposed, it would be refused. If the application was refused but no steps were taken to evict the squatter or otherwise regulate the position, he was entitled to apply again to be registered as proprietor, and would be so registered whether or not the application was opposed. The 2002 Act came into force on 13 October 2002.

35.   On 23 March 2005, Deputy Judge Strauss in the Chancery Division gave judgment in the case of *Beaulane Properties Ltd v. Palmer* (Times Law Reports, 13 April 2005). The case concerned a licensee who had remained in possession of registered land for over twelve years after the expiry of his licence. Applying the judgment of the House of Lords in the present case, the judge found that under English law as it stood up to the entry into force of the Human Rights Act 1998 the registered owner of the land lost all claim to it. However, on analysing the facts on a Convention basis, he found that there was no real public or general interest in the law on adverse possession in the case of registered land, and that the adverse consequences for the landowner were disproportionate. By reinterpreting the relevant legislation in accordance with section 3 of the Human Rights Act, the judge found that the claim by the former licensee to have acquired the disputed land failed.


# THE LAW


## ALLEGED VIOLATION OF ARTICLE 1 OF PROTOCOL No. 1

36.   The applicant companies submitted that the taking away of ownership of their land because of twelve years' adverse possession upset the fair balance required by Article 1 of Protocol No. 1 and was a disproportionate interference with their property rights in violation of that Article. Article 1 of Protocol No. 1 provides as follows:

"Every natural or legal person is entitled to the peaceful enjoyment of his possessions. No one shall be deprived of his possessions except in the public interest and subject to the conditions provided for by law and by the general principles of international law.

The preceding provisions shall not, however, in any way impair the right of a State to enforce such laws as it deems necessary to control the use of property in accordance with the general interest or to secure the payment of taxes or other contributions or penalties."


## A.  The Chamber judgment

37.   The Chamber considered that, as the applicant companies had lost beneficial title to the land by the operation of the Land Registration Act 1925 ("the 1925 Act") and the Limitation Act 1980 ("the 1980 Act"), Article 1 of Protocol No. 1 was applicable. In particular, the pre-existing rules on adverse possession could not be said to be an incident of the applicant companies' property right at the time of its acquisition such that Article 1 ceased to be engaged when the relevant provisions took effect and the property right was lost after twelve years' adverse possession. Further, the mere fact that

limitation periods were generally considered under Article 6 of the Convention did not prevent the Court from considering a case from the angle of Article 1 of Protocol No. 1. The Chamber found that Article 1 of Protocol No. 1 was engaged and that the operation of the relevant provisions of the 1925 and 1980 Acts gave rise to an interference by the State with the applicant companies' rights under the Article.

38.  Noting the Court's judgment in *James and Others v. the United* Kingdom (21 February 1986, Series A no. 98), the Chamber was of the view that the applicant companies had been deprived of their possessions by the contested legislation, and that the case fell to be examined under the second sentence of Article 1. Whilst accepting that in the case of unregistered land the law of adverse possession served two important public interests – namely the prevention of uncertainty and injustice arising from stale claims, and ensuring that the reality of unopposed occupation of land and its legal ownership coincided – the Chamber considered that the importance of these aims was more questionable in the case of registered land where the ownership of the land was readily identifiable by inspecting the proprietorship register of the relevant title at the Land Registry. However, the Chamber noted that, despite the major changes to the law of adverse possession made by the Land Registration Act 2002 ("the 2002 Act"), in the case of registered land the law itself had not been abolished, and it rejected the applicant companies' argument that it served no continuing public interest so far as registered land was concerned. The Government had also referred to the law and practice in other jurisdictions.

39.  As to the proportionality of the provisions in issue, the Chamber accepted that the limitation period of twelve years was relatively long, that the law of adverse possession was well established and had not changed during the applicant companies' period of ownership, and that limited steps taken by the applicant companies would have avoided the loss of title. The Chamber noted criticism of the state of the law by the domestic courts and the Law Commission, and further noted that the result for the applicant companies was one of exceptional severity in that not only were they deprived of their property but they received no compensation for their loss. The lack of compensation had to be viewed in the light of the lack of procedural protection for the right of property within the legal system in force at the relevant time. In this respect the Chamber attached weight to the fact that since the present case the law had been amended to provide for notice to be given to a paper owner before title is transferred, thereby giving the paper owner an opportunity to stop the running of the limitation period. The Chamber saw the changes in the law as an indication that Parliament had recognised the deficiencies in the procedural position of registered landowners before the 2002 Act. The Chamber concluded that the fair balance between the public interest and the applicant companies' right to the peaceful enjoyment of their possessions had been upset, such that there had been a violation of Article 1 of Protocol No. 1.

## B.  The parties' submissions

### 1.  The applicant companies

40.  The applicant companies agreed with the Chamber's judgment. They saw three related reasons why the taking of their land, which was then held on trust by them for the squatters, breached the fair-balance principle and thus violated Article 1 of Protocol No. 1. Firstly, they saw no justification for the applicant companies, as owners of the land, to lose their right to ownership of the registered land. Secondly, they saw no justification for depriving them of the land without having to pay any compensation. The result was disproportionate to any legitimate aim as it imposed an excessive burden on the applicant companies and constituted a substantial windfall for the squatters. There were no exceptional circumstances which justified the taking of property without

compensation. Thirdly, there was no justification for depriving them of their land when there was no procedural protection providing that the person in adverse possession only acquired title if he or she first stated a claim to which the formal title owner had an opportunity to respond.

41.   The applicant companies noted the extensive criticism of the law as it then stood from the first-instance judge in the case, two members of the House of Lords in the case, the recommendations of the Law Commission and the Land Registry and Parliament's amendment of the law, and the criticism of the High Court judge in the case of *Beaulane Properties Ltd v.* Palmer (see paragraph 35 above). They saw no justification for a transfer of registered land at the end of the limitation period without compensation and without proper procedural protection.

42.   The applicant companies submitted a summary of the law on adverse possession or equivalent doctrines in various jurisdictions. The summary showed that in most of the countries covered, title was acquired by adverse possession only after substantially more than twelve years, and that in most countries where title could be acquired by adverse possession this could only occur where the occupier was acting in good faith, that is, where he or she honestly believed that a good title to the land had been acquired, for example after the transfer of the defective title.

### 2. *The Government*

43.   The Government took issue with the Chamber's judgment. They considered, in the first place, that the matter should be determined by reference to Article 6 of the Convention and not Article 1 of Protocol No. 1. Unlike in previous cases, the Government in this case had not appropriated property to its own use, and had not introduced legislation for the involuntary transfer of private property from one person to another in pursuit of a social-policy objective. The only interference with the applicant companies' land came about through the actions of private individuals, the squatters, who obtained adverse possession in 1983-84. The outcome of the proceedings was dictated by the applicant companies' own inaction. They contended that the application to the present facts of the conventional case-law as to the necessity, in principle, for compensation to be paid in respect of deprivations of property confirmed the logic of analysing the case by reference to Article 6: the purpose of a limitation period is to deprive a claimant, at the end of the relevant time period, of any opportunity of enforcing his rights through the courts. That objective would be frustrated if a limitation provision could only be compatible with the Convention if the claimant was provided with compensation against the very person against whom his claim was barred.

44.   For the Government, the Chamber's reference to the need for procedural safeguards was also in error. When a limitation provision was applied in private-interest litigation between private parties, there were no "responsible authorities" to whom a claimant could sensibly make representations "challenging the measures interfering with [his] rights" (see *Jokela v.* Finland, no. 28856/95  (/sites/eng/pages/search.aspx#{"appno":["28856/95"]}), § 45, ECHR 2002-IV) because there were no public authorities seeking to acquire his property.

45.   Under Article 1 of Protocol No. 1, the Government considered that the provision was not engaged, because the applicant companies had acquired the disputed land subject to the risk of losing it pursuant to the provisions of the 1925 and 1980 Acts. That risk had to be viewed as an incident of their property. They pointed out that the second applicant company had acquired the land from the first applicant company in April 1986, at which time the Grahams had been in adverse possession for some one and a half years. The second applicant company therefore took the land subject to an existing risk of losing it to the Grahams.

46.   The Government suggested that the Chamber had failed to deal with their argument that the State's obligations under Article 1 of Protocol No. 1 were not engaged. There was no reason to impose a positive obligation on the Government to protect the applicant companies against the consequences of their own inattention.

47.  To the objectives of the legislation accepted by the Chamber as legitimate, the Government added a third objective. Land was a limited resource, and it was in the public interest that it should be used, maintained and improved. A finite time-limit for recovery of possession encouraged landowners to make use of their land.

48.  In connection with proportionality, the Government were of the view that the Chamber had wrongly taken into account the absence of compensation and questions of procedural protection, and that it had taken insufficient account of many factors which demonstrated that any interference was proportionate: the length of the limitation period, the fact that the applicant companies were entirely free to bring an action for repossession at any time within the twelve-year period, the availability of a court remedy to determine whether the action was statute-barred, and the degree of fault on the part of the applicant companies.

49.  As to the position in other countries, the Government referred to the research in the Law Commission's 1998 Consultation Paper No. 151, and also to further research which they had commissioned. The results of the study indicated substantial differences between the structure of the various legal regimes, particularly between common-law and civil-law jurisdictions, and also between the lengths of the different limitation periods. They concluded that there was no European "norm": limitation periods varied considerably, good faith was irrelevant in some jurisdictions, and other factors, such as place of residence, were sometimes taken into account.

### 3. The third party

50.  The Irish Government gave a description of the law on adverse possession as it applied in Ireland, and saw five areas of public interest which are served by the institution: in quieting titles, that is, the desirability of clarifying title where land, whether registered or unregistered, had remained abandoned and was occupied by another person; in cases of failure to administer estates on intestacy; in pursuance of a policy of using land to advance economic development; in perfecting title in cases of unregistered title; and in dealing with boundary disputes.

51.  The Irish Government submitted that ownership of land brings duties as well as rights, and the duty to take some action to maintain possession was not unreasonable. The Court should not be influenced by *post* hoc legislative changes which provided a higher standard of human rights protection. They also referred to the wide margin of appreciation allowed to States in regulating land use and ownership in accordance with social policy, to the antiquity of the doctrine and the familiarity of purchasers and owners of land with it, and concluded that the doctrine did not upset the fair balance between the public interest and the right to the peaceful enjoyment of possessions.

## C.  The Court's assessment

### 1. General considerations

52.  Article 1 of Protocol No. 1, which guarantees the right to the protection of property, contains three distinct rules: "the first rule, set out in the first sentence of the first paragraph, is of a general nature and enunciates the principle of the peaceful enjoyment of property; the second rule, contained in the second sentence of the first paragraph, covers deprivation of possessions and subjects it to certain conditions; the third rule, stated in the second paragraph, recognises that the Contracting States are entitled, amongst other things, to control the use of property in accordance with the general interest ... The three rules are not, however, 'distinct' in the sense of being unconnected. The second and third rules are concerned with particular instances of interference with the right to peaceful enjoyment of property and should therefore be construed in the light of the general principle enunciated in the first rule" (see, as a recent authority with further references, *Anheuser-Busch* Inc. *v.* Portugal [GC], no. 73049/01 (/sites/eng/pages/search.aspx#{"appno": ["73049/01"]}), § 62, ECHR 2007-I).

53.   In order to be compatible with the general rule set forth in the first sentence of the first paragraph of Article 1, an interference with the right to the peaceful enjoyment of possessions must strike a "fair balance" between the demands of the general interest of the community and the requirements of the protection of the individual's fundamental rights (see *Beyeler v.* Italy [GC], no. 33202/96 (/sites/eng/pages/search.aspx#{"appno":["33202/96"]}), § 107, ECHR 2000-I).

54.   The taking of property under the second sentence of the first paragraph of Article 1 without payment of an amount reasonably related to its value will normally constitute a disproportionate interference that cannot be justified under Article 1. The provision does not, however, guarantee a right to full compensation in all circumstances, since legitimate objectives of "public interest" may call for less than reimbursement of the full market value (see *Papachelas v.* Greece [GC], no. 31423/96 (/sites/eng/pages/search.aspx#{"appno":["31423/96"]}), § 48, ECHR 1999-II, again with further references).

55.   In respect of interferences which fall under the second paragraph of Article 1 of Protocol No. 1, with its specific reference to "the right of a State to enforce such laws as it deems necessary to control the use of property in accordance with the general interest ...", there must also exist a reasonable relationship of proportionality between the means employed and the aim sought to be realised. In this respect, States enjoy a wide margin of appreciation with regard both to choosing the means of enforcement and to ascertaining whether the consequences of enforcement are justified in the general interest for the purpose of achieving the object of the law in question (see *AGOSI v.* the *United Kingdom*, 24 October 1986, § 52, Series A no. 108).

56.   The applicant companies' complaint is directed in essence against the terms of the relevant legislation on limitation of actions and land registration. Whilst the court decisions in the case exemplify the way in which that legislation is applied, the complaint does not relate to the manner of execution of the law by the courts. The Court will therefore direct its attention primarily to the contested legislation itself, although the consequences of the application of the legislation must also be taken into account (see *James and Others*, cited above, § 36).

57.   The responsibility of the Government in the present case is therefore not direct responsibility for an executive or legislative act aimed at the applicant companies, but rather their responsibility for legislation which is activated as a result of the interactions of private individuals: in the same way as the law in *James and* Others was applied (and the Government were responsible for it) because private individuals had requested enfranchisement, in the present case the law was applied to the applicant companies only when the pre-existing conditions for the acquisition of title by adverse possession had been met.

## 2. *Applicability of Article 1 of Protocol No. 1*

58.   The Court will first turn to the question whether the case should be dealt with under Article 1 of Protocol No. 1, or whether, as the Government contended, it should be considered only under Article 6 of the Convention.

59.   In *Stubbings and Others v. the United* Kingdom, the Court dealt with limitation periods under Articles 6, 8 and 14 of the Convention. Under Article 6, the Court found that a non-extendable time-limit of six years from the applicants' eighteenth birthdays did not impair the very essence of the applicants' right of access to a court (22 October 1996, § 52, *Reports of Judgments and* Decisions 1996-IV). The Court also considered the case under Article 8 in the context of the positive obligations inherent in an effective respect for private or family life, finding that overall such protection was afforded (ibid., §§ 60-67).

60.   The Court finds nothing in its case-law to suggest that the present case should be dealt with only under Article 6 of the Convention, and indeed, given the different content of the two rights, it would be unusual if the Court were to decline to deal with a complaint under one head solely

because it were capable of raising different issues under a separate Article. The Court agrees with the Chamber that there is nothing in principle to preclude the examination of a claim under Article 1 of Protocol No. 1 where the complaint is directed against legislation concerning property rights.

61. Article 1 of Protocol No. 1 protects "possessions", which can be either "existing possessions" or assets, including claims, in respect of which the applicant can argue that he or she has at least a "legitimate expectation" of obtaining effective enjoyment of a property right. It does not, however, guarantee the right to acquire property (see *Kopecký v.* Slovakia [GC], no. <u>44912/98 (/sites/eng/pages/search.aspx#{"appno":["44912/98"]})</u>, § 35, ECHR 2004-IX). Where there is a dispute as to whether an applicant has a property interest which is eligible for protection under Article 1 of Protocol No. 1, the Court is required to determine the legal position of the applicant (see Beyeler, cited above).

62. In the present case, the applicant companies were the beneficial owners of the land in Berkshire, as they were successive registered proprietors. The land was not subject to a right of pre-emption, as in Beyeler, but it was subject to the ordinary law of the land, including, by way of example, town and country planning legislation, compulsory-purchase legislation, and the various rules on adverse possession. The applicant companies' possessions were necessarily limited by the various rules of statute and common law applicable to real estate.

63. It remains the case, however, that the applicant companies lost the beneficial ownership of 23 ha of agricultural land as a result of the operation of the 1925 and 1980 Acts. The Court finds inescapable the Chamber's conclusion that Article 1 of Protocol No. 1 is applicable.

### 3. The nature of the interference

64. The Court has, on a number of occasions, considered cases in which a loss of ownership of possessions was not categorised as a "deprivation" within the meaning of the second sentence of the first paragraph of Article 1 of Protocol No. 1. In AGOSI and *Air* Canada, the forfeiture of the applicant companies' possessions was considered to amount to a control of use of gold coins and a control of the use of aircraft which had been employed for the import of prohibited drugs respectively (see AGOSI, cited above, § 51; *Air Canada v. the United* Kingdom, 5 May 1995, § 34, Series A no. 316-A; see also *C.M. v.* France (dec.), no. <u>28078/95 (/sites/eng/pages/search.aspx#{"appno": ["28078/95"]})</u>, ECHR 2001-VII). The applicant company in *Gasus Dosier- und Fördertechnik* GmbH *v. the* Netherlands had sold a concrete-mixer to a third party subject to a retention of title clause. The tax authorities' seizure of the concrete-mixer was considered an exercise of the State's right to "secure the payment of taxes", although the tax debts were not those of the applicant company (23 February 1995, § 59, Series A no. 306-B). The Court declined, in Beyeler, to determine whether the interference with the applicant's property rights constituted a "deprivation of possessions", as it sufficed to examine the situation complained of in the light of the general rule in the first sentence of the first paragraph of Article 1 (see Beyeler, cited above, § 106).

65. The applicant companies did not lose their land because of a legislative provision which permitted the State to transfer ownership in particular circumstances (as in AGOSI, *Air Canada* and *Gasus Dosier- und Fördertechnik* GmbH, cited above), or because of a social policy of transfer of ownership (as in *James and* Others), but rather as the result of the operation of the generally applicable rules on limitation periods for actions for recovery of land. Those rules provided that at the end of the limitation period, the paper owner's title to unregistered land was extinguished (section 17 of the 1980 Act). In the case of registered land, the position was amended to take into account the fact that until the register was rectified, the former owner continued to appear as registered proprietor. Thus in the present case section 75(1) of the 1925 Act provided that on expiry of the limitation period the title was not extinguished, but the registered proprietor was deemed to hold the land in trust for the adverse possessor.

66.  The statutory provisions which resulted in the applicant companies' loss of beneficial ownership were thus not intended to deprive paper owners of their ownership, but rather to regulate questions of title in a system in which, historically, twelve years' adverse possession was sufficient to extinguish the former owner's right to re-enter or to recover possession, and the new title depended on the principle that unchallenged lengthy possession gave a title. The provisions of the 1925 and 1980 Acts which were applied to the applicant companies were part of the general land law, and were concerned to regulate, amongst other things, limitation periods in the context of the use and ownership of land as between individuals. The applicant companies were therefore affected, not by a "deprivation of possessions" within the meaning of the second sentence of the first paragraph of Article 1, but rather by a "control of use" of land within the meaning of the second paragraph of the provision.

### 4. The aim of the interference

67.  The applicable provisions of the l925 and 1980 Acts were concerned to apply the limitation period for actions for recovery of land which had been fixed at twenty years since the Limitation Act 1623 and at twelve years since the Real Property Limitation Act 1874, and they were concerned then to regulate the subsequent position that the paper owner was no longer able to recover possession, and the adverse possessor had been in possession for sufficiently long to establish title.

68.  The Court has considered limitation periods as such in the context of Article 6 of the Convention in *Stubbings and Others*, cited above. It held as follows:

> "51.  It is noteworthy that limitation periods in personal injury cases are a common feature of the domestic legal systems of the Contracting States. They serve several important purposes, namely to ensure legal certainty and finality, protect potential defendants from stale claims which might be difficult to counter and prevent the injustice which might arise if courts were required to decide upon events which took place in the distant past on the basis of evidence which might have become unreliable and incomplete because of the passage of time."

69.  Although that statement referred to limitation periods in personal-injury cases in the context of Article 6, the Court considers that it can also be applied to the situation where limitation periods in actions for recovery of land are being assessed in the light of Article 1 of Protocol No. 1. Indeed, the parties do not suggest that limitation periods for actions for recovery of land do not pursue a legitimate aim in the general interest.

70.  The Court finds that the existence of a twelve-year limitation period for actions for recovery of land as such pursues a legitimate aim in the general interest.

71.  As to the existence, over and above the general interest in the limitation period, of a specific general interest in the extinguishment of title and the attribution of new title at the end of the limitation period, the Court notes that in discussing the public interest present in *Jahn and Others* v. Germany, in the context of a deprivation of property, it stated that, "finding it natural that the margin of appreciation available to the legislature in implementing social and economic policies should be a wide one [the Court] will respect the legislature's judgment as to what is 'in the public interest' unless that judgment is manifestly without reasonable foundation" ([GC], nos. 46720/99 (/sites/eng/pages/search.aspx#{"appno":["46720/99"]}), 72203/01 (/sites/eng/pages/search.aspx#{"appno":["72203/01"]}) and 72552/01 (/sites/eng/pages/search.aspx#{"appno":["72552/01"]}), § 91, ECHR 2005-VI, with reference back to *James and* Others, cited above, and *The former King of Greece and Others v. Greece* [GC], no. 25701/94 (/sites/eng/pages/search.aspx#{"appno": ["25701/94"]}), ECHR 2000-XII, and to *Zvolský and Zvolská v. the Czech* Republic, no. 46129/99 (/sites/eng/pages/search.aspx#{"appno":["46129/99"]}), § 67, ECHR 2002-IX). This is particularly true in cases such as the present one where what is at stake is a long-standing and complex area of law which regulates private-law matters between individuals.

72.   It is plain from the comparative material submitted by the parties that a large number of member States possess some form of mechanism for transferring title in accordance with principles similar to adverse possession in the common-law systems, and that such transfer is effected without the payment of compensation to the original owner.

73.   The Court further notes, as did the Chamber, that the amendments to the system of adverse possession contained in the 2002 Act did not abolish the relevant provisions of the 1925 and 1980 Acts. Parliament thus confirmed the domestic view that the traditional general interest remained valid.

74.   It is a characteristic of property that different countries regulate its use and transfer in a variety of ways. The relevant rules reflect social policies against the background of the local conception of the importance and role of property. Even where title to real property is registered, it must be open to the legislature to attach more weight to lengthy, unchallenged possession than to the formal fact of registration. The Court accepts that to extinguish title where the former owner is prevented, as a consequence of the application of the law, from recovering possession of land cannot be said to be manifestly without reasonable foundation. There existed therefore a general interest in both the limitation period itself and the extinguishment of title at the end of the period.

### 5.  *Whether there was a fair balance*

75.   The second paragraph of Article 1 is to be construed in the light of the general principle enunciated in the opening sentence. There must, in respect of a "control of use", also exist a reasonable relationship of proportionality between the means employed and the aim sought to be realised. In other words, the Court must determine whether a fair balance has been struck between the demands of the general interest and the interest of the individuals concerned. In determining whether a fair balance exists, the Court recognises that the State enjoys a wide margin of appreciation, with regard both to choosing the means of enforcement and to ascertaining whether the consequences of enforcement are justified in the general interest for the purpose of achieving the object of the law in question (see AGOSI, cited above, § 52, and, for a more recent authority concerning a deprivation of possessions, *Jahn and* Others, cited above, § 93). In spheres such as housing, the Court will respect the legislature's judgment as to what is in the general interest unless that judgment is manifestly without reasonable foundation (see *Immobiliare Saffi v.* Italy [GC], no. 22774/93 (/sites/eng/pages/search.aspx#{"appno":["22774/93"]}), § 49, ECHR 1999-V). In other contexts, the Court has underlined that it is not in theory required to settle disputes of a private nature. It can nevertheless not remain passive, in exercising the European supervision incumbent on it, where a domestic court's interpretation of a legal act appeared "unreasonable, arbitrary or ... inconsistent ... with the principles underlying the Convention" (see *Pla and Puncernau v.* Andorra, no. 69498/01 (/sites/eng/pages/search.aspx#{"appno":["69498/01"]}), § 59, ECHR 2004-VIII). When discussing the proportionality of a refusal of a private television company to broadcast a television commercial, the Court considered that a margin of appreciation was particularly essential in commercial matters (see *VgT Verein gegen Tierfabriken v.* Switzerland, no. 24699/94 (/sites/eng/pages/search.aspx#{"appno":["24699/94"]}), § 69, ECHR 2001-VI). In a case concerning a dispute over the interpretation of patent law, and at the same time as noting that even in cases involving litigation between individuals and companies the State has obligations under Article 1 of Protocol No. 1 to take measures necessary to protect the right of property, the Court reiterated that its duty is to ensure the observance of the engagements undertaken by the Contracting Parties to the Convention, and not to deal with errors of fact or law allegedly committed by a national court unless Convention rights and freedoms may have been infringed (see *Anheuser-Busch* Inc., cited above, § 83).

76.   The Chamber (at paragraph 55 of its judgment) found that the relevant provisions – section 75 of the 1925 Act in particular – went further than merely precluding the applicant companies from invoking the assistance of the courts to recover possession of their property. The Court observes that the Court of Appeal in the present case was of the view that the Grahams had not established the requisite intention to possess the land, so that time had not started to run against the applicant companies (see paragraph 17 above). It nevertheless considered that the extinguishment of title at the end of the limitation period of an action for recovery of land was a logical and pragmatic consequence of the barring of the right to bring an action after the expiration of the limitation period. The House of Lords disavowed the Court of Appeal's interpretation of the law on intention to possess, but did not comment on the suggestion that to terminate title at the end of the limitation period was "logical and pragmatic". Even though the general position in English law is that the expiry of a limitation period bars the remedy but not the right, the Court accepts that where an action for recovery of land is statute-barred, termination of the title of the paper owner does little more than regularise the respective positions, namely to confirm that the person who has acquired title by twelve years' adverse possession is the owner. Moreover, the law reflected the aim of the land registration legislation, which was to replicate the preregistration law so far as practicable. As already noted above (see paragraph 74), such a regime cannot be considered as "manifestly without reasonable foundation".

77.   The Court has rejected the Government's contention that the pre-existing nature of the regime of adverse possession excluded the facts of the case from consideration under Article 1 of Protocol No. 1 (see paragraphs 62 and 63 above). The fact that the rules contained in both the 1925 and 1980 Acts had been in force for many years before the first applicant even acquired the land is nevertheless relevant to an assessment of the overall proportionality of the legislation. In particular, it is not open to the applicant companies to say that they were not aware of the legislation, or that its application to the facts of the present case came as a surprise to them. Indeed, although the case proceeded domestically as far as the House of Lords, the applicant companies do not suggest that the conclusions of the domestic courts were unreasonable or unforeseeable, in the light of the legislation.

78.   In connection with the limitation period in the present case, the Court notes that the Chamber took the view that the period was relatively long (see paragraph 73 above). It has been unable, however, to derive any assistance from the comparative material submitted by the parties in this connection, beyond noting that there is no clear pattern as regards the length of limitation periods. It is in any event the case that very little action on the part of the applicant companies would have stopped time running. The evidence was that if the applicant companies had asked for rent, or some other form of payment, in respect of the Grahams' occupation of the land, it would have been forthcoming, and the possession would no longer have been "adverse". Even in the unlikely event that the Grahams had refused to leave and refused to agree to conditions for their occupation, the applicant companies need only have commenced an action for recovery, and time would have stopped running against them.

79.   The Chamber and the applicant companies emphasised the absence of compensation for what they both perceived as a deprivation of the applicant companies' possessions. The Court has found that the interference with the applicant companies' possessions was a control of use, rather than a deprivation of possessions, such that the case-law on compensation for deprivations is not directly applicable. Further, in the cases in which a situation was analysed as a control of use, even though the applicant had lost possessions (see AGOSI and *Air* Canada, both cited above), no mention was made of a right to compensation. The Court would note, in agreement with the Government, that a requirement of compensation for the situation brought about by a party failing to observe a limitation period would sit uneasily alongside the very concept of limitation periods, whose aim is to further legal certainty by preventing a party from pursuing an action after a certain date. The Court would also add that, even under the provisions of the 2002 Act, which the applicant

companies use as confirmation that the provisions of the earlier legislation were not compatible with the Convention, no compensation is payable by a person who is ultimately registered as the new owner of registered land on expiry of the limitation period.

80.  The Chamber and the applicant companies were also exercised by the absence of procedural protection for a paper owner whose property rights are about to be extinguished by the running of the limitation period under section 15 of the 1980 Act, at least in so far as it applied to registered land. The Court would note here that the applicant companies were not without procedural protection. While the limitation period was running, and if they failed to agree terms with the Grahams which put an end to the "adverse possession", it was open to them to remedy the position by bringing a court action for repossession of the land. Such an action would have stopped time running. After expiry of the period, it remained open to the applicant companies to argue before the domestic courts, as they did, that the occupiers of their land had not been in "adverse possession" as defined by domestic law.

81.  It is true that since the entry into force of the Land Registration Act 2002, the paper owner of registered land against whom time has been running is in a better position than were the applicant companies at the relevant time. The 2002 Act requires, in effect, the giving of notice to a paper owner before the expiry of the limitation period, to give him time, if he wishes, to take action to deal with the adverse possessor. It improves the position of the paper owner and, correspondingly, makes it more difficult for an adverse possessor to acquire a full twelve years' adverse possession. The provisions of the 2002 Act do not, however, apply to the present case, and the Court must consider the facts of the case as they are. In any event, legislative changes in complex areas such as land law take time to bring about, and judicial criticism of legislation cannot of itself affect the conformity of the earlier provisions with the Convention.

82.  The Government contended that it could not be the role of Article 1 of Protocol No. 1 to protect commercial operators against their own failings. The Court regards this suggestion as related to those aspects of the Court's case-law which underline that the Court is not in theory required to settle disputes of a private nature, in respect of which States enjoy a wide margin of appreciation (see paragraph 75 above). In a case such as the present, where the Court is considering, principally, the statutory regime by which title is extinguished at the end of the limitation period, rather than the specific facts of the case, the relevance of the individual applicant's conduct is correspondingly restricted.

83.  The applicant companies contended that their loss was so great, and the windfall to the Grahams so significant, that the fair balance required by Article 1 of Protocol No. 1 was upset. The Court would first note that, in *James and Others*, it found that the view taken by Parliament as to the tenants' "moral entitlement" to ownership of the houses in issue fell within the State's margin of appreciation. In the present case, too, whilst it would be strained to talk of the "acquired rights" of an adverse possessor during the currency of the limitation period, it must be recalled that the registered land regime in the United Kingdom is a reflection of a long-established system in which a term of years' possession gave sufficient title to sell. Such arrangements fall within the State's margin of appreciation, unless they give rise to results which are so anomalous as to render the legislation unacceptable. The acquisition of unassailable rights by the adverse possessor must go hand in hand with a corresponding loss of property rights for the former owner. In *James and* Others, the possibility of "undeserving" tenants being able to make "windfall profits" did not affect the overall assessment of the proportionality of the legislation (see *James and* Others, cited above, § 69), and any windfall for the Grahams must be regarded in the same light in the present case.

84.  As to the loss for the applicant companies, it is not disputed that the land lost by them, especially those parts with development potential, will have been worth a substantial sum of money. However, limitation periods, if they are to fulfil their purpose (see paragraphs 67-74 above), must apply regardless of the size of the claim. The value of the land cannot therefore be of any consequence to the outcome of the present case.

85. In sum, the Court concludes that the fair balance required by Article 1 of Protocol No. 1 was not upset in the present case.


## FOR THESE REASONS, THE COURT

Holds, by ten votes to seven, that there has been no violation of Article 1 of Protocol No. 1.

Done in English and in French, and delivered at a public hearing in the Human Rights Building, Strasbourg, on 30 August 2007.


Michael O'Boyle        Jean-Paul Costa
Registrar        President


In accordance with Article 45 § 2 of the Convention and Rule 74 § 2 of the Rules of Court, the following separate opinions are annexed to this judgment:
(a)  joint dissenting opinion of Judges Rozakis, Bratza, Tsatsa-Nikolovska, Gyulumyan and Šikuta;
(b)  dissenting opinion of Judge Loucaides joined by Judge Kovler.


J.-P.C.
M.O'B.


## JOINT DISSENTING OPINION OF JUDGES ROZAKIS, BRATZA, TSATSA-NIKOLOVSKA, GYULUMYAN AND ŠIKUTA

1.  We are unable to agree with the majority of the Court that Article 1 of Protocol No. 1 was not violated in the present case. In our view, the extinction of the applicant companies' beneficial interest in the land of which they were the registered owners, as a result of the effect of the relevant provisions of the 1925 and 1980 Acts, was in violation of their right to the peaceful enjoyment of their possessions under that Article.

2.  In common with the majority of the Court, we consider that Article 1 of the Protocol was not only applicable in the present case, but that the impugned legislation gave rise to a clear interference with the applicant companies' rights under that Article which was such as to engage the responsibility of the respondent State.

3.  The judgment, correctly in our view, rejects the Government's argument that, since it is principally concerned with the law of limitation of actions, the case falls to be examined under Article 6 of the Convention alone and not under Article 1 of the Protocol. As pointed out in the judgment, not only is there nothing in principle to exclude the examination of a claim under Article 1 where the complaint is directed against legislation concerning property rights, but the Government's argument gives insufficient weight to the fact that the Court is concerned in the present case not only with the limitation of actions but with the law of adverse possession as it affects registered land. That law is embodied not merely in the provisions of section 17 of the 1980 Act, which bars a course of action to

recover the land, but in the provisions of section 75 of the 1925 Act, the effect of which is to extinguish beneficial title to the property after twelve years' adverse possession. The Court of Appeal in the present case held that the extinction of the applicant's title (under section 75) was simply a "logical and pragmatic" consequence of the barring of an owner's right to bring an action (under section 15). This view appears to be endorsed by the majority of the Court in asserting that, where an action for recovery of land is statute-barred, "termination of the title of the paper owner does little more than regularise the respective positions, namely to confirm that the person who has acquired [the] title by twelve years' adverse possession is the owner" (paragraph 76 of the judgment). Even if the provisions of section 75 are properly to be so regarded as a matter of domestic law, the fact remains, as noted in the judgment of the Chamber (§ 55), that the combined effect of the legislative provisions was both to deprive the applicants of their substantive property rights and to preclude them from lawfully repossessing the land, the beneficial title to which they had lost.

4.  It is also implicit in the judgment that the Court – again, correctly in our view – has upheld the rejection by the Chamber of two further arguments of the Government, namely (i) that Article 1 was not engaged, since the applicant companies had only a defeasible property interest in their land which ceased to exist after the expiry of twelve years of adverse possession, and (ii) that there was, in any event, no interference with the applicants' property rights for which the State could be held responsible, the case giving rise at most to the positive obligations of the State to secure rights to property.

5.  According to the view of the majority of the Grand Chamber, the interference with the applicant companies' property rights which resulted in a loss of beneficial ownership is to be seen as a "control of use of property" which falls to be examined under the second paragraph of Article 1, rather than as a "deprivation" of possessions within the meaning of the second sentence of that Article, as found by the Chamber.

6.  It is well established that a legislative measure which brings about a transfer of property from one individual to another in furtherance of a particular social policy may give rise to a "deprivation" of possessions within the second sentence (see, for example, *James and Others v. the* United Kingdom, 21 February 1986, Series A no. 98). It is, however, also clear that not every loss of ownership of property resulting from a legislative measure or from an order of a court will be equated with a "deprivation" of possessions: as noted in the judgment, in *AGOSI v. the* United *Kingdom* (24 October 1986, Series A no. 108), *Air Canada v. the United Kingdom* (5 May 1995, Series A no. 316-A), and *Gasus Dosier- und Fördertechnik GmbH v. the* Netherlands (23 February 1995, Series A no. 306-B), the forfeiture or other loss of ownership was treated as a "control of use" of property within the second paragraph of Article 1, while in *Beyeler v. Italy* ([GC], no. 33202/96 (/sites/eng/pages/search.aspx#{"appno":["33202/96"]}), ECHR 2000-I), the interference with the applicant's property rights was examined under the first sentence of that Article.

Like the majority of the Court, we consider that the legislative provisions in issue in the present case are significantly different from those examined in the earlier cases referred to. In particular, we accept that the relevant provisions of the 1925 and 1980 Acts were not intended to deprive property owners of their beneficial title in furtherance of a social policy of redistribution of land or transfer of ownership. Rather, they represented generally applicable rules designed to regulate questions of title in a system in which twelve years' adverse possession was sufficient to extinguish the former owner's right to re-enter or to recover possession of land. We can agree that the loss of beneficial title in such circumstances is to be seen as a "control of use" of land rather than a "deprivation" of possessions. However, like the Chamber, we would emphasise that the three "rules" in Article 1 are not distinct or watertight in the sense of being unconnected and that the principles governing the question of justification are substantially the same, requiring both a legitimate aim and the preservation of a fair balance between the aim served and the individual property rights in question.

Notice of Intent, Exhibit B

7.  As to the legitimacy of the aim of the measures, it is not in dispute that limitation periods for the recovery of land may be said to pursue a legitimate aim in the public interest. However, as was pointed out in the Consultative Document of the Law Commission, the law of adverse possession, which does not merely bar claims but has the effect of extinguishing title, can only be justified by "factors over and above those which explain the law of limitations".

The present case concerns the law of adverse possession as it applies to registered land in which, as noted in paragraph 10 below, the reasons traditionally advanced to justify the transfer of beneficial title to the adverse possessor at the end of the limitation period have much less cogency than in the case of unregistered land. We find much force in the view of Lord Bingham in the present case, endorsed by Judge Loucaides in his dissenting opinion, that where land is registered it is difficult to see any justification for a legal rule which compels such an apparently unjust result as to deprive the owner of his beneficial title in favour of an adverse possessor. However, not only is the taking of property as a result of adverse possession a feature common to many legal systems, including other common-law systems, but, despite the important changes to the system of adverse possession made by the 2002 Act in the case of registered land, the system itself has not been abolished. In these circumstances, we share the view of the majority that the extinction of the beneficial ownership of the registered title-holder following the expiry of twelve years of adverse possession cannot be said to be manifestly without reasonable foundation and that the system, as applied in the case of the present applicants, may therefore be said to have served a legitimate aim in the general interest.

8.  The central question remains whether the rules of adverse possession applicable to registered land and applied in the present case struck a fair balance between the rights of the registered owners and the general interest served by that system or whether, as the applicant companies argue, they were required to bear "an individual and excessive burden" (see, for example, James and Others, § 50). It is primarily on this point that we part company with the majority of the Court.

9.  The striking feature of the manner in which the rules on adverse possession applied in the present case is the contrast between the gravity of the interference with the owners' property rights and the justification provided for that interference.

10.  In the case of unregistered land, title was made out by establishing a number of years' possession. Title deeds served only as evidence in support of possession, and could be defeated by a person who could prove actual (adverse) possession for the requisite number of years. In such a system, the extinguishment of title at the end of the limitation period could be seen as a coherent element in the rules on acquisition of title. In the Consultative Document of the Law Commission (paragraph 30), four particularly cogent reasons were identified for maintaining a law of adverse possession – the prevention of uncertainty and injustice arising from stale claims; the avoidance of the risk that land becomes unmarketable when possession and ownership are out of kilter; the avoidance of hardship to an innocent but mistaken squatter, who may have incurred expenditure on the land; and the facilitation of the investigation of title to the land (and see, in this regard, The Holy Monasteries v. Greece (9 December 1994, §§ 57-61, Series A no. 301-A), in which acquisition by adverse possession was found to be of particular importance because there was no land survey in Greece, and because it had been impossible to have title deeds registered before 1856, and legacies and inheritances registered before 1946 (see § 60)).

11.  In the case of registered land, however, title depends not on possession, but on registration as the proprietor. A potential purchaser of land can ascertain the owner of the land by searching the register, and there is no need for a potential vendor to establish title by proving possession. As pointed out by the Law Commission, the traditional reasons advanced to justify a law of adverse possession which resulted in the extinguishment of title on expiry of the limitation period had lost much of their cogency. This view was shared in the circumstances of the present case both by Lord Bingham and by Mr Justice Neuberger, who found that the uncertainties which sometimes

arose in relation to the ownership of land were very unlikely to arise in the context of a system of land ownership where the owner of the land was readily identifiable by inspecting the proprietorship register.

12. In the proceedings before the Grand Chamber, the Government placed reliance on a further public interest, namely, the fact that land is a limited resource which should be used, maintained and improved and that, by imposing a finite limit on the time within which land occupied by an adverse possessor may be recovered, a legal owner is encouraged to make use of the land.

While we can accept that, where land is abandoned, it may be in the general interest that it should be acquired by someone who would put it to effective use, we are unable to accept that the general interest would extend to depriving a registered landowner of his beneficial title to the land except by a proper process of compulsory acquisition for fair compensation.

13. It was further contended by the Government that, quite apart from any public interest served by the law, regard should be had, in determining the proportionality of the measures, to the interests of the adverse possessor, in the present case, the Grahams. This view is reflected in paragraph 83 of the judgment, where reference is made to the case of *James and* Others, in which the Court found that the view taken by Parliament as to the tenants' "moral entitlement" to ownership of the houses in issue fell within the State's margin of appreciation, despite the "windfall profits" made by certain "undeserving" tenants.

We are unable to attach weight to this consideration. While, in a case such as the present where there is no mistake on the part of the adverse possessor as to the owner of the land, a justification might arguably be found for a law which prevented the adverse possessor from being summarily evicted from the land after twelve years of occupation or which prevented a landowner from recovering rent or mesne profits for that period, we are quite unable to accept that the adverse possessor has any legitimate interest in obtaining the windfall of acquiring title to the land itself without payment of compensation. In this regard, the position of the adverse possessor is entirely different from that of the long-leasehold tenants in *James and* Others, whose moral entitlement to acquire the freehold of houses they occupied at below market value under the Leasehold Reform Act 1967 was found to derive from the fact that they and their predecessors had not only paid a capital sum to acquire the leasehold interest but had over the years invested a considerable amount of money in the upkeep of houses which had been their homes.

14. While the general interest served by the law of adverse possession in the case of registered land was thus in our view of limited weight, the impact of the law on the registered landowner was exceptionally serious, as is graphically illustrated by the facts of the present case. Although the case falls to be examined under Article 1 of the Protocol as one concerning the control of use of land, in judging the proportionality of the measures it is in our view a highly material factor that the relevant legislative provisions went further than merely precluding the registered landowners from invoking the assistance of the courts to recover possession of their land, by depriving them of their beneficial ownership of it.

15. The Chamber, referring to the statements of Neuberger J and Lord Bingham, took into consideration the lack of compensation for the deprivation of property (§§ 71-72). This is criticised by the majority of the Grand Chamber. It is pointed out not only that the Court's case-law as to the need for compensation applies to "deprivations" of possessions and has no direct application to a case of "control of use", but that a requirement of compensation in a case such as the present "would sit uneasily alongside the very concept of limitation periods whose aim is to further legal certainty by preventing a party from pursuing an action after a certain date".

16. While it is true that the availability of compensation has principally been examined by the Court in the context of deprivations of possessions under the second sentence of Article 1, it is clear that the absence of compensation may also be of relevance to the overall proportionality of a control of use (see, for example, *Immobiliare Saffi v.* Italy [GC], no. 22774/93 (/sites/eng/pages/search.aspx#{"appno":["22774/93"]}), § 57, ECHR 1999-V). However, we share

Notice of Intent, Exhibit B

the view of the majority that limitation provisions cannot easily be coupled with a requirement for compensation and that the payment of compensation does not, on the basis of the comparative material before the Court, appear to be a feature of any system of adverse possession or prescription. It is, moreover, significant that the Land Registration Act 2002, which substantially improved the position of the owner of registered land whose land was occupied by adverse possessors, did not provide for a mechanism by which compensation could be claimed or obtained.

While the absence of compensation cannot thus of itself be regarded as rendering the control of use disproportionate, the fact that the landowner received no compensation made the loss of beneficial ownership the more serious and required, in our view, particularly strong measures of protection of the registered owner's property rights if a fair balance was to be preserved.

17. The majority of the Court argue that such procedural protection was provided. Reliance is placed on the fact that the law of adverse possession in general and the provisions which extinguished title at the end of the period of twelve years in particular were accessible to the applicant companies, as the registered landowners, and that the provisions had been in place for many years. Emphasis is also placed on the fact that the applicant companies, as any landowner, could have safeguarded their position and stopped time running by requesting rent or other payment from the occupiers for the use of the land or by commencing proceedings for its recovery (paragraphs 77 and 78 of the judgment).

18. Although clearly correct, we do not find that either factor ensured that a fair balance was preserved or provided sufficient protection for the property rights of registered landowners. While it was open to the registered owner to argue, after the expiry of the twelve-year period, that there had not been sufficient "possession" of the land on the part of the occupier to prevent recovery of the land, no form of notification was required to be given to the owner during the currency of that period to alert him to the risk of losing his title to the land. What was lacking were effective safeguards to protect a registered landlord from losing beneficial ownership of land through oversight or inadvertence. Such safeguards were provided by the Land Registration Act 2002 which not only puts the burden on a "squatter" to give notice of his wish to apply to be registered as the proprietor after ten years of adverse possession, but requires special reasons to be adduced to entitle him to acquire the property where the legal owner opposes the application. The legal owner is then granted two years within which to regularise the position as, for example, by evicting the adverse possessor. The effect of the 2002 Act was, as pointed out by Judge Strauss in the case of *Beaulane* Properties *Ltd v.* Palmer, to place the burden where it should lie, namely on the party seeking to override a registered title.

19. The majority of the Court, while noting that the position of the registered owner was improved by the new legislation, attach little weight to the change in the law, holding that the provisions of the 2002 Act were not applicable in the present case which had to be judged according to the law in effect at the material time. It is further said that, in any event, legislative changes in complex areas such as land law take time to bring about and that judicial criticism could not of itself affect the conformity of the earlier provisions with the Convention.

In our view this is to underestimate the significance of the change in the law. As was noted by the Chamber, it does not necessarily follow from the fact that new rules have been introduced to provide enhanced protection for Convention rights that the previous rules were incompatible with the Convention (see, for example, *Hoffmann v.* Germany, no. <u>34045/96 (/sites/eng/pages/search.aspx#{"appno":["34045/96"]})</u>, § 59, 11 October 2001). However, we attach considerable importance to the fact that the amendments made by the 2002 Act represented more than a natural evolution in the law of adverse possession as it affected registered land: they marked a major change in the existing system which had been recognised, both by the Law Commission and judicially, as leading to unfairness and as having a disproportionate effect on the rights of the registered owner.

20.   The Government emphasise, as a further element relevant to the assessment of proportionality, the degree of fault on the part of the applicant companies in the present case, arguing that they failed to take the most minimal steps to look after their own interests.

While it is true that in other contexts the Court has held that the question whether a fair balance has been struck under the second paragraph of Article 1 of the Protocol will depend on a number of factors, including the degree of fault or care which an applicant has displayed (see, for example, AGOSI, cited above, § 54), we cannot consider it to be a significant factor in the present case, in which the very complaint is that the system of adverse possession, as it existed before the passing of the 2002 Act, failed adequately to protect the proprietary rights of registered landowners against the loss of beneficial ownership as a result of their inadvertence or oversight.

21.   In sum, we are unable to agree with the majority of the Court that the provisions of the 1925 and 1980 Acts, as they applied to registered owners of land and whose application in the present case was variously described by the national judges as "draconian", "unjust", "illogical" and "disproportionate", struck a fair balance between the rights of the owners and any general interest served. In being deprived of their beneficial ownership of the land of which they were the registered owners, the applicant companies were in our view required to bear an individual and excessive burden such that their rights under Article 1 of Protocol No. 1 were violated.

## DISSENTING OPINION OF JUDGE LOUCAIDES JOINED BY JUDGE KOVLER

I am unable to agree with the majority in this case that there has been no violation of Article 1 of Protocol No. 1. The question is whether the existence of a twelve-year statutory limitation period for actions for recovery of land is compatible with the Convention, bearing in mind that this limitation has as a consequence the deprivation of ownership of the registered owner of the land in cases where he has been out of possession for that entire period and a stranger has been in possession. In such cases the owner's title is extinguished and the stranger acquires a title which is good against all the world, including the former owner (see paragraph 27).

There are two factors that have to be examined in order to answer this question.

The first is whether the twelve-year limitation period as such pursues a legitimate aim in the general interest. And the second is whether, assuming there is a legitimate aim, the interference with the right of property is proportionate to the aim pursued.

Where there is no land survey and title of ownership is not registered in a land registry – as may be the case at certain times and in certain countries – this institution of adverse possession leading to acquisition of title could undoubtedly be justified on the ground of avoiding uncertainty of land ownership. However, when and where a land registry has been established and ownership of land can easily be ascertained through inspection of the registration of title deeds, I personally have great difficulty in accepting that adverse possession could serve any general interest. In this respect I fully endorse the following opinion of Lord Bingham:

"... In the case of unregistered land, and in the days before registration became the norm, such a result could no doubt be justified as avoiding protracted uncertainty where the title to land lay. But where land is registered it is difficult to see any justification for a legal rule which compels such an apparently unjust result, and even harder to see why the party gaining title should not be required to pay some compensation at least to the party losing it. ..." (see paragraph 21)

The argument was put forward that another possible legitimate aim of such an institution would be to encourage landowners to exploit, improve, or make use of their land. I cannot find this acceptable, first of all because such encouragement may be achieved by other less onerous means such as

taxation, or the creation of incentives; and secondly I cannot accept that the general interest connected with that aim can reasonably extend to depriving a registered landowner of his beneficial title to the land except by a proper process of compulsory acquisition for fair compensation.

In determining whether or not adverse possession now serves a legitimate aim, I am not bound by what the parties suggest.

The majority, firstly, referred to comparative material to the effect that a large number of member States possess some formal mechanism for transferring title in accordance with principles similar to adverse possession in the common-law systems, and that such transfer is effected without the payment of compensation to the original owner. These mechanisms in other member States may be explained by the absence of land registration or may be remnants of an archaic system. In any event, an unsatisfactory system in certain countries does not justify retaining such a system elsewhere. Secondly, the majority invoked the fact that the amendments to the system of adverse possession contained in the Land Registration Act 2002 did not abolish the relevant provisions. However no clear grounds were given for such a decision, and more particularly for the necessity of maintaining the present system of adverse possession. Thirdly, the majority argued that it must be open to the legislature to attach more weight to lengthy, unchallenged possession than to the formal fact of registration. Again I do not understand the logic of this approach and I certainly do not find it convincing. I do not see how illegal possession can prevail over legitimate ownership (*de* facto versus *de jure*).

Taking everything into consideration, I find that the aim of the interference with the applicant companies' property lacks reasonable foundation. I may add in this respect that such a system (a) shows disrespect for the legitimate rights and expectations of the registered property owners which include the possibility of keeping their property unused for development at a more appropriate time, when financially and otherwise they are ready to proceed with such development, or to maintain their property as security for their children or grandchildren; and (b) encourages illegal possession of property and the growth of squatting.

I could stop there, being confident that there is no legitimate objective of public interest behind the provisions in question. I might add that personally I am inclined to take the view that the application of the principle of adverse possession in this case does not, for the purposes of Article 1 of Protocol No. 1, fall within the concept of control of use of land, but is a case of deprivation of possessions subject to certain conditions.

In any event, even assuming that there was a public interest to be served by the deprivation of ownership through adverse possession, the conditions for the implementation of such deprivation (limitation period of only twelve years, loss of title, lack of any compensation) render the measure completely disproportionate.

In simple terms this system of adverse possession looks as if it is intended to punish a registered lawful owner of land for not showing sufficient interest in his property and for not sufficiently pursuing a squatter, who as a result is rewarded by gaining title to the property. And in this respect I fully endorse the statement of Mr Justice Neuberger when he said that the fact that an owner who had sat on his rights for twelve years should be deprived of the land was "illogical and disproportionate" (see paragraph 16).

In interpreting and applying Article 1 of Protocol No. 1 in this case, I was guided by the rule that the principle of the rule of law is inherent in all the Articles of the Convention (see *Amuur v.* France, 25 June 1996, § 50, *Reports of Judgments and Decisions* 1996-III).

In the circumstances I find that there has been a violation of Article 1 of Protocol No. 1 in this case.

[1].  Future interests, such as the reversion of a lease, in respect of which the limitation period began to run only when the interest fell into possession.

# EXHIBIT C

Notice of Intent, Exhibit C

Page 61

# THE

# SWISS CIVIL CODE

### ENGLISH VERSION

by

IVY WILLIAMS, M.A., D.C.L., Oxon; LL.D., Lond.
Barrister-at-Law

published by Oxford University Press, 1925
reprinted by Remak Verlag Zürich, 1976

completely reset, revised and up-dated edition
with Notes, Vocabularies, Index and a Synopsis
of all changes of the law since 1912

by

**SIEGFRIED WYLER**, Dr. phil.        **BARBARA WYLER**, Dr. iur.
Professor of English                              Barrister-at-Law

## VOLUME I

### PRELIMINARY CHAPTER
### PART I: LAW OF PERSONS
### PART II: FAMILY LAW

## ReMaK
Verlag Zürich

1

# Swiss Civil Code

## Preliminary Chapter

### Art. 1

[1] The Law must be applied in all cases which come within the letter or the spirit of any of its provisions.

[2] Where no provision is applicable, the judge shall decide according to the existing Customary Law and, in default thereof, according to the rules which he would lay down if he had himself to act as legislator.

[3] Herein he must be guided by approved legal doctrine and case-law.

A. Application of Law

### Art. 2

[1] Every person is bound to exercise his rights and fulfil his obligations according to the principles of good faith.[1]

[2] The law does not sanction the evident abuse of a person's rights.

B. Limits of civil rights
I. Misuse of a right

### Art. 3

[1] *Bona fides* is presumed whenever the existence of a right has been expressly made to depend on the observance of good faith.

[2] No person can plead *bona fides* in any case where he has failed to exercise the degree of care required by the circumstances.

II. *Bona fides*

### Art. 4

Where the law expressly leaves a point to the discretion of the judge, or directs him to take cir-

III. Discretion of judge

[1] The masculine includes both sexes unless it appears from the context that it is applicable to males only.

[3] The finder can claim a suitable reward which must not, however, exceed half the value of the treasure-trove itself.

### Art. 724

5. Objects of scientific value

[1] Where natural curiosities or antiquities are found which have no owner and are of considerable scientific value, they become the property of the Canton in whose borders they were found.

[2] The owner of the land in which such objects are found is bound to permit all necessary excavations, but must receive compensation for all damage caused thereby.

[3] The finder of the object and, if it is treasure-trove, the owner thereof also have the right to a suitable reward which, however, must not exceed the value of the object found.

### Art. 725

IV. Drifts and strays

[1] Where chattels have drifted by the action of water, wind, avalanches, or other forces of nature, or by accident, or animals have strayed to a person's land, that person is in the same legal position as if he had found lost property.

[2] Where a swarm of bees settles in an occupied hive belonging to another person, it becomes the property of the owner of the hive, and no compensation can be claimed for the loss of it.

### Art. 726

V. Manufactured articles

[1] Where a person has used another's material to make or transform some article, the new product becomes the property of the craftsman if the work done is more valuable than the material and that of the owner of the material in the contrary case.

[2] If the craftsman has not acted in good faith, the court can, even if the work is more valuable than the material, assign the new product to the owner of the material.

[3] This provision, however, does not take away the right to bring an action for damages for loss suffered or for the return of profits made.

### Art. 727

VI. Fusion

[1] Where materials belonging to different owners have been intermixed or joined together in such a way that they cannot be separated without material damage or excessive labour and expense, the parties interested in them become co-owners of the new product, their shares in it being proportionate to the value of the different materials at the time of mixing.

[2] Where things are mixed or joined together in such a way that one of them can be held accessory to the other, the whole belongs to the owner of the principal thing.

[3] This provision does not, however, take away the right to bring an action for damages for loss suffered or for the return of profits made.

### Art. 728

VII. Prescription

[1] Where a person has been continuously in *bona fide* and peaceable possession of another's chattel for five years as owner, he is held to have acquired the ownership of it by prescription.

[2] The running of the years is not interrupted by involuntary loss of possession, provided possession is recovered within one year or an action to recover it has been brought within one year.

[3] The rules laid down in regard to the limitation of actions apply here by analogy for the purpose of calculating the period of prescription and of determining in what cases the running of years is stopped or suspended.

Civil Code

immediately after the commission of the wrong and the identity of the wrongdoer have come to his knowledge.

[2] The period of limitation for this action is one year from the dispossession or trespass, even though the plaintiff did not know of the wrong or the identity of the wrongdoer until a later date.

### Art. 930

II. Protection of right to possession 1. Presumption of ownership

[1] The person in possession of a movable chattel is presumed to be its owner.

[2] A person who has been, but has ceased to be, in possession is presumed to have been the owner during the period of his possession.

### Art. 931

2. Presumption in the case of derivative possession

[1] Where a person is in possession of a movable chattel without any intention to hold it as owner, he can plead the presumption that the person from whom he acquired *bona fide* possession is the owner.

[2] Where a person is in possession of a movable chattel by virtue of a personal right to it or a real right short of ownership, the existence of the right is presumed, but he cannot validly plead it as against the person from whom he acquired possession.

### Art. 932

3. Action against the person in possession

The person in possession of a movable chattel can in every action brought against him plead the presumption that he has the better title; subject nevertheless to the provisions on wrongful dispossession and trespass.

### Art. 933

4. Right of alienation and recovery *a.* In case of goods delivered to another

Where a movable chattel is transferred with a view to passing ownership or some other real right to the transferee, and he takes possession in good faith, his right over the chattel must be protected, even

Possession  313

where the transferor had himself no authority to alienate it.

### Art. 934

*b.* In case of lost or stolen property

[1] Where a person in possession of a movable chattel loses it or has it stolen from him or otherwise taken from him against his will, he can demand it back within a period of five years from any person who is detaining it.

[2] Where the chattel has been bought at a public auction or in market overt or from a dealer in property of the same kind, it cannot be recovered from the first purchaser or any subsequent *bona fide* purchaser, unless he is compensated for the purchase-money paid.

[3] The rules in regard to the restoration of the thing are in other respects the same as those governing the rights of a *bona fide* possessor.

### Art. 935

*c.* In case of cash and negotiable instruments to bearer

Cash and negotiable instruments to bearer cannot be recovered from the *bona fide* holder, even though the plaintiff was deprived of his possession in them against his will.

### Art. 936

*d.* In case of bad faith

[1] Where a person has acquired possession of a movable chattel in bad faith, he is always bound to restore it to the former possession.

[2] If, however, the latter was not a *bona fide* possessor himself, he cannot recover it from any subsequent possessor.

### Art. 937

5. Presumption in regard to immovables

[1] Where the property is an immovable entered in the land register, only the person whose name is on the register is presumed to have the right to its possession and to the actions for its protection.

Civil Code

Land Register

[2] The person, however, who has effective control of the immovable can bring an action for dispossession or trespass.

### Art. 938

III. Liabilities
1. Of *bona fide* possessor
a. For use

[1] Where any person is in *bona fide* possession of some property, he is not liable to the person entitled to it for any damage caused by his use of it.

[2] He is not bound to make good any losses or deterioration consequent on such use.

### Art. 939

b. Indemnity

[1] Where the person entitled to the property demands its return, the defendant can if he is a *bona fide* possessor claim compensation for any necessary and useful outlay on it and refuse to return it until this has been paid.

[2] For other expenditure he cannot demand compensation, but, if this is not offered, he can before returning the property remove any improvements or additions that he has made to it, provided this can be done without injury to the property.

[3] The value of the fruits that the possessor has gathered must be deducted from the amount of compensation due to him for his expenditure.

### Art. 940

2. *Mala fide* possessor

[1] Where any person is in *mala fide* possession of property, he must restore it to the person entitled to it and also give compensation for the damage caused by the wrongful detention and for the fruits which he has gathered or neglected to gather.

[2] He cannot make any claims for expenditure on the property, unless the person entitled would have been obliged to incur them himself.

[3] If the possessor does not know to whom he is to return the property, he is liable only for the damage which has been caused by his own fault.

### Art. 941

IV. Prescription and adverse possession

Where a person claims the property by prescription or adverse possession, he can add to his own period of possession that of his predecessor, provided the latter's possession also was such that a prescriptive title could be based on it.

### Title XXV: Land Register

### Art. 942

A. Organization
I. Register itself
1. In general

[1] A land register is kept of rights over immovable property.

[2] It consists of the big book, supplementary plans, lists of properties, their title deeds and particulars, and the day-book.

### Art. 943[1]

2. Entries
a. Subject

[1] The following are entered in the register as immovables:

1. land and houses;
2. independent and permanent rights in immovables;
3. mines;
4. co-owned shares of immovables.

[2] The Federal Council will draw up an order to regulate the mode of registration of independent and permanent rights and mines and the co-owned shares of immovables.

### Art. 944

b. Exceptions

[1] Immovables which are not subject to private ownership and those which are used for public purposes are not entered in the register, unless real

[1] Wording according to cipher III of the Federal Statute of 19th December 1963, in force since 1st January 1965 (AS 1964 993 1005; BBl 1962 II 1461).

# EXHIBIT D

# Ministerio de Justicia



## CRIMINAL CODE

Notice of Intent, Exhibit D

Colección: Traducciones del derecho español

Edita:

Ministerio de Justicia- Secretaría General Técnica

NIPO: 051-11-004-3

Traducción jurada realizada por: Clinter Traducciones e Interpretaciones, S.A.

Maquetación: Subdirección General de Documentación y Publicaciones

**ORGANIC ACT 10/1995, DATED 23ʳᵈ NOVEMBER,** ON THE CRIMINAL CODE.
GOVERNMENT OFFICES

**Publication**: Official State Gazette number 281 on 24ᵗʰ November 1995

**RECITAL OF MOTIVES**

If the legal order has been defined as a set of rules that regulate the use of force, one may easily understand the importance of the Criminal Code in any civilised society. The Criminal Code defines criminal and misdemeanours that constitute the cases for application of the supreme action that may be taken by the coercive power of the State, that is, criminal sentencing. Thus, the Criminal Code holds a key place in the Law as a whole, to the extent that, not without reason, it has been considered a sort of "Negative Constitution". The Criminal Code must protect the basic values and principles of our social coexistence. When those values and principles change, it must also change. However, in our country, in spite of profound changes in the social, economic and political orders, the current text dates, as far as its basic core is concerned, from the last century. The need for it to be reformed is thus undeniable.

Based on the different attempts at reform carried out since the establishment of democracy, the Government has prepared a bill submitted for discussion and approval by the both Chambers. Thus, it must explain, even though briefly, the criteria on which it is based, even though these may easily be deduced from reading its text.

The axis of those criteria has been, as is logical, that of positive adaptation of the new Criminal Code to the constitutional values. The changes this bill introduces in that direction are innumerable, although it is worthwhile pointing out some of these.

Firstly, a full reform of the present penalties system, in order for it to achieve the aims of re-socialisation assigned to it by the Constitution. The system proposed partially simplifies regulation of custodial sentences, while extending the possibilities of these being replaced by others that affect less basic legal assets and, on the other, introduces changes in monetary penalties, adopting a day-fine system and adding community service work.

Secondly, the existing antinomy between the principle of minimum intervention and the growing needs for protection in an increasingly more complex society have been dealt with, with a cautious approach to new kinds of offence, although, in turn, eliminating criminal offences that have become obsolete. In the first sense, it is worth pointing out the introduction of offences against the social and economic order, or the new provisions on offences concerning organisation of the territory and natural resources; secondly, the disappearance of the complex figures of robbery with violence and personal threat that, having arisen in the context of combating highway robbery, should disappear, leaving the way to apply the general rules.

Thirdly, special emphasis has been placed on protecting fundamental rights and an attempt has been made to design the punitive instrument with special care wherever the exercise of any of these is at stake: for example, on one hand, specific protection of moral integrity, and on the other, the new regulation of offences against honour. On specifically protecting moral integrity, citizens are granted greater protection against torture, and by defining offences against honour in the manner proposed, freedom of expression is granted the full relevance it may and must be recognised under a democratic regime.

Fourthly, and in keeping with the objective of protecting and respecting fundamental rights, the regime of privilege enjoyed up to present by unlawful interference by civil servants in the rights and liberties of the citizens has been eliminated. Thus, it is proposed that arrests, entering and searching dwellings carried out by authorities or officers outside the cases allowed by the Law be treated as aggravating forms of the relevant common offences, and not as they have been up to present, that is, as special offences that, incomprehensibly and unjustifiably, had been mitigated.

Fifthly, an attempt has been made to advance on the path of real and effective equality, attempting to fulfil the task in that sense that is imposed upon the public powers by the Constitution. Certainly, the Criminal Code is not the most important instrument to carry out such task. However, it may contribute to it by eliminating regulations that are an obstacle to its realisation, or by introducing protective measures to deal with discriminatory situations. In addition to the regulations that grant specific protection against activities that tend toward discrimination, here one must mention the new regulation of offences against sexual freedom. This is aimed at adapting the offences classified to the legal asset protected, which is no longer, as it was historically, a woman's honour, but rather the sexual freedom of all. Protection of a woman's honour hid an intolerable discriminatory situation, which the new laws aim to totally eliminate. The novelty of the punitive techniques used may be surprising, but, in this case, moving away from tradition appears to be the correct thing to do.

Leaving the scope of principles and considering that of preparation techniques, this bill differs from the previous ones in its claim to be universal. The idea formally was that the Criminal Code had to include a complete regulation of the punitive power of the State. The starting point of this idea was already wrong, considering the importance of the powers of penalisation of the Administration in our country; what is more it was both unnecessary and unsettling.

It was unnecessary because the 19th Century option in favour of the Criminal Code and against special laws was based on the undeniable fact that the legislator, in preparing a Code, was constrained, due to external reasons of a social nature, to respect the constitutional principles, something that did not happen, or that happened to a lesser extent, in the case of a special laws. Within the framework of a flexible constitutionalism, this was an especially important argument as the basis to claim an absolutely universal nature of the Code. Nowadays, however, both the Criminal Code as well as the special laws are hierarchically subordinate to the Constitution and submitted thereto, not only due to that hierarchy, but also due to the existence of a jurisdictional control over their constitutionality.

Thus, special laws need not give rise to the caution they historically invoked.

Unsettling because, although it is undeniable that a Code would not deserve that name if it did not contain the majority of the criminal provisions and, of course, the basic principles on which all such provisions are to be based, the fact is that there are matters that it would be difficult to include therein. Now, while a claim to universality is inherent to the idea of a Code, stability and permanence are also goals that befit it, and there are scopes in which, due to the special situation of the rest of the legal order, or the very nature of things, such stability and permanence are impossible. Such is, for example, the case of offences related to exchange controls. In these, the constant changes in the financial conditions and in the legislative context surrounding such offences, makes it advisable, whether one wishes or not, to place the criminal provisions within that setting and to leave them out of the Code. In addition, this is our tradition and there is no lack, in the countries around us, of examples characterised by a similar way of acting.

Thus, in that and other similar cases, it has been decided to refer the criminal regulation of the respective matters to the relevant special laws in their field. The same technique has been applied to the provisions on decriminalisation of abortion. In this case, along with similar reasons to those stated above, one might argue that these are not incriminating laws, but rather laws that regulate cases of non-incrimination. The Constitutional Court of Law has demanded that, in configuring those cases, guarantees be provided that do not seem those of a Criminal Code, but rather those of another kind of regulation.

While preparing the Bill, the parliamentary discussions of 1992, the report by the General Council of the Judiciary, the state of the case law and scientific opinion have been kept very much in mind. It has been carried out based on the deep-rooted idea that the Criminal Code should belong to all and that, thus, all opinions must be heard and the solutions that appear most reasonable adopted, that is, those that everybody should be able to accept.

There is no pretence that this is a perfect work, but rather, simply a useful piece of work. The Government does not have the last word here, but rather only the first. Thus, via this Bill it only expresses its opinion, inviting all political forces and all citizens to collaborate in the task of perfecting it. Only if we all wish to have a better Criminal Code and contribute to achieve this, may an objective whose importance for coexistence and peaceful enjoyment of the rights and liberties the Constitution proclaims, one it is difficult to exaggerate, be attained.

## Article 5

No punishment whatsoever shall be imposed in the absence of either mens rea or negligence.

## Article 6

**1.** Security measures shall be based on the criminal risk of the subject on whom they are imposed involves, exteriorised by committing an act defined as a felony.

**2.** Security measures may not be more onerous, nor last longer than the punishment abstractly applicable to the act committed, nor exceed the limit necessary to prevent the principal being dangerous.

## Article 7

In order to determine the Criminal Law applicable thereto, felonies and misdemeanours shall be deemed to have been committed at the moment when the subject perpetrates the action, or omits the act he was obliged to perpetrate.

## Article 8

Acts liable to be defined pursuant to two or more provisions of this Code and not included in Articles 73 to 77 shall be punishable by observing the following rules:

**1.** A special provision shall have preferential application rather than a general one;

**2.** A subsidiary provision shall be applied only if the principal one is not, whether such a subsidiary nature is specifically declared or when it may tacitly be deduced.

**3.** The most ample or complex penal provision shall absorb those that punish offences committed therein.

**4.** Failing the preceding criteria, the most serious criminal provision shall exclude those punishing the act with a minor punishment.

## Article 9

The provisions of this Title shall be applied to the felonies and misdemeanours that are punishable by special laws. The remaining provisions of this Code shall be applied to supplement everything not specifically foreseen therein.

**TITLE II**

**On persons criminally responsible for felonies and misdemeanours**

**Article 27**

Those criminally responsible for felonies and misdemeanours are the principals and their accessories.

**Article 28**

Principals are those who perpetrate the act themselves, alone, jointly, or by means of another used to aid and abet.

The following shall also be deemed principals:

a) Whoever directly induces another or others to commit a crime;

b) Whoever co-operates in the commission thereof by an act without which a crime could not have been committed.

**Article 29**

Accessories are those who, not being included in the preceding Article, co-operate in carrying out the offence with prior or simultaneous acts.

**Article 30**

**1.** In felonies and misdemeanours that are committed using media or supports of mechanical diffusion, neither the accessories, nor those who have personally or actually favoured these shall be held criminally accountable.

**2.** The principals to which Article 28 refers shall be held accountable in a progressive, excluding and subsidiary manner, in the following order:

  1º. Those who materially drafted the text or produced the sign concerned, and those who induced others to perpetrate the act;

  2º. The directors of the publication or programme in which it is disseminated;

  3º. The directors of the printing, broadcasting or distribution company;

  4º. The directors of the recording, playing or printing company;

**3.** When, for any reason other than extinction of criminal accountability, or for declaration of contempt of court or not residing in Spain, any of the persons included in any of the Sub-Sections of the preceding Section may be prosecuted, proceedings shall be taken against those mentioned in the Sub-Section immediately following.

**Article 31**

**1.** Whoever acts as *de facto* or *de jure* administrator of a legal person, or on behalf or in legal or voluntary representation of another, shall be held personally accountable, even though he does not fulfil the conditions, qualities or relationship that the relevant definition of felony or misdemeanour requires to be an active subject thereof, if such circumstances concur in the entity or person in whose name or on behalf of whom he so acts.

**2.** (Suppressed)

**Article 31 bis**

**1.** In the cases foreseen in this Code, legal persons shall be held criminally accountable for the felonies committed in their name or on their behalf, and to their benefit, by their legal representatives and *de facto* or *de jure* administrators.

In the same cases, legal persons shall also be criminally accountable for the felonies committed when perpetrating the corporate activities and on account and to the advantage thereof, who, these being committed by the natural persons mentioned in the preceding Section, were able to perpetrate the acts as due control was not exercised over them in view of the specific circumstances of the case.

**2.** The criminal accountability of legal persons shall be applicable whenever there is record of a felony being committed that must have been committed by the person who holds office or perpetrates the duties referred to in the preceding Section, even when the specific natural person responsible has not been individually identified, or it has not been possible to prosecute that person. When fines are handed down to both as a consequence of these acts, the Judges or Courts of Law shall modulate the respective amounts, so the resulting sum is not disproportionate in relation to the seriousness of such acts.

**3.** Concurrence, in the persons who have materially perpetrated the acts or those who have made these possible due to not having exercised due control, of circumstances that affect the culpability of the accused or aggravate his responsibility, or the fact that those persons have died or have escaped the action of justice, shall not exclude or modify the criminal accountability of legal persons, without prejudice to what is set forth in the following Section.

**4.** Circumstances that mitigate criminal accountability of legal persons may only de deemed to concur when, after the felony is committed, they have carried out the following activities through their legal representatives:

  a) Having proceeded, prior to having knowledge of judicial proceedings being brought against them, to confess the felonies committed by them to the authorities;

  b) Having collaborated in investigation of the events, providing evidence, at any moment of the proceedings, that are new and decisive to clarify the criminal liabilities arising from the events;

  c) Having proceeded at any time during the proceedings, and prior to the trial itself, to repair or decrease the damage caused by the felony;

  d) Having established, prior to the trial itself, measures that are effective to prevent and discover felonies that might be committed in the future using the means or under the coverage of the legal person.

**5.** The provisions related to criminal accountability of legal persons shall not be applicable to the State, to the territorial and institutional Public Administrations, to the Regulatory Bodies, the Public Agencies and Corporate Entities, to political parties and Trade Unions, to organisations under Public International Law, or to others that exercise public powers of sovereignty, administration, or in the case of State Mercantile Companies that implement public policies or provide services of general economic interest.

In these cases, the jurisdictional bodies may effect declaration of criminal accountability in the case of these noting that it is a law-based scheme created by the promoters, founders, administrators or representatives in order to avoid eventual criminal accountability.

## TITLE VII

### On expiration of criminal accountability and its effects

CHAPTER I

### On the causes that extinguish criminal accountability

### Article 130

**1.** Criminal accountability is extinguished:

    **1.** On death of the convict.

    **2.** When the sentence is fully served.

    **3.** By definitive remission of the sentence, as set forth in Article 85.2 of this Code.

    **4.** By the granting of the royal pardon.

    **5.** When forgiven by the victim, when the Law foresees this. Such forgiveness must be granted specifically before the sentence is handed down, to which end the Judge or Court of Law sentencing must hear the victim of the offence before handing it down.

    In felonies or misdemeanours against minors or the incapacitated, Judges or Courts of Law, having heard the Public Prosecutor, may reject the effectiveness of the forgiveness granted by their representatives, ordering proceedings to continue, with intervention by the Public Prosecutor, or the serving of the sentence.

    In order to reject the forgiveness to which the preceding Section refers, the Judge or Court of Law must hear the representative of the minor or incapacitated person again.

    **6.** By prescription of the offence.

    **7.** By prescription of the sentence or the security measure.

**2.** Transformation, merger, absorption or split of a legal person does not extinguish its criminal accountability, which shall be transferred to the firm or firms into which it is transformed, is merged or absorbed, and it shall extend to the firm or firms arising from the split. The Judge or Court of Law may order the punishment to be transferred to the legal person in view of the proportion that the legal person originally accountable for the offence has therein.

Criminal accountability is not extinguished by concealed or merely apparent dissolution of the legal person. It shall be deemed, in all cases, that there is concealed or merely apparent dissolution of the legal person when its economic activity continues and it maintains a substantial identity of clients, providers and employees, or the most important part thereof.

### Article 131

**1.** Felonies prescribe:

After twenty years, when the maximum punishment set for the offence is imprisonment of fifteen or more years.

After fifteen, when the maximum punishment set by Law is barring for more than ten years, or imprisonment for more than ten and less than fifteen years.

After ten, when the maximum punishment set by Law is imprisonment or barring for more than five years and does not exceed ten.

After five, all other felonies, except those of slander and defamation, which shall prescribe in one year.

**2.** Misdemeanours prescribe in six months.

**3.** When the punishment stated in the Law is a compound one, that requiring the longest time to prescription shall be considered to apply the rules considered in this Article.

**4.** Crimes against humanity and of genocide and offences against persons and assets protected in the case of armed conflict, except those punished under Article 614, shall not have a statute of limitations.

Nor shall offences of terrorism have a statute of limitations, if they have caused the death of a person.

**5.** In cases of concurrent or related felonies, the term for prescription shall be that of the most serious offence.

### Article 132

**1.** The terms foreseen in the preceding Article these shall be calculated from the day on which the punishable crime was committed. In cases of continued offence, permanent offence, as well as offences requiring assiduity, those terms shall be calculated, respectively, from the day on which the last infraction took place, from when the unlawful situation or the conduct ceased.

In attempted homicide and offences of non-consensual abortion, injury, against liberty, of tortures and against moral integrity, sexual freedom and indemnity, privacy, the right to personal dignity and the inviolability of the dwelling, when the victim is a minor, the terms shall be calculated from the day on which he has come of age, and if he were to die before coming of age, as of the date of his death.

**2.** Prescription shall be interrupted, leaving the time elapsed without effect, when proceedings are brought against the person deemed to be responsible for the felony or misdemeanour, and shall begin to elapse again from the proceedings halting or ending without sentencing, pursuant to the following rules:

  **1.** Proceedings shall be deemed as being conducted against a specific person from the moment when, at the suit's inception, or thereafter, a reasoned judicial resolution is handed down attributing him the presumed participation in an event that might constitute a felony or misdemeanour.

  **2.** Notwithstanding the foregoing, filing a suit or the accusation brought before a judicial body, in which a specific person is charged with presumed participation in an act that might constitute a felony or misdemeanour, shall suspend calculation of the prescription for a maximum term of six months in the case of an felony and for two months in the case of a misdemeanour, to be counted from the very date the suit is filed or the accusation brought.

  If any of the court resolutions mentioned in the preceding Section is issued against the accused or defendant within that term, or against any other person involved in the events, the interruption of prescription shall be deemed to have taken place retroactively, for all purposes, on the date of the suit or accusation being filed.

  On the contrary, calculation of the term of prescription shall continue from the date of the suit or accusation being filed if, within the term of six or two months, in the respective cases of felony or misdemeanour, a final court order of non-admission of the suit or accusation is handed down or the Court decides not to proceed against the person sued or accused. Continuation of the calculation shall also take place if the Investigating Judge does not adopt any of the resolutions foreseen in this Article within those terms.

  **3.** For the purposes of this Article, the person against whom the proceedings are filed must be sufficiently determined in the court order, either by direct identification or by data that allow subsequent specification of that identification within the organisation or group of persons charged with the act.

## Article 133

**1.** Penalties imposed by final judgement prescribe:

In thirty years, those of imprisonment for more than twenty years.

In twenty- five years, those of imprisonment of fifteen years or more, without exceeding twenty.

In twenty, those of barring for more than ten years and those of imprisonment for more than ten and less than fifteen.

In fifteen, those of barring for more than six years and that do not exceed ten, and those of imprisonment for more than five years and that do not exceed ten.

After ten, the remaining serious penalties.

After five, less serious penalties.

After one year, minor penalties.

**2.** Penalties imposed for crimes against humanity and of genocide and for offences against protected persons and assets in the event of armed conflict, except those punished under Article 614, shall not have a the statute of limitations.

Nor shall penalties for offences of terrorism have a statute of limitations, if the latter have caused the death of a person.

## Article 134

The time until prescription of the punishment shall be calculated from the date of the final judgement, or from breach of the sentence, if it had begun to be served.

## Article 135

**1.** Security measures shall prescribe in ten years, if depriving of freedom for a term exceeding three years, and in five years if depriving of freedom for a term equal to or less than three years, or if they have another content.

**2.** The time for prescription shall be calculated from the day on which the resolution imposing the measure became final or, when consecutively served, from when it should have begun to be served.

**3.** Should fulfilment of a security measure be later than that of a punishment, the term shall be calculated from extinction of the latter.

CHAPTER II

**On cancellation of criminal records**

## Article 136

**1.** Convicts whose criminal accountability has been extinguished shall be entitled to obtain cancellation of their criminal record by the Ministry of Justice, on its own motion or at the request of the party, following report by the Judge or Court of Law sentencing.

**2.** The following shall be indispensable requisites for this right to be recognised:

## TITLE XIII

### Felonies against property and against social-economic order

CHAPTER I

### On larceny

### Article 234

Whoever, for profit, were to take moveable property pertaining to others without the permission of their owner, shall be convicted of larceny, with a sentence of imprisonment from six to eighteen months if the amount of what was stolen exceeds four hundred euros.

Whoever perpetrates the action described in Section 1 of Article 623 of this Code three times within the term of one year, as long as the accumulated amount of the offences exceeds the minimum figure set for the felony, shall be punished with the same penalty.

### Article 235

Larceny shall be punished with a sentence of imprisonment from one to three years:

**1.** When items of artistic, historic, cultural or society value are stolen;

**2.** When the items concerned are a primary necessity or those assigned to a public service, whenever their theft causes serious disturbance thereof or shortage of supply;

**3.** When especially serious, in view of the value of the items stolen, or when particularly major damage is caused;

**4.** When the larceny causes the victim or his family serious financial distress, or when perpetrated taking advantage of the personal circumstances of the victim;

**5.** When using children under fourteen years of age to commit the offence.

### Article 236

Whoever, being the owner of an item of moveable property or acting with the owner's consent, takes it from whoever lawfully has it in his possession, to his detriment or that of a third party, when the value thereof exceeds four hundred euros, shall be punished with a fine of three to twelve months.

CHAPTER II

### On robbery and burglary

### Article 237

Those who seize moveable assets pertaining to others for profit, using forcible means to access the place where these are located, or violence or intimidation of persons, shall be convicted of burglary or robbery, respectively.

CHAPTER II

**On felonies against historical heritage assets**

### Article 321

Those who demolish or seriously alter buildings uniquely protected due to their historic, artistic, cultural or monumental interest shall be punished with imprisonment of six months to three years, a fine of twelve to twenty-four months and, in all cases, special barring from profession or trade for a term from one to five years.

In any event, the Judges or Courts of Law, on reasoned grounds, may order reconstruction or restoration of the works at the expense of the doer, without prejudice to the compensations due to third parties in good faith.

### Article 322

**1.** The authority or public officer who, being aware of the injustice thereof, has favourably reported on projects to demolish or alter uniquely protected buildings, shall be punished, in addition to the punishment established in Article 404 of this Code, with that of imprisonment for six months to two years or a fine of twelve to twenty- four months.

**2.** The same penalties shall be applied to the authority or public officer who, himself or as a member of a collegiate body has resolved or voted in favour of the granting thereof despite being aware of the injustice thereof.

### Article 323

A sentence of imprisonment from one to three years and a fine of twelve to twenty- four months shall be imposed on whoever causes damage to an archive, registry, museum, library, teaching centre, scientific laboratory, similar institution or to assets of historical artistic, scientific, cultural or monumental value, as well as to archaeological sites.

In these cases, the Judges or Courts of Law may order, at the expense of the doer of the damage, adoption of measures aimed at restoration of the damaged asset to the extent possible.

### Article 324

Whoever, due to serious negligence, causes damage, in an amount exceeding four hundred euros, to an archive, registry, museum, library, teaching centre, scientific laboratory, similar institution or to assets of historical, artistic, scientific, cultural or monumental value, as well as to archaeological sites, shall be punished with a penalty of a fine from three to eighteen months, in view of the extent thereof.

CHAPTER III

**On felonies against natural resources and the environment**

### Article 325

Whoever, breaking the laws or other provisions of a general nature that protect the environment, directly or indirectly causes or makes emissions, spillages, radiation, extractions or excavations, filling with earth, noises, vibrations, injections or deposits, in the atmosphere, the ground, the subsoil or the surface water, ground water or sea water, including the high seas, even those affecting cross border spaces, as well as the water catchment basins, that may seriously damage the balance of the natural systems shall be punished with a sentence of imprisonment from two

CHAPTER II

**On omission of the duties to prevent felonies or to promote their persecution**

### Article 450

**1.** Whoever is able, by his immediate intervention and without risk to himself or another, and does not prevent a felony being committed that affects the life, integrity or health, freedom or sexual freedom of persons, shall be punished with a sentence of imprisonment of six months to two years if the offence is against life, and that of a fine from six to twenty- four months in the other cases, except if the offence not prevented is subject to an equal or lower punishment, in which case a lower degree punishment than that for the actual felony shall be imposed.

**2.** The same penalties shall be incurred by whoever, being able to do so, does not resort to the authority or its agents in order for them to prevent a felony of those foreseen in the preceding Section when informed that it is about to be, or is being committed.

CHAPTER III

**On covering up**

### Article 451

Whoever has knowledge of a felony committed and, without having intervened in it as a principal, subsequently intervenes in its execution, in any of the following manners, shall be punished with a sentence of imprisonment of six months to three years:

**1.** Aiding the principals or accomplices to benefit from the gains, product or price of the offence, without intending personal profit;

**2.** Hiding, altering or destroying the evidence, effects or instruments of an offence, to prevent it being discovered;

**3.** Aiding the suspected criminals to avoid investigation by the authority or its agents, or to escape search or capture, whenever any of the following circumstances concur:

  a) That the act covered up amounts to treason, regicide, the homicide of any of the King's ascendants or descendents, of the Queen Consort or the Consort of the Queen, the Regent or any other member of the Regency, of the Heir to the Throne, genocide, crimes against humanity, crimes against protected persons and assets in the event of armed conflict, rebellion, terrorism, homicide, piracy, trafficking in human beings or trafficking in human organs;

  b) When the person abetting has acted in abuse of his public functions. In this case, in addition to the punishment of custodial sentence, that of special barring from public employment and office for a term of two to four years shall be imposed if the felony concealed is less serious, and of absolute barring for a term from six to twelve years if it is serious.

### Article 452

Under no circumstances whatsoever may a sentence of imprisonment be handed down that exceeds that set for the felony covered up. Should the latter be subject to a punishment of another nature, the sentence of imprisonment shall be substituted by that of a fine from six to twenty- four months, except if the felony concealed is assigned a punishment equal to or lower than this, in which case the offender shall have the punishment for the felony in its lower half imposed.

3. With imprisonment from eight to fifteen years, if they were to subject the group or any of its members to conditions of existence that endanger their life or seriously affect their health, or when any of the injuries foreseen in Article 150 are caused;

4. With the same punishment, if forcible transportation of the group or its members are carried out, if they adopt any measure aimed at preventing their lifestyle or procreation, or if they forcibly transfer individuals from one group to another;

5. With imprisonment from four to eight years, if they were to cause any injury other than that stated in Sub-Sections 2 and 3 of this Section.

**2.** Diffusion by any means of ideas or doctrines that deny or justify the crimes defined in the preceding Section of this Article, or that aim to reinstate regimes or institutions that protect practices that generate these shall be punished with a sentence of imprisonment from one to two years.

CHAPTER II BIS

**On crimes against humanity**

**Article 607 bis**

**1.** Conviction for crimes against humanity shall befall whoever commits the acts foreseen in the following Section as part of a widespread or systematic attack on the civil population or against part thereof.

In all cases, committing such acts shall be deemed a crime against humanity when:

1. Due to the victim pertaining to a group or community persecuted for political, racial, national, ethnic, cultural, religious or another kind of reasons, disability, or other motives universally recognised as unacceptable under International Law;

2. In the context of an institutionalised regime of systematic oppression and domination of a racial group over one or more racial groups and with the intention of maintaining such a regime.

**2.** Those convicted of crimes against humanity shall be punished:

1. With a sentence of imprisonment from fifteen to twenty years if they cause the death of any person. A punishment higher in one degree shall be imposed if any of the circumstances foreseen in Article 139 concur;

2. With a sentence of imprisonment from twelve to fifteen years if they commit rape, and from four to six years imprisonment if the act were to consist of any other type of sexual assault;

3. With a sentence of imprisonment from twelve to fifteen years if any of the injuries of Article 149 were to take place and from eight to twelve years imprisonment if persons are subjected to conditions of existence that endanger their life or seriously affect their health, or when they are caused any of the injuries foreseen in Article 150. A sentence of imprisonment from four to eight years shall be applied if they commit any of the injuries of Article 147;

4. With a sentence of imprisonment from eight to twelve years if they deport or forcibly transport one or more persons from one State or place to another, by expulsion or other acts of coercion without authorised reasons;

5. With a sentence of imprisonment from six to eight years if they were to forcibly make pregnant any woman in order to modify the ethnic composition of the population, without prejudice to the relevant punishment, as appropriate, for other felonies;

6. With a sentence of imprisonment from twelve to fifteen years when they detain any person and refuse to recognise that custodial sentence or to report on the situation or whereabouts of the person arrested;

**7.** With a sentence of imprisonment from eight to twelve years if they were to arrest a person, depriving him of his liberty, with breach of the international rules on arrest.

The punishment shall be imposed at a lower degree when the arrest lasts less than fifteen days;

**8.** With the punishment from four to eight years imprisonment if they commit serious torture of persons they have under their custody or control and of imprisonment from two to six years if less serious. For the purposes of this Article, torture shall be construed as submitting a person to physical or mental suffering. The punishment foreseen in this Sub-Section shall be imposed without prejudice to the relevant penalties, as appropriate, for the violations of other rights of the victim;

**9.** With a sentence of imprisonment from four to eight years if they commit any of the conducts related to prostitution defined in Article 187.1, and with that of six to eight years in the cases foreseen in Article 188.1. The punishment shall be imposed from six to eight years on whoever transports persons from one place to another with the intent to sexually exploit them, using violence, intimidation or deceit, or abusing a situation of superiority or need or the vulnerability of the victim. When the conduct foreseen in the preceding Section and in Article 188.1 is committed against minors or the incapacitated, the higher degree penalties shall be imposed;

**10.** With a sentence of imprisonment from four to eight years if any person is subjected to slavery or kept in servitude. The punishment shall be applied without prejudice to the appropriate ones for the specific violations committed against the rights of persons. Slavery shall be construed as the situation of a person over whom another exercises, albeit *de facto*, all and some of the attributes of the right of property, such as buying, selling, lending or exchanging such person.

CHAPTER III

**On crimes against protected persons and assets in the event of armed conflict**

**Article 608**

For the purposes of this Chapter, the following are intended as protected persons:

**1.** The wounded, the sick or shipwrecked, and the medical or religious personnel protected by the First and Second Geneva Conventions dated on 12th August 1949, or the First Additional Protocol dated on 8th June 1977;

**2.** Prisoners of war protected by the Third Geneva Convention dated on 12th August 1949 or the First Additional Protocol dated on 8th June 1977;

**3.** The civilian population and individual civilian protected by the Fourth Geneva Convention dated on 12th August 1949 and by the First Additional Protocol dated on 8th June 1977;

**4.** Non-combatants and the personnel of the Protecting Power and its Substitute protected by the Geneva Conventions dated on 12th August 1949 or by the First Additional Protocol dated on 8th June 1977.

**5.** Parliamentarians and the persons accompanying them, protected by the Second Convention of The Hague dated on 29th July 1899;

**6.** The United Nations and associated personnel, protected by the Convention on the Safety of United Nations and Associated Personnel, dated on 9th  December 1994;

**7.** Any others with that status by virtue of the Second Additional Protocol dated 8th June 1977, or any other international treaties to which Spain is a party.

**Article 609**

Whoever, during an armed conflict, physically abuses or seriously endangers the life, health or integrity of any protected persona, subjects him to torture or inhumane treatment, including biological experiments, causes him

serious suffering or subjects him to any medical act that is not in keeping with his state of health, nor according to the generally recognised medical standards that the Party responsible would apply to its own nationals not detained under similar medical circumstances, shall be punished with a sentence of imprisonment from four to eight years, without prejudice to the punishment that might be appropriate for the damaging results caused.

## Article 610

Whoever, during an armed conflict, uses or orders methods or means of combat that are prohibited or intended to cause unnecessary suffering or superfluous harm, as well as those conceived to cause, or that can be reasonably be expected to cause extensive, lasting and serious damage to the natural environment, compromising the health or survival of the population, or who orders all-out war, shall be punished with a sentence of imprisonment from ten to fifteen years, without prejudice to the relevant punishment for the results caused.

## Article 611

Whoever perpetrates the following acts during an armed conflict shall be punished with a sentence of imprisonment from ten to fifteen years, without prejudice to the relevant punishment for the results caused:

**1.** Conducts or orders indiscriminate or excessive attacks or makes the civil population the target of attacks, retaliation or acts or threats of violence, the main purpose of which is to strike fear therein;.

**2.** Destroys or damages, breaching the rules of International Law applicable to armed conflicts, the non-military ships or aircraft of an adversary or neutral party, unnecessarily and without allowing time or without adopting the necessary measures to provide for the safety of persons and conservation of the ship's papers;

**3.** Forces a prisoner of war or a civilian to serve, in any way, in the Armed Forces of the adversary, or deprives him of his right to a due and impartial process of law;

**4.** Deports, forcibly transports, takes hostage or unlawfully detains or confines any protected person or uses him to protect certain military locations, zones or forces from an attack by the adversary;

**5.** Transports and settles population from the side occupying, directly or indirectly, in the occupied territory, to reside there permanently;

**6.** Perpetrates, orders the carrying out or maintains, with regard to any protected person, practices of racial segregation and other inhumane and degrading practices based on other distinctions of an unfavourable nature, that amount to an outrage against personal dignity;

**7.** Prevents or delays, without reason, the release or repatriation of prisoners of war or civilians;

**8.** Declares the rights and actions by the nationals of the adversary to be abolished, suspended or inadmissible before a Judge or Court of Law;

**9.** Attacks the sexual freedom of a protected person by committing acts of rape, sexual slavery, induced or forced prostitution, forced pregnancy, forced sterilisation or any other kind of sexual assault.

## Article 612

Whoever perpetrates the following acts during an armed conflict shall be punished with a sentence of imprisonment of three to seven years, without prejudice to the relevant punishment for the results caused:

**1.** Knowingly violates the protection due to hospitals, installations, materiel, units and means for health transport, prisoner camps, sanitary and safety zones and locations, neutralised zones, locations for internment of the civil population, undefended locations and demilitarised zones, made known by the appropriate and distinctive signs;

**2.** Acts with violence against the medical or religious staff or those forming medical missions or aid organisations, or against the personnel authorised to use then signs and distinctive signals, established by the Geneva Conventions, pursuant to International Law;

**3.** Severely abuses, deprives or does not ensure the essential food or necessary medical assistance to any protected person, or subjects him to humiliating or degrading treatment, fails to inform him of his situation without justified delay, and in a comprehensible manner, imposes collective punishment for individual acts, or infringes the requisites for accommodation of women and families, or for special of women and children established in the international treaties to which Spain is a party, and in particular, who recruits or enrols persons under the age of eighteen or uses them to participate directly in the hostilities;

**4.** Unduly uses the protective or distinctive signs, emblems or signals established and recognised in the international treaties to which Spain is a party, especially the distinctive signs of the Red Cross, of the Red Crescent and the Red Crystal.

**5.** Unduly or perfidiously uses a flag, uniform, insignia or distinctive emblem of neutral States, of the United Nations or other States that are not parties to the conflict, or of the adversaries, during attacks or to cover, favour, protect or hinder military operations, except in the cases specifically foreseen in the international treaties to which Spain is a party;

**6.** Unduly or perfidiously uses the flag of parley or surrender to attack the inviolability or unduly retain the negotiator or any of the persons accompanying him, personnel of the Protecting Power or its Substitute, or a member of an International Fact Finding Commission;

**7.** Strips a corpse, the wounded, sick, shipwrecked, prisoner of war or interned civilian of his belongings;

**8.** Intentionally starves the civilian population as a means of warfare, depriving it of the indispensable resources for survival, including the act of randomly obstructing aid supplies conducted pursuant to the Geneva Conventions and its Additional Protocols;

**9.** Violates a ceasefire, armistice, capitulation or another arrangement made with the adversary;

**10.** Intentionally attacks any member of the United Nations and associated personnel, or that participating in a peace or humanitarian aid mission pursuant to the United Nations Charter, as long as they are entitled to the protection granted to civilians or civil objects, pursuant to International Law on armed conflicts, or threaten them with such an attack to oblige a natural or legal person to carry out or abstain from carrying out any act.

## Article 613

**1.** Whoever perpetrates or orders any of the following actions during an armed conflict shall be punished with a sentence of imprisonment from four to six years:

a) Attacks or targets cultural property or places of worship that are the cultural or spiritual heritage of persons as an object of reprisals or acts of hostility, as long as those assets or locations are not in the immediate vicinity of a military objective and are not used to support the military effort by the adversary and are duly marked;

b) Makes undue use of the cultural property or places of worship referred to in Sub-Section a) to support military action;

c) Appropriates on a large scale, robs, sacks or perpetrates acts of vandalism against the cultural property or places of worship referred to in Sub-Section a);

d) Attacks or makes assets of a civil nature of the adversary a target for reprisals or acts of hostility, when this does not provide, under the circumstances of the case, a defined military advantage, or when those assets do not contribute effectively to the military action of the adversary;

e) Attacks, destroys, removes or puts assets that are indispensable for survival of the civilian population out of service, except if the adversary uses those assets to directly support military action, or exclusively as a means of subsistence for members of its armed forces;

## TITLE V

### Common provisions for misdemeanours

### Article 638

Judges and Courts of Law shall proceed to apply the penalties of this Book pursuant to their prudent criteria, within the limits of each one, in view of the circumstances of the case and of the offender, without being bound by the rules of Articles 61 to 72 of this Code.

### Article 639

Misdemeanours that can only be prosecuted at the request of the person offended may also be reported by the Public Prosecutor if the victim is a minor, incapacitated or a handicapped person.

The absence of a report shall not stop preventive proceedings being conducted.

In these misdemeanours, forgiveness by the victim or his legal representative shall extinguish the criminal action or the punishment imposed, except as provided in Sub-Section Two of Section 4 of Article 130.

### Additional Provision One

When a person is declared exempt of criminal accountability due to any of the causes foreseen in Sections 1 and 3 of Article 20 of this Code arising, the Public Prosecutor shall request, when appropriate, for declaration of incapacity before the Civil Jurisdiction, except if this has already been previously resolved and, when appropriate, internment pursuant to the civil legislation.

### Additional Provision Two

When a governmental authority has knowledge of the existence of a minor or incapacitated person who is in a state of prostitution, whether voluntary or otherwise, but with the complicity of the persons exercising family, ethical-social or *de facto* authority over him, or who is lacking such, or should these have abandoned and not take charge of custody of him, it shall immediately report this to the public institution charged with protection of minors in the relevant territory, as well as to the Public Prosecutor, for them to act within their respective domains.

Likewise, in the cases in which the Judge or Court of Law orders special barring from the exercise of parental rights, fostership, safekeeping, guardianship or care, or deprivation of parental rights, this shall immediately be notified to the public institution charged with protection of minors in the relevant territory, as well as to the Public Prosecutor, for them to act within their respective domains.

### Additional Provision Three

When, by report or claims by the offended part, criminal proceedings are commenced acts constituting felonies foreseen and punishable under Articles 267 and 621 of this Code, all other parties affected by those acts that consider themselves victims may appear in the criminal proceedings to be deemed a party thereto, whatever the amount of damages they claim.

### Transitional Provision One

The felonies and misdemeanours committed up to the day this Code came into force shall be judged pursuant to the legal text and other special criminal laws that are hereby repealed. Once this Code comes into force, should the provisions hereof be more favourable to the convict, these shall be applied.

**Transitional Provision Two**

In order to determine which law is most favourable, the relevant punishment for the act judged through application of the complete rules of one Code or another shall be taken into account. The provisions on redemption of penalties through work shall only be applicable to all convicts pursuant to the Code hereby repealed and they may not be taken advantage of by those to whom the provisions of this Code apply. The convict shall be heard in all cases.

**Transitional Provision Three**

Within the shortest possible time following publication of this new Criminal Code, the Directors of penitentiary establishments shall submit the Judges or Courts of Law dealing with the enforcement the list of convicts interned in the Centre they direct and the provisional settlement of the sentence being served, stating the days the convict has redeemed for work and those who may redeem them in the future, as appropriate, pursuant to Article 100 of the repealed Criminal Code and complementary provisions.

**Transitional Provision Four**

The Judges or Courts of Law mentioned in the preceding Provision shall proceed, once they have received the preceding settlement of conviction, to notify the Public Prosecutor, in order for him to report on whether it is appropriate to review the sentence and, in such an event, the terms of the review. Once the Public Prosecutor has given his report, they shall also proceed to hear the convict, notifying him of the terms of the review proposed, as well as informing the Solicitor who defended him at the trial, in order for him to state what he considers most favourable for the convict.

**Transitional Provision Five**

The General Council of the Judiciary, within the scope of the powers it is attributed by Article 98 of the Organic Act on the Judiciary, may appoint one or several of the Criminal Courts of Law or Sections of the High Provincial Courts exclusively to devote themselves to enforcement of criminal sentences to review the final judgements handed down before this Code came into force.

Those Judges or Courts of Law shall proceed to review final judgements and those sentences the convict is effectively serving, applying the most favourable provision construed strictly without taking into account judicial discretion possible in handing down sentence. In custodial sentences, this Code shall not be deemed more favourable when the term of the prior sentence imposed due to the act and its circumstances may also be imposed pursuant to this new Code. Exceptionally, if this Code establishes provisions for a non-custodial punishment for the same offence; in which case the sentence must be reviewed.

Sentences shall not be reviewed in which fulfilment of the punishment is suspended, without prejudice to doing so in the event of the suspension being revoked and prior to proceeding to effective fulfilment of the punishment suspended. The same rule shall be applied if the convict is on probation.

Nor shall sentences be reviewed in which, pursuant to the Code repealed and the new one, only the punishment of a fine is applicable.

**Transitional Provision Six**

Sentences shall not be reviewed in which the punishment has been executed or suspended, although other pronouncements of the ruling may be pending enforcement, as well as those that have been fully enforced, without prejudice to the fact that the Judge or Court of Law which has to take them into account in the future for the purposes of recidivism must previously examine whether the act penalised therein has ceased to be a felony or might attract a lower punishment than that imposed under this Code.

In cases of partial pardon, the sentences shall not be reviewed when the resulting punishment the convict is serving falls within a lower applicable framework established in this new Code.

**Transitional Provision Seven**

For the purposes of appreciating the aggravating circumstance of recidivism, the same Title of this Code shall be construed to include the felonies foreseen in the Code that is repealed and that have the same name and affect the legal right in the same way.

**Transitional Provision Eight**

In cases in which the punishment that may be applicable by application of this Code is one of weekend arrest, it shall be deemed, in order to value its comparative severity, that the duration of the custodial sentence be equivalent to two days for each weekend that is to be imposed. Should the punishment be one of a fine, it shall be deemed that each day of substitute detention that has been imposed, or that might be imposed by the Judge or Court of Law under the Code repealed shall be equivalent to two daily quotas of the fine under this Code.

**Transitional Provision Nine**

In the sentences handed down under the legislation repealed and that are not final due to an appeal being pending, the following rules shall be observed once the period of *vacatio legis* has elapsed:

a) In the case of appeal, the parties may invoke and the Court of Law shall apply the provisions of the new Code on its own motion, when they are more favourable to the convict;

b) In the case of a cassation appeal, even when not yet formalised, the appellant may define the legal offences based on the provisions of this new Code;

c) If, having filed the cassation appeal, this is being substantiated, this shall be returned to the appellant, on the Court's own motion or at the request of the party, for the term of eight days, in order to adapt the motives for cassation alleged to the provisions of this new Code, and the parties concerned, the Public Prosecutor and Magistrate presiding shall given time to scrutinise the appeal thus amended, continuing the formalities in the legal manner thereafter.

**Transitional Provision Ten**

Security measures that are under execution or pending, ordered pursuant to the Dangerousness and Social Reinstatement Act, or in application of Sections 1 and 3 of Article 8 or number 1 of Article 9 on the Criminal Code that is hereby repealed, shall be reviewed pursuant to the provisions of Title IV of Book I of this Code and the preceding rules.

In cases in which the maximum duration of the measure foreseen in this Code is lower than the time effectively served by those subject to it, the Judge or Court of Law shall declare that fulfilment completed and, if a custodial measure, order the inmate to be released immediately.

**Transitional Provision Eleven**

**1.** When special criminal or procedural laws are to be applied by the ordinary jurisdiction, the following substitutions are deemed to take place:

a) The punishment of major incarceration, for that of a custodial sentence from fifteen to twenty years, with the clause of this being raised to a sentence of imprisonment from twenty to twenty- five years when two or more aggravating circumstances concur with the offence.

b) The punishment of minor incarceration, for that of a custodial sentence from eight to fifteen years.

c) The punishment of major imprisonment, for that of a custodial sentence from three to eight years.

d) The punishment of minor imprisonment, for that of a custodial sentence from six months to three years.

e) The punishment of major detention, for that of detention from seven to fifteen weekends.

f) The punishment by fine imposed in an amount exceeding one hundred thousand pesetas set for acts punished as a felony, for that of fine of three to ten months.

g) The punishment by fine imposed in an amount less than one hundred thousand pesetas set for acts punished as a felony, for that of a fine from two to three months.

h) The punishment by fine imposed for criminal acts in an amount proportional to the gains obtained or the damage caused shall continue to be applied proportionally.

i) The punishment of minor detention, for that of detention from one to six weekends.

j) The punishment by fine set for acts defined as a misdemeanour, for a fine from one to sixty days.

k) The penalties depriving the convict of rights shall be imposed pursuant to the provisions and for the terms set in this Code.

l) Any other punishment included among those suppressed by this Code, for the punishment or security measure the Judge or Court of Law deems more similar and of equal or lower severity. Should such not exist, or if all are more serious, their imposition shall be lifted.

**2.** In the event of doubt, the convict shall be heard.

**Transitional Provision Twelve**

(Repealed)

**Sole Repealing Provision**

**1.** The following are hereby repealed:

a) The consolidated text of the Criminal Code published by Decree 3096/1973, of 14th September, pursuant to the Act 44/1971, dated on 15th November, with its subsequent amendments, except for Articles 8.2, 9.3, Rule 1 of Article 20 with regard to Section 2 of Article 8, Section 2 of Article 22, 65, 417 bis and Additional Provisions One and Two of Organic Act 3/1989, dated 21st June;

b) The Act, dated 17th March 1908, on parole, with its subsequent amendments and complementary provisions;

c) Act 16/1970, dated 4th August, on Social Dangerousness and Reinstatement, with its subsequent amendments and complementary provisions;

d) The Act dated 26th July 1878, on prohibition of dangerous practices carried out by minors;

e) The substantive criminal provisions contained in the following special laws:

Act dated 19th September 1896, for protection of insectivorous birds;

Act dated 16th May 1902, on industrial property;

Act dated 23rd July 1903, on begging by minors;

Act dated 20th February 1942, on river fishing;

Act dated 31st December 1946, on fishing with explosives;

Act 1/1970, dated 4th April, on hunting. The felonies and misdemeanours foreseen in that Act, not contained in this Code, shall be deemed very serious administrative offences, being punished with a fine of fifty thousand to five hundred thousand pesetas and withdrawal of the hunting licence, or entitlement to obtain one, for a term from two to five years.

f) The following provisions:

Article 256 of the Penitentiary Regulations, approved by Royal Decree 1201/1981, of 8th  May;

Articles 65 to 73 of the Prisons Services Regulations, approved by Decree of  2nd  February 1956;

Articles 84 to 90 F) the Act 25/1964, dated 29th April, on Nuclear Energy;

Article 54 of Act 33/1971, dated 21st July, on Emigration;

Section 2 of Article 24 of Organic Act 2/1981, dated 6th April, on the  Ombudsman;

Article 2 of Organic Act 8/1984, dated 26th December, on the regime of appeals in the case of conscientious objection and its penal regime;

Article 4 of Organic Act 5/1984, of 24th May, on Appearance before the  Investigation Commissions of Congress of Deputies, the Senate or both  Chambers;

Articles 29 and 49 of Act 209/1964, dated 24th December, Penal and  Procedural on Aviation;

The terms "active and" of Article 137 of Organic Act 5/1985, dated 19th  June, on the General Electoral Regime;

Article 6 of the Act 57/1968, dated 27th July, on Receipt of Moneys Advanced for the Building and Sale of Homes.

**2.** All provisions that are incompatible with the provisions of this Code are also hereby repealed.

**Final Provision One**

The Criminal Procedure Act is hereby amended and shall henceforth be drafted as follows:

"Article 14. Three. For the cognisance and resolution of trials over less serious felonies, as well as for misdemeanours, whether or not they are incidental, with which the principals of those felonies or others may be charged, when commission of the misdemeanour or its evidence is related thereto, the Penal Judge of the district where the felony was committed, or the Central Penal Judge where this falls within his remit."

"Article 779. Without prejudice to the terms established in the other special proceedings, the procedure regulated under this Title shall be applied to the judgement of felonies punished with a sentence of imprisonment not exceeding nine years, or by any other penalties of a different nature, whether unique, joint or alternative, whatever their amount or duration."

**Final Provision Two**

Section 2 of Article 1 of Organic Act 10/1995, dated 23rd November, on the Jury, hereby amended and shall henceforth be drafted as follows:

"2. Within the field of the judicial proceedings to which the preceding Section refers, a Jury shall be competent to consider and hand down a verdict in the felonies defined in the following provisions of the criminal code:

a) On unlawful killing (Articles 138 to 140);

b) On intimidation (Article 169.1);

c) On failure in the duty to assist (Articles 195 and 196);

d) On trespassing a dwelling (Articles 202 and 204);

e) On forest fires (Articles 352 to 354);

f)  On disloyalty in the custody of documents (Articles 413 to 415);

g)  On corruption (Article 419 to 426);

h)  On influence peddling (Articles 428 to 430);

i)  On embezzlement (Articles 432 to 434);

j)  On fraud and illegal taxation (Articles 436 to 438);

k)  On negotiations prohibited to civil servants (Articles 439 and 440);

l)  On disloyalty in the custody of prisoners (Article 471)".

**Final Provision Three**

**1.** Chapter VI of Act 35/1988, dated 22nd November, on Assisted Reproduction Techniques, is hereby amended and shall henceforth be drafted as follows:

 **1.** Letters a), k), l) and v) of Section 2.B) of Article 20 are suppressed;.

 **2.** The text of Sub-Section r) of Section 2. b) shall be replaced with the following: "transfer of human gametes or pre-embryos in the uterus of another animal species, or the reverse operation, as well as unauthorised fecundation between human and animal gametes".

**2.** Article 21 of Chapter VII of Act 35/1988, on Assisted Reproduction Techniques, shall become Article 24.

**Final Provision Four**

Organic Act 1/1982, dated 5th May, on Protection of the Right to Honour, Personal and Family Privacy and Personal Image, is hereby amended and shall be drafted as follows:

 "Article 1.

 **2.** The criminal nature of the intrusion shall not prevent recourse to the judicial protection proceedings foreseen in Article 9 of this Act. In any event, the criteria of this Act shall be applicable to determine the civil liability arising from the felony"

 "Article 7.

 **7.** Charging with facts, or judgemental statements through actions or expressions that are in any way damaging to the dignity of another person, detracting from his fame or attacking his self-esteem."

**Final Provision Five**

Additional Provision Two of Organic Act 6/1995, dated 29th June, is hereby amended and shall be drafted as follows:

 "The exemption from criminal accountability established in the second paragraphs of Articles 305, Section 4; 307, Section 3, and 308, Section 4, shall be equally applicable although the debts subject to regularisation are lower than the amounts established in those Articles."

**Final Provision Six**

Title V of Book I of this Code, Articles 193, 212, 233.3 and 272, as well as Additional Provisions One and Two, Transitional Provision Twelve and Final Provisions One and Three shall have the status of an ordinary Act of Parliament.

**Final Provision Seven**

This Code shall come into force six months after its full publication in the "Official State Gazette" and it shall be applied to all punishable acts committed after it coming into force.

Notwithstanding the foregoing, Article 19 hereof shall not be effective, until the act that regulates criminal accountability of minors to which such provision refers comes into force.



—155—

# EXHIBIT E

# Ministerio de Justicia



# Spanish Civil Code

Colección:Traducciones del derecho español

Edita:
© MINISTERIO DE JUSTICIA - SECRETARÍA GENERAL TÉCNICA

NIPO: 051-09-014-0
Traducción jurada realizada por: Dª Sofía de Ramón-Laca Clausen

Maquetación: DIN Impresores, S.L.
Cabo Tortosa, 13-15. Pol. Ind Borondo - 28500 - Arganda del Rey (Madrid)

# TITLE V

## On possession

CHAPTER ONE

*On possession and its species*

**Article 430.** Natural possession is the holding of a thing or the enjoyment of a right by a person. Simple possession is that same holding or enjoyment joined with the intention of having the thing or right as one's own.

**Article 431.** Possession is exercised on things or rights by the same person who holds and enjoys them, or by another in his name.

**Article 432.** Possession of property and rights may be held in one of two capacities: either as owner, or as holder of the thing or right, to preserve or enjoy them, while ownership belongs to another person.

**Article 433.** The person who is unaware that there is a defect which invalidates his title or manner of acquisition shall be deemed a possessor in good faith.
Otherwise he shall be deemed a possessor in bad faith.

**Article 434.** Good faith is always presumed, and the person asserting a possessor's bad faith shall have the burden of proving it.

**Article 435.** Possession acquired in good faith shall not lose this nature save if and when there are acts which evidence that the possessor is not unaware that he possesses the thing improperly.

**Article 436.** It shall be presumed that possession continues to be enjoyed in the same capacity in which it was acquired, unless there is evidence to the contrary.

**Article 437.** Only things and rights which are capable of appropriation may be subject to possession.

CHAPTER 2º

*On acquisition of possession*

**Article 438.** Possession is acquired by material occupation of the thing or right possessed, or by the latter becoming subject to our will, or pursuant to the acts and legal formalities set forth to acquire such right.

**Article 439.** Possession may be acquired by the same person who is to enjoy it, his legal representative, his attorney or by a third party without mandate; but this last case possession shall not be deemed to have been acquired until the person in whose name the act of possession has been verified should ratify it.

**Article 440.** Possession of hereditary property shall be deemed transferred to the heir without interruption from the time of death of the decedent, in the event that the former should finally accept the inheritance.
The person who validly rejects an inheritance shall be deemed never to have possessed it.

**Article 441.** In no event may possession be acquired violently where there is a possessor who opposes this. A person who believes he has an action or right to deprive another of holding a thing, if the holder refuse to deliver it, must request the assistance of the competent Authority.

**Article 442.** A person succeeding by inheritance shall not suffer the consequences of his principal's defective possession, if it is not proven that he was aware of the defects which affected it; however, the effects of possession in good faith shall only benefit him from the date of his decedent's death.

**Article 443.** Minors and incapacitated persons may acquire possession over things; but they shall require the assistance of their legitimate representatives to use the rights arisen in their favour as a result of such possession.

**Article 444.** Acts which are merely tolerated, and those which are performed in a clandestine fashion and without the possessor of the thing being aware of them, or with violence, shall not affect possession.

**Article 445.** Possession, as a fact, may not be acknowledged in favour of two different persons, other than in cases of pro indiviso. If a dispute should arise on the fact of possession, the current possessor shall be preferred; if there should be two possessors, the oldest shall be preferred; if the dates of possession should be the same, the possessor who presents a title shall be preferred; and, all these conditions being equal, the thing shall be deposited or consigned with the court, until the possession or ownership thereof is determined pursuant to the corresponding proceedings.

CHAPTER 3°

*On the effects of possession*

**Article 446.** Any possessor is entitled to be respected in his possession; and, if he should be disturbed in it, he must be protected or such possession must be restored to him by the means set forth in procedural laws.

**Article 447.** Only possession acquired and enjoyed in the capacity of owner may serve as title to acquire ownership.

**Article 448.** The possessor in the capacity of owner has a legal presumption of possessing based on just title, and cannot be obliged to exhibit it.

**Article 449.** Possession of a real property shall involve possession of the furniture and objects located therein, unless it should be expressed or evidenced that they are to be excluded.

**Article 450.** Each participant of thing possessed in common shall be deemed to have possessed exclusively the part which, upon dividing the thing, should be allocated to him, during the whole period during which it remained undivided. Interruption in the possession of the whole or part of the thing possessed in common shall be to the equal detriment of all.

**Article 451.** The possessor in good faith shall make any fruits received his own unless he is legally interrupted in his possession.
Natural and industrial fruits shall be deemed received from the time on which they arise or are separated.
Civil fruits shall be deemed accrued on a daily basis, and shall belong to the possessor in good faith in such proportion.

**Article 452.** If at the time on which good faith should cease, any natural or industrial fruits should be pending, the possessor shall be entitled to recover any expenses made for their production, and also to the part of the liquid product of the harvest proportional to the time of his possession.
Charges shall be allocated pro rata in the same manner among two possessors.

—64—

The owner of the thing may, if he wishes to, grant the possessor in good faith the power to finish cultivation and gathering of any fruits which are pending, as compensation for the part of the cultivation expenses and the liquid proceeds which belong to him; the possessor in good faith who for any reason does not wish to accept this grant, shall forfeit the right to be compensated in another manner.

**Article 453.** Necessary expenses shall be paid to every possessor; but only the possessor in good faith may retain the thing until satisfaction thereof.
Useful expenses shall be paid to the possessor in good faith, who shall be entitled to the same right of retention, and the person who should have prevailed in the dispute over possession may choose to satisfy the amount of the expenses, or pay the increase in value of the thing as a result thereof.

**Article 454.** Purely luxurious or merely recreational expenses shall not be payable to the possessor in good faith; but he may take away any adornments with which he has embellished the principal thing if it should not suffer any impairment, and if his successor in possession does not prefer to pay the amount of the relevant expenses.

**Article 455.** The possessor in bad faith shall pay any fruits received and those which the legitimate possessor could have received, and shall only be entitled to be repaid any necessary expenses made for the preservation of the thing. Expenses made for luxurious and recreational improvements shall not be paid to the possessor in bad faith; but he may take the objects in which such expenses have been invested, provided that the thing suffers no impairment, and that the legitimate possessor does not prefer to keep them by paying their value at the time of becoming their possessor.

**Article 456.** Improvements resulting from nature or from time shall always inure to the benefit of the person who has won possession.

**Article 457.** The possessor in good faith shall not be liable for the impairment or loss of thing possessed, outside cases where he should be proved to have acted with malice. The possessor in bad faith shall be liable for impairment or loss in any case, and even for those caused by force majeure when he should have maliciously delayed delivery of the thing to its legitimate possessor.

**Article 458.** The person who obtains possession is not obliged to pay improvements which have ceased to exist upon acquiring the thing.

**Article 459.** The current possessor who proves having previously possessed the thing shall be presumed to have possessed it also during the time in between, unless evidence to the contrary is provided.

**Article 460.** The possessor may lose his possession:
**1.** By abandonment of the thing.
**2.** By assignment made in favour of another for valuable consideration or as a gift.
**3.** By total destruction or loss of the thing, or as a result of its becoming beyond the bounds of commerce.
**4.** By another's possession, even against the will of the former possessor, if such new possession should have lasted more than one year.

**Article 461.** Possession of movable property shall not be deemed lost while it remains in the power of the possessor, even if the latter should accidentally be unaware of its whereabouts.

**Article 462.** Possession of immovable property and rights *in rem* shall only be deemed to have been lost or transferred, for the purposes of prescription to the detriment of a third-party, subject to the provisions of the Mortgage Law.

**Article 463.** Acts relating to possession, performed or consented by the person possessing a thing belonging to another as mere holder, to enjoy it or retain it in any capacity, shall not bind the owner nor inure to his detriment, unless the latter should have expressly granted to the former powers to perform them or should subsequently ratify them.

**Article 464.** Possession of movable property, acquired in good faith, is equivalent to title. Notwithstanding the foregoing, any person who has lost movable property or has been deprived of it illegally may claim it from its possessor.

If the possessor of the lost or stolen movable property should have acquired it in good faith at a public sale, the owner may not have it restored to him without reimbursing the price paid for it.

The owner of things pawned in Pawnshops created with governmental authorisation may not recover them, irrespective of who pawned them, without first reimbursing the Establishment the amount of the pledge and any interest payable.

As relates to things acquired in an Exchange, fair or market, or from a legally established trader who regularly trades in analogous objects, the provisions of the Commercial Code shall apply.

**Article 465.** Wild animals are only possessed while they are in one's power; domesticated or tamed animals shall be deemed tame or domestic pets, if they are in the habit of returning to the home of their possessor.

**Article 466.** A person who lawfully recovers the possession improperly lost shall be deemed for all purposes which may inure to his benefit to have enjoyed it without interruption.

## TITLE VI

### On usufruct, on use and on habitation

CHAPTER ONE

*On usufruct*

SECTION ONE

*On usufruct in general*

**Article 467.** Usufruct entitles one to enjoy another's property with the obligation to preserve its form and substance, unless otherwise authorised by the deed pursuant to which it was created or the law.

**Article 468.** Usufruct is created by law, by the will of individuals expressed in acts *inter vivos* or in a last will and testament and by prescription.

**Article 469.** Usufruct may be created in respect of all or part of the fruits of the thing, in favour of one or several persons, simultaneously or successively, and in any event from or until a certain day, absolutely or subject to a condition. It may also be created over a right, provided that it is not a strictly personal or a non-transferable right.

**Article 470.** The rights and obligations of the usufructuary shall be as determined in the deed constituting the usufruct; in the event of absence or insufficiency thereof, the provisions contained in the two following sections shall be observed.

CHAPTER 2º

*On the nature and effects of obligations*

**Article 1,094.** The person obliged to give something is also obliged to preserve it with the diligence of an orderly *paterfamilias*.

**Article 1,095.** The creditor is entitled to the fruits of the thing from the time when the obligation to deliver it should arise. Notwithstanding the foregoing, he shall not acquire a right *in rem* over it until it is delivered to him.

**Article 1,096.** Where a specific thing is to be delivered, the creditor may compel the debtor to perform delivery, irrespective of the rights granted to him under article 1101.

If the thing should be indeterminate or generic he may request the performance of the obligation at the debtor's expense.

If the obligor should default on his obligation, or should have undertaken to deliver the same thing to two or more different persons, he shall be liable for any fortuitous events until delivery thereof.

**Article 1,097.** The obligation to give a specific thing comprises that of delivering all its fittings, even if they have not been mentioned.

**Article 1,098.** If the person obliged to do something should fail to do it, it shall be ordered to be done at his expense.

The same shall also be observed if he should perform contravening the content of the obligation. Likewise, he may be ordered to undo anything which was done badly.

**Article 1,099.** The provisions of the second paragraph of the preceding article shall also be observed where the obligation consists of not doing something and the debtor should do what he was forbidden to do.

**Article 1,100.** Persons obliged to deliver or to do something shall incur in default from the time on which the creditor judicially or extra-judicially demands performance of their obligation.

However, the creditor's intimation shall not be necessary for the existence of default:

**1.** Where the obligation or the law should expressly provide it.

**2.** Where it should result from the nature and circumstances of the obligation that the designation of the time in which the thing was to be delivered or the service to be performed was a decisive factor to establish the obligation.

In reciprocal obligations, neither of the obligors shall incur in default if the other does not perform or does not agree to duly perform of his obligation. Default shall begin for the other obligor from the time that one of the obligors performs his obligation.

**Article 1,101.** Persons who, in the performance of their obligations, should incur in wilful misconduct, negligence or default, and those who in any way should contravene the content of the obligation shall be subject to compensation of any damages caused.

**Article 1,102.** Liability arising from wilful misconduct is enforceable for all obligations. Waiver of the action to enforce it shall be null and void.

**Article 1,103.** Liability arising from negligence is equally enforceable in the performance of all kinds of obligations; but may be moderated by the Courts on a case-by-case basis.

**Article 1,104**

The debtor's fault or negligence consists of the omission of the diligence required by the nature of the obligation that corresponds to the circumstances of the persons, the time and the place.

Where the obligation should not express the diligence to be used in its performance, the diligence of an orderly *paterfamilias* shall be required.

**Article 1,105.** Outside the cases expressly mentioned in the law, and those in which the obligation should require it, no one shall be liable for events which cannot be foreseen or which, being foreseen, should be inevitable.

**Article 1,106.** Damage compensation comprises not just the value of the loss suffered, but also that of the gain which the creditor has failed to obtain, save for the provisions of the following articles.

**Article 1,107.** The damages for which the debtor in good faith shall be liable are those which are foreseen or which could have been foreseen at the time of contracting the obligation and which are a necessary consequence of his failure to perform.
In the event of wilful misconduct the debtor shall be liable for all damages which are known to have arisen from the failure to perform the obligation.

**Article 1,108.** If the obligation should consist of the payment of an amount of money, and the debtor should incur in default, unless otherwise agreed damages shall consist of paying the agreed interest and, in the absence of an agreement, the legal interest.

**Article 1,109.** Interest outstanding shall accrue the legal interest from the time that it is judicially demanded, even if the obligation is silent on this point.
For commercial transactions the provisions of the Commercial Code shall apply.
Pawnshops and Savings Banks shall be governed by their special regulations.

**Article 1,110.** Receipt by the creditor of the capital amount, without any reservation as to interest, shall extinguish the debtor's obligations in respect of the latter.
Receipt of the last instalment of the debt, where the creditor should also fail to make reservations, shall extinguish the obligation in respect of prior instalments.

**Article 1,111.** After pursuing all property in the debtor's possession to enforce their debts, creditors may exercise all rights and remedies of the debtor for the same purpose, excepting those which are inherent to his person; they may also challenge any acts which the debtor has performed in fraud of their right.

**Article 1,112.** All rights acquired pursuant to an obligation are transferable subject to the laws, unless otherwise agreed.

CHAPTER 3º

*On the different kinds of obligations*

SECTION ONE

*On pure and conditional obligations*

**Article 1,113.** Any obligation whose performance does not depend on a future or uncertain event, or on a past event of which the interested parties are unaware, shall be enforceable from the present.
Likewise, any obligation containing a condition subsequent shall be enforceable, without prejudice to the effects of termination thereof.

**Article 1,935.** Persons with the capacity to dispose of property may waive the prescription achieved, but not the right to acquire by prescription thereafter.

Prescription shall be deemed implicitly waived where such waiver results from actions which make one suppose that the right acquired has been relinquished.

**Article 1,936.** All things which are within the bounds of trade between men are capable of prescription.

**Article 1,937.** Creditors, and any other person interested in enforcing prescription, may use it in spite of the express or implied waiver of the debtor or owner.

**Article 1,938.** The provisions of the present title shall be understood without prejudice to the provisions in this Code or in special acts in respect of specific instances of prescription.

**Article 1,939.** Prescription begun prior to the publication of the present Code shall be governed by the laws prior hereto; but if the whole period required herein for prescription should expire after the present Code enters into force, such prescription shall be effective, even if such prior laws should require a longer lapse of time.

CHAPTER 2º

*On prescription of ownership and other rights in rem*

**Article 1,940.** Ordinary prescription of ownership and remaining rights *in rem* shall require possession of the thing in good faith and pursuant to just title for the period provided in the law.

**Article 1,941.** Possession must be in the capacity of owner, and must be public, peaceful and uninterrupted.

**Article 1,942.** Acts of a possessory nature executed pursuant to licence or mere tolerance by the owner shall not serve to establish possession.

**Article 1,943.** For prescription purposes, possession is interrupted on a natural or on a civil basis.

**Article 1,944.** Possession is interrupted naturally when for any reason such possession should cease for more than one year.

**Article 1,945.** Civil interruption occurs as a result of the judicial summons to the possessor, even if it should be by order of an incompetent Judge.

**Article 1,946.** The judicial summons shall be deemed not to have been given, and shall cease to generate an interruption:

**1.** If it should be null and void as a result of lack of the legal solemnities.

**2.** If the plaintiff should abandon the claim or should let the action lapse.

**3.** If the possessor should be acquitted.

**Article 1,947.** Civil interruption shall also take by an act of conciliation, provided that, within two months thereof, the claim concerning possession or ownership of the thing in question is submitted before the Judge.

**Article 1,948.** Any express or implied recognition by the possessor of the owner's right shall likewise interrupt possession.

**Article 1,949.** Ordinary prescription of ownership or rights *in rem* to the detriment of a third party shall not take place against a title registered in the Property Registry, unless it is pursuant to another title which has also been registered, and the time shall begin to run from registration of the latter.

**Article 1,950.** The possessor's good faith consists of the belief that the person from whom he received the thing was its owner, and could transfer ownership thereof.

**Article 1,951.** The conditions of good faith required for possession in articles 433, 434, 435 and 436 of this Code are likewise necessary to establish this prerequisite for the prescription of ownership and other rights *in rem*.

**Article 1,952.** Just title shall be deemed to mean a title legally sufficient to transfer ownership or the right *in rem* subject to prescription.

**Article 1,953.** For prescription purposes, title must be authentic and valid.

**Article 1,954.** Just title must be proved; it is never presumed.

**Article 1,955.** Ownership of movable property prescribes by three years of uninterrupted possession in good faith.
Ownership of movable property also prescribes by six years of uninterrupted possession, without any other condition.
The provisions of article 464 of this Code shall apply as related to the owner's right to claim movable property which has been lost or of which he has been unlawfully deprived, and likewise as relates to movable property acquired in a public sale in an Exchange, fair or market or from a tradesman who is legally established and dedicated on a habitual basis to trading in similar objects.

**Article 1,956.** Movable property purloined or stolen may not prescribe in the possession of those who purloined or stole it, or their accomplices or accessories, unless the crime or misdemeanour or its sentence, and the action to claim civil liability arising therefrom, should have become barred by statute of limitations.

**Article 1,957.** Ownership and other rights *in rem* over immovable property prescribe by ten years' possession among present persons, and twenty among absent persons, in good faith and with just title.

**Article 1,958.** For the purposes of prescription, foreign or overseas residents are deemed to be absent.
If part of the time the owner should have been present and another part absent, two years of absence shall be deemed one year in order to complete the ten years of presence required.
Absences for less than a whole continuous year shall not be taken into account for the calculation.

**Article 1,959.** Ownership and other rights *in rem* over immovable property also prescribe as a result of thirty years of uninterrupted possession, without requiring any title or good faith, and without distinction between persons present and absent, save for the exception provided in article 539.

**Article 1,960.** The following rules shall be observed to count the time required for prescription:
**1.** The current possessor may complete the time required for prescription adding to his own that of his predecessor.
**2.** The current possessor who was also a possessor in a previous time, shall be presumed to have continued to be so during the time in between, unless there is evidence to the contrary.
**3.** The day on which such time begins to be counted shall be deemed to have been a full day; but the last day must be completed in full.

CHAPTER 3º

*On the statute of limitations on actions*

**Article 1,961.** Actions expire by the running of the statute of limitations by the mere lapse of the time set forth in the law.

**Article 1,963.** Actions *in rem* relating to immovable property shall become barred by statute of limitations after thirty years.
This provision shall be understood without prejudice to the provisions relating to acquisition of ownership of rights *in rem* pursuant to prescription.

**Article 1,964.** The mortgage remedy shall become barred by statute of limitations after twenty years, and personal remedies for which no special statute of limitations has been provided, after fifteen years.

**Article 1,965.** The action between co-heirs, co-owners or owners of adjoining properties to request partition of the estate, division of common property or the setting of boundaries of the adjoining properties shall not be subject to statute of limitations.

**Article 1,966.** Actions to claim the performance of the following obligations shall be barred by statute of limitations after five years:
**1.** The obligation to pay support.
**2.** The obligation to pay leases, whether of rural or urban properties.
**3.** Any other payments to be made on a yearly basis or in shorter time periods.

**Article 1,967.** Actions to claim the performance of the following obligations shall be barred by statute of limitations after three years:
**1.** The obligation to pay Judges, Attorneys, Registrars, Notaries Public, Scriveners, experts, agents and clerks their fees and charges, and any expenses and disbursements made thereby in the performance of their duties or professions in the affairs to which such obligations refer.
**2.** The obligation to pay Pharmacists the medicines they supplied; teachers and Masters their fees and stipends for their teaching, or for the exercise of their profession, art or trade.
**3.** The obligation to pay manual workers, servants and agricultural labourers the amount for their services and any supplies or disbursements made in respect thereof.
**4.** The obligation to pay innkeepers food and board, and merchants the price of the goods sold to others who are not or who, being merchants, deal in another trade.
The time required for the statute of limitations to run in the actions mentioned in the three preceding paragraphs shall count from the date on which the respective services ceased to be provided.

**Article 1,968.** The following shall be barred by statute of limitations upon the lapse of one year:
**1.** The action to recover or retain possession.
**2.** The action to claim civil liability as a result of insults or slander, and for obligations resulting from fault or negligence as provided in article 1,902, from the date on which the injured party became aware of them.

**Article 1,969.** The time required for the barring of all kinds of actions by statute of limitations, unless otherwise provided by a specific provision, shall be counted from the day on which they could be exercised.

**Article 1,970.** The time required to bar by statute of limitations actions whose purpose is to claim the performance of obligations to pay capital with interest or rent shall run from the last payment of the rent or interest.

The same shall be understood of the capital sum in consignative ground rents.

In emphyteutic and reservative ground rents, the time required for the running of the statute of limitations shall likewise be counted from the last payment of the pension or rent.

**Article 1,971.** The time required for the statute of limitations on actions to request performance of obligations declared in a judgement shall begin to run from the time when the judgement becomes final.

**Article 1,972.** The term of the statute of limitations on actions to require the giving of accounts shall run from the day on which those who are to give them were removed from their positions.

The term corresponding to the action relating to the result of such accounts shall run from the date on which such result was acknowledged by agreement between the interested parties.

**Article 1,973.** The statute of limitations on actions is interrupted by the bringing of such actions before the Courts, by an out of court claim issued by the creditor and by any act of acknowledgement of the debt by the debtor.

**Article 1,974.** Interruption of the statute of limitations on actions in joint and several obligations shall inure to the benefit or detriment of all creditors and debtors equally.

This provision shall also apply in respect of the heirs of the debtor in all kinds of obligations.

In joint obligations, where the creditor only claims from one of the debtors the part which corresponds to him, the statute of limitations shall not be interrupted in respect of the other co-debtors as a result.

**Article 1,975.** Interruption of the statute of limitations against the principal debtor as a result of the judicial claiming of the debt shall also be effective against his guarantor; but the interruption occurred as a result of out of court claims by the creditor or private acknowledgements by the debtor shall not prejudice the guarantor.

### FINAL PROVISION

**Article 1,976.** All laws, uses and customs which comprise Common Civil Law in all matters constituting the subject matter of this Code are hereby repealed, and they shall become without force and effect as directly enforceable laws and as subsidiary rules. This provision shall not apply to the laws that this Code has declared to subsist.

# EXHIBIT F

# CONSTITUTION

**PASSED BY THE CORTES GENERALES IN PLENARY MEETINGS OF THE CONGRESS OF DEPUTIES AND THE SENATE HELD ON OCTOBER 31, 1978**

**RATIFIED BY REFERENDUM OF THE SPANISH PEOPLE ON DECEMBER 7, 1978**

**SANCTIONED BY HIS MAJESTY THE KING BEFORE THE CORTES GENERALES ON DECEMBER 27, 1978**

Notice of Intent, Exhibit F

**LIST OF ABBREVIATIONS**

| | |
|---:|:---|
| **Add. Prov.:** | Additional Provisions |
| **C:** | Constitution |
| **Final Prov.:** | Final Provisions |
| **SO:** | Standing Orders |
| **Trans. Prov.:** | Transitional Provisions |

6

# ARRANGEMENT OF SECTIONS

| | Page |
|---|---|
| **PREAMBLE** ................................................................. | 9 |
| **PRELIMINARY PART** ...................................................... | 10 |
| **PART I.** *Fundamental Rights and Duties* ........................ | 12 |
| Chapter 1.  Spaniards and Aliens .................................. | 13 |
| Chapter 2.  Rights and Liberties ................................... | 14 |
| Division 1.  Fundamental Rights and Public Liberties ......... | 14 |
| Division 2.  Rights and Duties of Citizens..................... | 21 |
| Chapter 3.  Principles governing Economic and Social Policy ..... | 24 |
| Chapter 4.  Guarantees of Fundamental Rights and Liberties......... | 28 |
| Chapter 5.  Suspension of Rights and Liberties ................. | 29 |
| | |
| **PART II.**  *The Crown*........................................... | 29 |
| | |
| **PART III.**  *The Cortes Generales (Parliament)* .................... | 34 |
| Chapter 1.  Houses of Parliament ................................. | 34 |
| Chapter 2.  Drafting of Bills..................................... | 41 |
| Chapter 3.  International Treaties ................................ | 45 |
| | |
| **PART IV.**  *Government and Administration*............................ | 47 |
| | |
| **PART V.**  *Relations between the Government and the Cortes Generales*.................................................... | 51 |
| | |
| **PART VI.**  *Judicial Power*........................................... | 54 |

7

Notice of Intent, Exhibit F

|  |  | Page |
|---|---|---|
| **PART VII.** | *Economy and Finance* | 58 |
| **PART VIII.** | *Territorial Organization of the State* | 62 |
| Chapter 1. | General Principles | 62 |
| Chapter 2. | Local Government | 63 |
| Chapter 3. | Self-governing Communities | 64 |
| **PART IX.** | *The Constitutional Court* | 77 |
| **PART X.** | *Constitutional Amendment* | 80 |
| **ADDITIONAL PROVISIONS** |  | 82 |
| **TRANSITIONAL PROVISIONS** |  | 83 |
| **REPEALS** |  | 86 |
| **FINAL PROVISION** |  | 87 |

8

**SPANISH CONSTITUTION**

*We, don Juan Carlos I, King of Spain, announce to all those who may have knowledge of this: that the Cortes have passed and the Spanish people have ratified the following Constitution:*

PREAMBLE

The Spanish Nation, desiring to establish justice, liberty, and security, and to promote the wellbeing of all its members, in the exercise of its sovereignty, proclaims its will to:

Guarantee democratic coexistence within the Constitution and the laws, in accordance with a fair economic and social order.

Consolidate a State of Law which ensures the rule of law as the expression of the popular will.

Protect all Spaniards and peoples of Spain in the exercise of human rights, of their culture and traditions, languages and institutions.

Promote the progress of culture and of the economy to ensure a dignified quality of life for all.

9

Establish an advanced democratic society, and Cooperate in the strengthening of peaceful relations and effective cooperation among all the peoples of the earth.

Therefore, the Cortes pass and the Spanish people ratifies the following.

SPANISH CONSTITUTION

**Preliminary Part**

### Section 1

A social and democratic State under the rule of law
**1.** Spain is hereby established as a social and democratic State, subject to the rule of law, which advocates freedom, justice, equality and political pluralism as highest values of its legal system. — 2, 6, 7, 9, 10, 117, 128 C

National sovereignty
**2.** National sovereignty belongs to the Spanish people, from whom all State powers emanate. — 56, 66, 117 C

Parliamentary monarchy
**3.** The political form of the Spanish State is the Parliamentary Monarchy. — 56, 66, 97, 108 C

### Section 2

National unity and devolution to nationalities and regions
The Constitution is based on the indissoluble unity of the Spanish Nation, the common and indivisible homeland of all Spaniards; it recognises and guarantees the right to selfgovernment of the nationalities and regions of which it is composed and the solidarity among them all. — 1, 137-139, 143-148 C

### Section 3

Language
**1.** Castilian is the official Spanish language of the State. All Spaniards have the duty to know it and the right to use it. — 14, 139.1, 149.1.1 C

**2.** The other Spanish languages shall also be official in the respective Self-governing Communities in accordance with their Statutes. — 147, 148.1.17, Final Prov. C

10

Notice of Intent, Exhibit F

46,
149.1.28,
149.2 C

**3.** The wealth of the different linguistic forms of Spain is a cultural heritage which shall be especially respected and protected.

### Section 4

1, 2 C

**1.** The flag of Spain consists of three horizontal stripes: red, yellow and red, the yellow stripe being twice as wide as each red stripe.

National flag

147 C

**2.** The Statutes may recognize flags and ensigns of the Self-governing Communities. These shall be used together with the flag of Spain on their public buildings and in their official ceremonies.

### Section 5

1 C

The capital of the State is the city of Madrid.

Capital

### Section 6

1.1, 7, 22,
23.1, 67.2,
127.1, 159.4
C 23 R

Political parties are the expression of political pluralism, they contribute to the formation and expression of the will of the people and are an essential instrument for political participation. Their creation and the exercise of their activities are free in so far as they respect the Constitution and the law. Their internal structure and their functioning must be democratic.

Political
parties

### Section 7

1.1, 22, 28,
37, 131.2 C

Trade unions and employers' associations contribute to the defence and promotion of the economic and social interests which they represent. Their creation and the exercise of their activities shall be free in so far as they respect the Constitution and the law. Their internal structure and their functioning must be democratic.

Trade unions
and
employers'
associations

### Section 8

28.1, 29.2 30,
62 h), 63.3,
70.1 e), 97 C

**1.** The mission of the Armed Forces, comprising the Army, the Navy and the Air Force,

Armed
Forces

11

is to guarantee the sovereignty and independence of Spain and to defend its territorial integrity and the constitutional order.

**2.**  The basic structure of military organization shall be regulated by an Organic Act in accordance with the principles of the present Constitution.

81 C

### Section 9

Rule of law

**1.**  Citizens and public authorities are bound by the Constitution and all other legal provisions.

1, 9.3, 10, 25.1, 103.1, 106, 161 C

Promotion of freedom, equality and citizens' participation by public autorities

**2.**  It is the responsibility of the public authorities to promote conditions ensuring that freedom and equality of individuals and of the groups to which they belong are real and effective, to remove the obstacles preventing or hindering their full enjoyment, and to facilitate the participation of all citizens in political, economic, cultural and social life.

1.1, 39-52, 128-131 C

Constitutional principles

**3.**  The Constitution guarantees the principle of legality, the hierarchy of legal provisions, the publicity of legal statutes, the non-retroactivity of punitive provisions that are not favourable to or restrictive of individual rights, the certainty that the rule of law shall prevail, the accountability of public authorities, and the prohibition of arbitrary action of public authorities.

1.1, 9.1, 25, 103, 106, 117, 133, 161 C

## PART I

### Fundamental Rights and Duties

### Section 10

Foundation of the constitutional system

**1.**  The dignity of the person, the inviolable rights which are inherent, the free development of the personality, the respect for the law and for the rights of others are the foundation of political order and social peace.

1.1, 9.2, 53, 81 C

12

93-96 C    **2.**  Provisions relating to the fundamental rights and liberties recognised by the Constitution shall be construed in conformity with the Universal Declaration of Human Rights and international treaties and agreements thereon ratified by Spain.    General interpretation guideline

CHAPTER 1

**Spaniards and Aliens**

### Section 11

14, 23, 29, 30, 35, 59.4, 60.1, 149.1.2. C    **1.**  Spanish nationality shall be acquired, retained and lost in accordance with the provisions of the law.    Nationality

**2.**  No person of Spanish birth may be deprived of his or her nationality.

93-96 C    **3.**  The State may negotiate dual nationality treaties with Latin-American countries or with those which have had or which have special links with Spain. In these countries Spaniards may become naturalized without losing their nationality of origin, even if those countries do not grant a reciprocal right to their own citizens.    Dual nationality treaties

### Section 12

23, 39, 149.1.8, Add. Prov. 2. C    Spaniards come legally of age at eighteen years.    Full legal age

### Section 13

10-55, 149.1.2 C    **1.**  Aliens in Spain shall enjoy the public freedoms guaranteed by the present Part, under the terms to be laid down by treaties and the law.    Aliens' rights

23, 68.5 C    **2.**  Only Spaniards shall have the rights recognised in section 23, except in cases which may be established by treaty or by law concerning the right to vote and the right to be

13

elected in municipal elections, and subject to the principle of reciprocity. (This text includes the first constitutional reform adopted on 27/08/1992; which added the words «and the right to be elected» to the paragraph).

*Extradition*    **3.**   Extradition shall be granted only in compliance with a treaty or with the law, on a reciprocal basis. No extradition can be granted for political crimes; but acts of terrorism shall not be regarded as such.

*Right of political asylum*    **4.**   The law shall lay down the terms under which citizens from other countries and stateless persons may enjoy the right to asylum in Spain.

## CHAPTER 2

### Rights and Liberties

### Section 14

*Equality before the law*    Spaniards are equal before the law and may not in any way be discriminated against on account of birth, race, sex, religion, opinion or any other personal or social condition or circumstance.

1.1, 9.2, 23, 31, 32, 35, 39, 138, 139 C

### DIVISION 1

*Fundamental Rights and Public Liberties*

### Section 15

*Right to life and to physical and moral integrity*    Everyone has the right to life and to physical and moral integrity, and under no circumstances may be subjected to torture or to inhuman or degrading punishment or treatment. Death penalty is hereby abolished, except as provided for by military criminal law in times of war.

10, 25, 53, 81, 117.5 C

14