Thaddeus J. Stauber (Bar No. 225518)
  tstauber@nixonpeabody.com
Sarah Erickson André (Bar No. 236145)
  sandre@nixonpeabody.com
Aaron M. Brian (Bar No. 213191)
  abrian@nixonpeabody.com
Irene Scholl-Tatevosyan (Bar No. 301568)
  itatevosyan@nixonpeabody.com
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071
Tel: (213) 629-6000
Fax: (213) 629-60011

Attorneys for Defendant
Thyssen-Bornemisza Collection Foundation

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID CASSIRER, AVA CASSIRER, and UNITED JEWISH FEDERATION OF SAN DIEGO COUNTY, a California non-profit corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>THYSSEN-BORNEMISZA COLLECTION FOUNDATION, an agency or instrumentality of the Kingdom of Spain,<br><br>Defendant. | Case No. 05-cv-03459-JFW (Ex)<br><br>**DEFENDANT THYSSEN-BORNEMISZA COLLECTION FOUNDATION'S TRIAL BRIEF**<br><br>Judge:    Hon. John F. Walter<br>Crtrm:    16<br>Pre-Trial:  November 16, 2018<br>Trial:    December 4, 2018 |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ......................................................................................................... 2

I.  The Foundation Is the Owner of the Painting through Valid
    Conveyance .................................................................................................. 2

    A.  Under Swiss law, the Baron was the Owner of the Painting ............... 2

        1.  Under Swiss Law, Good Faith is Presumed ................................. 2

        2.  There Is No Evidence that the Baron Acted in Bad Faith
            When He Purchased the Painting ................................................. 3

        3.  It Was Reasonable to Believe that One Could Obtain
            Good Title to the Painting from the Stephen Hahn Gallery
            in 1976 ....................................................................................... 5

    B.  Under Spanish law, the Foundation Obtained Ownership of the
            Painting in the 1993 Acquisition Agreement ..................................... 10

II.  The Foundation Is the Owner of the Painting under Spanish Laws of
     Acquisitive Prescription ............................................................................. 10

    A.  The Foundation Obtained Good Title Under Spanish Civil Code
            Article 1955's Six-Year Acquisitive Prescription ............................. 10

    B.  The Foundation Obtained Good Title Under Spanish Civil Code
            Article 1955's Three-Year Good-Faith Acquisitive Prescription ....... 11

        1.  Under Spanish Law, Good Faith is Presumed ........................... 11

        2.  "Red Flag" Speculation Does Not Rebut the Foundation's
            Presumption of Good Faith ....................................................... 13

    C.  Spain's Substantive Statute of Limitations (Extinctive
            Prescription) Vests the Foundation with Ownership ......................... 14

    D.  Spanish Civil Code Article 1956 Does Not Apply ............................. 15

        1.  The Foundation Has Not Been Found (and Cannot Now
            Be Found) Liable as an Accessory .......................................... 17

        2.  Even if Article 1956 *Could* Apply, Plaintiffs Cannot
            Demonstrate the Requisite Actual Knowledge ......................... 22

i

III.    Laches Bars Plaintiffs' Claim ........................................................ 23

CONCLUSION.................................................................................... 25

ii

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

5

*Boone v. Mech. Specialties Co.*,
    609 F.2d 956, 958 (9th Cir. 1979) ........................................................ 24

6

7

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
    862 F.3d 951 (9th Cir. 2017) ......................................................... *passim*

8

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
    153 F. Supp. 3d 1148 (C.D. Cal. 2015) ................................... 11, 20, 21

9

10

*Cities Serv. Oil Co. v. Dunlap*,
    308 U.S. 208 (1939) ............................................................................... 3

11

12

*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938) ................................................................................. 3

13

14

*New York Life Ins. Co. v. Rogers*,
    126 F.2d 784 (9th Cir. 1942) .............................................................. 2, 3

15

16

*Miller v. Glenn Miller Prods., Inc.*,
    454 F.3d 975 (9th Cir. 2006) .............................................................. 24

17

18

*Piper Aircraft Corp. v. Wag-Aero, Inc.*,
    741 F.2d 925 (7th Cir. 1984) .............................................................. 24

19

20

**Other Authorities**

21

22

Holocaust Expropriated Art Recovery Act of 2016, H.R. 6130 .............................. 23

23

Senate Report 114-394, December 6, 2016 .............................................. 23

24

Spanish Civil Code Article 434 .................................................................. 11

25

Spanish Civil Code Article 464 .................................................................. 15

26

Spanish Civil Code Article 1930 ........................................................... 14, 15

27

Spanish Civil Code Article 1932 .................................................................. 15

28

DEFENDANT'S TRIAL BRIEF
Case No.: 05-cv-03459-JFW (Ex)

Spanish Civil Code Article 1955 ................................................................*passim*

Spanish Civil Code Article 1956 ................................................................*passim*

Spanish Civil Code Article 1961 ........................................................................ 15

Spanish Civil Code Article 1962 .......................................................... 15, 17, 25

Spanish Criminal Code (1870) ....................................................................... 2, 16, 20

Spanish Criminal Code (1973) ............................................................................ 2

Swiss Civil Code (ZGB), Art. 728 ..................................................................... 2

Swiss Civil Code (ZGB), Art. 3(1) ..................................................................... 3

DEFENDANT'S TRIAL BRIEF
Case No.: 05-cv-03459-JFW (Ex)

# PRELIMINARY STATEMENT[1]

On July 10, 2017, the U.S. Court of Appeals for the Ninth Circuit issued a decision remanding this action to the district court. The panel's decision affirmed a majority of this Court's findings, including that foreign law governs the determinations of whether the Baron Thyssen-Bornemisza (under Swiss law) and the Thyssen-Bornemisza Collection Foundation ("Foundation" or "Defendant") (under Spanish law) obtained superior title to the painting *Rue St. Honoré, apres midi, effet de pluie* (St. Honoré Street, Afternoon, Rain Effect), oil on canvas (1897) by Camille Pissarro (the "Painting"). The panel affirmed this Court's determination that Spanish Civil Code Article 1955 does not violate the European Convention on Human Rights. The panel also affirmed this Court's determination that the requirements to satisfy ownership under Article 1955's six-year acquisitive prescription were satisfied.

After reviewing the evidence proffered by the Plaintiffs "with all inferences in their favor as required by our summary judgment rules," *Cassirer v. Thyssen-Bornemisza Collection Foundation*, 862 F.3d 951, 972 (9th Cir. 2017), the panel

---

[1] As this Court is familiar with the facts and procedural history of this case, Defendant's Trial Brief focuses on the legal issues to be adjudicated by this Court. Defendant's Proposed Findings of Fact and Conclusions of Law, filed on November 20, 2018, Dkt. No. 427, ("Defendant's Proposed Findings") identifies the relevant facts. Where appropriate, this brief references evidence from the direct trial testimony of: (1) former Spanish State Prosecutor Adriana de Buerba, Spanish criminal law expert, Dkt. No. 402 ("de Buerba Decl."); (2) Professor Mariano Yzquierdo Tolsada, Spanish civil law expert, Dkt. No. 409 ("Yzquierdo Decl."); (3) Professor Wolfgang Ernst, Swiss law expert, Dkt. No. 396 ("Ernst Decl."); (4) Ms. Laurie L. Stein, art provenance researcher, Dkt. No. 412 ("Stein Decl."); (5) Ms. Lynn Nicholas, historical researcher and author of *The Rape of Europa*, Dkt. No. 399 ("Nichols Decl."); and (6) Mr. Guy Jennings, art appraisal expert, Dkt. No. 394 ("Jennings Decl."). This brief also references evidence found in the witness testimony of: (1) Mr. Evelio Acevedo Carrero, General Director of the Thyssen-Bornemisza Foundation Museum, Dkt. No. 411 ("Acevedo Decl."); and (2) Fernando Pérez de la Sota, attorney and one of the lead legal advisor to the Kingdom of Spain (the "Kingdom") and Foundation in connection with the loan of the Collection to Spain and the Foundation in 1988 and the acquisition in 1993 (the "1993 Acquisition Agreement"), Dkt. No. 405 ("Pérez de la Sota Decl.").

1

found that triable issues of fact remained as to: (1) whether the Baron met the good faith requirement to take title under Swiss rules of acquisitive prescription, and (2) whether the Foundation took lawful title to the Painting under the 1993 Acquisition Agreement, noting that the Foundation took lawful title if the Baron was able to convey lawful title. The panel affirmed this Court's determination that the Foundation could not be an "encubridor" (an accessory) under the 1973 Spanish Criminal Code, as the Foundation was not an accessory to the Holocaust.

The panel, however, considered Plaintiffs' new argument, that the 1870 Spanish Criminal Code's more expansive definition – which defined an accessory to include one who knowingly receives stolen property for benefit – should supply the operative definition of "encubridor." The panel left for this Court to determine whether Article 1956 can, in fact, apply to the Foundation. And, if so, whether the Foundation had the requisite "actual knowledge" to be deemed an "encubridor." The appellate court did not address the Foundation's assertion that Article 1955's three-year good faith acquisitive prescription vests the Foundation with title to the Foundation, or that Plaintiffs' claim to the Painting is barred by laches. These legal issues that remain for this Court to consider and adjudicate.

ARGUMENT[2]

## I.   THE FOUNDATION IS THE OWNER OF THE PAINTING THROUGH VALID CONVEYANCE

### A.   Under Swiss Law, the Baron Was the Owner of the Painting

#### 1.   Under Swiss Law, Good Faith is Presumed

Under Swiss law, ownership of moveable property prescribes by five years of uninterrupted possession in good faith.[3] *See* Swiss Civil Code (ZGB) Art. 728;

---

[2] To avoid any uncertainty, the Foundation reserves the right to raise arguments not addressed herein, in response to Plaintiffs' trial brief.

[3] Citing U.S. law, Plaintiffs contend that there "may be issues as to which party has the burden of proving the Baron's and [the Foundation's] knowledge of the theft and good faith, or lack thereof." Dkt. No. 375 at 11-12. But the "question of where the burden of proof lies is one of *substantive* law[.]" *New York Life Ins. Co. v.*

2

*Cassirer*, 862 F.3d at 975. The Ninth Circuit recognized that the Baron's possession satisfied the requirements of five years of uninterrupted possession. *Id.* This leaves only the element of "good faith" which is presumed – for this Court to consider. Swiss Civil Code (ZGB), Art. 3(1).

### 2.     There Is No Evidence that the Baron Acted in Bad Faith When He Purchased the Painting

"Good faith" is *presumed* and must be *affirmatively rebutted* by Plaintiffs. Swiss Civil Code (ZGB), Art. 3(1); Ernst Decl., ¶¶21-25. Under Swiss law, there are two ways to rebut the presumption of good faith. Ernst Decl., ¶29. The first way to rebut good faith is to identify direct evidence of bad faith. *Id.* Because the Baron cannot testify in person, and no evidence of his actual knowledge has been offered, the Baron's state of mind must be established with circumstantial evidence (indirect proof). *Id.*, ¶30. To rebut the good faith presumption with indirect proof, the facts demonstrating bad faith must be proven conclusively, allowing the court to reliably deduce that the Baron *must* have acted in *actual* bad faith. *Id.* The deduction must be based on proven facts, not mere assertions. *Id.* Here, there is no evidence to prove that the Baron acted in bad faith.

There is no evidence that the Baron purchased the artwork at a suspiciously low cost. Three other Pissarro's were sold at auction between 1975 and 1977. In 1975, Sotheby's sold *Soleil, après-midi, la rue de l'Epicerie, Rouen* (1898), 81.9 x 65.4 cm. (cat. raisonne no.1223) sold for $262,800. Jennings Decl., ¶25, Exh. 166. In 1976, Sotheby's sold *La Mere Jolly raccommodant* (1874), 103 x 80.7 cm. (cat. raisonné no. 368) for $230,000. *Id.*, ¶26, Exh. 168.[4] And in 1977, Christie's sold *Le*

*Rogers*, 126 F.2d 784, 788 (9th Cir. 1942) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) and *Cities Serv. Oil Co. v. Dunlap*, 308 U.S. 208 (1939)). Shown below, under Swiss and Spanish law, the burden of proof is born by *Plaintiffs*, not the Foundation.

[4] Plaintiffs' expert, William Smith, makes no reference to this artwork in his expert report, Dkt. No. 408, which was originally filed on April 20, 2015, as Dkt. No. 274.

*Boulevard de Montmartre, matin, temps de pluie* (1897) 52.5 x 66 cm (cat. raisonné no. 1161) for $275,000. *Id.*, ¶27, Exh. 171. The price paid by Baron for the Painting ($275,000) wholly in line with the prices achieved by the three comparable Pissarro in the mid-1970s. *Id.*, ¶¶36-37, 48-49. And the Baron's purchase from the reputable Stephen Hahn Gallery was well-documented in correspondence and receipts that openly discuss the prices and payment. Nicholas Decl., ¶¶160-61; Stein Decl. ¶¶145-54.

No evidence of bad faith can be found in the Baron's ownership of the Painting – during which time the Painting was publicized and publically exhibited in international tours between 1979 and 1986, and in the 1988 magazine *Architectural Digest*. Nicholas Decl., ¶¶141, 145-53; Stein Decl. ¶¶141, 150-51. And there is no evidence that the Baron was aware of the torn label's reference to the long-closed Bruno and Paul Cassirer gallery (or that connection to a gallery that closed in 1901 indicates the Painting was looted by Nazis) or of the footnote reference to the Painting in a decision found in a post-war U.S. Government publication (the twelve volume Court of Restitution Appeals ("CORA")[5]; neither, therefore, can provide indirect proof of the Baron's actual state of mind. Nicholas Decl., ¶¶53, 72; Stein Decl., ¶57. Given the Baron's well-documented 1976 purchase, from a reputable gallery, where the Painting had been on public display, Plaintiffs' attempts to rely on a partial label and a U.S. government publication cannot negate that the Baron acted in good faith when he purchased the Painting. Stein Decl., ¶¶13, 58, 196-97; Nicholas Decl. ¶¶151-54; Ernst Decl., ¶¶32, 34. But, the absence of negative evidence does not demonstrate bad faith – it simply demonstrates a lack of evidence, leaving the good faith presumption unrebutted.

---

[5] There is no evidence that Plaintiffs themselves knew of the CORA decision until recently, when it was first discovered in German archives after Mr. Cassirer authorized access to the family's German files. Claude Cassirer made no reference to the CORA decision in his 2001 petition to the Spanish government. He made no reference to the CORA decision – or to *any* of the German litigation that led to the 1958 Settlement Agreement – in the Complaint.

4

Ernst Decl., ¶87. Because there is no evidence to demonstrate that the Baron had actual knowledge that the Painting was stolen during World War II, Plaintiffs cannot rebut the Baron's presumed good faith with direct or indirect proof of actual bad faith.[6]

### 3. It Was Reasonable to Believe that One Could Obtain Good Title to the Painting from the Stephen Hahn Gallery in 1976

The second way to rebut the good faith presumption is to demonstrate that the circumstances surrounding the Baron's purchase were so suspicious that, at the time of purchase, no reasonable person would have believed that good title to the Painting could be obtained from the Stephen Hahn Gallery in New York City.[7] *Id*., ¶¶37, 41. This inquiry requires an examination of what was known at the time of the 1976 purchase; the Baron's actual state of mind is not relevant. *Id.*, ¶¶42-48. Under Swiss law, good faith is related to the time of the purchase and not to additional circumstances which eventually become known or knowable ex post facto. *Id.*, ¶¶43. To determine whether the purchaser is faced with a "red flag" situation, the judge must draw all relevant circumstances together and come to a balanced overall evaluation of the purchase as either suspicious or not suspicious. *Id*., ¶¶84, 135.

Swiss law does not recognize a "general" duty of care that would apply to the Baron's 1976 purchase. Ernst. Decl., ¶¶52-58. And in 1976 – decades before the creation of the German Lost Art Database, the Art Loss Register, the UNIDROIT

---

[6] Under Swiss law, the concept of "willful blindness" falls short of the "actual knowledge" required to rebut the good faith presumption with proof of actual bad faith. Ernst Decl., ¶36 (citing Swiss Civil Code Art. 3(2)).

[7] Mr. Cassirer filed suit against Stephen Hahn on July 19, 2004, for his role in purchasing and selling the Painting. Defendant's Proposed Findings, ¶247. On June 24, 2005, Claude Cassirer and Hahn entered into a settlement agreement to "definitively resolve[] all claims that Cassirer may have against Hahn in connection with, or arising from, the Pissarro." *Id.* ¶249. Had Mr. Cassirer discovered any provenance information useful in that case, he surely would have produced such information in this case. As Plaintiffs did not produce any information, one must assume that there is none.

5

1  Convention on Stolen or Illegally Exported Cultural Objects, and The Washington

2  Principles – there was no reason to question the provenance of an artwork

3  publically displayed for sale in a reputable gallery. Stein Decl., ¶81; Ernst. Decl.,

4  ¶47. With the research tools available today, as well as the heightened awareness of

5  artwork looted during the Holocaust, the standard of care employed now when

6  purchasing an artwork may be higher. But in 1976 – the time on which the Court

7  must focus – the Baron's purchase did not violate any general or specific duty of

8  care and there is nothing known now about the Baron's purchase that raises

9  suspicion.  Stein Decl., ¶¶173, 180, 196; Nicholas Decl., ¶¶16, 21.

10      Plaintiffs assert that "red flags," would have raised suspicions that could have

11  lead one to discovery Lilly Cassirer Neubauer's prior ownership. But as there is no

12  general duty of care, there was no duty to affirmatively search for "red flags."

13  Nicholas Decl., ¶¶40-41, 56-61; Ernst Decl., ¶¶52-58. And it is not a purchaser's

14  obligation to prove that he acquired the Painting in the absence of red flags – if no

15  facts are affirmatively asserted, substantiated, and proven to undercut the

16  presumption of good faith, the presumption remains. Ernst Decl., ¶¶55, 58.

17      But even if the Baron – or another theoretical purchaser – had happened upon

18  one or more of Plaintiffs' purported "red flags," these modern speculative

19  suspicions do not prove – as Plaintiffs must – that no purchaser could have

20  reasonably believed that the Stephen Hahn Gallery could convey good title to the

21  Painting. Nicholas Decl., ¶¶39-61; Stein Decl., ¶146, 184-85. This is so, even if one

22  were to apply the Swiss "dubious market-doctrine," asserting that the high-end

23  market for French Impressionists was so interspersed with looted art that no

24  reasonable purchaser could expect to acquire good title. Ernst Decl., ¶¶110-28.

25      In 1976, there was no evidence to challenge the trustworthiness of the

26  Stephen Hahn Gallery – which was known internationally for selling artworks

27  similar to the Painting. Jennings Decl., ¶45; Nicholas Decl. ¶141-59; Stein Decl.,

28  ¶¶141-49. Hahn, who was Jewish, had a very good reputation and had previously

6

1   sold artworks to celebrities and other high profile persons, like the Baron. Nicholas
2   Decl., ¶144; Stein Decl., ¶¶142, 146; Ernst. Decl., ¶¶60-63. The Baron purchased
3   three other paintings from Stephen Hahn at the same time he purchased the
4   Painting. Proposed Pre-Trial Conference Order, Dkt. No. 377, Stipulated Facts,
5   ¶28. Plaintiffs do not question the provenance of those artworks.[8] Nor does the
6   method of sale (consignment) or the price paid by the Baron suggest suspicious
7   circumstances relating to the Painting. Consignment is common in the art world,
8   and the price paid by Baron for the Painting ($275,000) is entirely in line with
9   figures paid for three comparable Pissarro artworks in the mid-1970s.

10          Plaintiffs make continued reference to the partial label that appears to
11   identify an art gallery owned by Bruno and Paul Cassirer which operated between
12   1989 and 1901, Petropoulos Decl., ¶109[9], but they cannot explain why the label of a
13   gallery that closed in 1901 suggests that the Nazi's had looted the Painting or that
14   the artwork was unlawfully removed from Germany immediately before, during, or

---

[8] The Painting's provenance lists "Hahn Gallery, Paris." Nicholas Decl., ¶154. The three other paintings acquired by the Baron from Stephen Hahn in New York at the same time, and which are still part of the Collection, also have "Hahn Gallery, Paris" in their provenance. *Id.* Plaintiffs do not suggest that these other three paintings were also looted during the war simply because they have an incorrect entry in their provenance. *Id.* And if the Baron were attempting to cover up illicit purchases, he would intentionally substitute a New York gallery with a gallery in Paris which, according to Dr. Petropoulos, was one of the most active areas of post-war Nazi loot trading. *Id.,* ¶156. More likely, the Thyssen cataloguers confused Hahn with his father, who once had a gallery in Paris. *Id.*, ¶155.

[9] Dr. Petropoulos acknowledges that the Painting's frame "is the one associated with the [P]ainting at the time when it was in the possession of the Cassirer family, and that canvas is original and that it has not been relined. Petropoulos Decl., ¶¶104-05. There are no visible labels or markings by Nazi agencies, Allied post-war agencies (such as the Central Collecting Points), or suspicious customs stamps, that are frequently seen on looted works and could be considered "red flags." Nicholas Decl., ¶51. Dr. Petropoulos also refers to handwriting on the back of the Painting that, he asserts, should have alerted purchasers to the prior Cassirer ownership. He claims that the name "Julius" is written on the Painting's frame, suggesting a "likely" reference to Julius Cassirer. Petropoulos Decl., ¶¶50,105. But closer examination of the image suggests that the name "Janis" is written on the frame – a name which provides no connection to Cassirer, Neubauer, Sulzbacher or any war time provenance. Nicholas Decl. ¶52; Stein Decl., ¶191.

7

after the War.[10] Nicholas Decl., ¶¶45, 53; Stein Decl., ¶¶102-04; 124; Ernst Decl., ¶¶73-77. The twelve volumes of CORA decisions may have been available to those searching for a copy, but there is no reason to expect that an art collector – particularly one who lived outside the United States in the pre-internet era – would locate and review these government publications before purchasing an artwork. The CORA decisions, published between 1954 and 1966 for specialized law libraries, provide only summaries of cases, not full documentation. Nicholas Decl., ¶68; Stein Decl., ¶¶56-57. And the decisions are indexed by party name, not by property claimed. Nicholas Decl., ¶68; Stein Decl., ¶57.

Plaintiffs do not actually contend that it was the practice for art collectors in the 1970s to consult property restitution decisions. And while Plaintiffs' expert faults the Baron for not reading the CORA records, he makes no reference to the CORA records in his books which discuss Nazi looting of art, even though those books were published decades after 1976. Nicholas Decl., ¶76. In fact, a review of the *known, publically accessible* provenance showed that, prior to 1976, the Painting was owned by several well-known art collectors – collectors who were Jewish and, in at least two instances, World War II veterans.[11] Stein Decl., ¶¶192-

---

[10] Plaintiffs' expert, Mr. Jonathon Petropoulos opines that the label "alerted the Baron and [the Foundation] to the Painting's dubious provenance." Petropoulos Decl., Dkt. No. 417, ¶110. Had the Bruno and Paul Cassirer Gallery operated during the war, or been shut down shortly before the war, such speculation could be reasonable, but a painting with the label of a gallery that closed decades before World War I can hardly make an artwork's provenance "dubious." Dr. Petropoulos also notes that approximately twenty other artworks obtained by the Baron (or his father) from the Bruno and Paul Cassirer Gallery were purchased by the Foundation in the 1993 Acquisition. Petropoulos Decl., ¶111. He notes that the artworks' "connections" to the Bruno and Paul Cassirer Gallery "are specifically referenced on the [Foundation] website today." *Id.* There have been no claims challenging the Foundation's ownership of these works.

Walter Feilchenfeldt, son of the gallerist who ran the Paul Cassirer gallery after Mr. Cassirer's death in 1926, did not recognize the label and advised that no records remain from that era of the earlier Bruno and Paul Cassirer Gallery. Stein Decl., ¶¶89, 100-01.

[11] The Painting's whereabouts following the war was unknown until its purchase in July, 1951, by the Jewish art dealer Frank Perls, a former U.S. military translator in

8

1    93; Nicholas Decl., ¶¶88-115.

2          Because, under Swiss law, a buyer did not have a duty of care to conduct

3    independent inquiries when purchasing the Painting from a reputable dealer,

4    especially after the Painting's public exhibition at the Stephen Hahn Gallery, and

5    there were no "red flags" apparent in 1976 to require the level of investigation

6    necessary to connect the Painting to Ms. Cassirer Neubauer – particularly as

7    Plaintiffs concede there was no claim made to the Painting between 1958 and 2001

8    – there is no evidence to prove that, based on the facts known in 1976, a reasonable

9    should doubt that the Stephen Hahn Gallery was able to pass good title, Plaintiffs

10   cannot rebut the Baron's presumption of good faith possession.[12]

11         As Plaintiffs cannot rebut the presumption of good faith and the Baron

12   satisfied the other requirements for acquisitive prescription – as recognized the by

13   the Ninth Circuit – the Baron was the owner of the Painting under Swiss law.[13]

14   _____

15   Germany, from a Herr Urban of Munich. Nicholas Decl., ¶89. It is not known how
     and when the Painting came to the United States. *Id.* Perls acquired the Painting for

16   Sidney Brody – who was Jewish and a decorated war hero – and his wife, who were
     well known collectors in Los Angeles, California. *Id.*, ¶¶89, 115. In May 1952,

17   Perls consigned the Painting to the Knoedler Gallery in New York on behalf of the
     Brodys. *Id.*, ¶99. Correspondence between Perls and Knoedler notes that the

18   Painting "does not appear on any of the lists" of artworks with questionable
     wartime provenance. *Id.* ¶104. It was sold later in May, 1952, in a documented

19   transaction, to Mr. and Mrs. Sydney Shoenberg of St. Louis for $16,500. *Id.* In
     May, 1954, the Painting, held in Shoenberg's private collection, was described and

20   illustrated in the internationally distributed art magazine, *Connoisseur*. *Id.*, ¶102.

21   [12] Plaintiffs make reference to John Rewald, a friend of Pissarro's fourth son, and

22   contend that the Baron would have learned that the Painting was Nazi-looted art if
     he or his staff had "made any effort to contact Rewald at the time of the 1976

23   purchase." Petropoulos Decl., ¶¶151, 155. But the Baron spoke with Rewald after
     the purchase. In 1989, the Baron's assistant wrote to Rewald asking him to write a

24   of catalogue of certain artworks in the Collection, including the Painting. Nicholas
     Decl., ¶139. In reply, Rewald declined the offer, but expressed no suspicions about

25   the Painting or any other artworks in the Collection. *Id.*

26   [13] Swiss law recognizes that to obtain ownership through acquisitive prescription,
     the purchase cannot lose good faith during the five-year prescription period. Ernst

27   Decl., ¶138. Because there were no facts or circumstances to rebut the presumption
     of good faith at the moment of purchase in 1976, continued good faith is presumed

28   and Plaintiffs bear the burden of proving otherwise. *Id.*, ¶139. As Plaintiffs failed to

9

**B.      Under Spanish Law, the Foundation Obtained Ownership of the Painting in the 1993 Acquisition Agreement**

Under Spanish law, the process of transfer of ownership requires two elements: the "title," usually a contract relating to the sale or exchange, and the "mode," which is the transfer of possession by the owner. 862 F.3d at 974; Yzquierdo Decl., ¶¶12, 58-59. The Ninth Circuit recognized, therefore, that both elements were satisfied, concluding that "*if the Baron had good title to the Painting* when he sold it to [the Foundation], the [Foundation] became the lawful owner of the Painting through the acquisition agreement." 862 F.3d at 974.

Because, the Baron possessed the Painting peacefully, publically – as owner – for more than five years, and because the Plaintiffs cannot rebut the Baron's presumed good faith possession, the Foundation "became the lawful owner of the Painting through the acquisition agreement" *id.*, under Spanish law, when it bought the Collection from the Baron's art trust, Favorita Trustees Ltd. ("Favorita").

**II.      THE FOUNDATION IS THE OWNER OF THE PAINTING UNDER SPANISH LAWS OF ACQUISITIVE PRESCRIPTION**

Even if the Foundation did not obtain good title through the 1993 Acquisition Agreement, it nonetheless obtained good title through Spain's laws of acquisitive prescription.

**A.      The Foundation Obtained Good Title Under Spanish Civil Code Article 1955's Six-Year Acquisitive Prescription**

Spain's acquisitive prescription laws require that the possessor: (1) possess the property for a statutory period, (2) possess the property as owner, and (3) possesses the property publicly, peacefully, and without interruption. Spanish Civil Code Art. 1955; 862 F.3d at 965. Within Article 1955, there are two categories of acquisitive prescription, each with different prescriptive periods. Spanish Civil

---

provide facts to prove a loss of good faith between 1976 and 1981, the Baron's ownership, as of 1981, is complete.

Code Art. 1955; Yzquierdo Decl., ¶¶13, 50. The Ninth Circuit recognized that the Foundation satisfied all three requirements for Article 1955's six-year acquisitive prescription, where good faith possession is not required. 862 F.3d at 965.

Explained below, the Foundation is also the lawful owner of the Painting under Article 1955's three-year acquisitive prescription, as the Foundation obtained and possessed the Painting in good faith.

### B.    The Foundation Obtained Good Title Under Spanish Civil Code Article 1955's Three-Year Good-Faith Acquisitive Prescription

#### 1.    Under Spanish Law, Good Faith Is Presumed

Spanish Civil Code Article 1955 affords that, where the above elements are satisfied, "[o]wnership of movable property prescribes by three years of uninterrupted possession in good faith." Spanish Civil Code Art. 1955; Yzquierdo Decl., ¶¶13, 50. Article 434 explains "[g]ood faith is always presumed, and the person asserting a possessor's bad faith shall have the burden of proving it." Spanish Civil Code Art. 434; Yzquierdo Decl., ¶¶18, 61.

While the Ninth Circuit – and this Court – reviewed Plaintiffs' purported evidence "with all inferences in their favor as required by our summary judgment rules," 862 F.3d at 972, *see also Cassirer v. Thyssen-Bornemisza Collection Found.*, 153 F. Supp. 3d 1148, 1153 (C.D. Cal. 2015), Plaintiffs can no longer rely on those inferences. The evidence demonstrates that the Foundation *did* possess the Painting in good faith. As the acquisition was to be made with public funds and its goal was to exhibit the Collection in a museum which would be visited by millions of people, it was necessary to ensure that the purchase was lawful and that the Foundation would take lawful title to the artworks in the Collection. Pérez de la Sota Decl., ¶100.[14] Spain took extra steps to conduct title investigations in 1989 and

---

[14] Seventeen paintings that were originally part of the Collection were excluded from the 1993 Acquisition because of authorship or title concerns. Pérez de la Sota Decl., ¶109. This included two of the most important artworks in the Collection (*Mata Mua* by Paul Gauguin and *The Lock* by John Constable). *Id.* Both were

1993 and obtained legal opinions from reputable law firms around the world to ensure the Baron held good title and the conveyance was lawful.[15] Pérez de la Sota Decl., ¶¶17, 55, 61. The Foundation's purchase was public, and accomplished with public funds and in connection with a Royal Decree. *Id*., ¶¶12, 91, 100; Acevedo Decl., ¶¶21-24. The $350 million paid for the entire Collection, including the Painting, was reasonable, taking into account contemporary values and limitations placed on the Collection[16], including the requirement that the Foundation cannot sell, exchange, charge, dispose, pledge, or otherwise encumber any artwork in the Collection; nor can the Foundation display artwork that was not part of the Collection. Pérez de la Sota Decl., ¶3; Acevedo Decl. ¶¶25-28.

But the $350 million, from funds given to the Foundation by Spain, was only part of the consideration agreed to by the parties: The Foundation is obligated by

_____

excluded from the Collection when it was purchased by the Foundation because it was not clear, after review by the law firms, that Favorita had free, marketable, and unencumbered title to the works. *Id.*

[15] As a condition subsequent to the 1993 Acquisition (which required the Favorita to represent and warrant good title) and as part of the further title investigation, Spain's lawyers examined more closely: (1) transfers of paintings between members of the Thyssen family or group which had taken place after 1980 but had not been covered by the 1989 investigation (some 50 paintings); (2) paintings added to the Collection to replace other paintings which had been withdrawn; (3) paintings which could be pledged by Favorita in favor of the Foundation as security for the satisfaction and performance of all the liabilities and obligations of the trustee; and (4) a thorough investigation, including a full inspection of all records in the Lugano Museum of the 30 most iconic paintings of the Collection. Pérez de la Sota Decl., ¶102. Counsel also conducted a search at the Art Loss Register "to see whether any of the relevant paintings had been registered as stolen," as the Foundation did not want to take the risk of acquiring property to which there could be an adverse claim. *Id.,* ¶103. All searches were clear as none of the listed artworks had been identified as stolen. *Id.*

[16] To determine the Collection's fair market value, Spain retained three of the most internationally recognized art consultants (Mr. William B. Jordan, Mr. Theodore E. Stebbins and Mr. François Daulte) to value the Spanish Collection. Pérez de la Sota Decl., ¶¶82-86. Spain asked Mr. Juan G. Domínguez Macías, to calculate the value of the main additional obligations which the Kingdom and the Foundation would have to undertake (the economic elements of the consideration other than the Price). *Id.,¶*87.

1  the 1993 Acquisition Agreement to: (1) maintain, conserve, exhibit publicly, and

2  promote all works in the Collection, (2) preserve the Palacio de Villahermosa

3  building and renovate it to house the Collection, and (3) finance these activities.[17]

4  Pérez de la Sota Decl., ¶79; Acevedo Decl., ¶10. Spain, in turn provided, free of

5  charge, the renovated Palacio de Villahermosa to house the Collection. Pérez de la

6  Sota Decl., ¶13. Spain also agreed that it would not alter the Collection and it

7  undertook to pay any deficit that the Foundation might run. *Id*.

8         Beyond the Foundation's public acquisition of the Collection, its ownership

9  of the Painting has been published in numerous documents and publicized in

10  exhibitions around the world. Acevedo Decl., ¶¶20, 30-32; Pérez de la Sota Decl.,

11  ¶¶47, 73, 97, 100. And Plaintiffs cannot point to an adverse ownership challenge

12  made against any other Collection artwork.[18]  Thus, Plaintiffs cannot rebut the

13  Foundation's presumed good faith possession.[19] Pérez de la Sota Decl., ¶106.

14         **2.      "Red Flag" Speculation Does Not Rebut the Foundation's**

15                **Presumption of Good Faith**

16         In the absence of evidence to affirmatively rebut the Foundation's

17  presumption of good faith possession, Plaintiffs rely on their "red flags" to suggest

18

---

19  [17] Dr. Petropoulos asserts that the Foundation's acquisition was "far below market

20  value," Petropoulos Decl., Dkt. No. 417, ¶198, ignoring the significant restrictions
   placed on the Collection by the Baron, as well as the significant costs taken on by

21  Spain and the Foundation in order to ensure that the Collection is properly housed
   for public view and benefit.

22  [18] The 1993 Acquisition Agreement included, as security to Spain and the

23  Foundation, a pledge by Favorita to pay $10 million in the event that there was a
   claim to an artwork purchased in the 1993 acquisition. Pérez de la Sota, Decl.,

24  ¶101. The term of the pledge – three years – corresponds intentionally to Article
   1955's three-year good-faith acquisitive prescription period. *Id.*

25
   [19] An encubridor is one who "*knowingly benefits* from stolen property."  862 F.3d at

26  967. This means that although the receiver did not participate in the underlying
   offense, the receiver takes economic advantage of its proceeds for their own

27  financial benefit. de Buerba Decl., ¶55. If the purchase price of the Collection was
   reasonable, there is no evidence that the Foundation attempted to obtain illicit

28  financial benefit. *Id.* ¶59.

13

1  that the Foundation knew, or should have known, that the Painting had an illicit

2  history. These "red flags" are merely hindsight-driven speculation and inferences.

3      As with the Baron, Plaintiffs argue that a torn, partial label on the back of the

4  Painting should have put the Foundation, its researchers, and its lawyers, on alert.

5  Dkt. No. 375 at 4-7, 9, 12. From the label, four words are legible: "Kunst" ("art" in

6  German), "und" ("and" in German), "Berl n," and "Pissarro." From this, Plaintiffs

7  extrapolate that the Foundation should have known the artwork was once in Bruno

8  and Paul Cassirer's art gallery in Berlin. Dkt. No. 375 at 6. Even if that connection

9  could be reasonably drawn, there is no reason to connect the gallery – *that closed in*

10  *1901* – with Nazi looting or Lilly Cassirer Neubauer. Nicholas Decl., ¶¶45, 53;

11  Stein Decl., ¶¶102-04; 124.

12      Plaintiffs contend that a 1954 CORA decision put the Foundation on notice

13  of Ms. Cassirer Neubauer's connection to the Painting, even though the decision

14  makes no reference to the name "Cassirer," referencing only "Neubauer." Dkt. No.

15  375 at 10. And even if this twelve volume U.S. Government publication was

16  accessible to those outside of the United States or Germany, there is no evidence

17  that the book was accessible to the Spanish government or its lawyers such that

18  they could search the haystack for the single "needle" – the footnote referencing the

19  Painting. Nicholas Decl., ¶68; Stein Decl., ¶¶56-57, 181.

20      Because the Foundation's public, peaceful possession as owner of the

21  Painting was not disturbed until May 3, 2001, almost eight years after it first

22  possessed the Painting as owner, and Plaintiffs cannot meet their burden of

23  demonstrating bad faith by the Foundation, under Spanish law, title vested in the

24  Foundation through good faith acquisitive prescription no later than June 21, 1996.

25   **C.    Spain's Substantive Statute of Limitations (Extinctive**

26         **Prescription) Vests the Foundation with Ownership**

27      Spanish Civil Code Article 1930 recognizes that "[o]wnership and other

28  rights in rem are acquired pursuant to prescription, in the manner and subject to the

14

conditions provided in the law. Spanish Civil Code Art. 1930; Yzquierdo Decl.,

¶57. Likewise, rights and actions of any kind are also extinguished by the running

of their statute of limitations." Spanish Civil Code Art. 1930; Yzquierdo Decl., ¶57.

Article 1961 states actions expire by the running of the statute of limitations by the

"mere lapse of the time set forth in the law." Spanish Civil Code Art. 1962;

Yzquierdo Decl., ¶57. Article 1962, which provides the statute of limitations for

actions involving moveable property, states:

> Actions in rem relating to movable property shall become barred by the
> statute of limitations six years after possession is lost, unless the
> possessor has acquired absolute title thereon, pursuant to Article 1,955,
> and excluding cases of loss and public sale and of purloin or theft, in
> which cases the provisions of Paragraph 3 of said Article [464] shall be
> observed.

Yzquierdo Decl., Exh. B. Spanish Civil Code Art. 1962. As required by Articles

1930 and 1932, Article 1962's six-year statute of limitations extinguishes the

Plaintiffs' right of action and right of ownership through extinctive prescription. *Id.*,

¶58, Exh. B. Thus, if the Foundation acquired ownership of the Painting through

good-faith acquisitive prescription, then the Foundation acquired "absolute title"

pursuant to Article 1955 after three years, and before Article 1962's six-year period

had run. *Id.*, ¶58. In the absence of good faith, the Foundation acquired "absolute

title" through acquisitive prescription under Article 1955 – at the same time that its

ownership is conferred by Article 1962 – on June 21, 1999, six years after the

Foundation took public, undisturbed ownership of the Painting.[20] *Id.*

---

[20] Article 1962, in conjunction with articles 1955 and 464, limits application of the statute of limitations in cases of loss, but it does not displace or supersede the prior clause recognizing acquisition of absolute title through acquisitive prescription (Article 1955). Yzquierdo, Decl., ¶58. Rather, the rule limits acquisition of title resulting from the running of the statute of limitations to permit an action by a deprived owner against a possessor that has not yet attained absolute title through acquisitive prescription. *Id.*

15

### D.    Spanish Civil Code Article 1956 Does Not Apply

The Ninth Circuit recognized that the Foundation met the requirements of six-year acquisitive prescription. *See* 862 F.3d at 965 ("Thus, Article 1955, read in isolation, would seem to bar the Cassirers' action for recovery of the Painting."). The panel noted correctly that Article 1956 limits application of Article 1955 where the possessor is a principal, an accomplice, or an accessory to the crime of theft. Article 1956 provides:

> Movable property purloined or stolen may not prescribe in the possession of those who purloined or stole it, or their accomplices or accessories [*encubridores*], unless the crime or misdemeanor or its sentence, and the action to claim civil liability arising therefore, should have become barred by the statute of limitations.

862 F.3d at 966. Restated by the Ninth Circuit, Article 1956 "extends the time of possession required for acquisitive prescription only as to those chattels (1) robbed or stolen from the rightful owner (2) as to the principals, accomplices or *accessories* after the fact ('encubridores') with *actual knowledge* of the robbery or theft." 862 F.3d at 966 (footnote omitted and emphasis added). Under Spanish law, the burden of proof lies with the party seeking to prove the necessary elements of the criminal offense; the defendant retains the presumption of innocence and may demonstrate elements which mitigate or exclude the purported criminal liability. de Buerba Decl., ¶68.

On appeal, Plaintiffs asserted that the Foundation meets the 1870 criminal code's more expansive definition of accessory because the Foundation "knew the Painting had been stolen when [it] acquired the Painting from the Baron." 862 F.3d at 966. The Ninth Circuit considered Plaintiffs' argument. Following a lengthy discussion of the history of Spanish law, the panel concluded that the 1870 criminal code provided the operative definition of "encubridor," and that, therefore, one who satisfies that definition may implicate Article 1956, thereby delaying application of Article 1955. *Id.* at 968.

The panel left for this Court two questions of fact (regarding Article 1956) to consider on remand. First, the panel found that "there is *a triable issue of fact* whether [the Foundation] is an encubridor (an "accessory") with the meaning of Civil Code Article 1956." 862 F.3d at 964 (emphasis added). Second, "*[a]ssuming* Article 1956 applies to someone who knowingly benefits from stolen property," the panel noted that it is *a triable issue of fact* whether the evidence demonstrates the "required actual knowledge element of Article 1956." 862 F.3d at 972 (emphasis added). Plaintiffs cannot prevail on either argument.[21]

## 1.     The Foundation Has Not Been Found (and Cannot Now Be Found) Liable as an Accessory

Article 1956 may delay application of Article 1955's acquisitive prescription where the property is held by an "accessory," until the "crime or misdemeanor or its sentence," and the derivative civil liability arising from the "crime or misdemeanor or its sentence," is barred by the statute of limitations. 862 F.3d at 966. Thus, as anticipated by the Panel, *were* the Foundation an accessory, Article 1956 *could* add five years to the six-year statute of limitations provided by Article 1962. And the statute of limitation *could* be extended further, pursuant to Article 1956, until expiration of the derivative civil liability statute of limitations.[22]

---

[21] Plaintiffs contend that the Foundation's challenge to Article 1956 is "contrary to the Ninth Circuit's decision." Dkt. No. 375 at 12. It is not, as the panel did not rule on the challenge, which was timely raised in a Petition for Rehearing and Rehearing En Banc in response to the panel's consideration of one of several waived arguments and subsequent misapplication of Spanish law.

[22] Mr. Alfredo Guerrero Righetto, asserts that civil liability derived from a crime may be imposed absent a final conviction.  Guerrero Decl., Dkt. No. 422. pages 29-32. As a general rule, that is not a correct statement. There have been isolated cases – where the accused died before the criminal action – in which a court has admitted the *possibility* of derivative civil liability. But in such scenarios, criminal charges were timely brought and the absence of conviction was the result of the accused death. Even in those cases, as described by Professor Yzquierdo, the case law rejects a claim of civil liability derived from a crime and would only admit civil liability derived from torts. Yzquierdo Decl., ¶11. Only in case of a pardon could it be admitted that the resulting liability qualifies as civil liability derived from a crime, but that is precisely because the existence of a crime (acknowledged by the

17

But *the Foundation is not an accessory*. It is not disputed that the Foundation has never been criminally charged, much less convicted, as an accessory.[23] de Buerba Decl., ¶12. The relevant five-year criminal statute of limitations, 862 F.3d at 966, ran on June 21, 1998, so the Foundation *cannot* be an accessory. Yzquierdo Decl., ¶31; de Buerba Decl., ¶22. And because the Foundation is not an accessory, there can be no *derivative* civil liability – no "action to claim civil liability arising therefrom" – to toll application of Article 1955 for an additional fifteen years. Yzquierdo Decl., ¶¶24, 31, 39, 63.

Plaintiffs and the Jewish Community Groups Amici reference commentators who *opine* that it was theoretically possible to apply Article 1956 in the absence of a valid conviction – for example, where the possessor dies or is pardoned – but even in those *theoretical* scenarios, criminal charges were brought prior to the close of the statute of limitations, such that the possessor's public, peaceful possession was disrupted.[24] Yzquierdo Decl., ¶24. There are, however, *no Spanish cases* in which Article 1956 was applied in the absence of a criminal conviction.[25] de

---

person accused) is a *necessary condition* for pardon. Plaintiffs fail to identify any case or commentary that suggests there can be *derivative* civil liability in the *absence of any criminal charges*.

[23] In Spain, criminal charges may be brought by public or private parties. This means that, prior to the June 21, 1998, when the criminal statute of limitation had run, *Plaintiffs themselves* could have brought criminal charges against the Foundation. de Buerba Decl., ¶17. They did not.

[24] Plaintiffs' commentator's theories cannot find support in case law from the Supreme Court which recognizes that, civil liability that is "derived from a crime" requires recognition that the underlying crime occurred. Except where the accused dies – precluding a conviction – or a person is pardoned after conviction, there must first be a formal finding of criminal liability before you can have civil liability driving from that crime. Yzquierdo Decl., ¶23. Without the crime, there can be no *derivative* civil liability; Plaintiffs identify no case law that purports to allow civil liability derived from a time-barred criminal allegation.

[25] None of the Spanish cases cited by Mr. Guerrero or the Brief Amici Curiae Comunidad Judía de Madrid and Federación de Comunidades Judías de España, Dkt. No. 400-2 ("Jewish Community Groups Amicus") supports their assertion that a prior criminal conviction is not required in a case like this.  Similarly, none of the cases support Plaintiffs' assertion that the Foundation is a criminal accessory and

18

1   Buerba Decl., ¶24. To find the Foundation to be an accessory in the absence of

2   criminal charges or a criminal conviction – more than ten years *after* the criminal

3   statute of limitations has run – would be to make new Spanish law that is not

4   supported by any existing Spanish law or case.

5

6   _____

that Article 1956 should apply – even though there was no charge or conviction,
and where the statute of limitations for bringing charges has long since passed –
simply because Plaintiffs now *allege* that the Foundation *might* have been an
accessory. Rather, in *every case cited where Article 1956 was applied*, there had
been a *criminal conviction*.

    Mr. Guerrero references – without attaching – STS of 18 December 2013 for
support. Guerrero Decl., page 24. His reference to this case is misleading, as the
Spanish Supreme Court did not apply Article 1956 in that case. The court made
reference to the fact that Article 1956 "denies that moveable property can be
acquired by prescriptive ownership by those whole sole or purloined them, or by
the accessories or "encubridores," as long as the crime or misdemeanor has no
prescribed, or its penalty, as well as the criminal action ex delicto." Guerrero Decl.,
page 25. But in doing so, the Spanish Supreme Court merely restated the language
of Article 1956 itself. The court did not take any further step – to analyze or apply
1956 – before it found that the possessor *did obtain ownership* through acquisitive
prescription.

    In the paragraph following the sentence quoted by Mr. Guerrero reads:

> Once proven in the first instance that the defendants have possessed the
> property object of the claim since the poet's death in 1984, for more
> than 26 years, and that this possession was as owner, public, peaceful
> and uninterrupted, and that the defendants held these goods because that
> is what the poet and his sister wanted, it is irrelevant in order to
> appreciate the extraordinary acquisitive prescription that they had not
> acquired by donation, the relevant thing is possession as an owner,
> public, peaceful and uninterrupted for the *term of six years*, conditions
> that are met.

Exhibit A (certified translation) (emphasis added).

    In STS 28 November 2008, also referenced by Mr. Guerrero, the claimant
made an argument similar to that made by Plaintiffs now, that the possessors may
have committed a crime and that the six-year acquisitive prescription period should,
therefore be delayed, but that argument was plainly dismissed by the court. Mr.
Guerrero again misleads the court. He asserts that this decision provides "an
example of the application of Article 1956," Guerrero Decl., page 25, but concedes
that the court "did not finally rule if, in fact, Article 1956 of the Civil Code was
applicable to the case," *id.* Mr. Guerrero offers a misleading description of that
ruling, as the court expressly dismissed the claimant's argument. Yzquierdo Decl.,
¶53, Exhs. H, U.

19

1    Moreover, as a matter of Spanish law, the Foundation cannot be deemed a

2 criminal accessory. Only individuals – not *legal persons*, like the Foundation – are

3 subject to liability under criminal law. *Id.*, ¶¶40-54. Prior to December 24, 2010,

4 only individuals could be held liable under Spanish criminal law. *Id.*, ¶41. Spanish

5 law was subsequently amended to allow legal persons to be held criminally liable

6 for certain offences enumerated in Spanish Criminal Code 1995. *Id.*, ¶41. But the

7 crime of receiving stolen assets – the crime equivalent to an encubridor under the

8 1870 criminal code – is not included in the list of criminal offenses which may give

9 rise to a legal person's liability. *Id.*, ¶41.

10    Plaintiffs attempt to evade this limitation by asserting that the Baron's

11 purported knowledge of the wartime taking must be imputed to the Foundation, and

12 that Foundation is somehow liable under a theory of *respondeat superior*. Even if

13 applicable, however, such a theory, could provide only civil – not the requisite

14 *criminal* – liability. *Id.*, ¶¶44-49, 52-54. This is evident in every one of the cases

15 cited by Mr. Guerrero, which reference that knowledge may be imputed to create

16 *civil* liability. Guerrero Decl., pages 13-19.

17    Nor can the Foundation be deemed criminally liable under a theory of

18 vicarious liability. Plaintiffs assert that the Baron's purported knowledge of the

19 Painting's theft "is imputed to [the Foundation] because, at the time of the 1993

20 sale of the collection from the Baron to [the Foundation], the Baron and his wife

21 were both vice-chairpersons of [the Foundation's] board and the Baron controlled

22 50% of the seats on [the Foundation's] Board." Dkt. No. 375 at 8. This contention,

23 however, is both factually and legally wrong.

24    First, as recognized by both the Ninth Circuit and this Court, Favorita was

25 the seller of the Collection (including the Painting), not the Baron. 862 F.3d at 957

26 ("In 1993, the Spanish government passed Real Decreto-Ley 11/1993, which

27 authorized and funded the purchase of the Collection. Spain bought the Collection

28 by entering into an acquisition agreement with Favorita Trustees Limited."); 153 F.

20

Supp. 3d at 1152 ("In accordance with Real Decreto-Ley 11/1993, on June 21, 1993, the Kingdom of Spain, the Foundation, and Favorita Trustees Limited entered into an Acquisition Agreement, by which Favorita Trustees Limited sold the Collection to the Foundation."); Pérez de la Sota Decl., ¶¶12, 36, 46, 71, 81. Plaintiffs' do not contend that the Baron's purported knowledge can be imputed to Favorita, and through Favorita, imputed to the Foundation or to Spain.

Under the loan agreement, the Baron had the right to appoint 1/2 of the members of the board of trustees – not a majority. Pérez de la Sota Decl., ¶79. The Baron was made the chairman, but he could not cast a vote. *Id.* After the 1993 Acquisition, the Thyssen family were entitled to appoint only 1/3 of the members of the board. *Id.* While the Baron was the chairman during the loan phase; after the 1993 acquisition, he became an honorary (non-member) chairman. *Id.* Similarly, the Baroness was a trustee during the loan phase and became a vice-chairperson after the 1993 Acquisition. *Id.* None of these positions gave the Baron or the Baroness any executive power or control during either the loan phase nor after the 1993 Acquisition. *Id.* It was Spain (which had to pass a Royal Decree to use public funds) – not the Foundation – that participated in the negotiation's leading up to the 1993 Acquisition, making the Foundation's purported imputed knowledge irrelevant. *Id.*, ¶12, 71-75. And it was Favorita – *not the Baron* – that sold the Collection to Spain, which placed it with the Foundation so that the Collection could be shared publically.[26] *Id.*, ¶¶12, 36, 46, 71, 81.

By its own terms, Article 1956 applies to delay application of Article 1955 *only* where the possessor *is* a principal, accomplice, or accessory to a crime. Because the Foundation was not found to be criminally liable as an accessory – and

---

[26] Plaintiffs' vicarious liability theory fails as a matter of Spanish law as, noted above, the knowing receipt of stolen assets is not one of the limited number of criminal offenses from which a legal person can be found criminally liable. de Buerba Decl., ¶41. Thus, neither theory of indirect liability is applicable; both fail to rebut Spanish law's long-established, codified limitation that a legal person – such as the Foundation – cannot be held criminally liable as an accessory.

21

1   cannot now be found criminally liable as an accessory – Article 1956 cannot, as a

2   matter of Spanish law, apply. As the Ninth Circuit recognized that Article 1955

3   vests title in the Foundation if Article 1956 does not apply, 862 F.3d at 965, the

4   Foundation is the owner of the Painting under Spanish law.

5   **2.   Even if Article 1956 *Could* Apply, Plaintiffs Cannot**

6   **Demonstrate the Requisite Actual Knowledge**

7   Even if this Court were to *ignore* Spain's five-year criminal statute of

8   limitations – which precludes the Foundation from being charged as an accessory

9   after June 21, 1998 – to consider whether the Foundation could be a criminal

10  accessory in 2018, Plaintiffs argument fails, as Plaintiffs cannot demonstrate, as

11  they must, that the Foundation "knowingly received stolen property when [it]

12  acquired the Painting from the Baron." 862 F.3d at 967.

13  As the Ninth Circuit recognized, Plaintiffs must demonstrate "actual

14  knowledge" that the Painting was stolen from Lilly Cassirer Neubauer. 862 F.3d at

15  968 n.17. "Actual knowledge," under Spanish law, is a high bar. de Buerba Decl.,

16  ¶¶57-61. The offence of receiving stolen assets must be committed willfully; the

17  reckless receipt of stolen assets is not categorized as criminal offence. *Id.*, ¶¶57-58.

18  The Spanish Supreme Court recognized, that in connection with receiving stolen

19  property, actual knowledge is the "state of mind of certainty, where mere suspicions

20  or presumptions are not enough, although the one responsible for the concealment

21  is not required to know the specific circumstances surrounding the punishable act."

22  *Id.*, ¶66. Spanish law recognizes a presumption of innocence. *Id.*, ¶67.

23  Plaintiffs' red flags and revisionist speculation may have defeated summary

24  judgment, but they fall far short of demonstrating "actual knowledge." Without

25  inferences drawn in their favor, "as required by [the Court's] summary judgment

26  rules," 862 F.3d at 972, Plaintiffs cannot meet their burden. Aside from the

27  Foundation's presumption of innocence, the evidence demonstrates that the

28  Foundation purchased (and has since, maintained, exhibited, and published), the

1  Collection, including the Painting, in good faith and without any knowledge that it

2  had been part of a forced sale until Claude Cassirer filed a petition in Spain in 2001

3  – marking the first claim to the Painting since the 1958 Settlement.

4       There is, however, one person who has provided direct testimony to this

5  Court *who does* have "actual knowledge" of the events relating to the sale of the

6  Collection to Spain and the Foundation. Spanish attorney Fernando Pérez de la Sota

7  was part of the legal team advising Spain and the Foundation from 1988 through to

8  the 1993 Acquisition Agreement. Pérez de la Sota Decl., ¶6. In addition to

9  describing, in detail, the process leading to the acquisition, *id.*, ¶¶7-109, Mr. Pérez

10 de la Sota testified, *under oath*, that neither Spain nor the Foundation had

11 knowledge of the Painting's theft when the Collection was acquired in 1993 and

12 they conducted multi-pronged due diligence to ensure that there were no concerns

13 in acquiring the Collection, with public funds and for public display, *id.* ¶¶10, 11,

14 116.

15      Because Plaintiffs' "evidence" does not suggest, much less prove, that the

16 Foundation had actual knowledge of the Painting's wartime looting until Mr.

17 Cassirer's 2001 petition, the Foundation cannot, under any legal theory, be deemed

18 an encubridor.

19 **III.   LACHES BARS THE CASSIRERS' CLAIM**

20      Finding the Foundation the owner of the Painting under Spanish laws of

21 acquisitive prescription, this Court found it unnecessary to address the Foundation's

22 argument that the Plaintiffs' claims are barred by laches.[27] This doctrine, however,

23 _____

24 [27] During the pendency of the last appeal, Congress enacted the Holocaust
   Expropriated Art Recovery Act of 2016 ("HEAR Act"), H.R. 6130, which created a

25 uniform, federal six-year statute of limitations.  While recognizing that the HEAR
   Act may preclude application of "any defense at law relating to the passage of

26 time," Section 5(a), the Ninth Circuit rejected Plaintiffs assertion that the HEAR
   Act barred the Foundation's acquisitive prescription defense. 862 F.3d at 965. After

27 the HEAR Act was introduced, it was amended to affirmatively remove prior
   references to laches, ensuring the continued "availability of equitable defenses and

28 the doctrine of laches." Senate Report 114-394, December 6, 2016, at 7. Thus, to

23

1    provides yet another sound basis on which this Court can reject Plaintiffs' claim.

2    "Laches is an equitable time limitation on a party's right to bring suit," *Boone v.*

3    *Mech. Specialties Co*., 609 F.2d 956, 958 (9th Cir. 1979), resting on the well-

4    established premise that "one who seeks the help of a court of equity must not sleep

5    on his rights," *Piper Aircraft Corp. v. Wag-Aero, Inc*., 741 F.2d 925, 939 (7th Cir.

6    1984) (Posner, J., concurring). Courts examine at what point the plaintiff "knew or

7    should have known" of the claim – a standard that allows a laches defense to be

8    based on either actual or constructive knowledge. *Miller v. Glenn Miller Prods.,*

9    *Inc*., 454 F.3d 975, 980 (9th Cir. 2006).

10       Here, Plaintiffs' predecessors "knew or should have known" of the existence

11   of their claim long before 2000. Despite the Cassirer family's prominent role in the

12   art world, between 1958 and 1999, the they did nothing to protect their strongly-

13   maintained assertion of ownership after the 1958 settlement. Nicholas Decl., ¶¶162-

14   65; Stein Decl., ¶¶119, 161. David Cassirer notes that his father, Claude Cassirer,

15   "always held out hope that Lilly's Pissarro would be found one day." D. Cassirer

16   Declaration, Dkt. No. 410 at 6:27-28. Yet Claude Cassirer testified that he did

17   nothing until late 1999, when he learned the Painting's location from a client. Dkt.

18   No. 403-2, 168:14-171:10; 181:11-182:14.

19       The Baron and the Foundation reasonably relied on the absence of any

20   interruption to their public ownership and on Swiss and Spanish law to obtain and

21   formalize their vested property interests.[28] Good faith reliance is evident from the

22   public nature of the 1993 acquisition, as well as the Painting's extensive publication

23   and public exhibition history. Acevedo Decl., ¶¶20, 30-32; Pérez de la Sota Decl.,

24   ¶¶47,73, 97, 100.

25   ───────────────

26   the extent that Plaintiffs' claims are facially timely under the HEAR Act, they are
     vulnerable to (and barred by) laches.

27   [28] As noted above, when Spain discovered title issues with two works in the
     Collection, those works were excluded from the 1993 Acquisition. Pérez de la Sota

28   Decl., ¶109.

24

1      Had Plaintiffs' predecessors taken any action before or during the Baron's or

2 the Foundation's acquisitions and their public, uninterrupted possessions vesting

3 title (1976-June 21, 1999), Plaintiffs' post-1958 ownership interest could have been

4 addressed before Swiss and/or Spanish law vested ownership of the Painting in the

5 Baron and the Foundation. If Plaintiffs' predecessors had opened one of the many

6 books published after the Foundation's 1993 acquisition that identified the

7 Painting's ownership and location, they would have discovered its whereabouts.

8      But Plaintiffs' predecessors did nothing for forty years, making no inquiry

9 until after *someone else* found the Painting in a book. Now the prior owners are

10 gone and no one can provide first-hand information regarding the 1958 Settlement

11 Agreement or any of the transactions that predate the Foundation's possession and

12 ownership. Because Plaintiffs' delay is unreasonable and the Foundation suffers

13 prejudice as Plaintiffs' claims go forward, laches bars Plaintiffs' claims are barred.

14      Spanish law also recognizes the doctrine of laches, known in Spain as

15 *Verwirkung*. Yzquiero Decl., ¶58 n.10. It is premised on the understanding that

16 good faith requires a party to exercise their rights. *Id.* Thus, a party in Spain can

17 raise the affirmative defense that an action is barred as the result of the plaintiff's

18 unreasonable delay. *Id.* But *Verwirkung* is a secondary defense, raised when the

19 plaintiff has delayed bringing a claim, but the statute of limitations has not yet run.

20 *Id.* Discussed above, Article 1962's six-year statute of limitations *has run*. *Id.* ¶¶57-

21 58. Thus, as applied here, extinctive prescription mandates that once the statute of

22 limitations ran on June 21, 1999, Plaintiffs' claim became time-barred and

23 "absolute title" vested in the Foundation.

24                              **CONCLUSION**

25      For the reasons set forth above, the Foundation is the lawful owner of the

26 Painting.

27

28

1    Dated: November 26, 2018              NIXON PEABODY LLP

2

3                                          By: */s/Sarah Erickson André*
                                               Thaddeus J. Stauber
4                                              Sarah Erickson André
                                               Aaron M. Brian
5                                              Irene Scholl-Tatevosyan

6                                              Attorneys for Defendant
                                               Thyssen-Bornemisza Collection
7                                              Foundation

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28