**BOIES SCHILLER FLEXNER LLP**
David Boies (*pro hac vice*)
 *dboies@bsfllp.com*
333 Main Street
Armonk, New York  10504
Tel.:   (914) 749-8200 Fax: (914) 749-8300

Stephen N. Zack (*pro hac vice*)
 *szack@bsfllp.com*
Andrew S. Brenner (*pro hac vice*)
 *abrenner@bsfllp.com*
Velvel (Devin) Freedman (*pro hac vice*)
 *vfreedman@bsfllp.com*
100 SE 2nd Street – Suite 2800
Miami, Florida  33131
Tel: (305) 539-8400  Fax: (305) 539-1307

David L. Zifkin, State Bar 232845
 *dzifkin@bsfllp.com*
401 Wilshire Boulevard
Suite 850
Santa Monica, California  90401
Telephone: (310) 752-2411
Facsimile: (310) 752-2490

**KENDALL BRILL & KELLY LLP**
Laura W. Brill (State Bar No. 195889)
 *lbrill@kbkfirm.com*
Nicholas Daum (State Bar No. 236155)
 *ndaum@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, CA  90067
Tel: (310) 556-2700  Fax: (310) 556-2705

Attorneys for Plaintiffs DAVID CASSIRER,
THE ESTATE OF AVA CASSIRER, and
JEWISH FEDERATION OF SAN DIEGO
COUNTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DAVID CASSIRER, THE ESTATE OF AVA CASSIRER, and the UNITED JEWISH FEDERATION OF SAN DIEGO COUNTY, a California nonprofit corporation,<br><br>       Plaintiffs,<br><br>     v.<br><br>THYSSEN-BORNEMISZA COLLECTION FOUNDATION, an Agency of instrumentality of the Kingdom of Spain,<br><br>       Defendant. | Case No. CV 05-03459-JFW (Ex)<br><br>**PLAINTIFFS' TRIAL BRIEF**<br><br>Judge:      Hon. John F. Walter<br>Courtroom:  7A<br>Trial:       December 4, 2018<br>Time:     8:00 a.m. |

1

# **TABLE OF CONTENTS**

2

Page

TABLE OF CONTENTS ......................................................................................ii

TABLE OF AUTHORITIES...............................................................................iv

I.    FACTS.......................................................................................................1

    A. The Cassirer family owned the painting for 39 years before the Nazis stole it ...........................................................................................1

    B. After the war, Lilly's ownership was reconfirmed, but the painting was illegally smuggled into the United States without her knowledge ..........2

    C. The Baron bought the Painting knowing it was stolen, ignoring obvious indicia of theft, and foregoing easy avenues to confirm that the Painting was Nazi-Looted art ................................................................3

        1. The Baron was aware of Nazi practices and joked about his willful blindness ............................................................................3

        2. The Painting had a label from the Cassirer Gallery in Berlin, and other identifying labels had been torn off .........................................5

        3. The Baron's knowledge is confirmed by his post-acquisition cover-up and conduct...............................................................................7

        4. The Baron's knowledge is further confirmed by his lack of effort to determine the painting's provenance from 1899-1976 .................10

    D. TBC likewise knew the painting was Nazi-looted art ...........................12

        1. The Baron's knowledge is imputed to TBC...................................12

        2. Other TBC Employees and Experts Had Independent Knowledge of the Theft ....................................................................................12

II.    LEGAL ISSUES......................................................................................14

    A. Burden of Proof and Presumption of Good Faith .................................14

    B. The Baron and TBC had "actual knowledge" of the theft.....................14

    C. The knowledge of the Baron and other TBC agents is imputed to TBC ......................................................................................................16

    D. The Baron did not acquire the Painting in good faith............................17

    E.  Other issues raised by TBC are not properly before the Court..............17

    F.  In any event, TBC's contentions lack merit...........................................20

        1.  Laches...................................................................................20

        2.  Alleged "Criminal Conviction" Requirement.................................20

        3.  Alleged "Legal Persons Excluded" requirement............................23

        4.  Alleged right to "tack" time held by prior possessors....................23

III.    CONCLUSION AND JUDGMENT.............................................................24

PROOF OF SERVICE...................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Bell v. Feibush*
   212 Cal.App.4th 1041 (2013)................................................................24

*Cassirer v. Thyssen-Bornemisza Collection Found.*
   862 F.3d 951 (9th Cir. 2017).................................................................1

*DeWeerth v. Baldinger*
   836 F.2d 103 (2d Cir. 1987)................................................................11

*Equitable Life Assur. Soc. v. McKay*
   861 F.2d 221 (9th Cir. 1988)...............................................................24

*In re Cellular 101, Inc.*
   539 F.3d 1150 (9th Cir. 2008)..............................................................20

*Menzel v List*
   267 N.Y.S.2d 804 (N.Y. Co. 1966)........................................................11

Payan v. Aramark Mgmt. Servs. Ltd. P'ship
   495 F.3d 1119 (9th Cir. 2007)..............................................................15

*Penn Intern. Industries v. Pennington Corp.*
   583 F.2d 1078 (9th Cir. 1978)..............................................................20

*Potter Voice Tech. v. Apple Inc.*
   24 F. Supp. 3d 882 (N.D. Cal. 2014) ...................................................17

*Sedima, S.P.R.L. v. Imrex Co., Inc.*
   473 U.S. 479 (1985) .........................................................................24

*United States v. Jewell*
   532 F.2d 697 (9th Cir. 1976)..............................................................16

*Volvo Trademark Holding Aktiebolaget v. Clark Machinery Co.*
   510 F.3d 474 (4th Cir.  2007)..............................................................20

*Weimar v. Elifcon*
   385 F. Supp. 747 ( E.D.N.Y. 1972)....................................................11

## STATUTES

18 USC §§ 1961................................................................................23
Cal. Penal Code § 496 .......................................................................23

## OTHER AUTHORITIES

*Concepts of Intention in German Criminal Law*, 24 OXFORD J. LEG. STUD. 99, 99
   (2004) ..........................................................................................16

*Convergence of Civil Law and Common Law in the Criminal Theory Realm*, 13
   U. MIAMI INT'L & COMP. L. REV. 163, 181 (2006) ............................................16

*The Duty to Investigate Alleged Violations of International Humanitarian Law*,
   49 N.Y.U. J. INT'L L. & POL. 181, 195 (2016) .................................................15

1

## SPANISH LEGISLATIVE CODE

Civil Code 1903 ................................................................................................ 16
Spanish Civil Code Article 1956 .................................................................. 1, 21
Spanish Criminal Code Article 116(1) ............................................................ 22
Spanish Criminal Code arts. 21-22 ................................................................. 16

## SPANISH LAW COMMENTARIES

M. Yzquierdo Tolsada, Lecciones Sobre Posesión y Usucapión 107-08
    (2002) ............................................................................................................ 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs (the "Cassirers") allege that Defendant, the Thyssen-Bornemisza Collection Foundation ("TBC"), is wrongfully in possession of a valuable work of art, that belongs to the Cassirers – specifically, *Rue Saint-Honoré, Après-midi, Effet de Pluie (St. Honoré St., Afternoon, Effect of Rain)*, oil on canvas, @ 1897 by Camille Pissarro ("*Rue Saint-Honoré* " or the "Painting"). The Cassirers seek its return.

TBC admits Lilly Cassirer owned *Rue Saint-Honoré*, that the Nazis stole it from her, that TBC continues to possess it without Lilly's heirs' consent and that TBC refuses to return it. It is also undisputed that TBC purchased the Painting in 1993 from its then "Chairman for Life," Baron Hans Heinrich Thyssen-Bornemisza (the "Baron").

The Ninth Circuit has held that Plaintiffs' claims are governed by Spanish law, *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951, 963 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1992 (2018), and that, under Spanish Civil Code Article 1956 ("CC 1956"), Plaintiffs are entitled to the Painting if TBC acquired it with "actual knowledge" that the painting was stolen property and if, as a matter of Swiss law, the Baron did not acquire the Painting in "good faith." *Id*. at 975, 981.

In light of the Ninth Circuit's holding, the primary issues for trial are whether TBC knew the Painting was Nazi-looted art (either independently or through its Chairman, the Baron), and whether the Baron bought the Painting in good faith. TBC has also raised various other defenses, which Plaintiffs submit lack merit and are, in any event, not properly before the Court.

## I.    FACTS

### A.    The Cassirer family owned the painting for 39 years before the Nazis stole it

The Painting's history, from its creation by legendary Impressionist Camille Pissarro in 1897 until its purchase by the Baron in 1976, is undisputed. Before World War II, the Cassirer family ran a prominent art gallery in Berlin. Declaration

Case No. CV 05-03459-JFW (Ex)
PLAINTIFFS' TRIAL BRIEF

of Jonathan Petropoulos (DE 417) ("DJP") ¶ 44. The Cassirers purchased the Painting in 1900 directly from the artist's exclusive agent in Paris. Lilly Cassirer, Plaintiffs' great-grandmother, inherited it in 1926 and displayed it prominently in her home.  Joint Exhibit (DE 376-1) ("Ex.") 10.

After Hitler assumed power in 1933, the Nazis systematically stripped Jewish families' possessions to pauperize, dehumanize, and eventually exterminate them. DE 377, Ex. A – Joint Proposed Stipulation of Facts ("Stip.") ¶ 12.  As part of this genocide, the Nazis ruthlessly plundered Jewish-owned art and other cultural property. DJP ¶ 54. In 1939, the Nazis forced Lilly to "sell" the Painting in exchange for exit visas for her and her husband, and 900 RM ($360) she could never access. Stip. ¶¶ 10-14. If Lilly had not fled Germany at that time, she likely would have been murdered in a concentration camp, as her sister Hanchen (Hannah) was.  Stip. 13.

After the war, the art world was well aware that Pissarro paintings in particular were immediately suspect as having been looted by the Nazis. This is because Pissarro, whose full name was Jacob Abraham Camille Pissarro, was a Jewish artist, with substantial Jewish clientele. This targeting of Pissarro's works by the Nazis was well documented. DJP ¶¶ 86–96.  It was also well known that members of the prominent Cassirer family were Nazi victims, and their art collections had been looted. DJP ¶ 56.

**B.    After the war, Lilly's ownership was reconfirmed, but the painting was illegally smuggled into the United States without her knowledge**

After the war, U.S. Military Law No. 52 declared all forced sales void, and criminalized the removal of Nazi-looted art from Germany. Stip. ¶¶ 15-16.  Both German and U.S. Military authorities confirmed Lilly owned the Painting.  Stip. ¶¶ 16-17.   In 1954, the United States Court of Restitution Appeals ("CORA")

published this holding and it was later cited in a four-volume "book of authority" for restitution laws.  Stip. ¶ 17; DJP ¶ 177; Ex. 23.

Nevertheless, the Painting was smuggled out of Germany and into the United States, where various people held it until 1976. The then-possessor, the estate of Sydney Shoenberg, delivered the Painting to the Stephen Hahn Gallery in New York City for consignment sale. Hahn put the Painting on exhibition at his Manhattan gallery, which the Baron personally visited in October 1976. Stip. ¶ 26; Ex. 72.

### C.   The Baron bought the Painting knowing it was stolen, ignoring obvious indicia of theft, and foregoing easy avenues to confirm that the Painting was Nazi-Looted art

#### 1. *The Baron was aware of Nazi practices and joked about his willful blindness*

Although TBC portrays the Baron as an innocent, art-loving philanthropist, in reality he was not an admirable man. As detailed below, his famous family, which owned Thyssen Steel, was deeply involved with the Nazis. The fact that the Baron himself was an alcoholic and a womanizer who was shamelessly unfaithful to his five wives (Ex. 343 at 291, 294, 335, 416; Ex. 351 at 96-97, 104-05, 113, 117–30) is relevant only to respond to TBC's assertions of his good character. However, his boasts that he "should be in jail" for tax evasion and enjoyed "smashing up a whole room at the Carlton Hotel because I was furious about something. That was so much fun" (Ex. 343 at 319; Ex. 344 at 2; Ex. 343 at 249) also go to his relevant state of mind.

The Baron's uncle Fritz, a wealthy German industrialist and close friend of Herman Goering, helped finance Hitler's rise to power, encouraged others to do so, and served as a Nazi Reichstag deputy and state councilor.  Ex. 310 at 111-15, 128-33, 158; Ex. 343 at 86-87, 98-99; Ex. 351 at 105. The Baron's sister, the "killer countess," was personally involved in the murder of 180 Jews after a dinner party

she hosted with her Gestapo boyfriend. Exs. 345, 353, Ex. 343 at 180-81. The Baron's father (a client of the Cassirer Gallery in Berlin before the Hitler era) also contributed financially to the Nazis and purchased art, a 160 acre stud farm with valuable race horses, and other property that the Nazis expropriated from Jewish people. Ex. 343 at 108-09, 118, 120, 123-24, 127, 135-36, 154. His companies built U-boats and munitions for the Nazi war machine and profited from slave labor. *Id*. at 114-15, 123-24, 135-36, 143, 153-54, 163, 165.

The Baron was aware of all this – he served as a board member on his father's companies, actively worked for them, and he inherited the stud farm. *Id*. at 143, 153-54, 163, 171, 261-62.  The Baron was therefore well aware of the Nazis' atrocities, his family's participation in them, his benefitting from their crimes, and their stealing and selling of Jewish property.

Moreover, the Baron was one of the most sophisticated art collectors in the world. DJP ¶ 6. He employed curators and other experts to assist him with evaluating art works he was interested in acquiring.  DJP ¶ 138.  The Baron and his experts knew about the conscience-shocking impact of the Nazis on the Jewish people, and the extent of Nazi art theft.

Despite his sophistication and experts, the Baron was not shy about claiming blindness to the truth in his acquisition of art with dubious provenance. When indicted in 1972 by Italian authorities for illegally exporting art from Italy, the Baron joked, "I hope that none of the pictures in my gallery was painted in Switzerland.  They were all painted abroad.  I buy the stuff in Switzerland and the United States, but how it gets there I don't know.  I can't check all that." Ex. 367 at 4; *see* Ex. 373. This statement was doubly false.  In the first instance, the Baron did know how the "stuff" had gotten to Switzerland – he personally sent a car to Italy to smuggle it out. Ex. 343 at 296.  But also, he *could* "check all that" – art curators, archivists, and other experts research art provenance for a living, and the Baron could and did employ such experts when it suited him. DJP ¶ 138.

### 2. *The Painting had a label from the Cassirer Gallery in Berlin, and other identifying labels had been torn off*

When a master work of art goes to a gallery or to an exhibition, the establishment typically places a label on the verso (back) of the work, which serves as an important reference for provenance purposes. DJP ¶ 114; Ex. 374. There is no legitimate reason to tear off these labels as they serve the dual purpose of fortifying an artwork's authenticity and increasing its value. DJP ¶ 114.[1] The removal of such labels is like filing the serial number off a stolen gun or the VIN number on a motor vehicle – clear causes for concern. *Id.*

The Nazis were particularly meticulous about documenting everything they did, and thus they attached labels to artworks they confiscated. DJP ¶ 115. Of course, it's likely any post-war trafficker of Nazi-looted art would remove such Nazi labels before showing the work to prospective buyers. *Id.*

When the Baron inspected the Painting at the Stephen Hahn Gallery in New York, offered for sale at a suspiciously low price,[2] he undoubtedly observed the remnants of ***numerous*** labels that had been torn off the Painting.[3] Ex. 348 at 6-8; Ex. 379 at 5. These remnants are still visible to this day, as shown in photographs taken by Dr. Jonathan Petropoulos, Plaintiffs' expert.[4]

Moreover, although most labels had been removed completely, the Painting still had one partial label easily recognized by any art expert: a torn

---

[1] Without support, TBC experts dubiously claim that removal of labels is "normal" and not a "red flag." DE 399 at 12; 412 at 52. TBC acknowledges, however, that labels are "an important source of information" that can lead to "key findings," DE 412 at 52, and does not suggest any legitimate reason for their removal.

[2] Declaration of William Smith ("DWS") (DE 408) ¶ 25.

[3] This is the least damning explanation. It is also possible that the Baron himself removed the labels after acquiring the Painting.

[4] TBC cites the lack of Nazi labels as a sign the Baron was unaware he was buying looted art. DE 399 at 13. But such labels would be the first things a trafficker would remove. DJP ¶ 115.

label from the prestigious Cassirer Gallery in Berlin. Ex. 348 at 3-4. In addition to plainly stating "Berlin," the torn gallery label irrefutably ties the Painting to the Cassirer Gallery, as TBC's own experts now admit.  Ex. 399 at 12; Ex. 412 at 51.

First, it bears the partial address "VICTO" of the world-renowned gallery at **Victo**riastrasse 35, and refers to the "KUNST UND VERLAGSANSTALT" ("Art and Publishing Establishment") that was widely known in the art world to be closely associated with the prominent Cassirer family in Germany. Similar labels are likely affixed to the verso of other paintings in the Baron's collection that his father had purchased at the Cassirer Gallery in Berlin.[5]

Furthermore, despite this label clearly stating "Berlin," the  provenance information provided by Hahn stated only that it has been on exhibition in Paris in 1899. It had *nothing* about a stint in Germany and failed to provide *any* information about the past *77 years* of the Painting's history.

Thus, in 1976, the Baron (one of the world's foremost art experts) was standing before a painting that he indisputably knew had both (1) clearly wrongful provenance information and (2) a massive gap in provenance that spanned almost a century and included the crucial Nazi era from 1933 through 1945. Ex. 72. In other words, the Baron knew that the provenance he was being given for the Painting was incomplete and inaccurate.  All of his action and inaction from that point must be viewed through that prism.

The Baron knew he was looking at a painting by a Jewish artist whose work was immediately suspect as stolen by the Nazis, that had many labels

---

[5] TBC, through its experts, implies that the Cassirer Gallery in Berlin opened in 1898, but somehow "ceased to exist" three years later, in 1901.  This is not true.  Indeed, TBC's own website, in its published provenance descriptions for the art works in its permanent collection, cites example after example where the Cassirer Gallery — long after the turn of the century — was the source from which the Baron's family purchased art. Ex. 368.

visibly torn off, and that still bore a partial label showing the Painting had been in Berlin (the Nazis' capital city), at the Cassirer Gallery —a famous Jewish gallery his own father had been a patron of that was known to have had its art plundered by the Nazis – and that it was being sold at a suspiciously low price.

Even a semi-sophisticated art collector would have instantly known he was looking at Nazi-looted art. And the Baron, a highly sophisticated art collector entangled in the Nazis' crimes as he was, undoubtedly knew exactly what he was purchasing.  Nazi looted art.

In a patently obvious attempt at misdirection, TBC's experts assert that none of this provided the Baron or TBC with information that would have "led to Lilly" or the *specifics* of the theft. DE 412 at 8, 41, 54; DE 399 at 12, 14. But that is irrelevant. The issue is whether the Baron and TBC knew the Painting had been *stolen*, full stop. The precise details of who it was stolen from, when it had been stolen, and where it had been stolen are irrelevant. As TBC's own Spanish law expert admits, an *encubridor* need not have "comprehensive or detailed knowledge of the date, method or place" or other "specific circumstances" of the theft. DE 402 at 33.

### 3. The Baron's knowledge is confirmed by his post-acquisition cover-up and conduct

The Baron's conduct after the purchase confirms he knew exactly what he had bought. Aware that he had just purchased looted art, the Baron took immediate action to obfuscate its provenance. On November 22, 1976, the very day the Baron received his invoice for the Painting from the Stephen Hahn Gallery in *New York*, Exs. 72 & 320 (see Arrival – EINGANG - stamp), he directed his employee to record falsely that the Painting had been purchased from the "Galerie Hahn" in *Paris*, France, that the Painting was being "stored in a safe in Paris," and that the name of the Painting was "*La Rue St. Honoré, effet de Soleil, Apres-Midi, 1898*" (effect *of sun*, a totally different Pissarro that the Baron never owned, not the

Cassirers' Pissaro, St. Honorè in the afternoon with the "*effect de pluie*," effect *of rain*). Ex. 322. The Baron's employee knew this was untrue (he had the New York invoice at hand) and appears to have tried to protect himself by writing that the false information had been provided by "H.HTB"[6] – the Baron himself. *Id.*

Further evidence that something was wrong with this transaction was that at the time of the purchase, Stephen Hahn asked the Baron to make the payment for his commission on the Painting and the full price of the three other artworks to a Liechtenstein entity via a Swiss bank. Exs. 318-321. The Baron agreed and made his payments as requested. Ex. 178.  There was no legitimate reason for a New York sale by a New York art dealer to be so concealed. DJP ¶ 131. TBC offers no explanation for this.

One of the other pictures purchased by the Baron from Hahn that same day was a $1.5 million Cézanne, one of the 30 most valuable and iconic works in the Baron's collection.[7] In a later interview, the Baron is quoted as saying of this Cézanne, "I neither remember where nor from whom I bought it, nor any story related to it, only that I always wanted to have a Cézanne and I believe I bought it in Paris." Ex. 343 at 314. This is further proof of "an obvious lie." DJP ¶ 127. This was a $1.5 million purchase after a personal visit by the Baron to the New York gallery in Manhattan, a purchase discussed in several letters between the Baron and Hahn. See Exs. 318-320.[8]

_____

[6] **H**ans **H**einrich **T**hyssen-**B**ornemisza.

[7] Defendant's Proposed Findings of Fact and Conclusions of Law (DE 427) at 36–37, ¶ 235; *see* Declaration of Fernando J. Perez de la Sota (DE 405) at 38, ¶ 102(d).

[8] As Ex. 320 makes clear, Stein's claim (DE 412 at 44) that it "appears that the Painting was stored in Paris at some point" is untrue; the Painting and the Cézanne were in New York on the date the ledger entry was made. Nothing suggests these artworks were ever in Paris after the Baron bought them. Nicholas' claim (DE 399 at 31) that the ledger entry refers to a "different Pissarro" is false, as "*effet de Soleil*" had not been in Paris since 1920, and the Baron never owned it. *See* Ex 381.

Furthermore, after purchasing the Painting, the Baron hung it in the dressing room of his master bedroom suite. Exs. 190, 327. This demonstrates that (i) he very much liked and therefore paid careful attention to this artwork and (ii) that he did *not* put the Painting in his private museum that was occasionally opened to the public, as asserted by TBC's experts. TBC's claim that the Painting was "openly displayed" at the villa and "seen by hundreds of thousands of people annually," is false. Ex. 399 at 34.

In fact, the Baron kept up this campaign of misdirection years after his purchase. For example, even when the Painting was purportedly sent abroad on exhibition,[9] the Baron published a false provenance. The catalogue for the 1979 Australia exhibition falsely states that the Painting had been acquired from a "Private collection, Paris." Ex. 172 at 4. Later catalogues falsely state the place of acquisition as the "Galerie Joseph Hahn, Paris," even though the Baron and his staff well knew he had personally made the purchase at the Stephen Hahn Gallery in New York (together with the Cézanne, one of the most valuable pieces of work in his collection). Exs. 174 at 7, 176 at 3, 57 at 3, 303 at 32.

The Baron intentionally falsified the place of acquisition because a Paris acquisition was far less suspicious. DJP ¶ 123. Pissarro and Paul Durand-Ruel (Pissarro's agent) lived in Paris. *Id.* By falsely claiming a Paris purchase (and obfuscating any history of presence in Germany or the United States), the Baron made it appear that the Painting had never left France. *Id.*

TBC suggests that, since all four of the Baron's November 1976 purchases from Stephen Hahn in New York were erroneously stated to have come from the Galerie Joseph Hahn in Paris, it can somehow be excused as a simple mistake or

---

[9] At the time of Dr. Petropoulos' 2014 inspection, the only exhibition label on the Painting was from the 1979 Australia tour. Mr. Acevedo's claim that other post-1976 labels are on the "cardboard backing" (DE 411 at 4) is inconsistent with photographs taken during the inspection, which show no such labels. *See* Ex. 379.

clerical error, not an attempt to hide the provenance of the Pissarro. A possible mistake might conceivably explain away misnaming the gallery or the painting, or the locale, or where it was to be stored. It is inconceivable that all four of these attempts to obfuscate were simple mistakes or clerical errors, as TBC now asserts.

### 4. The Baron's knowledge is further confirmed by his lack of effort to determine the painting's provenance from 1899-1976

Despite the fact that provenance research is routinely undertaken by sophisticated or experienced collectors to verify good title, protect against forgeries, and to increase the value of paintings if it was previously owned by prominent persons, the Baron conducted no such research when he bought the Painting.

Without support, TBC's expert implausibly suggests that prior to the "mid-1990s" provenance research was only done to "highlight distinguished collections" and not to find "ownership title information," DE 412 at 14, as if prior to then collectors and museums did not care whether expensive art they were buying was fake, stolen, or otherwise not the property of the seller. Nicholas asserts that Nazi art theft had "faded from view" prior to events of the "mid to late 1990s." DE 399 at 7-8.  This is all belied by the historical record.  *See, e.g.*, Ex. 380 (1964 front page NY Times article detailing extensive, continuing, worldwide efforts to find Nazi plunder and quoting a museum director: "when things are offered for sale, we are very careful to determine whether they are war loot"), cases such as *Weimar v. Elificon*, 385 F. Supp. 747, 748 ( E.D.N.Y. 1972); *DeWeerth v. Baldinger*, 836 F.2d 103, 106 (2d Cir. 1987); *Menzel v List*, 267 N.Y.S.2d 804 (N.Y. Co. 1966), and ethical codes such as Ex. 79 ¶ 3.2 (1986 ICOM Ethics Code) (obligation to take care not to acquire stolen art).

Notwithstanding his knowledge that the provenance he was given was incomplete and inaccurate, the Baron did nothing to fill in the gaps.  He did not ven Hahn Gallery.

Case No. CV 05-03459-JFW (Ex)
PLAINTIFFS' TRIAL BRIEF

Most significantly, the Baron did not contact John Rewald, the premier source for information about Pissarro's art. The Baron and/or his staff knew Rewald -- he  had visited the Baron's home in Switzerland just three months before the purchase.  Ex. 170; DE 399 at 29.  Rewald lived just 11 blocks from the Stephen Hahn Gallery, where the Baron made his purchase (*see* DE 417-2).  Had the Baron and/or his staff contacted Rewald, they would have been informed that the Painting had been stolen from Lilly by the Nazis in 1939. The index card for the Painting in Rewald's Pissarro archive expressly noted the theft. Ex. 143 at 1–2.[10]

The Baron and his experts could also have confirmed the theft by reviewing the U.S. military's Court of Restitution Appeals ("CORA") published decision confirming the 1939 Nazi looting, Ex. 23, the 1974 Schwarz book about Allied restitution laws, Ex. 314, or by consulting the U.S. State Department, which had circulated warnings to art dealers and museums about Nazi looted art. DJP ¶¶ 171– 177; Ex. 311; Ex. 329.

The evidence is undisputed that the Baron exhibited willful blindness in refusing to review ***anything at all*** of the Painting's history; instead, he only took actions to obfuscate that history. The Baron evidently thought that if later questioned he could get away with saying, just as he did in 1972, "I buy the stuff in Switzerland and the United States, but how it gets there I don't know.  I can't check all that." Ex. 367 at 4.  Taken together, the evidence undeniably leads to the conclusion that the Baron knew he was purchasing stolen art and could not be acting in good faith.

---

[10] TBC's experts acknowledge that the theft is expressly noted on Rewald's card, part of a Pissarro archive Rewald inherited from Rodo Pissarro, the artist's son. They argue that Rewald may not have been "aware of the notations" on the card or "examined or processed these papers," DE 422 at 47; DE 399 at 29, but they cannot seriously dispute that, had the Baron simply asked Rewald to check on the Painting's provenance, Rewald would have checked his archive and informed the Baron of the theft.

Case No. CV 05-03459-JFW (Ex)
PLAINTIFFS' TRIAL BRIEF

He did not do any provenance research because he did not want to document what he already knew. He was buying Nazi looted art.

### D. TBC likewise knew the painting was Nazi-looted art

#### 1. The Baron's knowledge is imputed to TBC

At the time of the 1993 sale of the collection from the Baron to TBC, the Baron was the "Chairman for Life" of TBC's board, and he controlled 50% of the seats on TBC's Board.  Ex. 132 at 5, 6; Ex. 83 at 10014, 10021; DE 405 at 29.  Under Spanish law, like U.S law, the Baron's knowledge is imputed to TBC. *See* Part II.C *infra* and Declaration of Alfredo Guerrero (DE 422) ("DAG") ¶¶ 4.1, 4.3, 11(b).  Thus, since the Baron knew of the theft, TBC knew of the theft as well.

#### 2. Other TBC Employees and Experts Had Independent Knowledge of the Theft

As set forth above, the Baron had repeatedly falsely claimed that he had purchased the Painting from the "Galerie Joseph Hahn, Paris." Even though TBC had the invoice showing the purchase from the Stephen Hahn Gallery in New York, Exs. 55 & 57; DE 411 at 6, it too repeated this false "Paris" provenance several times. TBC only changed it only after this lawsuit had been filed.

Moreover, according to one of TBC's own lawyers, each painting in the collection came with a "very lengthy file on each painting containing invoices, scholarly commentaries, and other documentary material relating to the painting concerned." Ex. 183 at 1.  No such file on the Painting was produced to Plaintiffs, not even the correspondence between the Baron and Stephen Hahn or the Baron's ledger falsely stating that the Painting (with an altered name) had been acquired at the "Galerie Hahn, Paris" and was being stored in a "safe in Paris." Ex. 322.  Plaintiffs retrieved these documents from a Thyssen archive in Germany. Ex. 354.

TBC's defense here relies primarily on its hiring of attorneys to do a "title examination" of the Baron's collection, including the Painting, before it purchased the collection from the Baron.  However, this examination is meaningless for

present purposes because first, the Baron was TBC's Chairman and as stated above, he knew it was stolen. But further, for all but the 30 most valuable and iconic works, TBC's attorneys were ***explicitly instructed*** just to "assume" that the Baron had good title to all works acquired ***before 1980***. The attorneys were further instructed just to "assume" that the Baron acquired the works in good faith (despite evidence to the contrary). Thus, the attorneys did not scrutinize the Baron's 1976 acquisition of the Painting ***at all***. Ex. 98 at 13, 19; Ex. 212 at 1; Ex. 183 at 2–3; Ex. 94 at 1; Ex. 205 at 7; Ex. 260 at 4–5, 11. At a minimum, TBC was at least willfully blind to the truth.

In fact, TBC's art experts fully recognized the Baron may have lacked title to some of the paintings in the collection, but judged the number small enough to be worth the risk, *see* Ex. 94 at 1–2 ("risks were acceptable" despite knowing fraud or theft could affect "a small group of paintings"), even after Brigham Young University informed TBC that at least one work was stolen. DE 405 at 46. Perhaps most telling is the fact that TBC's research protocol was designed not to document the true provenance of the Painting, but instead to later make a claim of good title based on acquisitive prescription. Ex. 98 at 19 ("Where possible, it was intended that reliance should be placed on prescriptive rights where the Baron . . . had held a painting in good faith in Switzerland for the required period.").

Routine provenance research would have confirmed the details of the theft TBC knew had occurred. The same sources the Baron could have consulted in 1976 – John Rewald, the State Department, the Frick Art Reference Library, the 1974 Schwarz book, and others – were just as available to TBC in 1993, but TBC intentionally chose to ignore them, for the sole reason that the Baron had acquired the Painting "before 1980" and TBC believed it could later claim title via acquisitive prescription regardless of the illicit nature of the purchase.  Having there, at best, willfully blinded itself, TBC knowingly assumed the risk of theft.

To this day, TBC's website describes at least 20 paintings in its permanent collection with a close connection with the "prestigious" Cassirer Gallery in Berlin (purchased there by the Baron's father or uncle, on exhibition there, etc.). Ex. 368; DJP ¶ 112. The provenance descriptions of these paintings were written by curators Paloma Alarco and Dr. Maria del Mar Borobia, who have both been at TBC since before the 1993 acquisition and who undoubtedly knew the significance of the label from the Cassirer Gallery in Berlin that admittedly is still on the Painting's verso, on the stretcher boards over which the priceless canvas is mounted.

## II.    LEGAL ISSUES

### A.    Burden of Proof and Presumption of Good Faith

Any presumption under applicable Spanish law that "Good faith is always presumed, and the person asserting a possessor's bad faith shall have the burden of proving it" (CC 434) falls once the plaintiff comes forward with "evidence that the possessor is not unaware that he possesses the thing improperly." CC 435. Plaintiffs can carry their burden of proving knowledge of theft with direct or circumstantial evidence. DE 401-3 at 000359, *Spanish Supreme Court Judgment* ("*SSCJ*") 5/19/16; DE 401-3, SSCJ, 2/24/09.[11] Acquisitive prescription is an affirmative defense, so TBC has the burden of proving all the required elements under CC 1955. *Payan v. Aramark Mgmt. Servs. Ltd. P'ship*, 495 F.3d 1119, 1122 (9th Cir. 2007).

### B.    The Baron and TBC had "actual knowledge" of the theft

The evidence shows that the Baron and TBC fully knew they were buying Nazi-looted art. As discussed above, the Baron knew it was stolen the instant he saw the verso with its numerous removed labels, the partial label showing the Painting had been in Berlin, the wrongful provenance, and the Pissarro name. The

---

[11] English translations of Spanish-language authorities cited herein are appended to the Supplemental Declaration of Alfredo Guerrero (DE 422) or the Brief of amici curiae *Comunidad Judía de Madrid* and *Federación de Comunidades Judías de España* (DE 401).

14

Baron's post-sale cover up of the place and location of the sale, the name of the gallery, and even the Painting's name, confirm his bad faith.

In any event, full knowledge is not required. Under the Spanish civil law doctrine of *dolo eventual*, TBC and the Baron are deemed to have had "actual knowledge" because at the very least they were "willfully blind" or "deliberately indifferent" to the truth, as they (at a minimum) knew the Pissarro was "probably stolen" yet bought it anyway, and they recklessly disregarded the likelihood of theft. Furthermore, as art experts, they had "actual knowledge" because they were "grossly negligent" in failing to determine the truth. *See* DAG ¶¶ 3.3-3.4; Brief of amici curiae *Comunidad Judía de Madrid* and *Federación de Comunidades Judías de España* (DE 401-1) ("Amicus") at 9–12.

Even if a defendant "was not directly and clearly aware of [the] illicit origin [of the purchased goods], but could perfectly imagine such possibility," he is still liable despite the lack of "direct willful misconduct (*dolo directo*) [because] recklessness (*dolo eventual*) . . . is perfectly acceptable in the reception of stolen goods crime according to the scholars and the case law." DE 422-6, SSCJ 6/28/00 at 6.[12] *See* DE 401-3, SSCJ 1/19/16 ("whoever is in a situation known as deliberate

---

[12] TBC's expert Ms. de Buerba acknowledges that *dolo eventual* qualifies as actual knowledge but disputes that *dolo eventual* includes recklessness or willful blindness. DE 402 at 26. However, recklessness is often called the civil law counterpart of common law recklessness, *e.g.*, Tan, *The Duty to Investigate Alleged Violations of International Humanitarian Law*, 49 N.Y.U. J. INT'L L. & POL. 181, 195 (2016); Hermida, *Convergence of Civil Law and Common Law in the Criminal Theory Realm*, 13 U. MIAMI INT'L & COMP. L. REV. 163, 181 (2006) ("the eventual dolus counterpart in common law is recklessness"); Taylor, *Concepts of Intention in German Criminal Law*, 24 OXFORD J. LEG. STUD. 99, 99 (2004) ("German law calls its approximation of recklessness *dolus eventualis*"). Ms. de Buerba grudgingly acknowledges that some Spanish cases on receiving stolen property have held that willful blindness is sufficient. DE 402 at 27, and the only authority she cites states expressly that "deliberate ignorance" has been "frequently applied in recent years" and constitutes *dolo eventual* for the crimes of money laundering, drug trafficking, and "*others against assets*." DE 402, Ex. WW (emphasis added).

blindness, cannot be excluded from criminal responsibility").[13]

### C. The knowledge of the Baron and other TBC agents is imputed to TBC

At the time the Baron sold the Painting to TBC, the Baron was "Chairman for Life" of TBC's board, and half of the board members were the Baron's own nominees. Ex. 132 at 5, 6; Ex. 83 at 10014, 10021; DE 405 at 29. His knowledge is TBC's knowledge. Similarly, the knowledge of any other TBC employees, known or unknown, who were involved in the 1993 sale, is also imputed to TBC.

Under Spanish law legal entities such as TBC have "subsidiary liability" for the actions of their managers and employees. DAG ¶¶ 4.2-4.3, quoting, *e.g.*, Spanish Criminal Code arts. 21-22 (companies have subsidiary civil liability for "the crimes and misdemeanors committed by its employees or clerks in the carrying out of their obligations or services"); Civil Code 1903 (owner responsible for harm caused by "dependents in the provision of their services or with occasion of the carrying out of their functions"). *See* Amicus at 16–17.

TBC contends the Baron's knowledge should not be imputed because the Kingdom of Spain, not TBC, handled the purchase negotiations. DE 402 at 24-25. TBC cites no authority suggesting this is a valid ground for non-imputation.[14]

In any event, the Baron in his role as TBC board chairman, and his other board nominees, played an essential role in the approval of the purchase – at least three TBC board resolutions had to be adopted for the deal to go through. See DE

---

[13] U.S. law is the same. *United States v. Jewell*, 532 F.2d 697 (9th Cir. 1976) (en banc) (quotation omitted) ("The rule that willful blindness is equivalent to knowledge is essential, and is found throughout the criminal law").

[14] Under U.S. law, "It is well established that corporations act through their employees and an agent's knowledge will generally be imputed to the corporate principal so long as employees are acting within the scope of their employment." *Potter Voice Tech. v. Apple Inc*., 24 F. Supp. 3d 882, 886 (N.D. Cal. 2014). This must be true here as well. How else could a legal entity, like TBC, have "knowledge" of anything, unless through its agents and board members

405 at 6, 35; Ex. 96 at Schedules 7 (new TBC bylaws) & 8 (new TBC maintenance regulations). Moreover, TBC has stipulated that, "For purposes of this litigation, it was and is an agency or instrumentality of the Kingdom of Spain." Stip. ¶ 54. Thus, the Kingdom is the same as TBC.

### D. The Baron did not acquire the Painting in good faith

The Ninth Circuit has held that, if the Baron had good title at the time he sold the Painting to TBC as a matter of Swiss law, then TBC acquired good title. But under Swiss law, the Baron only acquired good title if he acquired, and held, the Painting in good faith, and he did not buy in good faith if he "failed to exercise the diligence required by the circumstances." *Cassirer*, 862 F.3d at 975.

As the Baron knew the Painting was stolen, it follows *a fortiori* that he did not purchase in good faith and did not exercise the requisite due diligence.

### E. Other issues raised by TBC are not properly before the Court

In 2015, this Court awarded summary judgment to TBC on the basis that TBC could not be an *encubridor* within the meaning of CC 1956, as a matter of law, regardless of whether TBC knew the Painting was stolen property. DE 315 at 3 n.5 ("the Foundation's alleged 'bad faith' is not material or relevant to the Court's decision on these motions"). On the Cassirers' appeal to the Ninth Circuit, TBC again argued that CC 1956 was inapplicable as a matter of law and stated:

> For Article 1956 to bar acquisitive prescription, ***three requirements*** must be satisfied:
>
> (1) there must be a crime of theft or robbery (or other similar crime relating to the misappropriation of movable property);
>
> (2) the possessor of the movable property must be a principal, accomplice, or accessory of the crime committed; and
>
> (3) the statute of limitations for the crime committed or an action claiming civil liability arising from that crime must not have expired.

Ninth Circuit DE 77 (TBC appeal brief) at 66 (emphasis added).

The Ninth Circuit disagreed and held "there is a triable issue of fact whether TBC is an *encubridor* (an "accessory") within the meaning of Civil Code Article 1956." *Cassirer*, 862 F.3d at 964. The triable issue is whether "TBC knew the Painting had been stolen from its rightful owner(s) when TBC acquired the Painting from the Baron." *Id*. at 972. If so, the Court held "TBC can be found by the trier of fact to be an *encubridor* who could not have acquired title to the Painting through acquisitive prescription until 2019 since an Article 1956 *encubridor* can be someone who knowingly benefits from the receipt of stolen property." *Id*. at 973.

TBC petitioned for rehearing of the Ninth Circuit's decision, based on a contention that CC 1956 is inapplicable as a matter of law because it can only apply if the adverse possessor has been criminally convicted. Ninth Circuit DE 136-1 at 4-12. The Kingdom of Spain submitted a supporting amicus brief. This contention had never been raised previously and was contrary to TBC's own Ninth Circuit brief, which, as quoted above, made no allegation of a criminal conviction requirement as one of the "three requirements [that] must be satisfied" for CC 1956 "to bar acquisitive prescription." The Ninth Circuit denied the petition for rehearing without comment. Ninth Circuit DE 150.

TBC now seeks to raise this "criminal conviction required" theory in this Court. Furthermore, TBC seeks to raise at least three additional new theories. The first of these, the theory that CC 1956 does not apply to legal entities, was raised the first time on November 1, 2018, just a month before trial. DE 373 at 13. The second of these, that the prescriptive period has expired because TBC is entitled to tack on the possession of prior possessors, was raised even later, on November 12, 2018, when the parties exchanged draft expert direct examinations. Regardless of when they were raised,  each of these defenses are founded on the notion that CC 1956 does not apply in this case as a matter of law, regardless of whether TBC bought the Painting with knowledge of the theft.  Thus, each is expressly contrary

to the Ninth Circuit's central holding that CC 1956 bars TBC's acquisitive prescription claim if TBC purchased with such knowledge.

TBC also raises a Spanish law laches defense. Previously, before this Court and the Ninth Circuit, TBC had raised a laches defense under California law, which the Ninth Circuit expressly rejected because this case is governed by Spanish law. 862 F.3d at 976. At the Pre-Trial Conference, TBC claimed it had raised a Spanish law laches defense in the 2015 declaration of Professor Yzquierdo. However, the referenced declaration does not mention laches at all. DE 271-2, and the alleged Spanish law laches defense was not raised in any brief TBC filed with this Court or with the Ninth Circuit, or even in TBC's November 1, 2018 filings. *See* DE 372 at 12.

"It would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost." *In re Cellular 101, Inc*., 539 F.3d 1150, 1155 (9th Cir. 2008) (quoting *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981) (Friendly, J.). The Ninth Circuit's decision "is the law of the case, and [TBC] may not now attack it on a ground that it had a fair opportunity to argue previously." 539 F.3d at 1156. *Accord, e.g., Volvo Trademark Holding Aktiebolaget v. Clark Machinery Co*., 510 F.3d 474, 481 (4th Cir.  2007) ("under the mandate rule a remand proceeding is not the occasion for raising new arguments or legal theories"); *Penn Intern. Industries v. Pennington Corp*., 583 F.2d 1078, 1082 (9th Cir. 1978) ("Appellants failed to raise this issue in the prior appeal and it is now too late for them to do so").

Under these cases, it is clear that all four of TBC's new arguments are not properly before this Court. TBC contends these are issues "which the Ninth Circuit clearly laid out in its decision over a year ago" (DE 392 at 1), but that is untrue; all of these issues were raised by TBC for the first time after the Ninth Circuit's decision. They have been forfeited or waived.

### F.   In any event, TBC's contentions lack merit

Even if this Court were to consider TBC's new theories, all lack merit.

#### 1.   Laches

The Spanish law of laches is limited to situations where parties have a contractual or other relationship and the plaintiff does more than unduly delay the exercise of a right. Laches only applies if the plaintiff first indicates "unequivocally" and "without a doubt" that his right will not be exercised and then later unfairly acts in "contradiction with the previous conduct," in violation of the duty to act in good faith. DE 426-5, SSCJ 4/26/18. Moreover, the defendant must have incurred prejudice from having placed "legitimate trust" in his counter-party that the right "would not be exercised." *Id*.; *see* DAG ¶ 10.[15]

Here, there was no relationship, contractual or otherwise, between the Cassirers and TBC. The Cassirers did not breach TBC's trust, fail to act in good faith, or act unfairly. Moreover, the Cassirers did not delay unduly in filing their restitution claim; quite the contrary, they acted promptly as soon as they learned the Painting had been located. TBC focuses on the Cassirers' alleged lack of action between 1958 and 1999, but during that time the Cassirers reasonably believed the Painting was lost or destroyed. They never gave up hope and continued to reach out to people for information about the lost Painting, and it was through these efforts that the Painting was eventually located. *See* Declaration of David Cassirer (DE 410) at 6–7. But most importantly, even assuming all the other elements of Spanish law laches were present (they aren't) TBC has not, and cannot, demonstrate any prejudice.

#### 2. Alleged "Criminal Conviction" Requirement

As stated above, the notion that Article 1956 requires a criminal conviction would directly contradict the Ninth Circuit's holding. There was no conviction in

---

[15] Without citing any case or treatise, TBC's expert mentions laches for the first time in a footnote in his direct testimony declaration, DE 409 at 25 n.10.

the appellate record so if a conviction were a prerequisite, the appellate court would have affirmed summary judgment in TBC's favor.

But importantly, the conviction requirement is contrary to the article's plain and unambiguous language:

> Movable property purloined or stolen may not prescribe in the possession of those who purloined or stole it, or their accomplices or *encubridores*, until the crime or misdemeanor *or its sentence*, and the action to claim civil liability arising therefrom, should have become ***barred by the statute of limitations***.

TBC's argument would delete the "barred by the statute of limitations" part of the article, since there will never be a conviction if prosecution is barred by limitations. Moreover, use of the disjunctive "*or* its sentence" further demonstrates that one of the ways, but not the only way as TBC argues, for the prescriptive period to be delayed pursuant to CC 1956 is when there is a sentence following conviction.

The plain text of CC 1956 says nothing about a criminal conviction requirement, and the Spanish legislature knew how to include one when it so intended. *Compare* Spanish Criminal Code Article 116(1) ("All persons held criminally responsible for a felony or misdemeanor shall also be held liable under Civil Law if the fact gives rise to damages or losses").

Given the clarity of the language in CC 1956, Spanish legal commentators expressly agree that a conviction is not required for CC 1956 to apply:

> For the application of this [CC 1956] prohibition, no final conviction is required from the criminal courts. ***Dismissal of the criminal case or the termination of same by a determination other than a final judgment will not prevent a civil court judge from declaring, where appropriate, the existence of the crime of theft or robbery, although, of course, solely with  civil effects***.

DE 431-20 at 10 (F. Reglero Campos). As Albadalejo explains:

> Article 1956: 1) provides, in the case of the perpetrator, accomplice or accessory after the fact of a crime that has as its object the personal property being acquired by adverse possession, that these individuals

are prevented from consummating such acquisition until the statute of limitations on the crime has expired; *if there was no prosecution for the crime*, then the time-barring of the *sentence*, which was not imposed, does not come into play; 2) and *if the crime was prosecuted before the expiration of the statute of limitations and a conviction was handed down*, then there is no expiration of statute of limitations on the crime, but Article 1956 provides that, in any case, the person who committed the crime is prevented from acquiring by adverse possession until his liability is terminated through expiration of the statute of limitations on the sentence.

DE 431-17. *Accord*, DE 431-18 (M. Nélida Tur); J. Menendez Hernandez, 9 Commentaries on the Civil Code 494 (2000) (attached Exhibit A at CAS-060) (only after "expiration of the statute of limitations on the crime or offense or (*if a conviction was handed down*) the sentence" does the defendant "become a normal possessor thus able to acquire by adverse possession").

TBC's de Buerba admits her opinion on this issue is contrary to "certain opinions expressed by scholars," (DE 402 ¶ 24), and none of TBC's experts have cited a single case or treatise that supports its assertion that CC 1956 requires a conviction.

If TBC's interpretation were accepted, victims would not have the benefit of CC 1956 if the receiver of stolen property dies, because the receiver's heirs could not be criminally prosecuted. But Spanish courts and commentators are unanimous in concluding that, even if a receiver's criminal liability is extinguished by his death, his heirs remain civilly liable. DAG ¶ 6.3, and authorities cited therein.

It is common in legal systems for civil liability to arise from conduct that constitutes a crime, even without a criminal conviction. A receiver of stolen property is civilly liable for treble damages under California law, without a criminal conviction, Cal. Penal Code § 496; *Bell v. Feibush*, 212 Cal.App.4th 1041, 1046 (2013), and a racketeer who engages in a pattern of criminal "racketeering activity" is civilly liable under the federal RICO statute, even without a criminal conviction, 18 USC §§ 1961 *et seq*; *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 493

(1985). Similarly, an *encubridor* is subject to limits in his ability to adversely possess stolen property, even without a criminal conviction. For civil purposes, a defendant's status as an *encubridor* may be determined in a civil action under both Spanish and U.S. law. DAG ¶ 6.3.

TBC's Yzquierdo contends that, in Spain, a civil court lacks jurisdiction to determine whether a civil defendant is an *encubridor*, even in a civil proceeding. This is incorrect, DAG ¶ 6.3, but in any event this Court's jurisdiction is determined by federal procedural rules, not by Spanish procedural rules. Spain's substantive law governs this case, but Spanish procedural law is completely inapplicable. *Equitable Life Assur. Soc. v. McKay*, 861 F.2d 221, 222 (9th Cir. 1988). Accordingly, TBC's "criminal conviction" argument is meritless.

### 3. Alleged "Legal Persons Excluded" requirement

TBC contends that legal entities cannot be *encubridores*. This argument also directly violates the Ninth Circuit's mandate. Moreover, the text of CC 1956 contains no "natural persons" limitation. It applies to all who "purloined or stole[]" movable property and "their accomplices or *encubridores*," with no exclusion of legal entities. DAG ¶ 7.2; Amicus at 17. If CC 1956 only applied to natural persons, traffickers could avoid it simply by making their acquisitions through a legal entity, which is obviously not what the Spanish legislature intended.

TBC's argument is premised on the fact that in Spain legal entities could not be held criminally liable until the Spanish Penal Code was amended in 2015. But this is not a criminal case and Plaintiffs are not seeking any criminal remedies. This is and always has been a purely civil case.

### 4. Alleged right to "tack" time held by prior possessors

On November 12, 2018, TBC claimed for the first time that, even if it had knowledge of the theft, it nevertheless has superior title because it has the right to "tack on" time the Painting was held by prior possessors. Again, this contention has been forfeited, is barred by the mandate rule, and is not properly before the

Court. In fact, this contention is even more directly contrary to the Ninth Circuit's decision than the others, because the Ninth Circuit has specifically held that, if TBC is an *encubridor*, TBC is unable to acquire via acquisitive prescription *until 2019*. *Cassirer*, 862 F.3d at 966 ("if Article 1956 applies, including the six-year period from Article 1955, TBC would need to possess the Painting for twenty six years after 1993, until 2019, to acquire title via acquisitive prescription"), 973 (if TBC knew the Painting was stolen, "TBC can be found by the trier of fact to be an *encubridor* who could not have acquired title to the Painting through acquisitive prescription until 2019"). In light of the Ninth Circuit holding, TBC cannot now argue that, if CC 1956 applies, it obtained title before 2019.

In any event, TBC's interpretation ignores the express language of CC 1956, which provides that for *encubridores*, prescription does not start to run until "the crime or misdemeanor or its sentence, and the action to claim civil liability arising therefrom, should have become barred by statute of limitations." Under the Spanish law principle of *lex specialis derogat lex generalis*, CC 1956's specific provision prevails over the general rule of CC 1960, upon which TBC relies. See DAG ¶ 9.2; Amicus at 17-18.

The testimony on this issue of TBC's expert, Professor Yzquierdo, is not credible, as it is directly contrary to his academic writing that "if the extinction of the criminal and civil responsibility [under CC 1956] has not yet occurred, the adverse possession that, in accordance with the general rules, would have been produced, is inoperative." M. YZQUIERDO TOLSADA, LECCIONES SOBRE POSESIÓN Y USUCAPIÓN 107-08 (2002).

## III.   CONCLUSION AND JUDGMENT

For the reasons stated above, the Court should enter judgment ordering TBC to return the Painting to the Cassirers immediately.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated November 26, 2018

Respectfully Submitted,

*/s/ Velvel (Devin) Freedman*
David Boies
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel:  (914) 749-8200
Fax:  (914) 749-8300

Stephen N. Zack
Andrew S. Brenner
Devin Velvel Freedman
BOIES SCHILLER FLEXNER LLP
100 S.E. 2nd Street, Suite 2800
Miami, FL 33131
Tel:  (305) 539-8400
Fax:  (305) 539-1307

Laura W. Brill (State Bar No. 195889)
Nicholas Daum (State Bar No. 236155)
KENDALL BRILL & KELLY LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, CA  90067
Tel:  (310) 556-2700
Fax: (310) 556-2705

*Attorneys for Plaintiffs*

Case No. CV 05-03459-JFW (Ex)
PLAINTIFFS' TRIAL BRIEF

1

## **PROOF OF SERVICE**

2

**STATE OF FLORIDA, COUNTY OF MIAMI-DADE**

3

        At the time of service, I was over 18 years of age and **not a party to this**
**action**.  I am employed in the County of Miami-Dade, State of Florida.  My
business address is 100 S.E. 2nd Street  Suite 2800, Miami, Florida 33131.

4

5

On November 26, 2018, I served true copies of the following document(s)
described as **Plaintiffs' Trial Brief** on the interested parties in this action as
follows:

6

7

        **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically
filed the document(s) with the Clerk of the Court by using the CM/ECF system.
Participants in the case who are registered CM/ECF users will be served by the
CM/ECF system.  Participants in the case who are not registered CM/ECF users
will be served by mail or by other means permitted by the court rules.

8

9

10

11

        I declare under penalty of perjury under the laws of the State of Florida that
the foregoing is true and correct.

12

        Executed on November 26, 2018, at Miami-Dade County, Florida.

13

14

/s/ *Nathalie Bermond*
_____

15

Nathalie Bermond

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. CV 05-03459-JFW (Ex)
PLAINTIFFS' TRIAL BRIEF