**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

AUG 17 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| DAVID CASSIRER; et al., <br><br> Plaintiffs-Appellants, <br><br> v. <br><br> THYSSEN-BORNEMISZA COLLECTION FOUNDATION, an agency or instrumentality of the Kingdom of Spain, <br><br> Defendant-Appellee. | No.   19-55616 <br><br> D.C. No. 2:05-cv-03459-JFW-E <br><br> MEMORANDUM[*] |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted July 7, 2020
Pasadena, California

Before: CALLAHAN, BEA, and IKUTA, Circuit Judges.

Plaintiffs David Cassirer, the estate of Ava Cassirer, and the United Jewish Federation of San Diego County (collectively "the Cassirers") appeal from the district court's judgment, entered after a bench trial, in favor of Defendant Thyssen-Bornemisza Collection Foundation ("TBC") in the Cassirers' action to recover a

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

painting by Camille Pissarro, a French Impressionist, which was stolen from their ancestors by the Nazi regime in 1939 ("the Painting"). In a prior appeal, we reversed the district court's grant of summary judgment in favor of TBC because there were genuine issues of material fact whether TBC knew the Painting was stolen when it purchased the Painting from the Baron Hans Heinrich Thyssen-Bornemisza (the "Baron") in 1993.[1]  *Cassirer v. Thyssen-Bornemisza Collection Foundation*, 862 F.3d 951, 973 (9th Cir. 2017). In that prior appeal, we explained that if TBC had actual knowledge the Painting was stolen, TBC could be found by the trier of fact to be an *encubridor* (an "accessory after the fact") under Spain Civil Code Article 1956 ("Article 1956") who could not have acquired title to the Painting through acquisitive prescription. *Id.* at 972–73. After a bench trial, the district court concluded that TBC acquired title to the Painting pursuant to Spain's law of prescriptive acquisition because TBC did not have actual knowledge that the Painting was stolen when it purchased the Painting from the Baron in 1993.

We have jurisdiction over the district court's final judgment pursuant to 28 U.S.C. § 1291. We review the district court's factual findings for clear error and the district court's conclusions of law de novo. *Kohler v. Presidio Int'l, Inc.*, 782 F.3d 1064, 1068 (9th Cir. 2015). We affirm.

---

[1]  TBC purchased the Painting from Favorita Trustees Limited, an entity of the Baron. We refer to Favorita and the Baron collectively as "the Baron."

1. As a threshold matter, the Cassirers request that our 2017 decision be revisited en banc. The Cassirers argue that we erred in holding that (1) Spanish law governs their substantive claims; (2) the Holocaust Expropriated Art Recovery Act does not bar Spain's acquisitive prescriptive defense; (3) Spain's Historical Heritage Law does not prevent TBC from acquiring the Painting by acquisitive prescription; (4) Spain's acquisitive prescription laws did not violate the European Convention on Human Rights; (5) and Spain satisfied the element of public possession necessary to establish acquisitive prescription under Spanish law. Our prior holdings are both law of the case and binding precedent that we must follow in this appeal. *See Nordstrom v. Ryan*, 856 F.3d 1265, 1270 (9th Cir. 2017). Because the Cassirers have not identified any new factual or legal developments since our prior decision that require us to reconsider any of those five holdings, we disagree that our 2017 decision should be revisited en banc and will not take any steps toward en banc review.

2. The district court applied the correct legal standard for determining actual knowledge under Article 1956. A litigant may satisfy Article 1956's actual-knowledge requirement through proof of willful blindness on the part of the receiver of stolen property. *See* Spanish Supreme Court Judgment ("SSCJ"), Feb. 24, 2009 (RJ 2009/449); SSCJ, June 28, 2000 (RJ 2000/6080). According to the Cassirers, there are two alternative tests for willful blindness: (1) the "high risk or

likelihood" test, which considers whether "the illicit origin of the chattel is highly probable in light of the existing circumstances," and (2) the "perfectly imagined" test, which considers whether "the perpetrator could have perfectly imagined the possibility" "that the goods have their origin in a crime against personal property or socio-economic order." SSCJ, Feb. 24, 2009 (RJ 2009\449). The Cassirers argue the district court should have applied the perfectly imagined test rather than the high risk or likelihood test to determine whether TBC was willfully blind to the illicit origin of the Painting because the perfectly imagined test has a lower standard of proof. We disagree.

We are not convinced that the perfectly imagined and high risk or likelihood tests are different tests for willful blindness or that the perfectly imagined test has a lower standard of proof than the high risk or likelihood test used by the district court. Both appear to be verbal formulas that require the trier of fact to evaluate circumstantial evidence after taking into account objective indications, if any, of prior theft of the object, as well as the subjective knowledge and experience of the accused *encubridor*. To the extent the perfectly imagined test *is* a different, lower standard of proof than the high risk or likelihood test for willful blindness, the district court's failure to address the perfectly imagined test is harmless because the Spanish Supreme Court has not mentioned or applied the perfectly imagined test for willful blindness in a case analogous to the present case. Although the Cassirers and Amici

rely on several Spanish decisions that mention or apply the perfectly imagined test for willful blindness, none of those decisions involve stolen artwork or a receiver who purchased stolen goods from a seller that had an invoice reflecting that he had purchased the stolen goods from an established and well-known art gallery. *See* SSCJ, Nov. 4, 2009 (RJ 2010/1996) (concluding the receiver of a stolen handbag "could not have been unaware of the illegal origin" of the handbag because it contained an identification card and bracelet belonging to someone other than the seller of the handbag); SSCJ, Feb. 24, 2009 (RJ 2009/449) (reciting, but not stating whether it applied, the perfectly imagined test where the defendant purchased stolen cars from a dealer he knew, produced documentation to get licenses for the cars in Belgium using false numbers, stored the cars in his garage spaces, and sold the cars in Malaga, Spain); SSCJ, June 28, 2000 (RJ 2000/6080) (concluding a receiver of stolen jewelry "could have perfectly imagined" that the jewelry was stolen because he purchased the jewelry from a seller he did not know, "did not ask for proof or explanation of" the seller's possession of the jewelry, and sold the jewelry at an auction to "profit without any risk"); Álava Provincial Court, May 13, 2019, JUR 2019/224552 (holding the receiver of a stolen cellphone knew or could have imagined the cellphone was stolen because he purchased it at a street market without a box, charger, or warranty for less than half of the cellphone's fair market value and then sold it in a different town through a proxy); Las Palmas de Gran Canaria

Provincial Court, March 1, 2019, JUR 2019/194217 (concluding the defendant had knowingly received stolen clothes because the anti-theft magnetic strips were still attached to the clothes). Thus, we reject the Cassirers' argument that the district court applied the incorrect test for actual knowledge under Article 1956; or even if the district court applied the incorrect test, any error was harmless.

3. The district court's finding that the Baron lacked actual knowledge that the Painting was stolen was not clearly erroneous. Although parts of the record suggest that the Baron may have had knowledge the Painting was stolen when he purchased it from the Stephen Hahn Gallery, there is sufficient evidence in the record from which a trier of fact could conclude that the Baron lacked actual knowledge that the Painting was stolen.[2] The district court found that the Baron lacked actual knowledge of the theft based in part on evidence that the Baron purchased the Painting for fair market value from a reputable art dealer while the Painting was

---

[2] The district court found that the Baron's employee mistakenly recorded false provenance information about the Painting in the Baron's purchase notebook: that the Baron purchased the Painting from the Hahn Gallery in Paris, rather than the Stephen Hahn Gallery in New York, and listed the name of the Painting as "*La Rue St. Honoré, effet de Soleil, Après-Midi, 1898*," rather than *Rue Saint Honoré, après-midi, effet de pluie*. The Cassirers accuse the Baron of falsifying the record in his purchase notebook and argue the district court's finding that it was a mistake was clearly erroneous. We reject this argument because there is evidence in the record from which a trier of fact could find that the erroneous provenance information about the Painting in the Baron's purchase notebook was a mistake. Indeed, TBC's expert Laurie Stein opined that the false provenance information was a "mistake[]," and three other paintings, none of which are claimed to have been stolen goods, were similarly reported as sold in Paris rather than New York.

6

publicly displayed and then publicly and frequently exhibited the Painting after he purchased it, without anyone asserting it had been stolen in the past. Because the district court's finding that the Baron lacked actual knowledge that the Painting was stolen is supported by inferences that may be drawn from facts in the record, it is not clearly erroneous. *See United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009). Therefore, even if the Baron's knowledge could be imputed to TBC, it does not cause TBC to have actual knowledge.

The Cassirers argue the district court's finding that the Baron did not possess the Painting in good faith under Swiss law satisfies the actual-knowledge requirement under Article 1956. We reject this argument because lack of good faith under Swiss law does not equate to having actual knowledge of the theft under Spanish law. Lack of due diligence in investigating provenance, after proof of suspicious circumstances, can establish lack of good faith under Swiss law. *Compare Cassirer*, 862 F.3d at 975 (citing Swiss Civil Code Articles 3.1, 3.2, and 728) *with* SSCJ, Nov. 4, 2009 (RJ 2010/1996) (noting that under Spanish law, "[i]t is . . . not enough to simply suspect the illegal origin; rather, the defendant must be certain of it"). Thus, even if the Baron's knowledge of suspicious circumstances is imputed to TBC, that knowledge does not rise to the level of actual knowledge.

4. The district court's finding that TBC lacked actual knowledge that the Painting was stolen was not clearly erroneous. Although there is evidence in the

record that suggests TBC had actual knowledge that the Painting was stolen at the time that it entered the 1993 purchase agreement with the Baron, there is sufficient evidence in the record from which a trier of fact could find that TBC lacked actual knowledge that the Painting was stolen.

The district court's finding that TBC lacked actual knowledge that the Painting was stolen is based, at least in part, on Fernando Pérez de La Sota's trial testimony that, at the time TBC acquired the Painting from the Baron, there was a "minimal" or "hypothetical" risk that the Baron "did not have good title to the paintings" that he sold to TBC as reflected in the Baron's $10 million pledge or "*prenda*." The *prenda* is not irrefutable evidence that TBC recognized there was a high risk of defective title to the Painting because the pledge was security for the satisfaction and performance of *all* of the Baron's liabilities and obligations under the 1993 purchase agreement, not just the Baron's obligation to sell the paintings free of claims against title, and the district court weighed other evidence, including the testimony of de La Sota. Because the district court's finding that TBC lacked actual knowledge that the Painting was stolen is supported by inferences that may be drawn from facts in the record, it is not clearly erroneous.[3] *See Hinkson*, 585 F.3d at 1262.

---

[3] In 1998, forty-four countries, including the Kingdom of Spain, agreed to several non-binding principles set forth in the Washington Principles on Nazi-Confiscated Art. *See* Washington Conference Principles on Nazi-Confiscated Art,

**AFFIRMED.**

---

U.S. Department of State (Dec. 3, 1998), https://www.state.gov/washington-conference-principles-on-nazi-confiscated-art/. The Washington Principles provide, in relevant part: "If the pre-War owners of art that is found to have been confiscated by the Nazis and not subsequently restituted, or their heirs, can be identified, steps should be taken expeditiously to achieve a just and fair solution, recognizing that this may vary according to the facts and circumstances surrounding a particular case." *Id.* More than 10 years later, in 2009, forty-six countries, including Spain, reaffirmed their commitment to the Washington Principles by signing the Terezin Declaration. *See* Terezin Declaration on Holocaust Era Assets and Related Issues, U.S. Department of State (June 30, 2009), https://www.state.gov/prague-holocaust-era-assets-conference-terezin-declaration/. The Terezin Declaration reiterated that the Washington Principles "were *voluntary* commitments that were based upon the *moral* principle that art and cultural property confiscated by the Nazis from Holocaust (Shoah) victims should be returned to them or their heirs, in a manner consistent with national laws and regulations as well as international obligations, in order to achieve just and fair solutions." *Id.* (emphases added). The Terezin Declaration "encourage[d] all parties including public and private institutions and individuals to apply [the Washington Principles]." *Id.* The preamble to the Terezin Declaration expressly states that these "moral responsibilities" are "*legally non-binding*" principles. *Id.* (emphasis added).

      The district court noted that Spain and TBC's refusal to return the Painting to the Cassirers is inconsistent with Spain's moral commitments under the Washington Principles and Terezin Declaration. However, the district court found that it could not force Spain or TBC to comply with these non-binding moral principles, which counsel for TBC characterized as "guidelines." It is perhaps unfortunate that a country and a government can preen as moralistic in its declarations, yet not be bound by those declarations. But that is the state of the law. *See Dunbar v. Seger-Thomschitz*, 615 F.3d 574, 577 (5th Cir. 2010) ("The Terezin Declaration is a 'legally non-binding' document."); *see id.* at 578 n.2 (referring to the Washington Principles as "non-binding principles"). We agree with the district court that we cannot order compliance with the Washington Principles or the Terezin Declaration.