**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DAVID CASSIRER; THE ESTATE OF AVA CASSIRER; UNITED JEWISH FEDERATION OF SAN DIEGO COUNTY, a California non-profit corporation,<br>*Plaintiffs-Appellants,*<br><br>v.<br><br>THYSSEN-BORNEMISZA COLLECTION FOUNDATION,<br>*Defendant-Appellee.* | No. 19-55616<br><br>D.C. No. 2:05-cv-03459-JFW-E<br><br>ORDER CERTIFYING QUESTION TO THE CALIFORNIA SUPREME COURT |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted December 12, 2022
Pasadena, California

Filed May 22, 2023

Before:  Consuelo M. Callahan, Carlos T. Bea, and Sandra
S. Ikuta, Circuit Judges.

Order;
Dissent by Judge Bea

# SUMMARY[*]

## Certification of Question to State Supreme Court

In an action brought by the Cassirer family under the Foreign Sovereign Immunities Act, seeking the return of a Pissarro painting stolen by the Nazis and now in the possession of Thyssen-Bornemisza Collection Foundation (TBC), an entity created and controlled by the Kingdom of Spain, the panel certified to the California Supreme Court the following question concerning the third step in California's governmental interest choice-of-law test:

Whether, under a comparative impairment analysis, California's or Spain's interest is more impaired if California's rule that a person may not acquire title to a stolen item of personal property (because a thief cannot pass good title, and California has not adopted the doctrine of adverse possession for personal property), were subordinated to Spain's rule that a person may obtain title to stolen property by adverse possession.

Applying the first step of California's governmental interest test, the panel concluded that the issue in question was a question of personal property law: whether TBC or the Cassirers own the painting; and the relevant law of the two jurisdictions of Spain and California was different. Applying the second step of the test, the panel concluded that a true conflict existed between Spanish and California law, meaning that each jurisdiction had a

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

legitimate interest in the application of its law and policy. The third step of the test required application of the law of the jurisdiction whose interest would be the more impaired if its law were not applied. The panel concluded that it needed the California Supreme Court's guidance on how to apply the third step because the existing California caselaw applying the comparative impairment analysis to tortious, and typically physical, injuries did not provide guidance in the context of property law, where it was necessary to determine which jurisdiction's interests would be more impaired when the issue was one of allocating title to stolen property.

The panel wrote that, in deciding to exercise its discretion to invoke the certification process, it considered that the case raised important, unresolved public policy ramifications of broad application regarding the ownership of stolen property, and that the issues were particularly thorny and substantial, given that stolen property cases may involve two innocent claimants to a specific piece of valued property which must be awarded to one claimant or the other. Further, in the spirit of comity and federalism, the panel recognized that the California legislature has expressed a particular policy interest in stolen art.

Dissenting from the certification order, Judge Bea wrote that, in his view, application of California's three-step choice-of-law test to the facts of this case was straightforward, and Spanish law applied. Judge Bea wrote that improper certification harms state courts, strains the comity between federal and state courts, harms federal courts by encouraging forum shopping bids, and harms litigants through delays.

## COUNSEL

David Boies (argued), Boies Schiller Flexner LLP, Armonk, New York; Stephen N. Zack, Andrew S. Brenner, Rossana Baeza, Boies Schiller Flexner LLP, Miami, Florida; Scott E. Gant, Boies Schiller Flexner LLP, Washington, D.C.; David A. Barrett, Boies Schiller Flexner LLP, New York, New York; Laura W. Brill and Nicholas Daum, Kendall Brill & Kelly LLP, Los Angeles, California; Samuel J. Dubbin, Dubbin & Kravetz LLP, Coral Gables, Florida; Devin Freedman, Freedmand Normand Friedland LLP, Miami, Florida; for Plaintiffs-Appellants.

Thaddeus J. Stauber (argued), Sarah Erickson André, Aaron M. Brian, and Irene Scholl-Tatevosyan, Nixon Peabody LLP, Los Angeles, California, for Defendant-Appellee.

Bernard M. Cremades Román and Patrick T. Byrne, B. Cremades & Asociados, Madrid, Spain, for Amici Curiae Comunidad Judía de Madrid and Federacíon de Comunidades Judías de España.

Amelia L.B. Sargent and Kirby Hsu, Willenken LLP, Los Angeles, California, for Amicus Curiae the Kingdom of Spain.

Catherine Z. Ysrael and Ben Conway, Deputy Attorneys General; Srividya Panchalam, Supervising Deputy Attorney General; Michael L. Newman, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the California Attorney General; Los Angeles, California; for Amicus Curiae the States of California.

## ORDER

We ask the California Supreme Court to resolve a question of state law: how the comparative impairment analysis, the third step in California's choice-of-law test, applies in a situation where, under the laws of California, a person may not acquire title to a stolen item of personal property (because a thief cannot pass good title, and California has not adopted the doctrine of adverse possession for personal property), while under the conflicting laws of Spain, a person may acquire title to a stolen item of personal property by means of adverse possession.  This question requires the application of the "choice of law considerations most relevant to property cases."  *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951, 962 (9th Cir. 2017) (*Cassirer III*).

While California has applied the comparative impairment analysis in many cases involving California residents who were physically injured by the conduct of out-of-state defendants, we have found no California precedent applying this analysis in a case involving the allocation of title to stolen personal property, and the factors identified in other choice-of-law cases are not readily applicable.

"We invoke the certification process only after careful consideration and do not do so lightly."  *Kremen v. Cohen*, 325 F.3d 1035, 1037 (9th Cir. 2003).  "In deciding whether to exercise our discretion, we consider: (1) whether the question presents important public policy ramifications yet unresolved by the state court; (2) whether the issue is new, substantial, and of broad application; (3) the state court's caseload; and (4) the spirit of comity and federalism."  *Murray v. BEJ Mins., LLC*, 924 F.3d 1070, 1072 (9th Cir. 2019) (cleaned up).  This case raises important, unresolved

public policy ramifications of broad application regarding the ownership of stolen property, and the issues here are particularly thorny and substantial, given that stolen property cases may involve two innocent claimants to a specific piece of valued property which must be awarded to one claimant or the other. Further, in the spirit of comity and federalism, we recognize that the California legislature has expressed a particular policy interest in stolen art. *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 958, 964–65 (9th Cir. 2010), *cert. denied*, 564 U.S. 1037 (2011); *see also* Cal. Code Civ. Proc. § 338(c)(3)(A).

Therefore, after considering these factors, we exercise our discretion to certify this question to the California Supreme Court. Pursuant to Rule 8.548 of the California Rules of Court, we provide the following information.

I

We first summarize the material facts and procedural history.[1] At issue in this case is the ownership of Camille Pissarro's Rue Saint-Honoré in the Afternoon, Effect of Rain (the Painting). Paul Cassirer, a member of a prominent German Jewish family, purchased the Painting in 1900. *Cassirer V*, 142 S. Ct. at 1506. In 1939, "[a]fter the Nazis came to power in Germany," Lilly Cassirer, Paul Cassirer's successor-in-interest, surrendered the Painting "to obtain an

---

[1] The facts are more fully set forth in four Ninth Circuit opinions, *Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010) (en banc), *cert. denied* 564 U.S. 1037 (2011) (*Cassirer I*); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613 (9th Cir. 2013) (*Cassirer II*); *Cassirer III*, 862 F.3d 951; *Cassirer v. Thyssen-Bornemisza Collection Found.*, 824 F. App'x 452, 454–55 (9th Cir. 2020) (*Cassirer IV*), and a Supreme Court opinion, *Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502 (2022) (*Cassirer V*).

exit visa." *Id*. at 1506.  The parties agree that the Painting "was forcibly taken from Lilly." *Cassirer III*, 862 F.3d at 955.[2]

After the Painting was confiscated, it was sold at a Nazi government auction in Dusseldorf and then sold again at a second auction in Berlin. *Id.* at 956.  In 1951, a Beverly Hills art gallery arranged to move the Painting to California. *Id.* From there, it was sold first to a California art collector, and then to another collector in St. Louis, *id*., where it remained from 1952 to 1976, *Cassirer V*, 142 S. Ct. at 1506.  In 1976, Baron Hans Heinrich Thyssen-Bornemisza purchased the Painting through a gallery in New York, and kept the Painting in his residence in Switzerland until 1992. *Cassirer V*, 142 S. Ct. at 1506; *Cassirer III*, 861 F.3d at 974.  In 1988, the Baron agreed to loan his art collection, including the Painting, to the Thyssen-Bornemisza Collection Foundation (TBC), an entity created and controlled by the Kingdom of Spain. *Cassirer III*, 862 F.3d at 957.  In 1993, the Spanish government bought the Baron's collection. *Id*.  "In addition to financing the $300 million-plus purchase, the Spanish Government provided [TBC] with a palace in Madrid to serve as a museum for the collection." *Cassirer V*, 142 S. Ct. at 1506.

Before entering into the acquisition agreement with the Baron, the Spanish government investigated title to the work. *Cassirer III*, 862 F.3d at 957.  As part of the acquisition agreement, the Baron represented to TBC that an entity he controlled was the legal owner of the artworks in

---

[2] Although Lilly Cassirer later accepted a settlement agreement, we previously concluded that as a matter of German law, she "did not waive her right to physical restitution of the Painting" by doing so. *Cassirer III*, 862 F.3d at 978. This issue is not on appeal.

the collection, and that TBC would become "the absolute beneficial owner" of those artworks, including the Painting. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 2019 WL 13240413, at *11 (C.D. Cal. Apr. 30, 2019); *see also Cassirer IV*, 824 F. App'x at 457. At TBC's request, the Baron agreed to pledge $10 million for three years as security for its performance of its agreement. *Id.*; *see also Cassirer IV*, 824 F. App'x at 457. The purpose of this pledge was to protect TBC and the Kingdom of Spain from the risk that one or more paintings could have a title issue, and the three-year term was intended to correspond to Spain's three-year good faith acquisitive prescription period as provided in Article 1955 of the Spanish Civil Code. *Id.* In 1999, Claude Cassirer, Lilly Cassirer's grandson and successor-in-interest and a California resident, became aware of the Painting's location after TBC's museum in Madrid published a catalogue of its holdings. *Cassirer V*, 142 S. Ct. at 1506.

In 2005, Claude Cassirer sued TBC in district court in California under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1330. *Cassirer I*, 616 F.3d at 1023. In 2010, we held en banc that TBC was not immune from suit under the FSIA, and the lawsuit could go forward. *Id.* at 1022. Claude Cassirer passed away shortly after our en banc ruling, and his heirs (the Cassirers) were substituted as plaintiffs. *Cassirer V*, 142 S. Ct. at 1507. The district court then granted TBC's motion to dismiss the Cassirers' complaint as barred by the statute of limitations. The court reasoned that Section 338(c)(3) of the California Code of Civil Procedure, which retroactively extended the statute of limitations for claims seeking the recovery of stolen fine art, was preempted under the foreign affairs doctrine, and therefore did not save the Cassirers' claim. *Cassirer v.*

*Thyssen-Bornemisza Collection Found.*, 2012 WL
12875771, at *2 (C.D. Cal. May 24, 2012). We reversed that
portion of the district court's ruling and remanded for further
proceedings. *Cassirer II*, 737 F.3d at 621.

On remand, the Cassirers moved for an order declaring
that the law of California, not the law of Spain, governed the
merits of their action. The district court recognized that
before making this determination, it first had to determine
whether it should apply California or federal common law
choice-of-law rules. *Cassirer v. Thyssen-Bornemisza
Collection Found.*, 153 F. Supp. 3d 1148, 1154 (C.D. Cal.
2015). The district court applied our then-current precedent*,*
which held that federal common law choice-of-law rules
governed a case arising under the FSIA. *Id.* (citing
*Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d
777, 782 (9th Cir. 1991)). Applying federal choice-of-law
rules, the district court determined that Spanish law applied.
*Id.* at 1155. "[O]ut of an abundance of caution," *id.* at 1154,
the district court also applied California choice-of-law rules,
and reached the same conclusion, *id.* at 1160. Applying
Spanish law, the district court ruled that TBC was the
rightful owner of the Painting, pursuant to Spain's law of
acquisitive prescription, as stated in Article 1955 of the
Spanish Civil Code. *Id.* at 1160.

On appeal, we agreed that federal choice-of-law rules
applied, and declined to consider how California choice-of-
law rules would apply to this case. *Cassirer III*, 862 F.3d at
961–62. Under the federal choice-of-law rules, we
recognized that California and Spain "have chosen different
rules for movable property." *Id.* at 964. After resolving the
conflict between California's rule (that "thieves cannot pass
good title to anyone," *id.* at 960) and Spain's rule (that title
to chattels may pass through extended possession), we

decided that Spanish law applied. *Id*. at 963. Applying
Spanish law, we considered whether TBC had fulfilled the
requirements for ownership of the Painting set forth in
Articles 1955 and 1956 of the Spanish Civil Code. *Id*. at
964. As we explained, Article 1955 provides that
"[o]wnership of movable property prescribes by three years
of uninterrupted possession in good faith," while
"[o]wnership of movable property also prescribes by six
years of uninterrupted possession, without any other
condition." *Id*. at 965 (quoting Ministerio de Justicia, *Spain
Civil Code* 220 (2009) (English translation)). But we
determined that acquisitive prescription under Article 1955
is modified by Article 1956, which states: "Movable
property purloined or stolen may not prescribe in the
possession of those who purloined or stole it, or their
accomplices or accessories [*encubridores*], until the crime or
misdemeanor or its sentence, and the action to claim civil
liability arising therefrom, should have become barred by the
statute of limitations." *Id.* at 966 (quoting Ministerio de
Justicia, *Spain Civil Code* 220 (2009) (English translation)).
This meant that, "as to any principals, accomplices, or
accessories (*encubridores*) to a robbery or theft, Article 1956
extends the period of possession necessary to vest title to the
time prescribed by Article 1955 *plus* the statute of
limitations on the original crime and the action to claim civil
liability." *Id.* "An *encubridor* within the meaning of Article
1956 can include someone who, with knowledge that the
goods had been stolen from the rightful owner, received
stolen goods for his personal benefit." *Id.* at 981. We
concluded that "there is a genuine dispute of material fact
whether TBC knew the Painting had been stolen when TBC
acquired the Painting from the Baron," and therefore there
was a genuine issue of material fact as to whether TBC was

an *encubridor*, as that term was used in Article 1956. *Id*. If TBC were an *encubridor*, it would not have acquired title to the Painting through acquisitive prescription until 2019, and so the period for acquisitive prescription had not yet run when the Cassirers brought their action against TBC. *Id.* at 966. Therefore, we reversed the district court and remanded the action for further proceedings. *Id*. at 981.

On remand, the district court conducted an extensive bench trial and concluded that TBC was not an *encubridor* because it did not have actual knowledge that the Painting was stolen when it purchased the Painting from the Baron in 1993. *Cassirer v. Thyssen-Bornemisza Collection Found*., 2019 WL 13240413, at *20–22 (C.D. Cal. Apr. 30, 2019). Therefore, the district court concluded, TBC had acquired title to the Painting pursuant to Spain's law of acquisitive prescription before the Cassirers brought their action. *Id*. at *22. We affirmed. *Cassirer IV*, 824 F. App'x at 454–55.

The Cassirers petitioned for certiorari on the question whether a federal court hearing state-law claims brought under the FSIA may apply federal common law to determine what substantive law governs the claims at issue. *Cassirer V*, 142 S. Ct. at 1507. The Supreme Court granted the petition, and held that the FSIA "requires the use of California's choice-of-law rule—because that is the rule a court would use in comparable private litigation." *Id*. at 1508–09. Because we had applied the federal common law rule, the Supreme Court vacated our judgment and remanded for application of California's "standard rule." *Id*. at 1508, 1510.

On remand from the Supreme Court, we must apply California's choice-of-law rule to determine whether Spanish or California law applies to this action.

## II

The California Supreme Court has indicated that the governmental interest test is "the appropriate general methodology for resolving choice-of-law questions" in California. *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 83 (2010). The parties agree that California's governmental interest test is the appropriate means for determining whether Spanish or California law applies to the Cassirers' action. The California Supreme Court has described the governmental interest test as involving three steps. First, a court must determine "whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different." *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107 (2006). Second, if the law is different, "the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists." *Id*. at 107–08. Finally, if there is a true conflict, the court "carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Id*. at 108 (citation and quotation marks omitted). After conducting this comparative impairment analysis, the court "then ultimately applies the law of the state whose interest would be the more impaired if its law were not applied." *Id.* We have concluded that we need the California Supreme Court's guidance on how to apply the third step of this test to the case before us, as explained below.

A

Applying the first step of this test, "the particular issue in question" is a question of personal property law: whether TBC or the Cassirers own the Painting, which was forcibly taken from the Cassirers by the Nazis, but which has been held in a Spanish museum by TBC since 1993 without actual knowledge that the Painting was stolen when purchased.

The relevant Spanish law is set forth in Article 1955 of the Spanish Civil Code, which provides that ownership in personal property vests after three years of uninterrupted good faith possession of that property or six years of uninterrupted possession, even absent good faith. *Cassirer III*, 862 F.3d at 965.[3]

By contrast, "[u]nder California law, thieves cannot pass good title to anyone, including a good faith purchaser." *Id.* at 960. The California Supreme Court has stated that:

> the seller of ordinary property can transfer to the buyer no better title than he has himself, and that if such property has been lost by the true owner, or stolen from him, one who buys from the finder or from the thief, though he pays full value and buys in good faith, without notice, obtains no title as against the true owner.

*Crocker Nat'l Bank of S.F. v. Byrne & McDonnell*, 178 Cal. 329, 332 (1918); *see also Suburban Motors, Inc. v. State Farm Mut. Auto Ins. Co.*, 218 Cal. App. 3d 1354, 1359

---

[3]Article 1956 of the Spanish Civil Code, which extends the period for acquisitive prescription, is not applicable here. ***See supra* 8–9**.

(1990) (reaffirming and applying "the common law rule that good title cannot pass from a thief").   In light of this principle, California law "imposes a continuing affirmative duty to restore stolen property to its rightful owner," and dictates that "[s]tolen property remains stolen property, no matter how many years have transpired from the date of the theft." *Naftzger v. Am. Numismatic Soc'y*, 42 Cal. App. 4th 421, 432 (1996), *as modified on denial of reh'g* (Mar. 4, 1996); *People v. Hernandez*, 172 Cal. App. 4th 715, 722 (2009) (stating that because "a thief cannot pass title to stolen property[,] . . . the true owner can reclaim the property from whoever has possession").   This common law rule is consistent with the California Commercial Code (the version of the Uniform Commercial Code enacted in California), which states that a purchaser can acquire only the "title which his transferor had or had power to transfer," and a thief lacks any transferable title. *Suburban Motors*, 218 Cal. App. 3d at 1359 (citing Cal. Com. Code § 2403(1)); *see also CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1145 (9th Cir. 2010) (stating that, under Section 2403(1), a "purchaser whose vendor obtained title by theft" cannot obtain good title "because an involuntary transfer results in a void title"). California has not adopted the Spanish rule "that title to chattels may pass through qualified, extended possession." *Cassirer III*, 862 F.3d at 961 n.8.   To the contrary, "no California case has been cited in support of" applying adverse possession law to personal property, *Soc'y of Cal. Pioneers v. Baker*, 43 Cal. App. 4th 774, 785 n.13 (1996), and the California Supreme Court has yet "to consider the question" whether "a title of adverse possession or

prescription . . . should be applied to personal property," *S.F. Credit Clearing House v. Wells*, 196 Cal. 701, 707 (1925).[4]

As we previously determined, the rules adopted by Spain and California on title to stolen property are in conflict. *See Cassirer III*, 862 F.3d at 960. We noted that, notwithstanding a Spanish Civil Code provision indicating that a person can claim stolen personal property from its possessor, "the Spanish Civil Code must be read in its entirety, including those articles which provide that title to chattels may pass through qualified, extended possession, such as Article 1955." *Id.* at 961 n.8. Because the Spanish rules, taken as a whole, conflicted with California's rule, we

---

[4] Although California allows adverse possession of real property, Dissent 43–44 & 44 n.5, n.6, those laws are not relevant here, because real property is fundamentally different from personal property, *see Real Est. Analytics, LLC v. Vallas*, 160 Cal. App. 4th 463, 476 (2008), and the considerations underlying the adverse possession of land are generally inapplicable to chattels, *see O'Keeffe v. Snyder*, 416 A.2d 862, 871 (N.J. 1980); *see also* Steven A. Bibas, *The Case Against Statutes of Limitations for Stolen Art*, 103 YALE L.J. 2437, 2438 (1994) ("Adverse possession, a doctrine that works well for real estate, is not suited to the very different realm of movable, concealable personal property."). For instance, an owner of real property "knows or should know where his property is located and reasonably can be expected to be aware of open, notorious, visible, hostile, continuous acts of possession on it." *O'Keeffe*, 416 A.2d at 873. By contrast, the doctrine of adverse possession is a poor fit for "works of art," which are "readily moved and easily concealed" and may be enjoyed by owners "in the privacy of their homes." *Id.* in at 871; *see also* Patty Gerstenblith, *The Adverse Possession of Personal Property*, 37 BUFF. L. REV. 119, 124 (1989) ("The fundamental problem is that when dealing with personal property, unlike real property, the adverse possessor can use the property as would a true owner (that is, openly, notoriously, visibly), and yet the owner—even the diligent owner—may never in fact receive notice of the adverse claim.").

concluded that it was necessary to resolve that conflict, which we proceeded to do under the federal choice-of-law rules. *Id*. at 960–64.[5]

The Supreme Court subsequently confirmed our conclusion. In *Cassirer V*, the Court recognized that "the substantive law differed" when, in one jurisdiction, "the plaintiff would recover the art, and in the other not." 142 S. Ct. at 1508. Faced with the question "whose property law (Spain's? California's?) should govern the suit, and thus determine the [P]ainting's rightful owner," the Court found it necessary to identify and apply the correct choice-of-law rule. *Id.* at 1507. And other courts have repeatedly applied choice-of-law principles to resolve a conflict between a jurisdiction that applies adverse possession principles to chattels and a competing jurisdiction that adheres to the rule that a thief cannot pass good title. *See, e.g., Kunstsammlungen Zu Weimar v. Elicofon*, 536 F. Supp. 829, 846 (E.D.N.Y. 1981) (holding that the conflict between the German law of adverse possession of chattels ("Ersitzung") and New York's rule "that a purchaser cannot acquire good title from a thief" required a choice-of-law analysis to resolve dispute over ownership of paintings), *aff'd* 678 F.2d 1150 (2d Cir. 1982); *see also Bakalar v. Vavra*, 619 F.3d 136, 140–41, 143–44 (2d Cir. 2010) (holding that the conflict between New York's rule and Article 934 of the Swiss Code, under which "a buyer acting in good faith will acquire valid title to stolen property after a period of five years," required an analysis of "the appropriate choice of

---

[5] The dissent's argument that there is only a "false conflict" between the laws of California and Spain regarding the ownership of stolen property, Dissent 39–40, 52 n.12, is therefore contrary to the law of the case.

law" to achieve "the resolution of an ownership dispute in the Drawing") (emphasis omitted).[6]

Because Spanish law expressly recognizes "that title to chattels may pass through qualified, extended possession," *Cassirer III*, 862 F.3d at 961 n.8, while no California judicial decision or statute has ever authorized such a practice, and California law has made clear that "[s]tolen property remains stolen property, no matter how many years have transpired from the date of the theft," *Naftzger,* 42 Cal. App. 4th at 432, the relevant laws of these jurisdictions are different "with regard to the particular issue in question," *Kearney*, 39 Cal. 4th at 107.

We recognize that the dissent's opposition to certifying this question is based on its deep-rooted conviction that California's rule (that a thief cannot pass good title) is not in conflict with Spain's rule (that a recipient of stolen property can obtain good title when the time period for acquisitive prescription has passed), and therefore there is only a "false conflict" between California and Spanish law.  Dissent 39–40, 52 n.12.   The dissent bases this conclusion on an elaborate chain of reasoning, starting with a cryptic 1872 statute, Section 1007 of the California Civil Code, that has

---

[6] Commentators have also recognized that, "[w]hen the owner (or his or her descendants) tries to reclaim stolen art from a bona fide purchaser, choice of law can make an enormous difference, because some states give the bona fide purchaser strong rights (usually through the doctrine of adverse possession) while others limit the operation of adverse possession," and that "[s]uch disputes are difficult" in light of states' "widely divergent laws applicable to such situations."   Daniel M. Klerman, *Jurisdiction, Choice of Law and Property*, Univ. of S. Cal. Law School Legal Studies Working Paper Series, Paper 112 at 3, 11 (2016), available at https://law.bepress.com/cgi/viewcontent.cgi?referer=&https redir=1&article=1250&context=usclwps-lss.

never been applied to adverse possession of personal
property, Dissent 38, moving to a California court of appeal
case indicating that the question whether the doctrine of
adverse possession applies to personal property has not been
settled, Dissent 39, 47 n.8, 49 (citing *Soc'y of Cal. Pioneers*,
43 Cal. App. 4th at 785 n.13), and then attempting to
distinguish another California court of appeal case stating
that "[s]tolen property remains stolen property, no matter
how many years have transpired from the date of the theft."
Dissent 45–48 & 45 n.7, 47 n.8 (citing *Naftzger*, 42 Cal.
App. 4th 421).[7]   The dissent's attenuated analysis and
argumentation only underscore that this is an undecided area
of California law, and principles of comity and federalism
render it more appropriate to ask the California Supreme
Court to weigh in rather than for federal judges to engage in
competing interpretations of state law.   *See L.A. All. For
Survival v. City of Los Angeles*, 22 Cal. 4th 352, 360–61
(2000) (stating that "the benefits of certification" include
"allow[ing] federal courts to avoid mischaracterizing state
law" and "strengthen[ing] the primacy of the state supreme

---

[7] In making this argument, the dissent also relies on *Blizzard Energy, Inc.
v. Schaefers*, which held that there was no conflict between California
and Kansas law where California applied the doctrine of "reverse veil
piercing" (*i.e.*, allowing a plaintiff injured by an individual to sue the
individual's alter ego corporate entity) and Kansas had not addressed that
doctrine.  Dissent 39–41 & 40 n.2, 41 n.3 (citing 71 Cal. App. 5th 832,
855–56 (2021), *rev. denied* (Feb. 16, 2022)).   *Blizzard Energy* is
inapplicable here, however, because the parties did not argue that the
doctrine of reverse veil piercing was inconsistent with any other Kansas
doctrine, whereas here there is a conflict between California and Spanish
law regarding title to stolen property, and only the dissent asserts
otherwise.

court in interpreting state law by giving it the first
opportunity to conclusively decide an issue").

For purposes of this order, we do not address the
question whether California courts would apply the
principles of adverse possession to personal property in
some future case. Nor, contrary to the dissent, do we assert
that "California law vests theft victims with eternal,
supercharged title that trumps any and all future civil law
claims to title." Dissent 47. Rather, we simply follow the
Supreme Court in noting that, under California law as it
currently stands, "the plaintiff would recover the art" while
under Spanish law, the plaintiff would not. *Cassirer V*, 142
S. Ct. at 1508. The Supreme Court recognized that this
difference created a conflict that required the application of
the correct choice-of-law rule. *Id.* at 1507. We therefore
also recognize the conflict, and explain why we need the
California Supreme Court's help to resolve it.

B

The second question is whether a true conflict exists
between Spanish and California law. A true conflict exists
when each jurisdiction has "a legitimate interest in the
application of its law and policy." *Hurtado v. Superior Ct.*,
11 Cal. 3d 574, 580 (1974). "Although the two potentially
concerned states have different laws, there is still no problem
in choosing the applicable rule of law where only one of the
states has an interest in having its law applied." *Id*.

We have previously recognized that both Spain and
California have an interest in upholding their basic policies
underlying property law. In *Cassirer III*, we explained that
"[t]he property laws of both Spain and California seek to
create certainty of title, discourage theft, and encourage
owners of stolen property to seek return of their property in

a timely fashion," and noted that, "[a]lthough these states have chosen different rules for movable property, both sets of rules further the basic polices underlying property law." 862 F.3d at 964.

The California Supreme Court has recognized "that a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders," *McCann*, 48 Cal. 4th at 97–98 (citation and quotation marks omitted), as well as "in being able to assure individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses in the event they are faced with litigation in the future," *id*. at 98; *see also Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 562 (9th Cir. 2020). In light of this rule, both Spain and California have a legitimate interest in applying their respective laws on ownership of stolen personal property.

Spain has an interest in regulating conduct that occurs within its borders, including applying its long-standing rule governing acquisitive prescription of personal property, which assures Spanish residents that their title to personal property is protected after they have possessed the property in good faith for a set period of time. The Kingdom of Spain argues in an amicus brief that "[t]he hypothetical enforcement of the laws of another state to determine the validity of the title of ownership of a property purchased by a Spanish person under a contract of sale entered in Spain, on a property located in Spain, . . . would unduly infringe on the interest of the Kingdom of Spain in legislating on the ownership of property located in its territory." In this case, for instance, Spain relied on the principle of acquisitive prescription in requiring a security pledge from the Baron

that extended only for the three-year acquisitive prescription period set forth in Article 1955 of the Spanish Civil Code. *Cassirer IV*, 824 F. App'x at 457.

California also has a legitimate interest in the application of its law and policy in this case. Generally, California residents have an expectation that a bona fide purchaser for value of movable property under a "chain of title traceable to the thief," *Suburban Motors*, 218 Cal. App. 3d at 1357, does not have title to that property, *id*. at 1359, "because a thief cannot transfer valid title," *Naftzger*, 42 Cal. App. 4th at 428. More specific to this situation, California has twice expressed its policy interest in personal property comprised of fine art works stolen by the Nazis. In 2002, California enacted Section 354.3 of the California Code Civil of Procedure, which provided that any owner of "Holocaust-era artwork" could bring an action to recover the art from a listed entity in any state superior court, and extended the statute of limitations for bringing such a suit. *Von Saher*, 592 F.3d at 958. We stated that "California's real purpose was to create a friendly forum for litigating Holocaust restitution claims, open to anyone in the world to sue a museum or gallery located within or without the state." *Id.* at 965. Although we struck down Section 354.3 as preempted under the Executive Branch's foreign affairs authority, *id*. at 968, we acknowledged that "California certainly has a legitimate interest in regulating the museums and galleries operating within its borders, and preventing them from trading in and displaying Nazi-looted art," *id*. at 965. After we invalidated Section 354.3 on field preemption grounds, California immediately enacted Section 338(c)(3)(A) of the California Code of Civil Procedure, which extended the statute of limitations to bring an action to recover "a work of fine art" in an action "brought against a museum, gallery, auctioneer,

or dealer, in the case of an unlawful taking or theft . . . including a taking or theft by means of fraud or duress." Cal. Code Civ. Proc. § 338(c)(3)(A). Indeed, we previously noted that California's creation of "a specific statute of limitations for cases involving an unlawful taking or theft of fine art" was evidence of California's "strong interest in protecting the rightful owners of fine arts who are dispossessed of their property." *Cassirer III*, 862 F.3d at 963. Accordingly, California has shown it has an interest in enabling residents to recover stolen personal property, even when it is in the hands of good faith purchasers, and a particular interest when that stolen property is Holocaust-era art.[8]

Because both Spain and California have legitimate interests in the application of their laws, we are faced with a true conflict.

## C

"Because the applicable laws of [Spain] and California differ and each state has an interest in having its law applied under the circumstances of the present case, we are faced with a 'true conflict,'" and therefore, "the so-called 'comparative impairment' approach" is applicable. *McCann*, 48 Cal. 4th at 96.

---

[8] Because California adheres to the rule that one who acquires personal property under a "chain of title traceable to [a] thief" does not take good title to that property, *Suburban Motors*, 218 Cal. App. 3d at 1357, the dissent errs in arguing that "California cannot have a legitimate interest in applying its *absence* of law regarding adverse possession of personal property." Dissent 49. Indeed, the same argument would apply to Spain, which does not have a real interest in applying its *absence* of a law that "stolen property remains stolen property, no matter how many years have transpired from the date of the theft." *Naftzger*, 42 Cal. App. 4th at 432.

A comparative impairment analysis requires courts to "carefully evaluate and compare the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Id*. at 96–97 (cleaned up).  In conducting this evaluation, a court's task "is not to determine whether the [foreign jurisdiction] rule or the California rule is the better or worthier rule, but rather to decide—in light of the legal question at issue and the relevant state interests at stake—which jurisdiction should be allocated the predominating lawmaking power under the circumstances of the present case." *Id*. at 97; *see also Kearney*, 39 Cal. 4th at 124 (describing the comparative impairment process as "an accommodation of conflicting state policies, attempting, to the extent practicable, to achieve the maximum attainment of underlying purpose by all governmental entities") (cleaned up).

In considering how California would apply the comparative impairment analysis to allocate title to stolen personal property, we are mindful of the distinction between the issues raised by tort law and those raised by property law. In *Cassirer III*, we considered this distinction and chose to apply the "choice of law considerations most relevant to property cases," rather than tort cases.  862 F.3d at 962.  We explained that, "[i]n contrast to torts, protection of the justified expectations of the parties is of considerable importance in the field of property," and noted that "the courts of Spain would apply their own property laws to adjudicate TBC's claim that it owns the Painting because Spain uses a law of the situs rule for movable property." *Id.* at 963 (alteration in original and citations omitted). Therefore, *Cassirer III* relied on the Second Restatement of

the Conflict of Laws's "specialized rule for a claim of acquisition by adverse possession or prescription of an interest in chattel," which looked to the "local law of the state where the chattel was at the time the transfer is claimed to have taken place." *Id.* (quoting Second Restatement § 246). Continuing this distinction between personal property and tort law, we rejected the Cassirers' objections to application of Spain's law of the situs rule because the cases on which they relied were "cases in which courts have abolished the law of the situs rule for *tort actions*," as distinct from the property dispute that was before us. *Id.* at 964 (emphasis in original). The Supreme Court subsequently confirmed that this case involves "a property-law dispute." *Cassirer V*, 142 S. Ct. at 1510.

While federal common law provided guidance on how its choice-of-law rules should be applied to property cases in *Cassirer III*, 862 F.3d at 960–63, California's choice-of-law rules do not do so. This is because California's application of the comparative impairment analysis has been largely limited to tort actions where a California resident, who has suffered a physical injury due to the negligent conduct of a defendant in a different jurisdiction, brings an action to impose liability on that defendant. *See, e.g., McCann*, 48 Cal. 4th at 95; *Castro v. Budget Rent-A-Car Sys., Inc*., 154 Cal. App. 4th 1162, 1181–82 (2007). The parties (and the dissent) do not cite, nor have we found, any California cases applying the comparative impairment analysis to the question at issue here—the allocation of title to stolen property.

Our review of the comparative impairment cases in the tort context shows they do not provide the "choice of law considerations most relevant to property cases." *Cassirer III*, 862 F.3d at 962. In evaluating which state's interest

would be more impaired in this context, California courts have considered factors that are generally more applicable to allocating liability in tort cases as opposed to in property cases, including: (1) where the injurious conduct occurred; (2) who exposed themselves to risk in the foreign jurisdiction; (3) whether a law imposing liability for injury is antique or progressive; and (4) whether the conflicting interests of the jurisdictions in imposing liability can be accommodated.

The most important factor in the tort context is the situs where the tortious conduct and physical injury occurred. In most cases, both occur in the same location. In *McCann*, the California Supreme Court considered a choice-of-law issue raised by a lawsuit filed in California by a worker injured due to his exposure to asbestos-containing material in Oklahoma. 48 Cal. 4th at 74. Applying the comparative impairment analysis, the California Supreme Court determined that because the defendant's conduct occurred in Oklahoma, and the plaintiff's exposure to asbestos and injury occurred in Oklahoma, Oklahoma's interest would be more impaired if its laws were not applied. *Id*. at 97. The California Supreme Court reached this conclusion even though the plaintiff "was a California resident when he was first diagnosed with an asbestos-related disease and when he incurred medical expenses in this state as a result of the disease." *Id*. at 101.

In the rare cases where the tortious conduct occurred outside of California, but the physical injury to the California resident occurred in California, California courts have looked to the law of the place where the injury occurred. For instance, when a California resident was injured on a California highway by a driver who had become drunk while drinking at a Nevada tavern, the California Supreme Court

determined that California law, which imposed civil liability on tavern keepers, was applicable. *Bernhard v. Harrah's Club*, 16 Cal. 3d 313, 319–20, 322–23 (1976). Although "each of the states involved ha[d] a legitimate but conflicting interest in applying its own law in respect to the civil liability of tavern keepers," the California Supreme Court held that California's interest—"to prevent tavern keepers from selling alcoholic beverages to obviously intoxicated persons who are likely to act in California"—would be more impaired if its policy were subordinated to Nevada's. *Id.* at 320, 322.

California courts also consider whether an injured party took the risk of exposure to another jurisdiction's rules. In a case involving a California resident who was injured in Alabama, a California court of appeal held that Alabama's law applied, because "Alabama's interest in allocating liability and deterring negligent driving within its borders would be more impaired by the application of California's permissive user statute than would California's interests if Alabama law is applied." *Castro*, 154 Cal. App. 4th at 1182. The court further explained that, "by entering and driving in Alabama, [the California resident] voluntarily exposed himself to the risks of that territory, and should not expect to subject [the Alabama defendant] to a financial hazard that Alabama law had not created." *Id.* (internal quotation marks omitted).

In considering which jurisdiction's interest in imposing liability for tortious conduct is more impaired by the application of the other jurisdiction's laws, California courts also evaluate whether a law imposing liability for injury is archaic and rarely enforced. For example, in *Offshore Rental Co. v. Cont'l Oil Co.*, a California statute gave an employer a cause of action for negligent injury to a "key"

employee.   22 Cal. 3d 157, 160 (1978).   A California
employer relied on that statute to sue a Louisiana company
for negligently injuring its employee on the defendant's
premises in Louisiana.   *Id*.   In addition to noting that the
location of the employee's injury was in Louisiana, the
California Supreme Court also considered that California's
interests would not be significantly impaired, because the
California statute at issue was "antique."   *Id*. at 166.
*Offshore Rental* then explained that an antique statute "may
be infrequently enforced or interpreted even within its own
jurisdiction, and, as an anachronism in that sense, should
have a limited application in a conflicts case."   *Id.*  Applying
this principle, the California Supreme Court stated that
"California has itself exhibited little concern in applying [the
law at issue] to the employer-employee relationship: despite
the provisions of the antique statute, no California court has
heretofore squarely held that California law provides an
action for harm to business employees, and no California
court has recently considered the issue at all."   *Id.* at 167.
Accordingly, *Offshore Rental* concluded that a law that is
"archaic and isolated . . . may not unreasonably have to yield
to []a more prevalent and progressive law."   *Id.* at 165.

Finally, the California Supreme Court has made efforts
to accommodate the conflicting interests of the jurisdictions
in protecting their respective residents from liability for a
personal injury.   For instance, in *Kearney*, California
plaintiffs brought suit against a Georgia-based company that
secretly recorded their telephone calls.   39 Cal. 4th at 99.
The plaintiffs alleged that the recording caused an injury by
violating their rights under a California privacy statute.   *Id.*
at 106–08.   The California Supreme Court, conducting a
comparative impairment analysis, stated that the failure to
apply California law would impair California's interest more

severely, because it would not affect any Georgia privacy interest, and Georgia companies could readily comply with California requirements.  *Id*. at 126–28.  Nevertheless, in order "to maximize each affected state's interest to the extent feasible in the present context," the California Supreme Court decided "to restrain the application of California law with regard to the imposition of liability for acts that have occurred in the past, in order to accommodate Georgia's interest in protecting persons who acted in Georgia in reasonable reliance on Georgia law from being subjected to liability on the basis of such action." *Id.* at 128.  Therefore, the California plaintiff could seek only "injunctive relief to require [the Georgia company] to comply with California law in the future," while Georgia law would apply with respect to the Georgia company's "potential monetary liability for its past conduct." *Id*. at 130.

The comparative impairment factors considered in these cases involving physical injuries to California residents are not readily applicable to cases involving disputes over who holds title to stolen property.  First, the primary factors in California's comparative impairment analysis in tort cases involving an injured plaintiff—the situs where the tortious conduct occurred and the situs where the physical injury occurred—provide little guidance in a case like this one.  If TBC is entitled to "a claim of acquisition by adverse possession or prescription of an interest in chattel," *Cassirer III*, 862 F.3d at 963, then TBC did not engage in any tortious conduct in Spain or elsewhere.  The question, as we recognized in *Cassirer III*, is one of title to personal property, not one of physical injury to person.  *Id*.  And the Cassirers did not suffer any *physical* injury, although the Cassirers may feel the impact of the deprivation of the Painting in California.  For the same reason, considerations

regarding whether the parties exposed themselves to the risks of the foreign jurisdiction, which make sense in a physical injury case, are not applicable here: the Cassirers did not expose themselves to the risk of having stolen property in Spain, and Spain did not expose itself to the risk that a person victimized by the theft of that property would reside in California. *Cf. McCann*, 48 Cal. 4th at 100 (citing *Castro*, 154 Cal. App. 4th at 1182).

And even though the question whether the law at issue is antique or progressive may be applicable in the property context, this factor is not helpful here. The Cassirers argue that Spain's acquisitive prescription statute should yield to Section 338(c)(3)(A), which was enacted in 2010 and was specifically aimed at assisting in the recovery of art stolen by the Nazis. But the California law relevant to the comparative impairment analysis is not Section 338(c)(3)(A), which merely extends the time in which a victim of theft can bring a lawsuit, but rather the rule that thieves cannot pass good title, and that even an innocent purchaser who acquired a chattel under a "chain of title traceable to the thief" does not have title to that property. *Suburban Motors*, 218 Cal. App. 3d at 1357. Both Spain's acquisitive prescription law (which was enacted in 1889 and has not been amended since), *see Cassirer III*, 862 F.3d at 967, and California's common law rule, *see Crocker Nat'l Bank*, 178 Cal. at 332 (decided in 1918), are equally "antique," *Offshore Rental*, 22 Cal. 3d at 166. Yet neither jurisdiction has shown any lack of interest in seeing its own law applied. To the contrary, both California and the Kingdom of Spain filed amicus briefs expressing their strong interests in the application of their respective laws to this

dispute.[9]  *See Wash. Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 920 (2001) (stating that courts should consider "the relative commitment of the respective states to the laws involved" in conducting a comparative impairment analysis).

Finally, there is no obvious way to accommodate the conflicting interests of the jurisdictions in this context, because California's interest in protecting its residents whose property was stolen is irreconcilable with Spain's interest in protecting its residents who acquire title to property via acquisitive prescription.  For instance, the decision to apply California's law prospectively only, the choice-of-law solution adopted by the California Supreme Court in *Kearney*, 39 Cal. 4th at 130, is not viable here: regardless which law applies, one party with an ownership interest in property will be deprived of that interest, under any scenario.

### D

In short, the existing California caselaw applying the comparative impairment analysis to tortious, and typically physical, injuries does not provide guidance in the context of property law, where it is necessary to determine which jurisdiction's interests will be more impaired when the issue is one of allocating title to stolen personal property.[10]

---

[9] California "asserted its strong interest in seeking justice for art theft victims," while the Kingdom of Spain has also expressed a germane policy "interest . . . in legislating on the ownership of property located in its territory."

[10] Our decisions applying California law are likewise silent on this issue. We have applied California's governmental interest test to property

Neither the parties nor we have found any California Supreme Court or state court of appeal case applying the governmental interest test to disputes involving the ownership of stolen personal property or the application of adverse possession law to determine ownership. There is no controlling precedent explaining how a court should determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state regarding the ownership of stolen property. The factors previously considered by California courts provide insufficient guidance in determining whether California's interest in protecting the right of California residents to obtain the return of property that has been stolen, or Spain's interest in protecting the expectations of its residents that they obtain title by adverse possession after sufficient time has passed, would be more impaired by the application of the other jurisdiction's law. Nor is there any obvious way to accommodate the interests of both jurisdictions.

Although California has codified a choice-of-law provision relating to personal property, *see* Cal. Civ. Code § 946, this likewise sheds no light on the dispute before us.[11] Section 946 of the California Civil Code states that, "[i]f

---

disputes, but have not addressed the comparative impairment analysis. *See, e.g., CRS Recovery*, 600 F.3d at 1142–43 (concluding, in case involving an action for theft and conversion of internet domain names, that there was no conflict between California and Virginia law as to whether domain names are intangible property subject to conversion claims); *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 610 (9th Cir. 2010) (holding that there was no conflict between the law of California and England because "[n]one of the parties remaining in this suit is a citizen of California" and the injurious conduct in the suit "occurred almost exclusively in the United Kingdom and Ireland").

[11] The parties have not addressed Section 946 on appeal.

there is no law to the contrary, in the place where personal property is situated, it is deemed to follow the person of its owner, and is governed by the law of his domicile."  Cal. Civ. Code § 946.  On its face, this section does not provide applicable guidance, because both the Cassirers and TBC claim a valid ownership interest in the Painting.  Nor have California courts addressed how Section 946 interacts with the governmental interest test, or how it might apply to a dispute over ownership of stolen property.  The California Supreme Court cases that mention Section 946 almost uniformly involve matters of family law, such as probate and succession, *see Est. of Griswold*, 25 Cal. 4th 904, 920 n.8 (2001), *In re Burnison's Est.*, 33 Cal. 2d 638, 640 (1949), and divorce, *see Smith v. Smith*, 45 Cal. 2d 235, 242 (1955).

## III

In light of the foregoing discussion, and because the answer to this question "could determine the outcome of a matter pending in [this] court," Cal. R. Ct. 8.548(a), we respectfully certify to the California Supreme Court the following question:

> Whether, under a comparative impairment analysis, California's or Spain's interest is more impaired if California's rule that a person may not acquire title to a stolen item of personal property (because a thief cannot pass good title, and California has not adopted the doctrine of adverse possession for personal property), were subordinated to Spain's rule that a person may obtain title to stolen property by adverse possession.

We do not intend our framing of this question to restrict the California Supreme Court's consideration of any issues that it determines are relevant. If the California Supreme Court decides to consider the certified question, it may in its discretion reformulate the question. *Broad v. Mannesmann Anlagenbau AG*, 196 F.3d 1075, 1076 (9th Cir. 1999). The answer to this question will resolve the appeal before us, because if California law applies, the Cassirers would have a superior ownership interest in the stolen Paining, while if Spanish law applies, TBC would have acquired ownership of the Painting through acquisitive prescription before the Cassirers brought their lawsuit. We agree to accept and follow the California Supreme Court's decision on this question. *See* Cal. R. Ct. 8.548(b)(2).

We are perplexed by the dissent's repeated accusations that certifying a question to the California Supreme Court is "improper," Dissent 52, 63, would "deplete our reservoir of comity," Dissent 64, and encourage forum shopping. Dissent 65. We recognize, as we must, that the United States Supreme Court has directed us to apply California's choice-of-law rule, and has stated that doing so might "lead to the application of California property law." *Cassirer V*, 142 S. Ct. at 1509. We are thus bound to apply California's choice-of-law rule, and for the reasons explained above, we are uncertain as to what rule of decision that application would produce in this context. Under such circumstances, considerations of comity and federalism compel us not to substitute our judgment for that of the state's highest court on an unsettled issue of state law, but rather to "seek guidance from the California Supreme Court, which remains the primary expositor of California law." *Allied Premier Ins. v. United Fin. Cas. Co.*, 991 F.3d 1070, 1076 (9th Cir. 2021) (cleaned up). The dissent's concern that we should not

certify a legal question because the "Cassirers' counsel candidly told us: 'We want you to certify because we are pretty confident [about] what the California Supreme Court is going to do'" is misplaced.  Dissent 65.  Our task is to ensure the correct application of California law, whether or not the California Supreme Court issues a ruling favorable to the Cassirers.

If the California Supreme Court accepts review of the certified question, we designate Appellants David Cassirer, the Estate of Ava Cassirer, and the United Jewish Federation of San Diego County as the petitioners pursuant to California Rule of Court 8.548(b)(1).

The clerk of our court is hereby ordered to transmit forthwith to the California Supreme Court, under official seal of the United States Court of Appeals for the Ninth Circuit, a copy of this order and all relevant briefs and excerpts of record, along with a certificate of service on the parties.  Cal. R. Ct. 8.548(c), (d).

Further proceedings in our court are stayed pending the California Supreme Court's decision on whether it will accept review, and if so, receipt of the answer to the certified question.  This case is withdrawn from submission until further order from this court.  The Clerk is directed to administratively close this docket, pending further order.

The panel will resume control and jurisdiction on the certified question upon receiving an answer to the certified question or upon the California Supreme Court's decision to decline to answer the certified question.  Within 14 days after the California Supreme Court decides whether or not to accept the certified question, each party shall file a report informing this court of the decision.  If the California Supreme Court accepts the certified question, each party

shall file a status report every six months after the date of the acceptance, or more frequently if circumstances warrant.

It is so **ORDERED**.

---

BEA, Circuit Judge, dissenting:

In 1939, the Nazis stole the *Rue St. Honoré, après midi, effet de pluie* ("Painting") from the Cassirer family. Through a series of transactions, the Painting wound up in the possession of Baron Hans Heinrich Thyssen-Bornemisza ("Baron"). The Baron, in turn, sold the Painting to the Thyssen-Bornemisza Collection Foundation ("TBC") in 1993. TBC publicly displayed the Painting in its museum in Madrid, Spain, where it remains today. The Cassirers learned of the Painting's location in 2000, filed an unsuccessful petition for its return in Spain in 2001, and filed the instant suit against TBC in the United States District Court for the Central District of California in 2005.

Twelve years later, consistent with our Circuit's precedent, we applied federal choice of law principles to conclude that Spanish property law governs this dispute. *Cassirer v. Thyssen-Bornemisza Collection Found. (Cassirer III)*, 862 F.3d 951 (9th Cir. 2017). After we remanded for a bench trial, the district court found that the Baron did not possess the Painting in good faith and thus did not *pass* title to TBC. *Cassirer v. Thyssen-Bornemisza Collection Found.*, No. CV-05-3459, 2019 WL 13240413, at *15 (C.D. Cal. Apr. 30, 2019). But it further found that TBC had no knowledge of the theft and therefore obtained *new prescriptive title* by satisfying the requirements for adverse

possession under Spanish law. *Id.* at \*19–24. We affirmed the district court's factual findings. *Cassirer v. Thyssen-Bornemisza Collection Found. (Cassirer IV)*, 824 F. App'x 452 (9th Cir. 2020). Thus, the sole theory under which TBC may now claim title to the Painting is through prescriptive title, gained by adverse possession. TBC no longer claims that title passed to it from the Baron, nor through any of the Baron's predecessors in title, including the Nazi thieves.[1]

Recently, the Supreme Court remanded this case for us to apply California, rather than Federal, choice of law principles. *Cassirer v. Thyssen-Bornemisza Collection Foundation (Cassirer V)*, 142 S. Ct. 1502 (2022). California's choice of law test, sometimes called the "governmental interest analysis," proceeds in three steps. *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 922 (Cal. 2006).

> First, the court determines whether the *relevant* law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each

---

[1] TBC repeatedly concedes that "Spain does not have an interest in protecting receivers of stolen property" in its briefing. Dkt. No. 88 at 2, 10.

> jurisdiction in the application of its own law
> to determine which state's interest would be
> more impaired if its policy were subordinated
> to the policy of the other state, and then
> ultimately applies the law of the state whose
> interest would be the more impaired if its law
> were not applied.

*Id.* (emphasis added) (cleaned up).

Rather than apply this analysis itself, the majority asks the California Supreme Court to do so. I must respectfully dissent from the majority's certification order because, in my view, application of this legal test to the facts of this case is straightforward. I first explain why that is so and then turn to the majority's errors in reaching a contrary conclusion.

## I.

We must analyze only the "relevant law" of each jurisdiction "under the circumstances of the particular case to determine whether a true conflict exists." *Kearney*, 137 P.3d at 922. Here, we have already affirmed the district court's finding that TBC did not obtain title to the Painting through its 1993 purchase from the Baron. Our task is therefore quite simple:  We must apply the governmental interest analysis to determine whether the laws of Spain or California regarding the creation and vesting of prescriptive title through adverse possession of personal property govern this dispute.

Spanish law regarding acquisition of title through adverse possession of personal property is easy to discern. *See Cassirer III*, 862 F.3d at 965. Spanish Civil Code Article 1955 ("Article 1955") provides: "Ownership of movable property prescribes by three years of uninterrupted

possession in good faith. Ownership of movable property also prescribes by six years of uninterrupted possession, without any other condition." *Id.* (citation omitted). As we previously held in *Cassirer III* and *Cassirer IV*, application of Article 1955 to the facts found by the district court clearly results in TBC being vested with title to the Painting.

But whether California law would produce a similar result has been an open question for the past century. Adopted in 1872, the California Civil Code provides five means by which title to real or personal property may be acquired: (1) occupancy; (2) accession; (3) transfer; (4) will; and (5) succession. Cal. Civ. Code § 1000. The word "occupancy" is a term of art that means "by prescription." *See Hansen v. Sandridge Partners, L.P.*, 232 Cal. Rptr. 3d 247, 255–56 (2018) ("When title is acquired by occupancy, it is called title by 'prescription.'" (citing Cal. Civ. Code, § 1007)). The word "occupancy" is not limited to the "occupancy" of real property; it also refers to possession of personal property. *See* 51 Cal. Jur. 3d Property § 32 (explaining that title to personal property, as in "property, generally, may be acquired by occupancy, accession, transfer, will, or succession."). This is important because California Civil Code § 1007 provides: "Occupancy for the period prescribed by the Code of Civil Procedure as sufficient to bar any action for the recovery of the property *confers a title thereto*, denominated a title by prescription, which is sufficient against all . . . ." (emphasis added).

By their plain terms, these provisions "would seem to establish the right to acquire title to personal property by adverse possession . . . ." 13 C. Witkin, Summary of California Law, Personal Property § 133 (11th ed. 2022). But beginning in 1925, California cases began to "cast some doubt upon this conclusion." *Id.* In *San Francisco Credit*

*Clearing House v. Wells (Wells)*, the California Supreme Court was asked to determine whether section 1007 applies to personal property. 239 P. 319, 322 (Cal. 1925). It declined to answer. "The evidence . . . being obviously insufficient to support a title of adverse possession or prescription, render[ed] it unnecessary to consider" the question. *Id.* And unresolved that question has remained. California courts have declined to answer this question ever since. *See Soc'y of Cal. Pioneers v. Baker (Baker)*, 50 Cal. Rptr. 2d 865, 872 n.13 (Cal. Ct. App. 1996) (declining to resolve this question); *Bufano v. City & Cnty. of San Francisco*, 43 Cal. Rptr. 223, 230 (Cal. Ct. App. 1965) (same). Thus, whether "personal property may be the subject of adverse possession . . . has never been squarely answered" in California, 54A Cal. Jur. 3d Real Estate § 764, and is an issue that "does not appear to be settled." *Baker*, 50 Cal. Rptr. 2d at 872 n.13. This backdrop renders our application of the governmental interest test relatively straightforward.

Where one jurisdiction (Spain) has taken a clear stance on the applicability of a doctrine—here, acquisition of prescriptive title to personal property by adverse possession—but the other has not (California), there is a "false conflict." *See Blizzard Energy, Inc. v. Schaefers*, 286 Cal. Rptr. 3d 658 (Cal. Ct. App. 2021), *rev. denied* (Feb. 16, 2022). False conflicts are easy to resolve. "When one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, there is no real problem; clearly the law of the interested state should be applied." *Hurtado v. Superior Ct.,* 522 P.2d 666, 670 (Cal. 1974).

For instance, in *Blizzard Energy*, a judgment was entered against Bernd Schaefers in his individual capacity in a Kansas court. 286 Cal. Rptr. 3d at 665–66. Schaefers and his

wife owned a limited liability company, "BKS Cambria," but neither Schaefers's wife nor BKS Cambria were parties to the Kansas action. *Id.* at 665. The plaintiff entered the Kansas judgment in California, where it was amended to include BKS Cambria under California's "outside reverse veil piercing doctrine." *Id.* (cleaned up).[2] Defendants appealed, arguing that the California court should have applied Kansas law, which they contended "does not recognize the outside reverse veil piercing doctrine." *Id.* at 677. In support, they cited only one case. *Id.* That case had *declined to determine* whether Kansas would recognize that doctrine because Kansas courts had articulated no "clear statement" rejecting or adopting it. *Id.* (citing *Floyd v. I.R.S. U.S.*, 151 F.3d 1295 (10th Cir. 1998)). Since Kansas had neither accepted nor rejected the doctrine of outside reverse veil piercing, the California Court of Appeal in *Blizzard Energy* concluded that Kansas had no legitimate interest regarding the application of that doctrine. *Id.* It thus found a "false conflict" and applied the law of the only state to articulate a clear position on outside reverse veil piercing—California. *Id.*

So too here. Spain expressly recognizes that adverse possession creates and vests title to personal property under Article 1955, *Cassirer III*, 862 F.3d at 958, 966, and Spain has an obvious interest in applying Article 1955 to regulate the  possession and ownership of personal property within its borders, *see McCann v. Foster Wheeler LLC*, 225 P.3d

---

[2] Unlike the traditional veil-piercing doctrine (which allows a plaintiff to recover from an *individual* owner of a defendant *legal entity*), the "outside reverse veil piercing" doctrine allows a plaintiff to recover from a *legal entity* of which an *individual* defendant is an insider. *Blizzard Energy*, 286 Cal. Rptr. 3d at 840.

516, 534 (Cal. 2010) ("A jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders."). But California has repeatedly declined to address the issue of the creation of prescriptive title to personal property acquired through adverse possession for the past century, *see Wells*, 239 P. at 322, and thus does not have a legitimate interest in applying its absence of law on this topic, *see Blizzard Energy*, 286 Cal. Rptr at 677. Spain is the only interested jurisdiction and therefore its law applies. This is a simple, straightforward analysis that requires no certification to the California Supreme Court.[3]

## II.

The majority makes a number of unfounded and puzzling assumptions to evade this commonsense conclusion.

### A.

On step one, the majority obfuscates what or which California "law" it believes conflicts with Article 1955.

It begins by claiming that California has clear law in this area: "[U]nder the laws of California, a person *may not* acquire title to a stolen item of personal property . . . ." Order at 5 (emphasis added). Yet when confronted with California's noncommittal caselaw as to prescriptive acquisition of title to chattels through adverse possession, the majority concedes "that this is an undecided area of

---

[3] What the majority order lacks in legal reasoning, it makes up for in adjectival deprecation. It characterizes this analysis as "elaborate," "cryptic," and "attenuated." Order at 17–18. My analysis is actually quite simple: Spain has stated a position on the determinative issue here, but California has not; therefore, under *Blizzard Energy*, Spain has an interest in applying its law and California does not. Is that truly so complicated?

California law" that supposedly requires us "to ask the California Supreme Court to weigh in . . . ." Order at 18. The careful reader will notice that the majority tries to get it both ways: California law regarding adverse possession of personal property is clear when the majority is defining the scope of the conflict (so that the majority can reach a true conflict under the governmental interest test), but that same area of California law is suddenly "undecided" when the majority is pressed on its reasoning (so that the majority can further justify its certification order). The majority cannot have it both ways. Either California *does* or does *not* have a clearly stated policy interest regarding the creation of prescriptive title to personal property through adverse possession.

The majority *sub silentio* concludes that it does. Contrary to the majority's acknowledgment that this an "undecided area of California law," Order at 18, and contrary to its self-proclaimed reticence to "substitute [its] independent judgment for that of the state's highest court," Order at 33, the majority takes upon itself to resolve this century-old question on California's behalf.[4] It argues that the doctrine of adverse possession is fundamentally inconsistent with California's rule that thieves "obtain[] no title as against the true owner," Order at 13 (citation omitted), which I shall call the "no-title-passes-through-theft rule." That won't work.

The no-title-passes-through-theft rule simply means that "good title cannot pass from a thief," *Suburban Motors, Inc.*

---

[4] The majority justifies its assumptions about California law by citing policy concerns articulated in a New Jersey case and in law review articles. Order at 15 n.4. But the weighing of various policy concerns regarding property rights is the province of the California Legislature and California state courts, not a federal court.

*v. State Farm Mut. Auto. Ins. Co.*, 218 Cal. App. 3d 1354, 1359 (Ct. App. 1990), because "no one gives what he does not have." *Cassirer III*, 862 F.3d at 961 n.8. It means that one is not divested of title to property "by the theft thereof," and that the "mere possession, *unaccompanied by other circumstances giving it a specific character*, is not such evidence of ownership as to prevail against the true owner . . . ." 51 Cal. Jur. 3d Property § 15 (emphasis added). It means nothing more. This rule is not the "relevant law" of California, *see Kearney*, 137 P.3d at 922, because it does not conflict with Article 1955. TBC's claim to the Painting is through *new prescriptive title* created by operation of law by adverse possession, not through chain of title tracing back to the Nazi thieves.

Indeed, Spain has a similar rule to California's "no-title-passes-through theft" rule. Spain allows "any person who has lost movable property or has been deprived of it illegally [to] claim it from its possessor." *Cassirer III*, 862 F.3d at 961 n.8. We have already said this rule is "similar" to the no-title-passes-through-theft rule. *Id.* And, practically speaking, both have already been applied to this case because no one claims passage of title through a thief or a thief's successors in interest. Application of these rules simply means that TBC did not obtain title from the Baron, which is precisely what the district court has already found as a factual matter. That finding is not challenged now.

Moreover, under either Spanish or California law, the fact that thieves cannot *pass* title says nothing about whether *new* prescriptive title can be *created by operation of law* through the mechanism of adverse possession. Notwithstanding Spain's rule precluding thieves from passing title, we held that TBC's satisfaction of the elements listed in Article 1955 could create new prescriptive title in a

mere possessor by operation of Spanish law. *Cassirer III*, 862 F.3d at 958, 966. Similarly, under California real estate law, adverse possession terminates the prior owner's title and establishes new title in the adverse possessor by operation of law.[5] Adverse possession creates and vests new prescriptive title to realty in a qualified possessor even though title never legitimately passed from a previous owner.[6] That is the entire point of adverse possession. Thus, the fact that California law does not allow title to *pass* from thieves is irrelevant to the choice of law question before us. TBC no longer contends that title to the Painting *passed* from

---

[5] *See, e.g.*, *City & Cnty. of San Francisco v. Fulde*, 37 Cal. 349, 352 (1869) ("[A]dverse possession is the means by which the former title is extinguished, and a new one created."); *Marriage v. Keener*, 31 Cal. Rptr. 2d 511, 514 (Cal. Ct. App. 1994) ("Fee simple title vests in the adverse possessor *by operation of law* at the moment the requisite conditions for adverse possession have been established for the statutory period." (emphasis added) (citation omitted).

[6] More specifically, California recognizes adverse possession "under either color of title or claim of right." *Dimmick v. Dimmick*, 374 P.2d 824, 826 (Cal. 1962) (In Bank). "There is no good faith requirement for adverse possession based on a claim of right." *Aguayo v. Amaro*, 153 Cal. Rptr. 3d 52, 59 (Cal. Ct. App. 2013). Under claim of right theory, occupancy can be satisfied through "deliberate trespass," *id.* which means that a "usurper" can create and vest prescriptive title in himself "by bow and spear without color of title." *Kimball v. Lohmas*, 31 Cal. 154, 159 (1866). "The title conferred by occupancy is not factually inconsistent with the crime of trespass" because "an adverse possessor is merely a trespasser, i.e., a person who enters on the land of another with the specific intent of injuring, interfering with or obstructing that other person's property rights." *People v. Lapchesk*, 86 Cal. Rptr. 2d 565, 567–68 (Cal. Ct. App. 1999). Thus, the fact that an adverse possessor engages in criminal conduct means only that title did not *pass* from the rightful owner. It has no bearing on whether new prescriptive title has been *created by operation of law* through adverse possession, which is the question before us here.

the Baron. It argues that new prescriptive title was created by operation of law through adverse possession. For the purposes of this case, Article 1955 and California's no-title-through-theft rule are ships passing in the night—they simply do not conflict.

The majority creatively, but without authority, enlarges the scope of the no-title-through-theft rule to conclude otherwise. It cites dicta from *Naftzger v. American Numismatic Society*, which states that California "law imposes a continuing affirmative duty to restore stolen property to its rightful owner" and that "[s]tolen property remains stolen property, no matter how many years have transpired from the date of the theft." 49 Cal. Rptr. 2d 784, 791 (Cal. Ct. App. 1996), *as modified on denial of reh'g* (Mar. 4, 1996). The majority interprets this language to mean that California law vests victims of theft with indefeasible title that trumps any and all future claims to title, no matter the circumstances. *See* Order at 5, 22 n.8, 32. That is a remarkable misreading of *Naftzger*.[7]

---

[7] In *Naftzger*, a thief stole coins from a museum sometime before 1970, swapping them with fakes. 49 Cal. Rptr. 2d at 787. In December 1990, the museum learned that the thief had sold the coins to Roy Naftzger, an innocent purchaser. *Id.* at 787–88. The museum sued Naftzger in May 1993, but the superior court sustained Naftzger's demurrer, reasoning that the three-year statute of limitations commenced on the date of the theft. *Id.* The sole question on appeal was whether the limitations period under California's pre-1983 statute commenced when the coins were stolen or when the museum discovered Naftzger's identity. *Id.* at 786. The Court of Appeal held that the date of discovery commenced the running of the statute of limitations. *Id.* at 793. Although the date of injury generally commences the statute of limitations, "fraudulent concealment," such as swapping coins with fakes, "provides an exception to" that rule. *Id.* at 788–89. *Id.* And because one has little

The snippet of *Naftzger* quoted by the majority discusses California's ability to prosecute, under criminal law, acts of knowingly concealing, withholding, or reselling stolen property. *See supra* note 7. If an individual knowingly conceals, withholds, or resells stolen property instead of returning it to the rightful owner, "no matter how many years have transpired from the date of the theft," California may prosecute that individual because each subsequent criminal act carries a "separate limitations period[]." 42 Cal. Rptr. 2d at 791. I fail to see the relevance of *Naftzger*'s criminal law dicta to this civil action. For aught that appears, California is not pursuing criminal charges against TBC.

---

reason to sue "if he knows nothing of the identity of the wrongdoer," the court concluded that the date of discovery applies. *Id.* at 791.

The court further explained that California's *criminal* statute of limitations regarding stolen property "lends support" to that conclusion—and this is where the majority's favored dicta comes in. *Id.* at 791. Each act of concealing, withholding, or reselling stolen property carries a "separate limitations period[]" under California's *criminal statutes* because *those criminal statutes* impose "a continuing affirmative duty to restore stolen property to its rightful owner." *Id.* (citing *Williams v. Superior Ct.*, 146 Cal. Rptr. 311 (Cal. Ct. App. 1978) (involving a criminal prosecution for receiving and concealing stolen property); *People v. Johnson*, 35 Cal. Rptr. 883, 884 (Cal. Ct. App. 1963) (same)); *see also People v. Hernandez*, 91 Cal. Rptr 3d 604, 608 (Cal. Ct. App. 2009) (same). The court noted that, under California *criminal law*, "[s]tolen property remains stolen property, no matter how many years have transpired from the date of the theft." *Naftzger*, 49 Cal. Rptr. 2d at 791. Because California may prosecute persons for subsequent acts of knowingly concealing, withholding, or reselling stolen property well beyond three years of the original theft, the court thought it reasonable to imply a discovery rule for civil actions under California's pre-1983 statute. *Id.*

The fact that stolen property retains its character as stolen property for the purpose of criminal prosecutions says nothing about whether title to that property, for the purposes of civil actions, may be created and vested by it being adversely possessed. *Naftzger* stated just that: The court noted the incongruence between California's ability to prosecute criminal acts regarding stolen property and the victim's ability to recover that property in civil actions. *Id.* at 792. It expressly declined to resolve that incongruence, noting that there were "numerous troubling questions inherent in the possible myriad circumstances surrounding the recovery of stolen property," including the question whether "a thief's void title [is] placed beyond the reach of the owner's civil lawsuit" in situations where the owner fails timely to sue but where the possessor remains subject to criminal penalties. *Id.* Clearly, then, *Naftzger* does not support the majority's theory that California law vests theft victims with eternal, supercharged title that trumps any and all future civil law claims to title, such as that created and vested by operation of law through adverse possession.[8]

In addition to being unsupported by caselaw, the majority's theory is simply illogical. To illustrate why that is so, consider two hypotheticals.

---

[8] Even if *Naftzger* could be read for such a creative proposition, the majority omits the fact that another panel expressly disagreed with *Naftzger*'s analysis. *See Baker*, 43 Cal. App. 4th at 783 n.10 (disagreeing with *Naftzger* because it failed to consider *Wells*, 239 P. at 322 (declining to address whether California recognizes adverse possession as to chattels)). To the extent this disagreement represents an intra-California split, that split further cements my conclusion that California has no coherent policy regarding whether adverse possession can create and vest prescriptive title to personal property.

First, what happens when a victim fails to file an action to recover the personal property or damages for its conversion within the period allowed by the statute of limitations? *Naftzger* itself suggests an answer. It cites with approval New York law, which "acknowledges that the effect of the expiration of the statute of limitations is to vest title in the possessor." 42 Cal. Rptr. 2d at 792 (citation omitted). How can one read *Naftzger* as stating that victims are vested with eternal, supercharged title, exempt from title passing through prescription, when *Naftzger* itself states that title is vested in *the possessor* upon expiration of the statute of limitations?

Second, consider eminent domain. Assume that a chattel is stolen and resold. Then, a California governmental entity exercises its eminent domain powers to take ownership of the chattel from the purchaser.[9] Certainly, the theft-victim might obtain some form of equitable restitution from the purchaser. But would he *still have title* to the chattel notwithstanding the sovereign's exercise of eminent domain? The majority would be forced to answer "yes" because its theory is that California's no-title-passes-through-theft rule precludes title from *ever* vesting in *anyone else* under *any circumstances* after an act of theft. Order at 5, 22 n.8, 32. That is a rather novel and bizarre theory of property rights, and it finds no support in California precedent. Certainly, the majority cites none.

Because the majority's assumption about the extent of the no-title-passes-through-theft rule is illogical and

---

[9] *See City of Oakland v. Oakland Raiders*, 646 P.2d 835, 839 (Cal. 1982) (In Bank) ("Personal property is subject to the exercise of the power of eminent domain . . . .").

unsupported by precedent, I must respectfully disagree regarding the scope of the conflict here. Instead, I take California precedent at its word:  Whether or not acquisition of prescriptive title through adverse possession applies to personal property in California is an "*issue [that] does not appear to be settled*." *Baker*, 50 Cal. Rptr. 2d at 872 n.13 (emphasis added). I thus reiterate that the entire conflict here is that Spain recognizes the creation and vesting of title to personal property through adverse possession, but California *might* not.

### B.

With the majority's error on the first step of the governmental interest analysis revealed, the rest of its analysis falls apart. Obviously, California cannot have a legitimate interest in applying its absence of law regarding adverse possession of personal property. *See Blizzard Energy*, 286 Cal. Rptr. 3d at 665–66. Perhaps realizing this shortcoming, the majority half-heartedly points to another rule that California may have an interest applying to this case—the extended statute of limitations in Section 338(c)(3)(A) of the California Code of Civil Procedure. Order at 21–22. But even the majority doesn't adopt this theory. It later concedes that section 338(c)(3)(A) is *not* "relevant to the comparative impairment analysis" here. Order at 29. It does seem difficult to argue that California could have a legitimate interest in applying law that the majority tabs irrelevant.[10]

---

[10] The majority is correct to find section 338(c)(3) irrelevant. This statute does not conflict with Article 1955 as a matter of the law of the case and binding precedent. The Cassirers urged us to consider section 338(c)(3)

and the Holocaust Expropriated Art Recovery Act ("HEAR"), *see* Pub. L. 114–308, 130 Stat. 1524, as relevant California law that we must compare to Article 1955. Section 338(c)(3)(A) creates an exception for California's general three-year statute of limitations for commencement of actions seeking recovery of personal property. Cal. Civ. Proc. Code § 338(c)(3). It applies a six-year statute of limitations for actions seeking recovery of works of fine art against museums, galleries, auctioneers, and dealers. *Id.* at § 338(c)(3)(A), rather than the general three-year period which applies to other possessors of chattels. HEAR states something similar. Subject to some nuances not relevant here, it provides that, "[n]otwithstanding . . . any defense at law relating to the passage of time," claimants may commence an action to recover Nazi-looted art within six years of actual discovery of the location of the art. Pub. L. 114–308, 130 Stat. 1524.

In 2017, we held that HEAR and Article 1955 do not conflict. "HEAR addresses *when* a suit may be commenced and creates a statute of limitations. . . . However, TBC's Article 1955 defense is a defense *on the merits*: that TBC has acquired title to the Painting based on Spain's property laws." *Cassirer III*, 862 F.3d at 965 (original emphasis deleted, new emphasis added). We held that HEAR applied to Plaintiffs' claims and that they were timely made under that statute. *Id.* at 959–60. Notwithstanding the application of HEAR, we held that Article 1955 could provide a defense on the merits. *Id.* at 965. In 2020, the Cassirers asked us to revisit these conclusions. We declined, explaining that *Cassirer III* was the "law of the case and binding precedent that we must follow." *Cassirer IV*, 824 F. App'x at 457.

Because HEAR does not conflict with Article 1955, neither can section 338(c)(3). The Cassirers concede that section 338(c)(3) simply "parallel[s]" HEAR. Dkt. No. 87 at 8. Contrary to the majority's suggestion, then, section 338(c)(3) cannot be considered conflicting law as a matter of binding precedent and the law of the case doctrine. The California Supreme Court will be similarly bound by these principles. When a case ends up in California state court after a federal appellate ruling has been issued, California courts recognize that the federal ruling is binding under the law of the case doctrine. *See Adams v. Pac. Bell Directory*, 111 Cal. App. 4th 93, 97–101, 3 Cal. Rptr. 3d 365, 367–70

Instead of identifying any actual *law* that California has an interest in applying here, the majority appears to conclude that California has an interest in applying some free-floating interest, not established by either statute or caselaw, in generally protecting its residents against theft. Order at 19–22. But, again, the governmental interest test requires the majority to identify an *actual California law* that conflicts with Article 1955 under the "particular circumstances" of this case. *Bernhard v. Harrah's Club*, 546 P.2d 719, 723 (Cal. 1976); *see also Kearney*, 137 P.3d at 922. Aside from California's equivocation over whether to recognize that adverse possession creates and vests title to personal property, the majority cannot identify any such law. Thus, properly framed, the governmental interest test requires us to consider whether California has an interest in applying its *lack* of statute or judicial precedent on this topic.[11] As

---

(2003); *see also Mendoza v. Fonseca McElroy Grinding Co.*, 492 P.3d 993, 1010 (Cal. 2021) ("While this court may restate the certified question . . . , we lack the power to reshape the federal litigation that gave rise to the question in the first instance."); *Peacock v. Cnty. of Orange*, No. G040617, 2009 WL 3184564, at *5 (Cal. Ct. App. Oct. 6, 2009) (unpublished) ("Thus, a federal appellate decision may establish the law of the case in subsequent state court proceedings in the same case.").

[11] In the majority's view, the question could just as easily be whether Spain has a legitimate interest in applying its "*absence* of a law" that mirrors the dicta in *Naftzger*. *See* Order at 22 n.8 (citing 49 Cal. Rptr. 2d at 791). But Spain's interest is clearly in applying Article 1955 to the Painting, not its alleged "*absence* of" a criminal statute of limitations for concealing, withholding, or reselling stolen property. Moreover, Spain *does* have a criminal statute of limitations for property theft. *See Cassirer III*, 862 F.3d at 966. Again, that statute of limitations is irrelevant to the particular facts of this case because TBC is not being criminally prosecuted. What is more, we have already affirmed the district court's

explained, California does not have such an interest and Spain manifestly *does* have an interest; therefore, Spanish law applies on step two of the governmental interest test.

We thus should not reach the comparative impairment analysis of the third step. By certifying a question that requires that analysis, the majority asks the California Supreme Court a question that is purely hypothetical, for it is based on a false premise: that California has an expressed interest in precluding the acquisition of prescriptive title to chattels through possession. But even were a true conflict somehow to exist, the majority's certification order would still be improper.[12]

---

decision that TBC is not an *encubridor* (an accessory after the fact), *Cassirer IV*, 824 F. App'x at 457, a conclusion that further diminishes the relevance of any criminal statute of limitations to the facts of this case.

[12] I am puzzled by the majority's contention that *Cassirer III* and *Cassirer V* demand the conclusion that a true conflict exists. Order at 15–16, 16 n.5.

In *Cassirer III*, we did *not* decide whether there was a true conflict under California choice of law principles. We merely concluded that there was a conflict *under Second Restatement principles*. *See* 862 F.3d at 960–64. That simply means that the laws of California and Spain are *different*, which I do not dispute. Spain has a system of prescriptive ownership of personal property, but California lacks any decisional law on the subject. That's a *difference*, but not a *conflict*. *See Blizzard Energy,* 286 Cal. Rptr at 677.

In *Cassirer V*, the Supreme Court concluded that the choice-of-law principles of the forum state must be applied in suits brought under the Foreign Sovereign Immunities Act, in part because of 28 U.S.C. § 1606, which states that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . ."

---

142 S. Ct. at 1508. In support of that holding, the Supreme Court offered the following hypothetical:

> Consider two suits seeking recovery of a painting—one suit against a foreign-state-controlled museum (as here), the other against a private museum. If the choice-of-law rules in the two suits differed, so might the substantive law in fact chosen. And if the substantive law differed, so might the suits' outcomes. *In one case, say, the plaintiff would recover the art, and in the other not*. Contrary to Section 1606, the two museums would not be "liable in the same manner and to the same extent."

*Id.* (emphasis added) (quoting 28 U.S.C. § 1606).

The majority quotes one third of the sentence emphasized above to argue that the Supreme Court has already held that "under California law as it currently stands, 'the plaintiff would recover the art' while under Spanish law, the plaintiff would not." Order at 16, 19 (quoting *Cassirer V*, 142 S. Ct. at 1508). But as clearly shown above, the Supreme Court merely assumed for purposes of illustration that, "*if* the substantive law" applied in two *hypothetical* lawsuits "differed, so might the [hypothetical] suits' outcomes." *Cassirer V*, 142 S. Ct. at 1508 (emphasis added). Indeed, the Supreme Court expressly stated that it was *not* resolving the question before us today. *Id.* at 1509 ("The Cassirer plaintiffs contend that the California rule would lead to the application of California property law. And they argue that under California property law, even a good-faith purchaser of stolen property cannot prevail against the rightful pre-theft owner. *We do not today decide those questions*; *they remain in the hands of the lower courts*." (internal citations omitted) (emphasis added)). Because neither *Cassirer III* nor *Cassirer V* addressed this issue, I am confused by the majority's argument that I violate the law of the case doctrine by concluding that a false conflict exists under California law. The hypothetical's very language posits a case different from ours. Taking a snippet of language from an inapposite hypothetical is hardly a basis for claiming that the

### C.

Even were the majority correct that this case presented a true conflict, it would have an obligation at least to attempt to apply the comparative impairment analysis. *Cf. Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Alas, the majority avoids that obligation because it worries that there is a distinction between "issues raised by tort law and those raised by property law," Order at 23–24, pointing out that we

---

Supreme Court has already recognized there is a true conflict of laws in this case.

Also puzzling to me is the majority's decision to bolster its argument with citations to cases "appl[ying] choice-of-law principles" in this situation. Order at 16–17. That is what I am doing. The majority apparently fails to understand that, *under California's choice of law principles,* a mere difference in law does not create a true conflict. *See, e.g.*, *Reich*, 432 P.2d at 730–31 (holding that, although California law differed from Ohio law, no true conflict existed because California had no interest in applying its law to the facts of the case); *Hurtado*, 522 P.2d at 670 (same with false conflict between California and Mexico law); *Blizzard Energy*, 286 Cal. Rptr. 3d at 677 (same with false conflict between California and Kansas law).

Finally, the majority is wrong to suggest that we must consider the interests of Spain and California in applying their bodies of law, "taken as a whole . . . ." Order at 15–16. Even if we previously concluded, applying Federal choice of law considerations, that the Second Restatement test required such a "taken as a whole" approach in *Cassirer III*, California's test expressly says otherwise. Again, California choice of law principles require us to examine "the *relevant law* of each of the potentially affected jurisdictions with regard to the *particular* issue in question," and to "examine[] each jurisdiction's interest in the application of its own law *under the circumstances of the particular case* to determine whether a true conflict exists." *Kearney*, 137 P.3d at 922 (emphases added); *see also Bernhard*, 546 P.2d at 723.

placed importance on that distinction in *Cassirer III*, 862 F.3d at 963.

But we drew that distinction only because the Second Restatement provides different rules for physical injury cases and personal property cases. *Id.* at 962–63 ("[T]he commentary to § 222 clarifies that in contrast to torts, protection of the justified expectations of the parties is of considerable importance in the field of property." (cleaned up)). Specifically, we put near-determinative weight on the Second Restatement's "specialized rule for a claim of acquisition by adverse possession or prescription of an interest in chattel." *Id.* at 963. Clearly, the precise nature of the claim is critical to a Second Restatement choice of law analysis.

Unlike the Second Restatement, however, California applies its general three-step governmental interest test to all cases unless specifically displaced by statute. *McCann*, 225 P.3d at 526–27. Neither party argues that a statue applies here.[13] Thus, there is no question that California would apply its "generally applicable choice-of-law principles" to this personal property dispute. *Id.* The majority's quibble is that the California Supreme Court has not yet applied those

---

[13] The majority suggests that Section 946 of the California Civil Code does not apply, even though the parties failed to address this issue in their briefing. Order at 31–32. On that much, at least, we can agree. That statute reads: "If there is no law to the contrary, in the place where personal property is situated, it is deemed to follow the person of its owner, and is governed by the law of his domicile." Cal. Civ. Code § 946. Because the Painting is situated in Spain, and because Spain rejects "the law of the domicile" rule, *Cassirer III*, 862 F.3d at 963, section 946 does not mandate application of the law of the domicile. Under these circumstances, *McCann* requires us to apply the governmental interest test. *See* 225 P.3d at 526–27.

principles to the precise facts of this case. That is not a proper basis for certification.[14]

True, California's comparative impairment analysis might be difficult to apply as a general matter. That is true for all applications of that test. *See Arno v. Club Med Inc.*, 22 F.3d 1464, 1467 (9th Cir. 1994) (describing the test as "amorphous"). That a state-law test is "difficult" to apply is insufficient to warrant certification. *Kremen v. Cohen*, 325 F.3d 1035, 1037 (9th Cir. 2003). That is because "[t]here is always a chance that a state supreme court, if it had the same case before it, might decide the case differently. This ever-present possibility is not sufficient to warrant certification." *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 672 (7th Cir. 2001).[15] Indeed, speculation that the California Supreme Court might decide this case differently cautions *against* certification. *See Metz v. BAE Sys. Tech. Sols. & Servs. Inc.*, 774 F.3d 18, 24–25 (D.C. Cir. 2014) (denying motion to certify because of forum-shopping concerns). In sum, if existing precedent is sufficient to "illuminate[] a clear path" for our analysis, *Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 514 F.3d 651, 659 (7th Cir. 2008), such that

---

[14] The majority contends that this case is also distinguishable from prior California Supreme Court cases because most of those cases involved situations where "the tortious conduct and physical injury occurred . . . . in the same location." Order at 25. But this situation is far from unique and has repeatedly been addressed in California Supreme Court cases. *See, e.g.*, *Kearney*, 137 P.3d at 917 (applying choice of law principles to case in which Georgia telephone calls caused injury in California); *McCann*, 25 P.2d at 520–29 (same in case where Oklahoma asbestos use caused mesothelioma that manifested in California).

[15] This is precisely the spoken hope of the Cassirers here. Their counsel told us: "We want you to certify because we are pretty confident [about] what the California Supreme Court is going to do." Oral Arg. at 20:10.

we can "predict" the correct answer, *U.S. Bank, N.A., v. White Horse Ests. Homeowners Ass'n*, 987 F.3d 858, 867 (9th Cir. 2021), certification should not be used.

Here, current California Supreme Court precedent sufficiently illuminates a path for our analysis, allowing us to predict the correct answer. It explains that we must "carefully evaluate[] and compare[] the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be the more impaired if its law were not applied." *Kearney*, 137 P.2d. at 922 (cleaned up). In particular, the California Supreme Court has articulated two considerations that provide substantial guidance here.

## 1.

First, we must determine whether application of one law results in the "maximum attainment of underlying purpose by all governmental entities." *Offshore Rental v. Continental Oil*, 583 P.2d 721, 726 (Cal. 1978). Applying Article 1955 to this dispute does so.

Applying Article 1955, California would still have attained its interest in providing a friendly forum in California to litigate this dispute. As explained *supra* note 10, we previously held that the Cassirers' claims were subject to, and timely made under, the statute of limitations in HEAR. *Cassirer III*, 862 F.3d at 960. It is the law of the case that HEAR does not conflict with Article 1955, *Cassirer IV*, 824 F. App'x at, 455, and the Cassirers concede that section 338(c)(3) simply "parallel[s]" HEAR. Dkt. No. 87 at 8. Thus, even were section 338(c)(3) relevant here to define California's interests in safeguarding its residents'

property,[16] HEAR's application to this case underscores that California's interest in creating a forum in which to litigate personal property disputes regarding Nazi-looted art has been "attain[ed]." *Kearney*, 137 P.3d at 934. The majority acknowledges that the "real purpose" of section 338(c)(3)'s predecessor "was to create a friendly forum for litigating holocaust restitution claims." Order at 21 (citation omitted). That is precisely what the Cassirers received here.

Also consider California's no-title-passes-through-theft rule. Again, this rule does not conflict with Article 1955. *See supra* pages 9–16. But even were it relevant here, whatever interest California has in applying that rule has been protected. Nobody was allowed to claim passage of title through a thief. Moreover, Spanish law makes it more difficult for title to vest in an "*encubridor*," which means one who covers over, "an accessory after the fact," *see* Oxford Spanish Dictionary 323 (3d ed. 2003), or as we have previously explained, someone who "knowingly receives and benefits from stolen property." *Cassirer III*, 862 F.3d at 968. If the possessor is proven to be an *encubridor*, Spanish law extends the period of time in which the property need be possessed before new prescriptive title is created. *Id.* But after "an extensive bench trial," Order at 11, the district court concluded that TBC was *not* an *encubridor* because it did not have actual knowledge that the Painting was stolen. *Cassirer*, 2019 WL 13240413, at *20–21. We affirmed that finding. *Cassirer IV*, 824 F. App'x at 457. California's interest in deterring passage of title through theft has been protected.

---

[16] Again, the majority agrees that § 338(c)(3) is irrelevant. Order at 29.

The majority balks at this conclusion, claiming that "there is no obvious way to accommodate the conflicting interests of the jurisdictions in this context[] because California's interest in protecting its residents whose property was stolen is irreconcilable with Spain's interest in protecting its residents who acquire title to property via acquisitive prescription." Order at 30. Notably, the majority cites no California law that protects California residents' "property [that] was stolen" under the particular circumstances of this case. As already explained, for purposes of its choice-of-law rules, California cannot assert some free-floating hypothetical interest in generally protecting its residents' property against theft. That interest must be tied to the application of some *actual law* that conflicts with Spanish law under *these* particular circumstances. *Bernhard*, 546 P.2d at 723. The truth that the majority strives to avoid is that declining to apply Article 1955 would result solely in the protection of California's interests, even though California's factual connection to the Painting is indisputably more attenuated than is Spain's. Applying Article 1955 reflects the maximum attainment of purpose of both California and Spain. And it is disappointing that the majority does not attempt this analysis.

## 2.

Second, California precedent requires us to examine the reliance interests the parties could have placed on the laws of the respective jurisdictions, starting from the premise that a jurisdiction has the "predominant interest in regulating conduct that occurs within its borders." *McCann*, 225 P.3d at 534; *see also Offshore Rental*, 583 P.2d at 726; *Reich*, 432 P.2d 727.

In *Reich*, the court noted that "Missouri is concerned with conduct within her borders and as to such conduct she has the predominant interest of the states involved." 432 P.2d at 730. But *Reich* went on to explain that Missouri's interest was diminished under the facts of that case because the law to be applied was merely a damages limitation that did nothing to change the way people "behave" within Missouri's borders. *Id.* at 731.

In *Offshore Rental*, the court noted that Louisiana had a "vital interest in promoting freedom of investment and enterprise [w]ithin Louisiana's borders, among investors incorporated both in Louisiana and elsewhere." 583 P.2d at 728 (holding that Louisiana law governed a negligence action by a California corporation against a Louisiana corporation, alleging loss caused by injury to plaintiff's employee, a loss that is cognizable under California law but not under Louisiana law). *Offshore Rental* considered whether that interest could "easily be satisfied by some means other than enforcement of the statute itself"—such as by purchasing insurance. *Id.* at 726. But it explained that the Louisiana defendant reasonably relied on the law of its own jurisdiction to conclude that insurance was unnecessary; instead, the court placed the insurance obligation on the California plaintiff who made deliberate contacts with Louisiana. *Id.*

In *McCann*, the court echoed *Offshore Rentals*' emphasis on the importance of a state law that creates incentives for businesses to operate in its borders. 225 P.3d at 530–34.[17] It further echoed *Reich*'s admonition that a

---

[17] In *McCann*, plaintiff California resident sued defendant corporation (organized in Delaware, located in New York), alleging exposure to

asbestos that occurred in Oklahoma. 225 P.3d at 520. The exposure occurred when plaintiff was an Oklahoma resident, but he developed symptoms only after moving to California. *Id.* Oklahoma's statute of repose would have barred plaintiff's suit, but California's statute would not. *Id.* at 527–29. *McCann* found a "true conflict." *Id.* at 533. Oklahoma was interested in applying its statute of repose in favor of the non-Oklahoma defendant for two reasons: First, it had "a legitimate interest in attracting out-of-state companies to do business within its state, both to obtain tax and other revenue . . . and to advance the opportunity of state residents to obtain employment and the products and services offered by out-of-state companies." *Id.* at 530. In support, *McCann* relied on *Offshore Rental*'s observation that a state has a legitimate interest in attracting "investors incorporated both [in-state] and elsewhere." *Id.* (cleaned up). But California also had a legitimate interest because it had a specific statute extending the time to bring suit for "an action for injury or illness based upon exposure to asbestos." *Id. McCann* clarified "that California has a legitimate interest in having a statutory provision that affords a remedy for or a benefit to an injured person or business applied when, as here, the injured person or business is a California business or resident, even when the injury-producing conduct occurs outside California." *Id.*

To resolve the conflict, *McCann* leaned heavily on the premise that, although California no longer applied the law of the place of the wrong, "California choice-of-law cases nonetheless continue to recognize that a jurisdiction ordinarily has 'the predominant interest' in regulating conduct that occurs within its borders . . . and in being able to assure individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdictions law will be available." *Id.* at 534. Although it concluded that plaintiff did not engage in "forum shopping," *McCann* found crucial that, if defendant were subjected to liability, Oklahoma's interest would be subordinated to that of California's "solely" because "plaintiff happened to move to a jurisdiction whose law provides more favorable treatment" "*after* defendant engaged in the allegedly tortious conduct in Oklahoma." *Id.* And even though California would be unable to "extend its liberal statute of limitations" to this case, its interest was less significantly impaired because California takes "a restrained view of the scope or reach of

jurisdiction has the "predominant interest in regulating
conduct that occurs within its borders." *Id.* at 534.

Here, neither the majority nor the parties claim that either
the Cassirers or TBC relied on California's *absence* of
precedent regarding whether adverse possession can create
and vest prescriptive title to personal property. Prior to its
purchase of the Painting, TBC did not learn that the Painting
had ever passed through California and thus was not on
notice as to the potential application of California law to the
Painting. Order at 28–29; *see also Cassirer*, 2019 WL
13240413, at *7–10.

Conversely, the majority concedes, as it must, that TBC
relied on Spanish law. TBC specifically relied on Article
1955 by requiring the Baron to provide a three-year *prenda*
for certain paintings. Order at 8, 20. *Prenda* means "security,
surety," or "pledge" in Spanish. Oxford Spanish Dictionary
661 (3d ed. 2003). The $10 million *prenda* operated as a
security device for the Baron's performance under the terms
of his agreement with TBC. *Cassirer*, 2019 WL 13240413,
at *11. Namely, TBC and Spain "requested this pledge, in
part, in order to protect themselves against the risk that there
might be a painting or small group of paintings that could
have a title issue." *Id.* The district court found that the three-
year term of the *prenda* "intentionally corresponded to
Spain's three-year good faith acquisitive prescription period
as provided in Article 1955 of Spain's Civil Code." *Id.*
Because TBC did not learn that the Painting had passed
through California until this action, TBC could not

California law with regard to the imposition of liability for conduct that
occurs in another jurisdiction and that would not subject the defendant
to liability under the law of the other jurisdiction." *Id.* at 535. Oklahoma
law thus applied.

reasonably "have anticipated a need for" a pledge or insurance coverage extending beyond a three-year period. *Offshore Rental*, 583 P.2d at 729. Thus, only Spanish law has been relied upon here.

### D.

In sum, even assuming the existence of a true conflict in step two of the conflict of laws analysis, the comparative impairment analysis in step three clearly favors the choice of Spanish law. Spain "has the predominant interest in regulating conduct that occurs within its borders." *McCann*, 225 P.3d at 534. Article 1955 is "an incentive for businesses" to operate in Spain because it provides predictability and certainty to businesses' property interests. *Cooper v. Tokyo Elec. Power Co. Holdings, Inc*., 960 F.3d 549, 560 (9th Cir. 2020). "California's courts have frequently applied foreign laws that serve to protect businesses by limiting liability, even when applying that law precludes recovery by injured California residents." *Id.* at 562. Each and every relevant factor favors Spanish law. The majority has not identified a single factor that goes the other way.[18] Spanish law applies.

### III.

The above analysis is clearly mapped out by decades of California Supreme Court precedent. There is nothing novel about this case that obfuscates this result. Yet the majority does not attempt to apply this analysis; instead, it ignores the relevance of California caselaw and then complains that that

---

[18] The majority correctly rejects the Cassirers' argument that Article 1955 is more "antique" than California law. Order at 29. This argument is simply a subjective attack on the social worthiness of Spain's policy, which attacks are not considered by California Courts in the comparative impairment analysis. *Kearny*, 137 P.3d at 925.

caselaw provides insufficient guidance. The majority's "anybody-but-us approach"[19] to certification imposes significant costs to state courts, federal courts, and litigants.[20]

Improper certification harms state courts for obvious reasons. Even if the California Supreme Court declines the certified question (which it should), it will do so only after investing precious judicial resources into evaluating the majority's request. Imagine the hours the California Supreme Court (and its staff) will spend familiarizing itself with the facts of this case in particular. The Cassirers filed their complaint almost two decades ago. In that time, there have been numerous important district court rulings, four Ninth Circuit decisions and one Supreme Court opinion. The excerpts of record for this appeal alone are over 2000 pages long. And all that effort will be for naught. The certified question clearly does not merit review.

The majority's unnecessary certification order strains the comity that we strive to maintain with our colleagues in state courts. Comity must play a special role in our decision to certify because certification is intended to denote "respect for the place of the States in our federal system." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 75 (1997); *see also Lehman Bros. v. Schein*, 416 U.S. 386, 393–94 (1974)

---

[19] *See Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 751, 758 n.5 (2005) (criticizing the dissent for urging certification of a question of state law in a case with "horrible facts," noting the dissent was adopting an "anyone-but-us approach").

[20] The majority claims to be "perplexed" by these observations. Order at 33. I doubt it. The majority would likely agree that it is improper to ask the California Supreme Court what is its favorite color. The question certified by the majority is equally hypothetical.

(Rehnquist, J., concurring). In this context, comity must be drawn upon with care because certification goes only one way. *See* Jason A. Cantone & Carly Giffin, *Certified Questions of State Law: An Empirical Examination of Use in Three U.S. Courts of Appeals,* 53 U. Tol. L. Rev. 1, 20 (2021). While federal courts may burden state courts with questions of state law, no comparable process exists for state courts similarly to burden federal courts. And "burden" is the right word. When we certify non-determinative, non-novel questions like the majority does today, we deplete our reservoir of comity by wasting the California Supreme Court's time and resources. That is contrary to the entire purpose of certification.

The California Supreme Court is not the only victim of today's order. Ill-considered certification harms federal courts as well because it encourages forum shopping bids. *See* Rebecca A. Cochran, *Federal Court Certification of Questions of State Law to State Courts: A Theoretical and Empirical Study*, 29 J. Legislation 157, 204–07 (2013); *Metz*, 774 F.3d at 24–25. Consider, for instance, the "leapfrogging diversity plaintiff" who files his state-law claim in federal court and then, after receiving adverse decisions there, asks for certification. Cochran, *supra* at 204. Here, the Cassirers have lately received adverse decisions at both the trial and appellate levels in the Ninth Circuit.[21] In particular, the district court has already applied California's choice of law test to conclude that Spanish law applied. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 153 F. Supp. 3d 1148, 1155–60 (C.D. Cal. 2015). It therefore comes as no

---

[21] Although the Cassirers did receive a favorable decision in *Cassirer III*, where we held that their claims were timely under HEAR. 862 F.3d at 959–64.

surprise that the Cassirers' counsel candidly told us, as earlier noted: "We want you to certify because we are pretty confident [about] what the California Supreme Court is going to do." Oral Arg. at 20:10. Allowing this forum-shopping undermines our legitimacy and hinders the administration of justice. *Cf. Org. for Advancement of Minorities with Disabilities v. Brick Oven Rest.*, 406 F. Supp. 2d 1120, 1131 (S.D. Cal. 2005) ("[D]iscouraging forum-shopping is a legitimate goal for the federal courts."). Other circuits take this factor into account when considering whether to certify. *See Metz*, 774 F.3d 18; *United States v. Defreitas*, 29 F.4th 135, 142 (3d Cir. 2022). So should we.

Finally, improper certification harms litigants through delays. On average, roughly 500 days elapse between certification from our court and a corresponding decision from the state court.[22] The impact of such a delay is palpable

---

[22] Between 1998 and 2002, an average of 602 days elapsed between certification orders from our Circuit the corresponding state-court decisions. *Kremen*, 325 F.3d at 1052 (Kozinski J., dissenting). Between 2010 and 2018, that time has diminished to a still-significant 509 days. *See* Jason A. Cantone & Carly Giffin, *Certified Questions of State Law: An Empirical Examination of Use in Three U.S. Courts of Appeals,* 53 U. Tol. L. Rev. 1, 38 (2021). This delay is made all the more concerning by the increasing frequency with which our Circuit has used certification.

From 2015 to 2020, we "certified eighty-four questions in fifty-five cases compared to twenty-three questions between 1990 and 1994." Hon. Kenneth F. Ripple & Kari Anne Gallagher, *Certification Comes of Age: Reflections of the Past, Present, and Future of Cooperative Judicial Federalism*, 95 Notre Dame L. Rev. 1927, 1931 n.32. (May 2020). The increase from 23 to 84 certifications from our Circuit presented "[t]he most dramatic shift" of any other circuit. Cantone & Giffin, *supra* at 29. In a study comparing the Third, Sixth, and Ninth Circuits from 2010 through 2018, researchers concluded that "[t]he Ninth Circuit was much

in this case. If this case were a person, it would be almost old enough to vote. This delay is needless. The answer is obvious; California choice-of-law principles require application of Spanish law.

I respectfully dissent from the majority's order.

---

more likely to certify a question than the Third or Sixth Circuit." *Id.* at 6, 44.

These data suggest that we have grown increasingly reliant on certification, and they further suggest that we are outpacing other Circuits in doing so. Our overreliance on certification creates unnecessary delay in what is already the one of the slowest circuit courts in the country. *See* U.S. Court of Appeals, Judicial Caseload Profile, Ninth Circuit (2022), available at https://www.uscourts.gov/sites/default/files/fcms_na_appprofile0630.2022_0.pdf (last visited May 15, 2023) (providing the median times that elapse between an appellant's filing of a notice of appeal and the disposition of the appeal). These data caution us to revisit our certification practices. Currently, four circuits have formal rules regarding certification. Ripple & Gallagher, *supra* at 1932 n.35. Our Circuit is not one of them. Perhaps it is time for us to promulgate a formal rule that cabins the excesses of panel-by-panel discretion.