**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DAVID CASSIRER; THE ESTATE OF AVA CASSIRER; UNITED JEWISH FEDERATION OF SAN DIEGO COUNTY, a California non-profit corporation, | No.19-55616 |
| | D.C. No. 2:05-cv-03459-JFW-E |
| *Plaintiffs-Appellants*, | |
| v. | OPINION |
| THYSSEN-BORNEMISZA COLLECTION FOUNDATION, an agency or instrumentality of the Kingdom of Spain, | |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted December 12, 2022
Pasadena, California

Filed January 9, 2024

Before:  Consuelo M. Callahan, Carlos T. Bea, and Sandra
S. Ikuta, Circuit Judges.

Opinion by Judge Bea;
Concurrence by Judge Callahan

## SUMMARY[*]

### Foreign Sovereign Immunities Act

On remand from the United States Supreme Court, the panel affirmed the district court's judgment in favor of the Thyssen-Bornemisza Collection, an instrumentality of the Kingdom of Spain, in an action under the Foreign Sovereign Immunities Act, seeking the return of a Pissarro painting stolen by the Nazis in 1939 Germany.

The Supreme Court vacated the panel's prior decision and remanded with instructions to apply California's choice-of-law rules, rather than federal choice-of-law rules, to determine whether California law or Spanish law governed the disputed claim of title to the painting.  Under California law the plaintiffs would recover the art, while under Spanish law they would not.

Applying California's choice-of-law test, the three-step "governmental interest analysis," the panel first reaffirmed its prior decision, in which it determined, under Steps One and Two of the test, that the applicable laws of California

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

and Spain differed and that a true conflict existed with respect to each jurisdiction's interests in applying its laws to this case. Addressing Step Three of California's test, the so-called "comparative impairment" analysis, the panel resolved the conflict by applying the law of the jurisdiction whose governmental interests would be the more impaired were its law not applied. The panel concluded that, under the facts of this case, Spain's governmental interests would be more impaired by the application of California law than would California's governmental interests be impaired by the application of Spanish law. Thus, Spanish law must apply.

Applying Spanish law, the panel held that the Thyssen-Bornemisza Collection had gained prescriptive title to the painting pursuant to Article 1955 of the Spanish Civil Code. The panel therefore affirmed the district court's order granting judgment in favor of the Thyssen-Bornemisza Collection.

Concurring, Judge Callahan wrote that she agreed with the result, but it was at odds with her moral compass, and Spain should have voluntarily relinquished the painting.

## COUNSEL

David Boies (argued), Boies Schiller Flexner LLP, Armonk, New York; David A. Barrett, Boies Schiller Flexner LLP, New York, New York; Stephen N. Zack, Andrew S. Brenner, and Rossana Baeza, Bois Schiller Flexner LLP, Miami, Florida; Laura W. Brill and Nicholas Daum, Kendall Brill & Kelly LLP, Los Angeles, California; Samuel J. Dubbin, Dubbin & Kravetz LLP, Coral Gables, Florida; Devin Freedman, Freedman Normand Friedland, Miami, Florida; for Plaintiffs-Appellants.

Thaddeus J. Stauber (argued), Sarah E. André, Aaron M. Brian, and Irene Scholl-Tatevosyan, Nixon Peabody LLP, Los Angeles, California, for Defendant-Appellee.

Patrick Byrne and Bernardo M. Cremades Roman, B. Cremades & Asociados, Madrid, Spain, for Amici Curiae Comunidad Judía de Madrid & Federación de Comunidades Judías de España.

Amelia L.B. Sargent, Willenken LLP, Los Angeles, California, for Amici Curiae Kingdom of Spain.

Benjamin Conway and Catherine Z. Ysrael, Deputy Attorneys General; Srividya Panchalam, Supervising Deputy Attorney General; Michael L. Newman, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the California Attorney General, Los Angeles, California; for Amici Curiae State of California.

Benjamin G. Shatz, Manatt Phelps & Phillips LLP, Los Angeles, California, for Amici Curiae 1939 Society, Bet Tzedek, Center for the Study of Law & Genocide, and Loyola Genocide Justice Clinic.

# OPINION

BEA, Circuit Judge:

This case is before us after the United States Supreme Court vacated our prior decision. The Court remanded with instructions that we apply California's choice-of-law rules, rather than federal choice-of-law rules, to determine whether California law or Spanish law governs a disputed claim of title to a painting, the *Rue Saint Honoré, après midi, effet de pluie* (the "Painting"), by French Impressionist Camille Pissarro. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 117 (2022) ("*Cassirer V*").

In 1939 Germany, the Nazis stole the Painting from Lilly Neubauer ("Lilly"), a Jew who was attempting to flee the Nazi regime. After a series of transactions, the Painting is now in the possession of the Thyssen-Bornemisza Collection ("TBC").[1] TBC had purchased the Painting from the Baron Hans Heinrich Thyssen-Bornemisza (the "Baron") in 1993. TBC has publicly displayed the Painting at the Museo Nacional Thyssen-Bornemisza in Madrid, Spain, (the "Museum") ever since.

In 2000, Claude Cassirer, a California resident and Lilly's sole heir, learned that the Painting was on display at the Museum in Spain. In 2001, Mr. Cassirer filed a petition with TBC and Spain for the return of the Painting; that petition was denied. In 2005, Mr. Cassirer brought this suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330(a), in the United States District Court for the

---

[1] TBC is an instrumentality of the Kingdom of Spain.

Central District of California, seeking the return of the Painting from TBC.[2]

After nearly two decades of litigation, the disposition of this case turns on one issue: whether, under California's choice-of-law test, Spanish law or California law applies to determine ownership of the Painting. "[U]nder California law as it currently stands, the plaintiff would recover the art while under Spanish law, the plaintiff would not."[3] *Cassirer v. Thyssen-Bornemisza Collection Found.*, 69 F.4th 554, 564 (9th Cir. 2023) ("*Cassirer VI*") (citation and internal quotation omitted).

On remand from the United States Supreme Court, we certified to the California Supreme Court the question whether California's choice-of-law test requires application of Spain's laws or California's laws to this dispute. *Id.* at 571–72. The California Supreme Court declined to answer our certified question. Thus, responsibility falls on us to apply California's choice-of-law test—the three-step "governmental interest analysis"—to determine whether

---

[2] Claude Cassirer died in 2010. David and Ava Cassirer, his children, and the United Jewish Federation of San Diego County succeeded to his claims. Ava later died, and her estate is now a substitute plaintiff. Collectively, we refer to these plaintiffs as "the Cassirers."

[3] We discuss the relevant laws in detail below. In brief, under Article 1955 of the Spanish Civil Code, TBC has acquired prescriptive title to the Painting because it possessed the Painting in good faith for over three years before the Cassirers brought suit. In contrast, California has not expressly recognized adverse possession of personal property, and as a thief cannot pass title to anyone, including a good faith purchaser, if California law applied, TBC would not have title to the Painting. The Cassirers, as successors to Lilly Neubauer and Claude Cassirer, would have title.

Spanish law or California law governs. *See Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 913, 922 (Cal. 2006).

Applying California's choice-of-law test, we first reaffirm our prior decision, in which we determined that the applicable laws of California and Spain differ and that a true conflict exists with respect to each jurisdiction's interests in applying its laws to this case. *Cassirer VI*, 69 F.4th at 563, 566. We then evaluate Step Three of California's choice-of-law test, the so-called "comparative impairment" analysis, under which we resolve such a conflict by applying the law of the jurisdiction whose governmental interests would be the more impaired were its law not applied. *See Kearney*, 137 P.3d at 934. We conclude that, under the facts of this case, Spain's governmental interests would be more impaired by the application of California law than would California's governmental interests be impaired by the application of Spanish law. Thus, applying California's choice-of-law test, we hold that Spanish law must apply.

Applying Spanish law, TBC has gained prescriptive title to the Painting pursuant to Article 1955 of the Spanish Civil Code. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 824 F. App'x 452, 456–57 (9th Cir. 2020) ("*Cassirer IV*"). We therefore affirm the district court's order which granted judgment in favor of TBC.

## I.   FACTS AND PROCEDURAL HISTORY

We discuss only the facts and procedural history relevant to our decision. A full account of this dispute is detailed in

the earlier decisions issued by the district court, this Circuit, and the U.S. Supreme Court.[4]

## A. Lilly's Ownership of the Painting and The Theft of the Painting

Paul Cassirer, a member of a prominent German Jewish family, purchased the Painting in 1900. Lilly inherited the Painting from Paul. Lilly displayed the Painting at her home in Berlin, Germany, until 1939.

In 1939, Lilly was forced to "sell" the Painting to Jackob Scheidwimmer ("Scheidwimmer"), a Berlin art dealer. Scheidwimmer had been appointed by the Nazi government to obtain the Painting, had refused to allow Lilly to take the Painting with her out of Germany, and had demanded that she sell the Painting to him for 900 Reichsmarks (around $360 at then-prevailing exchange rates) to obtain an exit visa to England. Lilly surrendered the Painting to Scheidwimmer and the 900 Reichsmarks were deposited into a bank account that Lilly was not allowed to access. There is no dispute that the Nazis stole the Painting from Lilly.

After the Nazis forced Lilly to sell the Painting to Scheidwimmer in 1939, Scheidwimmer then forced another

---

[4] *See Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010) (en banc) ("*Cassirer I*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613 (9th Cir. 2013) ("*Cassirer II*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951 (9th Cir. 2017) ("*Cassirer III*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 824 F. App'x 452 (9th Cir. 2020) ("*Cassirer IV*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107 (2022) ("*Cassirer V*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 69 F.4th 554 (9th Cir. 2023) ("*Cassirer VI*"); *see also Cassirer v. Thyssen-Bornemisza Collection Found.*, 153 F. Supp. 3d 1148 (C.D. Cal. 2015); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 2019 WL 13240413 (C.D. Cal. Apr. 30, 2019).

German Jewish collector, Julius Sulzbacher ("Sulzbacher"), to exchange three German paintings for the Painting. Sulzbacher was also seeking to escape Nazi Germany. After the Sulzbacher family fled Germany, the Gestapo confiscated the Painting. The exchange and the confiscation took place in Germany.

After the war, the Allies established a process for restoring property to the victims of Nazi looting, authorizing victims to seek restitution of looted property. In 1948, Lilly filed a timely claim against Scheidwimmer for restitution of, or compensation for, the Painting. In 1954, the United States Court of Restitution Appeals published a decision confirming that Lilly owned the Painting.

Lilly, Sulzbacher, and Scheidwimmer believed the Painting had been lost or destroyed during the war. In 1957, after the German Federal Republic regained its sovereignty, Germany enacted a law, the Brüg, which authorized claims for Nazi-looted property. Lilly then dropped her restitution claim against Scheidwimmer and initiated a claim against Germany for compensation for the wrongful taking of the Painting. In 1958, the parties reached a settlement agreement, which provided, in relevant part, that Germany would pay Lilly 120,000 Deutschmarks (the Painting's agreed value as of April 1, 1956), about $250,000 in today's dollars after adjusting for inflation. *See Cassirer V*, 596 U.S. at 110.

## B.  The Painting's Post-War History

After the Nazis confiscated the Painting, it allegedly was sold at a Nazi government auction in Düsseldorf, Germany. In 1943, the Painting was sold by an unknown consignor at the Lange Auction in Berlin, Germany, to an unknown purchaser for 95,000 Reichsmarks. In 1951, the Frank Perls

Gallery of Beverly Hills, California, arranged to move the Painting out of Germany and into California to sell the Painting to collector Sidney Brody for $14,850. In 1952, Sydney Schoenberg, a St. Louis, Missouri, art collector, purchased the Painting for $16,500. The Painting sat in a private collection in St. Louis from 1952–1976. In 1976, the Baron purchased the Painting through the Stephen Hahn Gallery in New York for $275,000. The Baron kept the Painting in Switzerland as part of his collection until 1992, except when it was on public display in exhibitions outside Switzerland.

In 1988, Favorita Trustees Limited ("Favorita"), an entity controlled by the Baron, and Spain reached an agreement with TBC that the Baron would loan his art collection (the "Collection"), including the Painting, to TBC, an entity created and controlled by the Kingdom of Spain. Pursuant to this agreement, Spain created TBC to maintain, conserve, publicly exhibit, and promote the Collection's artwork. Spain agreed to display the Collection at the Villahermosa Palace in Madrid, Spain, and to restore and redesign the palace as the Museum.

After the Villahermosa Palace had been restored and redesigned as the Museum, pursuant to the loan agreement, the Museum received a number of paintings from Favorita, including the Painting, and in 1992, the Museum opened to the public. Since October 10, 1992, the Painting has been on public display at the Museum in Spain.

In 1993, the Spanish government passed Real Decreto-Ley 11/1993, which authorized and funded the purchase of the Collection. Spain bought the Collection by entering into an acquisition agreement with Favorita. TBC paid Favorita and the Baron $350 million for the Collection. TBC required

the Baron to provide a $10 million, three-year *prenda*[5] of certain paintings as a security device for the Baron's performance under the terms of his agreement with TBC.

## C.  Procedural History

Claude Cassirer, Lilly's sole heir, moved to California in 1980 and resided there until his death in 2010. In 2000, Mr. Cassirer learned that the Painting was in the Museum. On May 3, 2001, Mr. Cassirer filed a petition in Spain with the Kingdom of Spain and TBC, seeking the return of the Painting. In 2005, after that petition was denied, Claude Cassirer filed this action, under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330(a), in the United States District Court for the Central District of California, seeking the return of the Painting. The litigation noted in footnote 4, above, proceeded.

In 2015, the Cassirers moved the district court for an order declaring that the law of California, not the law of Spain, governed the merits of their action.[6] The district court

---

[5] *Prenda* means "security, surety," or "pledge" in Spanish. Oxford Spanish Dictionary 661 (3d ed. 2003).

[6] Under Article 1955 of the Spanish Civil Code, ownership in personal property vests by prescription after either (1) three years of uninterrupted possession of the property in good faith, (2) or six years of uninterrupted possession, even absent good faith. However, the six-year prescriptive period is tolled for the period during which a criminal or civil action can be brought if the possessor is a principal, accomplice, or accessory (*encubridor*) to the theft. *See Cassirer III*, 862 F.3d at 966. California, in contrast, has not specifically endorsed adverse possession for personal property, *see Cassirer VI*, 69 F.4th at 562, and allows a victim of fine art theft to recover the stolen art from a museum or similar institution so long as he brings suit to recover it within six years of his discovery of its whereabouts, regardless whether the possessor took possession of the

recognized that before making this determination, it first had to determine whether it should apply California or federal common law choice-of-law rules. *See Cassirer*, 153 F. Supp. 3d at 1154. The district court held that federal choice-of-law rules governed a case where jurisdiction is premised on the FSIA.[7] *Id*. Applying federal choice-of-law rules, the district court concluded that Spanish law applied to determine the ownership of the Painting. *Id.* at 1155.

Out of an abundance of caution, the district court also applied California choice-of-law rules and reached the same conclusion: that Spanish law applied. *Id*. at 1160. The court reasoned that the Painting "was present in California for less than a year," whereas "for more than twenty years . . . the Painting has been in the possession of an instrumentality of the Kingdom of Spain in Madrid, Spain . . . and that possession in Spain provides the basis for [TBC's] claim of ownership." *Id.* at 1155. The court concluded Spain has a "strong interest in regulating conduct that occurs within its borders," and in assuring individuals acting within its

---

property in good faith. Cal. Code Civ. Proc. § 338(c)(3)(A). Moreover, under California law, thieves cannot pass good title to anyone, including a good faith purchaser. *Crocker Nat'l Bank v. Byrne & McDonnell*, 173 P. 752, 754 (Cal. 1918).

[7] The district court's decision to apply federal-choice-of-law rules in a case arising under the FSIA was based on then-binding Ninth Circuit precedent. *Cassirer*, 153 F. Supp. 3d at 1154 (citing *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991)). The federal choice-of-law test draws from the Second Restatement. Under that approach, a court must consider a set of factors to decide which state has the "most significant relationship" to the case. Restatement (Second) of Conflict of Laws §§ 6, 222. The Second Restatement provides that, in cases of adverse possession of chattel, the local law of the state where the chattel was located at the time of transfer typically governs. Second Restatement, § 246.

borders that "their title and ownership of . . . property [is] certain," whereas "California's interest [in facilitating recovery for one of its residents] is significantly less." *Id.*

Applying Spanish law, the district court ruled that TBC was the rightful owner of the Painting, pursuant to Spain's law of acquisitive prescription,[8] as stated in Article 1955 of the Spanish Civil Code. *Id.* at 1160. The district court therefore entered summary judgment in favor of TBC. *Id.*

On appeal in this Court, consistent with our Circuit's precedent, we applied federal choice-of-law principles to conclude that Spanish property law governed this dispute.[9] *Cassirer III*, 862 F.3d at 961 (citing *Schoenberg*, 930 F.2d at 782).

Applying Spanish law, we considered whether TBC had fulfilled the requirements for ownership of the Painting set forth in Articles 1955 and 1956 of the Spanish Civil Code. *Id.* at 964–76. We explained that acquisitive prescription under Article 1955 is modified by Article 1956, which extends the period of possession necessary to vest title when the person who has possession was a principal, accomplice, or accessory (*encubridor*), *see* Oxford Spanish Dictionary 323 (3d ed. 2003), to the robbery or theft of the property at issue. *Cassirer III*, 862 F.3d at 966. We then held that there was a genuine dispute of material fact as to whether TBC knew the Painting had been stolen when TBC acquired the Painting from the Baron, and therefore whether TBC was an

---

[8] Acquisitive prescription is "a mode of acquiring ownership or other legal rights through possession for a specified period of time." *Acquisitive Prescription*, Black's Law Dictionary (11th ed. 2019). The term is synonymous with adverse possession.

[9] In so holding, we did not consider how California's choice-of-law rules applied. *See Cassirer III*, 862 F.3d at 961–64.

*encubridor* under Article 1956. *Id.* at 975. If TBC were an *encubridor*, it would not have acquired title to the Painting through acquisitive prescription until 2019—six years after the criminal and civil limitations periods had run—long after the Cassirers brought their action in 2005. *Id*. at 966. Therefore, we reversed the district court's order which granted summary judgment in favor of TBC, and remanded for that court to consider whether TBC knew the Painting had been stolen when it acquired the Painting from the Baron. *Id.* at 981.

On remand, the district court conducted an extensive bench trial. The court concluded that TBC was not an *encubridor* under Article 1956 of the Spanish Civil Code, because TBC did not have actual knowledge that the Painting was stolen when it purchased the Painting from the Baron in 1993. *Cassirer*, 2019 WL 13240413, at *20–22. Because TBC had possessed the Painting publicly, as an owner, for over three years in good faith, the district court held that TBC had fulfilled the requirements of Article 1955 of the Spanish Civil Code and had therefore acquired prescriptive title to the Painting. *Id.* at *19. It thus entered judgment in favor of TBC. We affirmed. *Cassirer IV*, 824 F. App'x at 457.

The Cassirers petitioned the Supreme Court for certiorari on the question whether a federal court hearing state-law claims as to title of the Painting, brought under the FSIA, may apply federal common law to determine what state's substantive law governs the claims at issue, or whether the forum state's choice-of-law provisions govern. The Supreme Court granted the petition and held that the FSIA "requires the use of California's choice-of-law rule—because that is the rule a court would use in comparable private litigation." *Cassirer V*, 596 U.S. at 115. Because we had applied federal

choice-of-law rules, the Supreme Court vacated our judgment and remanded for us to apply California's "standard choice-of-law rule." *Id.* at 117.

On remand, by majority vote of the panel, we certified the following question to the California Supreme Court:

> Whether, under a comparative impairment analysis, California's or Spain's interest is more impaired if California's rule that a person may not acquire title to a stolen item of personal property (because a thief cannot pass good title, and California has not adopted the doctrine of adverse possession for personal property), were subordinated to Spain's rule that a person may obtain title to stolen property by adverse possession.

*Cassirer VI*, 69 F.4th at 571–72.[10]

On August 9, 2023, the California Supreme Court declined to answer the certified question by a 6-1 vote. We thus resumed jurisdiction over the case. We then allowed for the filing of supplemental briefs and amici briefs. It is now our responsibility to determine whether, under California's choice-of-law test, Spain's laws or California's laws apply to determine title to the Painting.

---

[10] As described below, California's choice-of-law test involves three steps. In our order which certified the question to the California Supreme Court, we concluded that Step One and Step Two were satisfied. *Cassirer VI*, 69 F.4th at 563, 566. Thus, our certified question to the California Supreme Court involved only Step Three. *Id.* at 561.

## II.  JURISDICTION AND STANDARD OF REVIEW

The FSIA, 28 U.S.C. § 1330(a), gave the district court original jurisdiction. We have appellate jurisdiction under 28 U.S.C. § 1291.

We review the district court's factual findings for clear error and its conclusions of law de novo. *Kohler v. Presidio Int'l, Inc.*, 782 F.3d 1064, 1068 (9th Cir. 2015).

## III.      ANALYSIS

California applies the "governmental interest approach" to resolve conflict-of-law disputes. *See McCann v. Foster Wheeler*, 225 P.3d 516, 527 (Cal. 2010). That test proceeds in three steps. At Step One, a court must determine "whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different." *Kearney*, 225 P.3d at 922. If the relevant laws are different, the court then moves to Step Two, under which it "examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists." *Id.* Finally, if there is a true conflict, the court at Step Three "carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Id.* (quoting *Bernhard v. Harrah's Club*, 546 P.2d 719, 723 (Cal. 1976)). After conducting this analysis, the court "ultimately applies the law of the state whose interest would be the more impaired if its law were not applied." *Id.*

### A. Spain's laws and California's laws differ with respect to the ownership of stolen property.

All agree that the relevant Spanish law here is Article 1955 of the Spanish Civil Code. Under that provision, title to movable goods (chattels) prescribes (is granted) to a possessor by either (1) "three years of uninterrupted possession in good faith," or (2) "six years of uninterrupted possession, without any other condition."   Spanish Civil Code Art. 1955 (English translation). As we have explained, the six-year prescriptive period is modified and extended by Article 1956. *See Cassirer III*, 862 F.3d at 966. Applying Article 1955 of the Spanish Civil Code to this dispute, we have already held that TBC gained prescriptive title to the Painting that is superior to the Cassirers' claim of title to the Painting under Spanish law. *See Cassirer IV*, 824 F. App'x at 455–57.

Meanwhile, three California laws are relevant to this case. First, unlike Spain, California has not expressly adopted a doctrine of adverse possession for personal property. *Cassirer VI*, 69 F.4th at 557, 562 (noting that California "has not adopted the Spanish rule 'that title to chattels may pass through qualified, extended possession'"); *see S.F. Credit Clearing House v. Wells*, 239 P. 319, 322 (Cal. 1925) (declining to consider whether adverse possession "should be applied to personal property").[11] Second, California employs the common law rule that

---

[11] On the other hand, one scholarly opinion suggests that California law does allow a possessor to take title to personal property by prescription. *See* 13 C. Witkin, Summary of California Law, Personal Property § 133 (11th ed. 2022) (explaining that California Civil Code Sections 1000 and 1007 "seem to establish the right to acquire title to personal property by adverse possession . . . .").

"thieves cannot pass good title to anyone, including a good faith purchaser." *Cassirer VI*, 69 F.4th at 561 (citing *Crocker Nat'l Bank of S.F.*, 173 P. at 754). Third, § 338(c)(3)(A) of the California Code of Civil Procedure extends the statute of limitations under which a plaintiff can bring an action to recover "a work of fine art . . . against a museum, gallery, auctioneer, or dealer, in the case of an unlawful taking or theft." Although the general statute of limitations for claims involving the return of stolen property in California is three years, § 338(c)(3)(A) provides that an action must be commenced "within six years of the actual discovery" of the identity and whereabouts of the work of stolen fine art in which the claimant asserts an interest. Cal. Code of Civ. Proc. § 338(c)(3)(A).

In turn, the laws of Spain and California differ regarding the particular issue in question: the ownership of stolen art. *See Cassirer VI*, 69 F.4th at 562. Under Spanish law, a possessor of stolen property can acquire prescriptive title that is superior to the original owner's title. In contrast, under California law as it stands today, a possessor of stolen property does not acquire possessory rights to stolen property that are superior to the rights of the true owner until the statute of limitations expires. Moreover, under Cal. Code of Civ. Proc. § 338(c)(3)(A), the Cassirers would have a forum to bring their claim because Claude Cassirer brought suit in 2005, only five years after he discovered the whereabouts of the Painting in 2000. Thus, although TBC has acquired superior title to the Painting under Spanish law, it has not acquired superior possession rights to the Painting under California law. The laws of Spain and California as applied to this case, therefore, differ.

## B. There is a true conflict between Spanish law and California law.

A true conflict exists where each jurisdiction has a "real and legitimate interest in having its [laws] applied under the circumstances presented here." *McCann*, 225 P.3d at 531–32. If a jurisdiction's interests in its laws would not be served were its law applied, the court should apply the law of the jurisdiction that has a real interest in the dispute. *See, e.g.*, *Reich v. Purcell*, 432 P.2d 727, 730–31 (Cal. 1967) (holding Missouri did not have a real interest in applying its law regarding damages limitation with respect to an accident that occurred in Missouri, because the defendant was a resident of Ohio and Missouri's interest was to shield Missouri residents from liability). "Although the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied." *Hurtado v. Superior Ct.*, 522 P.2d 666, 670 (Cal. 1974).

We have already concluded that a true conflict exists between Spain's and California's interests in having their laws applied to this case. *Cassirer VI*, 69 F.4th at 564. "[B]oth Spain and California have a legitimate interest in applying their respective laws on ownership of stolen personal property." *Id.* The property laws of Spain and California serve each jurisdiction's real and legitimate governmental interests, both of which seek to "create certainty of title, discourage theft, and encourage owners of stolen property to seek return of their property in a timely fashion." *Cassirer III*, 862 F.3d at 964. Spanish law, for its part, "assures Spanish residents that their title to personal property is protected after they have possessed the property in good faith for a set period of time," whereas California law seeks to deter theft, facilitate recovery for victims of

theft, and create "an expectation that a bona fide purchaser for value of movable property under a 'chain of title traceable to the thief,' . . . does not have title to that property." *Cassirer VI*, 69 F.4th at 565 (citing *Suburban Motors, Inc. v. State Farm Mut, Auto. Ins. Co.*, 218 Cal. App. 3d 1354, 1259 (1990)).

Moreover, California's 2010 enactment of § 338(c)(3)(A) evinces its "strong interest in protecting the rightful owners of fine arts who are dispossessed of their property." *Cassirer III*, 862 F.3d at 963. California has demonstrated a real interest in returning stolen art to victims of theft, such as the Cassirers.

Thus, we encounter a true conflict between the laws of Spain and California as both Spain and California have a "real and legitimate interest[]" in applying their respective laws to this dispute. *See McCann*, 225 P.3d at 531–32.

## C. Spain's governmental interests would be more impaired by the application of California law than would California's interests be impaired by the application of Spanish law.

Because such a true conflict exists, we must resolve that conflict at Step Three of California's choice-of-law test: the comparative impairment analysis. Under that analysis, we determine which jurisdiction's interest "would be more impaired if its policy were subordinated to the policy of the other state." *Offshore Rental Co. v. Cont'l Oil Co.*, 583 P.2d 721, 726 (Cal. 1978). We then apply the law of the state "whose interest would be the more impaired were its law not applied." *Id.*

As the California Supreme Court has instructed, our task in applying the comparative impairment analysis "is not to

determine whether the [Spanish] rule or the California rule is the better or worthier rule." *See McCann*, 225 P.3d at 534; *Bernhard*, 546 P.2d at 724 (cleaned up) ("Emphasis is placed on the appropriate scope of conflicting state policies rather than on the quality of those policies."). Instead, our task is to decide, "in light of the legal question at issue and the relevant state interests at stake—which jurisdiction should be allocated the predominating lawmaking power under the circumstances of the present case." *McCann*, 225 P.3d at 534.

In making this determination, we are directed to measure the interests of each jurisdiction based on "the circumstances of the present case"—the facts of this *particular dispute*—not the jurisdiction's general policy goals expressed in the laws implicated. *See id*. And we do not look only to the jurisdiction's "single subject or rule of law"; rather, we must "identify the distinct state interests that may underlie separate aspects of the issue in question." *Kearney*, 137 P.3d at 924; *see, e.g.*, *Hurtado*, 522 P.2d at 672 (explaining that where a state limits damages for wrongful death actions, three distinct state interests should be evaluated under California's choice-of-law test: compensation for survivors, deterrence of conduct, and limitation, or lack thereof, upon the damages recoverable). Based on the magnitude of the distinct state interests, as derived from the facts of the present dispute, we can then compare the extent to which each jurisdiction's interests would be impaired were its law not applied. *See Kearney*, 137 P.3d at 924.

In sum, our task is to compare, under the facts of this case, (1) the extent to which Spain's interests in providing certainty of title to entities like TBC would be impaired by the application of California law, and (2) the extent to which California's interest in deterring theft and facilitating

recovery for victims of stolen art, like the Cassirers, would be impaired by the application of Spanish law.

The California Supreme Court has identified several factors to evaluate in analyzing the scope of "the distinct . . . interests" a jurisdiction has in applying its laws to a specific case.  *See id.* Those factors include the "current status of a statute," *see Offshore Rental*, 583 P.2d at 726–27; the location of the relevant transactions and conduct, *see McCann*, 225 P.3d at 535–37; *Offshore Rental*, 583 P.2d at 728–29; *Kearney*, 137 P.3d at 937–38; and the extent to which one jurisdiction's laws either impose similar duties to the other jurisdiction's laws, or are accommodated by the other jurisdiction's laws, such that the application of the other jurisdiction's laws would only partially—rather than totally—impair the interests of the state whose law is not applied, *see Bernhard*, 546 P.2d at 725–26.  We evaluate each factor in turn.

### 1.

First, we analyze whether the policy underlying a state's law "is one that was much more strongly held in the past than it is now." *Offshore Rental*, 583 P.2d at 726 (citation omitted). "[T]he current status of a statute is an important factor to be considered in a determination of comparative impairment." *Id.* If a particular statute is "infrequently enforced or interpreted even within its own jurisdiction," it has limited application in a conflict-of-laws case. *Id.*[12]

---

[12] For example, in *Offshore Rental*, the California Supreme Court considered a California cause of action for "negligent injury to a key employee" brought by a California employer against a Delaware corporation for an injury to an employee that occurred on the defendant's

The Cassirers argue that Spain's acquisitive prescription law is archaic, and therefore should be afforded little weight, because (1) it is out of step with international consensus supporting the return of Nazi-looted art, including agreements to which Spain is a party, and (2) Spain's six-year acquisitive prescription law for property obtained in bad faith is an outlier compared to other countries. That argument fails.

First, TBC does not claim to have taken prescriptive title under Spain's six-year acquisitive prescription law, which vests title after six years regardless whether the possessor acted in good faith. *Cassirer III*, 862 F.3d at 966. Were that law applied, we previously held that, pursuant to Article 1956 of the Spanish Civil Code, TBC would not have acquired title to the Painting until 2019—six years after the criminal and civil limitations period had run—and so the Cassirers would have been entitled to the return of the Painting. *Id.* Thus, we find irrelevant the Cassirers' argument that Spain's six-year acquisitive prescription for

---

premises in Louisiana. 583 P.2d at 722. It was unclear whether § 49 of the California Civil Code recognized such an action. *Id.* at 724. The court assumed that California did recognize the action, which it reasoned "expresse[d] [California's] interest in protecting California employers from economic harm." *Id.* But in applying the comparative impairment analysis, the court discounted California's interest because it had "exhibited little concern" in applying the law. *Id.* at 728. "[N]o California court has heretofore squarely held that California law provides an action for harm to business employees, and no California court has recently considered the issue at all." *Id.* The court also reasoned that the law was "archaic and isolated in the context of the laws of the federal union." *Id* (citation and quotation marks omitted). The court thus discounted California's interest "in the application of its unusual and outmoded statute," as compared to Louisiana's more "prevalent and progressive law" that did not recognize the cause of action. *Id.*

stolen property is an "outlier compared to all of the other jurisdictions that had contact with the Painting." That provision of the law is not applicable in the "present case." *See McCann*, 225 P.3d at 534. The three-year period of Article 1955 is the basis for TBC's claim.

Second, we reiterate the California Supreme Court's directive that a court's task "is not to determine whether the [foreign jurisdiction] rule or the California rule is the better or worthier rule." *Id*. Rather, the inquiry rests on the "relative commitment of the respective states to the laws involved." *Offshore Rental*, 583 P.3d at 727. The Cassirers' argument strikes at the social worthiness of Article 1955 of the Spanish Civil Code—an invalid basis upon which to weigh the scope of Spain's interests. *See id.*

As we have recognized, "neither jurisdiction has shown any lack of interest in seeing its own law applied." *Cassirer VI*, 69 F.4th at 569. Spain has demonstrated a commitment to enforcing its acquisitive prescription laws and to legislating on the ownership of property located in its territory. *Id.* And California has asserted its strong interest in seeking justice for victims of art theft. *Id.* at 569 n.9. Both California and the Kingdom of Spain filed amicus briefs expressing their strong interests in the application of their respective laws to this dispute.

Therefore, the relative commitment of the jurisdictions to their laws as applied to this dispute does not favor or disfavor the application of either jurisdiction's laws under the comparative impairment approach.

2.

The California Supreme Court has reasoned that the place where the relevant conduct occurs receives significant

weight in measuring the interests involved in the comparative impairment analysis. Indeed, a jurisdiction "ordinarily has the predominant interest in regulating conduct that occurs within its borders and in being able to assure individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses in the event they are faced with litigation in the future." *McCann*, 225 P.3d at 534 (cleaned up)*. In such a case, the jurisdiction has a strong interest in "establishing a reliable rule of law" to promote predictability, to allow actors operating within the jurisdiction's borders reasonably to rely on the jurisdiction's law, and to facilitate investment by entities operating within the jurisdiction. *Id.*; *Offshore Rental*, 583 P.2d at 728; *Kearney*, 137 P.3d at 936–37.

In turn, failing to apply a jurisdiction's laws that limit liability with respect to conduct that occurs within its borders will, typically, significantly impair a jurisdiction's real and legitimate interests in promoting reliance on its laws. *See McCann*, 225 P.3d at 534–35; *Kearney*, 137 P.3d at 936–37. This is particularly so when the failure to apply the jurisdiction's law to conduct within its borders is based solely on the fortuity of the residence or choice of tribunal of an adverse party. *See McCann*, 225 P.3d at 534–35.

In contrast, where none of the relevant conduct occurs in California, a "restrained view of California's interest" in facilitating recovery for one of its residents is warranted. *Id.* at 535. "[P]ast California choice-of-law decisions generally hold that when the law of the other state limits or denies liability for the conduct engaged in by the defendant in its territory, that state's interest is predominant, and California's legitimate interest in providing a remedy for, or in facilitating recovery by, a current California resident

properly must be subordinated because of this state's diminished authority over activity that occurs in another state." *Id.* at 536; *see also Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 560 (9th Cir. 2020) ("California's courts have frequently applied foreign laws that serve to protect businesses by limiting liability, even when applying that law precludes recovery by injured California residents.").

We find *McCann* particularly instructive here. There, a former Oklahoma resident was exposed to friable asbestos at his workplace in Oklahoma. 225 P.3d at 518. The plaintiff later moved to California and developed mesothelioma there. *Id.* Breathing in friable asbestos is a known—perhaps the only known—cause of mesothelioma. He then sued his former employer in California state court. *Id.* Oklahoma's statute of repose would have barred the suit, but California's statute of limitations would not have barred the suit. *Id.* Thus, a "true conflict" existed between California law and Oklahoma law. *Id.* at 533.

Applying the comparative impairment analysis of California's choice-of-law test, the California Supreme Court held that Oklahoma law applied and barred the plaintiff's suit. *Id.* at 537. The court concluded that "a failure to apply Oklahoma law would significantly impair Oklahoma's interest," because all relevant conduct—the exposure to the asbestos—"occurred in Oklahoma." *Id.* at 534. In so reasoning, the court stressed that a jurisdiction "ordinarily has the predominant interest in regulating conduct that occurs within its borders." *Id.*; *see also Castro v. Budget Rent-A-Car System, Inc.*, 154 Cal. App. 4th 1162, 1180 (Cal. Ct. App. 2007) (reasoning that a state has a "presumptive interest in controlling the conduct of those persons" who engage in relevant conduct in the state and that

a state has an interest in "not subjecting its residents and businesses to the laws of other states that expand liability").

Thus, applying California law would have significantly impaired Oklahoma's governmental interests in regulating conduct within its borders, because doing so "would rest solely upon the circumstance that after defendant engaged in the allegedly tortious conduct in Oklahoma, plaintiff happened to move to a jurisdiction whose law provides more favorable treatment to plaintiff than that available under Oklahoma law." *McCann*, 225 P.3d at 534.   The court reasoned:

> [T]he displacement of Oklahoma law limiting liability for conduct engaged in within Oklahoma, in favor of the law of a jurisdiction to which a plaintiff subsequently moved, would—notwithstanding the innocent motivation of the move— nonetheless *significantly impair the interest of Oklahoma* served by the statute of repose. If Oklahoma's statute were not to be applied because plaintiff had moved to a state with a different and less "business-friendly" law, Oklahoma could not provide any reasonable assurance—either to out-of-state companies or to Oklahoma businesses—that the time limitation embodied in its statute would operate to protect such businesses in the future. Because a commercial entity protected by the Oklahoma statute of repose has no way of knowing or controlling where a potential plaintiff may move in the future, subjecting such a defendant to a different rule

of law based upon the law of a state to which
a potential plaintiff ultimately may move
*would significantly undermine Oklahoma's
interest in establishing a reliable rule of law*
governing a business's potential liability for
conduct undertaken in Oklahoma.

*Id.* at 534–35 (emphases added); *see also Kearney*, 137 P.3d
at 937 (explaining that "Georgia has a legitimate interest in
ensuring that individuals and businesses who act in Georgia
with the reasonable expectation that Georgia law applies to
their conduct are not thereafter unexpectedly and
unforeseeably subjected to liability for such action" and
holding that "restrain[ing] the application of California law
with regard to the imposition of liability for acts that have
occurred in the past" was necessary "to accommodate
Georgia's interest in protecting persons who acted in
Georgia in reasonable reliance on Georgia law").

In contrast, the failure to apply California's statute of
limitations would create "a far less significant impairment of
California's interest," because none of the relevant conduct
occurred in California. *McCann*, 225 P.3d at 535. Although
California would not be able to "extend its liberal statute of
limitations for asbestos-related injuries or illnesses to some
potential plaintiffs," "California's interest in applying its
laws providing a remedy to, or facilitating recovery by, a
potential plaintiff in a case in which the defendant's
allegedly tortious conduct occurred in another state is less
than its interest when the defendant's conduct occurred in
California." *Id.* In turn, "a restrained view of California's
interest in facilitating recovery by a current California
resident is warranted in evaluating the relative impairment
of California's interest that would result from the failure to

apply California law." *Id.*; *see also Castro*, 154 Cal. App. 4th at 444 (reasoning that a California plaintiff's "individual financial circumstance and the possible cost to California taxpayers and businesses [of an uncompensated loss] are . . . not sufficient to reallocate" lawmaking power from the jurisdiction where the conduct occurred to California).

Thus, because all relevant conduct occurred in Oklahoma—and California's only connection to the dispute was the fortuitous residence of the plaintiff in California— Oklahoma law applied under the comparative impairment analysis. *McCann*, 225 P.3d at 537.

Similarly, in *Offshore Rental*, the California Supreme Court—applying the comparative impairment approach— applied Louisiana law over California law to bar a claim by a California plaintiff relating to a physical injury that occurred in Louisiana. 583 P.3d at 728–29. There, the plaintiff, a California corporation, brought a negligence action against the defendant out-of-state corporation, seeking to recover damages that the plaintiff corporation allegedly sustained as a result of an injury that an officer of the corporation suffered while the officer was on the defendant's premises in Louisiana. *Id.* at 722. The California plaintiff (the employer) sued for the value of its lost services under a theory of "negligent injury to a key employee." *Id.* It was unclear whether California law recognized such a claim, but Louisiana law foreclosed such a claim. *Id.* at 724.

The California Supreme Court held that Louisiana law applied and barred the California plaintiff's suit, in part because the relevant conduct (the employee's injury at the defendant's workplace) occurred in Louisiana. *Id.* at 728–

29. The court affirmed the trial court's order that had dismissed the plaintiff's claim, reasoning:

> The accident in question occurred within Louisiana's borders; although the law of the place of the wrong is not necessarily the applicable law for all tort actions, the situs of the injury remains a relevant consideration. At the heart of Louisiana's denial of liability lies the vital interest in promoting freedom of investment and enterprise within Louisiana's borders, among investors incorporated both in Louisiana and elsewhere. The imposition of liability on defendant, therefore, would strike at the essence of a compelling Louisiana law.

*Id.* at 728.

Based in part on the fact that the relevant conduct occurred in Louisiana, the California Supreme Court concluded that Louisiana's interests would be the more impaired if its law were not applied and, therefore, held that Louisiana law applied. *Id.* at 728–29.[13]

In sum, California Supreme Court precedent teaches that the place in which the relevant conduct occurs in the particular case is a crucial factor in measuring the jurisdictions' relative interests under the comparative

---

[13] As explained above, *supra* note 12, the California Supreme Court also discounted California's interest because California had "exhibited little concern" for applying its outdated law. *Id.* at 728. But the fact that the accident occurred within Louisiana's borders, and not California's borders, "provide[d] additional support for our limitation of the reach of California law in the present case." *Id.*

interest analysis. This is because a jurisdiction has a strong interest in "establishing a reliable rule of law"—especially one that may limit future liability—with respect to conduct that occurs within its borders. *See McCann*, 225 P.3d at 535. Furthermore, when California's sole contact to the dispute was the happenstance of the plaintiff's residence there, California's interest in facilitating recovery for that resident was minimal and the extraterritorial reach of its laws was restrained. *See id*.

Here, as in *McCann*, California's governmental interest rests solely on the fortuity that Claude Cassirer moved to California in 1980, at a time when the Cassirer family believed the Painting had been lost or destroyed. *See McCann*, 225 P.3d at 535. Like *McCann*, none of the relevant conduct involving the Painting occurred in California.[14] *See id.* Moreover, although California has evinced a strong interest in returning stolen art to victims of theft, *see* Cal. Code Civ. Proc. § 338(c)(3)(A), a "restrained view of California's interest in facilitating recovery by a current California resident" is warranted. *See McCann*, 225 P.3d at 535 ("California's interest in applying its laws providing a remedy to, or facilitating recovery by, a potential plaintiff in a case in which the defendant's allegedly tortious conduct occurred in another state is less than its interest when the defendant's conduct occurred in California."). In sum, because no relevant conduct with respect of the Painting occurred in California, the impairment of California's interest that would result from applying Spanish

---

[14] The only conduct connected to the Painting that occurred in California involved the sale of the Painting there in the early 1950s, when the Painting was in California for around a year before its sale to a St. Louis art dealer. But the parties do not claim this sale is in any manner relevant.

law would be minimal. *See id.* Claude Cassirer's decision to move to California—a move that was unrelated to his claim for the Painting—is "not sufficient to reallocate" lawmaking power from Spain to California. *See Castro*, 154 Cal. App. 4th at 444; *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1424 (9th Cir. 1989) ("California courts have rejected arguments that a party's contacts with California, unrelated to the cause of action at hand, create a basis for extending the reach of California's law.").

In contrast, applying California law would significantly impair Spain's interest in applying Article 1955 of the Spanish Civil Code. For one, because the relevant conduct (TBC's purchase of the Painting and its display in the museum) occurred in Spain—or at least not in California[15]— *McCann* teaches that Spain has the "predominant interest" in applying its laws to that conduct. *See* 226 P.3d at 534. As *McCann* and *Offshore Rental* both make clear, when the relevant conduct occurs within a jurisdiction's borders, that jurisdiction has a strong "interest in establishing a reliable rule of law governing a business's potential liability for conduct undertaken" there. *See id.* at 535; *Offshore Rental*, 583 P.2d at 728–29 (reasoning that a jurisdiction has a "vital interest in promoting freedom of investment and enterprise within [its] borders"); *Arno v. Club Med Inc.*, 22 F.3d 1464, 1469 (9th Cir. 1994) (applying French law to a vicarious-

---

[15] Certainly, some of the Painting's history involves jurisdictions other than Spain: (1) the Nazis' theft of the Painting in 1939, in Germany, (2) the movement of the Painting into California and its sale in 1951, (3) the sale of the painting to a St. Louis, Missouri art collector in 1952, (3) the sale of the Painting to the Baron in New York in 1976, and (4) the Painting's possession and display by the Baron from 1976-1992 in Switzerland. But no one claims that Germany, Missouri, New York, or Switzerland has an interest in applying its laws here.

liability claim because Guadeloupe's interest in "encouraging local industry . . . and reliably defining the duties and scope of liability of an employer doing business within its borders" would be more impaired than California's interest in "providing compensation to its residents" would be impaired were its law not applied).

Moreover, applying California law based only on the Cassirers' choice of residence would mean that Spain could not provide any "reasonable assurance[s]" to persons who possess property within Spain's borders that Article 1955 would ever protect them from replevin or damages actions by California claimants. *See McCann*, 225 P.3d at 534. Rather, applying California law would mean that Spain's law would not apply to property possessed within Spain's borders, so long as the initial owner (1) happened to be a California resident (a fact over which, as in *McCann*, the defendant has "no way of knowing or controlling," *see id.* at 535), and (2) the California resident did not know where the property is located and who possessed it—contrary to Article 1955 of the Spanish Civil Code. Applying California law based only on Claude Cassirer's decision to move to California would "strike at the essence of a compelling [Spanish] law." *See Offshore Rental*, 583 P.2d at 728. And it would contradict the principles from *McCann* and *Offshore Rental*, which recognize the strong interest that Spain has in ensuring its laws will predictably regulate conduct that occurs within its borders. *See McCann*, 225 P.3d at 535 ("[S]ubjecting such a defendant to a different rule of law based upon the law of a state to which a potential plaintiff

ultimately may move would significantly undermine Oklahoma's interest.").**[16]**

Finally, Spain's interests in promoting reliance, predictability, and investment are especially relevant under the facts of this case, as shown by TBC requiring the Baron to provide a three-year *prenda* specifically to align with Article 1955's prescriptive acquisition period. Applying California law to this case would leave entities in Spain, like TBC, unable to structure and plan their conduct in Spain in reliance on Spain's laws. *McCann* and *Offshore Rental* dictate that such an outcome would significantly impair Spain's governmental interests.

In sum, applying California law to this dispute would significantly impair Spain's interests, whereas applying Spanish law would relatively minimally impair California's interests.

### 3.

Finally, the California Supreme Court has directed that a court applying the comparative impairment analysis should strive for the "maximum attainment of underlying purpose by all governmental entities." *Offshore Rental*, 583 P.2d at 728 (reasoning that a court should look to "the function and purpose of th[e] laws"). Thus, the court should look to whether one jurisdiction's laws accommodate the other jurisdiction's interests or imposes duties the other

---

[16] We recognize that *McCann* and *Offshore Rental* involved causes of action involving bodily injury, whereas this case involves an injury that relates to property. *See Cassirer VI*, 69 F.4th at 561–62. But as in *McCann* and *Offshore Rental*, which involved tort causes of action, the Cassirers' legal interests were also invaded by tortious conduct: conversion of the Painting by the Nazis in Germany. The principles from *McCann* and *Offshore Rental* are therefore applicable here.

jurisdiction already imposes. *See, e.g.*, *Bernhard*, 546 P.2d at 724–26. A state's laws can more readily be discarded if the failure to apply its laws would only partially—rather than totally—impair the policy interests of the jurisdiction whose law is not applied. *See Offshore Rental*, 583 P.2d at 726–27. Here, the failure to apply California's laws would only partially undermine California's interests in deterring theft and returning stolen art to victims of theft, which provides further support for limiting the extraterritorial reach of California's laws to this dispute.

An example comes from *Bernhard*. There, a patron became intoxicated at Harrah's Club, a Nevada tavern located near the California border, and thereafter was involved in a car accident in California with a California resident. 546 P.2d at 720. Harrah's had advertised in California and solicited customers in California to patronize its business. *Id.* The plaintiff sued Harrah's in California state court for negligently serving alcohol to the patron. *Id*. Nevada had a law which immunized tavern keepers from civil liability for the negligent actions of their patrons, whereas California did not have a law so protecting tavern keepers. *Id*. Nevada law, however, imposed criminal liability on tavern owners who served alcohol to obviously intoxicated patrons. *Id.* at 725.

The California Supreme Court, applying the comparative impairment analysis, held that California law applied, in part because the failure to apply Nevada law would only partially undermine Nevada's interests, whereas the failure to apply California's law would significantly impede California from effectuating its policy interests in protecting against the risks of drunk driving. *Id.* at 724–26. Although the court recognized that application of California law would result in "an increased economic exposure" for Nevada tavern

keepers, it explained that "Nevada's interest in protecting its tavern keepers from civil liability of a boundless and unrestricted nature will not be significantly impaired when as in the instant case liability is imposed only on those tavern keepers who actively solicit California business." *Id.* at 725.

Moreover, the California Supreme Court noted that, since the "act of selling alcoholic beverages to obviously intoxicated persons is already proscribed in Nevada" by criminal law, application of California's rule would not impose "an entirely new duty" on Nevada tavern keepers. *Id.* Because Nevada law already contemplated that tavern keepers could be punished—albeit criminally—for serving intoxicated persons, exposing those businesses to civil liability would only partially undermine Nevada's interests. *Id.* Accordingly, the court concluded that California law should be applied. *Id.* at 725–26.

Here too, applying Spanish law would only partially undermine California's interests in facilitating recovery of stolen art for California residents. California law already contemplates that a person whose art—or other personal property—is stolen may eventually lose the ability to reclaim possession: namely, if the person fails to bring a lawsuit within six years after he discovers the whereabouts of the art. *See* Cal. Code Civ. Proc. § 338(c)(3)(A). If the victim fails to bring a lawsuit within that time, the victim loses the right of possession because he can no longer use the judicial process to enforce his ownership interest. *See, e.g.*, *Harpending v. Meyer*, 55 Cal. 555, 561 (1880) (holding that a plaintiff whose jewelry had been stolen could not recover from a third party because the statute of limitations had expired). And in such a case, as in Spain, the possessor retains possession rights as against all third parties, even if the property is stolen. *See Rosenthal v. McMann*, 29 P. 121,

121–22 (Cal. 1892) (explaining that "one having the possession, merely, is the owner as against a wrongdoer," and that possession "is presumed lawful, and as against a trespasser, even one who obtained possession wrongfully was deemed to have been lawfully possessed"); *Nat'l Bank of New Zealand, Ltd. v. Finn*, 253 P. 757, 769 (Cal. Dist. Ct. App. 1927) (noting the "general rule" is that "[a]ctual possession of a chattel at the time of its conversion will sustain trover, except as to the true owner or one claiming under him, even though the title be conceded to be in a third person" (quoting 24 Cal. Jur. § 19)); *Armory v. Delamirie*, 93 Eng. Rep. 664 (K.B. 1722) (holding that the finder and possessor of property has rights superior against all but the rightful owner).

Even under the most generous interpretation of California's no-title-passes-through-theft rule, then, certain victims of theft (i.e., those who do not bring suit to recover the chattel before the statute of limitations expires) will not prevail against subsequent possessors of the chattel. As with the risk of criminal liability for a tavern keeper under Nevada law in *Bernhard*, California law already contemplates the risk that certain victims of art theft will lose the right to reclaim property. *See Bernhard*, 546 P.2d at 725. Thus, failure to apply California's laws will not absolutely undermine California's interest in returning stolen art to victims of theft because California law protects the victim only if a timely suit is filed.

Similarly, Article 1955 of the Spanish Civil Code accommodates California's interest in deterring theft. As we have explained, Spanish law makes it more difficult for title to vest in an "*encubridor*," which includes, "an accessory after the fact," or someone who "knowingly receives and benefits from stolen property." *Cassirer III*, 862 F.3d at 968.

If the possessor is proven to be an *encubridor*, Spanish law extends the period in which the property must be possessed before new prescriptive title is created. *Id.* Here, had TBC been an *encubridor*, the Cassirers would have prevailed in this action because TBC would not have gained prescriptive title by the time the Cassirers brought their claim. *See Cassirer III*, 862 F.3d at 966 ("[I]f Article 1956 applies, TBC has not acquired prescriptive title to the Painting."). California's interest in deterring passage of title through theft has, at least in part, been protected.

In sum, applying Spain's laws here would only partially undermine California's interests in deterring theft and in returning stolen art to victims of theft.

## IV. CONCLUSION

We conclude that the application of California's laws would significantly impair Spain's governmental interests, whereas the application of Spain's laws would only relatively minimally impair California's governmental interests. As a result, Spain's interests would be more impaired by the application of California law than would California's interests be impaired by the application of Spanish law. Under California's choice-of-law test, then, we hold that Spanish law applies to determine ownership of the Painting. And pursuant to Article 1955 of the Spanish Civil Code, TBC has acquired prescriptive title to the Painting. *See Cassirer IV*, 824 F. App'x at 457.

We therefore affirm the district court's order which granted judgment in favor of TBC.

**AFFIRMED.**

CALLAHAN, Circuit Judge, concurring:

Sometimes our oaths of office and an appreciation of our proper roles as appellate judges require that we concur in a result at odds with our moral compass.  For me, this is such a situation.  As we have previously held, the district court's "finding that the Baron lacked actual knowledge that the Painting was stolen was not clearly erroneous," and thus, "even if the Baron's knowledge could be imputed to TBC, it does not cause TBC to have actual knowledge."  *Cassirer v. Thyssen-Bornemisza Collection Foundation*, 824 F. App'x. 452, 456-57 (2020).  Furthermore, I fully agree with the opinion's application of California law to the facts in this litigation and the determination that Spain's interests would be more impaired if California law were applied than California's interests would be impaired by applying Spanish law.

Nonetheless, I reaffirm the point we made in footnote three of our opinion in *Cassirer*, 824 F. App'x. at 457. Spain, having reaffirmed its commitment to the Washington Principles on Nazi-Confiscate Art when it signed the Terezin Declaration on Holocaust Era Assets and Related Issues, should have voluntarily relinquished the Painting.  However, as we previously held, "we cannot order compliance with the Washington Principles or the Terezin Declaration."  *Id*.  Our opinion is compelled by the district court's findings of fact and the applicable law, but I wish that it were otherwise.