**BOIES SCHILLER FLEXNER LLP**
John J. Kucera (Bar No. 274184)
    jkucera@bsfllp.com
Daniel G. Boyle (Bar No. 332518)
    dboyle@bsfllp.com
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: (213) 629-9040
Facsimile: (213) 629-9022

David A. Barrett (admitted *pro hac vice*)
    dbarrett@bsfllp.com
55 Hudson Yards
New York, NY 10001
Telephone:(212)446-2300
Facsimile: (212) 446-2350

**KENDALL BRILL & KELLY LLP**
Laura W. Brill (Bar No. 195889)
    lbrill@kbkfirm.com
Jeffrey M. Chemerinsky (Bar No. 270756)
    jchemerinsky@kbkfirm.com
10100 Santa Monica Blvd.
Los Angeles, CA 90067
Telephone: (310) 556-2700
Facsimile: (310) 556-2705

[Additional counsel on signature page]
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DAVID CASSIRER, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>THYSSEN-BORNEMISZA COLLECTION FOUNDATION, an agency or instrumentality of the Kingdom of Spain,<br><br>Defendant. | Case No. 2:05-cv-03459-JFW (Ex)<br><br>**PLAINTIFFS' RESPONSE TO SPAIN'S MOTION TO FILE AMICUS BRIEF**<br><br>Date: March 30, 2026<br>Time: 1:30 p.m.<br>Courtroom: 7A<br>Judge:  Honorable John F. Walter |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................... 4

SPAIN'S AMICUS SUBMISSION IS ENTITLED TO MINIMAL OR NO
WEIGHT IN DECIDING THE PARTIES' SUMMARY JUDGMENT
MOTIONS ....................................................................................................... 4

    A. Spain's Ministry of Culture Has No "Role" or "Authority" with
       Respect to Interpretation of the Spanish Civil Code and Has
       Evident Bias Due to Its Control of TBC ............................................ 4

       1. The author of Spain's "Ministry Report" lacks authority to
          opine on the Spanish Civil Law or International Law .................. 4

       2.  The Report is compromised by the Spanish government's
          control of and identity of interests with TBC ............................... 6

    B.   Spain's Submission of the Ministry Report in the Context of
       Litigation Makes Its Value Highly Questionable  ................................. 7

    C.   Spain's Submission Has Minimal Value Because It Conflicts with
       Numerous Other Statements and Actions by Spain ............................... 9

    D.   Spain's Litigation Position Lacks Clarity, Thoroughness, and
       Support, which Further Diminishes Its Weight ................................... 12

       1.    Meritless Claim of "Vested Interest" ........................................... 12

       2.    Lack of Good Faith and Proper Investigation .............................. 14

       3.    Failure to Respect the Sovereignty of Other States ..................... 16

CONCLUSION ............................................................................................. 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

**Cases**

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co., Ltd.*,
   585 U.S. 33 (2018) ...............................................................................passim

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
   145 S. Ct. 1331 (2025) ...................................................................................3

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
   2019 WL 13240413 (C.D. Cal. Apr. 30, 2019) .....................................2, 10, 13, 15

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
   596 U.S. 107 (2022) ("*Cassirer V*") ...............................................................3, 7, 9

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
   69 F.4th 554 (9th Cir. 2023) ...........................................................................17

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
   862 F.3d 951 (9th Cir. 2017) ...........................................................................13

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
   89 F.4th 1226 (9th Cir. 2024) ..........................................................................17

*CC/Devas (Mauritius) Ltd. v. Antrix Corp., Ltd.*,
   605 U.S. 223 (2025) .........................................................................................4

*First Nat'l City Bank v. Banco Exterior de Cuba*,
   462 U.S. 611 (1983) .......................................................................................13

*Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*,
   582 F.3d 393 (2d Cir. 2009) ...........................................................................13

*Hilton v. Guyot*,
   159 U.S. 113 (1895) .........................................................................................3

*In re Grand Jury Subpoena*,
   749 F.App'x 1 (D.C. Cir. 2018) .........................................................................8

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941) .........................................................................................3

*Naftzger v. American Numismatic Soc'y*,
   42 Cal.App.4th 421 (1996) ..................................................................... 17

*Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   495 F.Supp.3d 257 (S.D.N.Y. 2020), *vacated and remanded on other grounds*, 106
   F.4th 263 (2d Cir. 2024), *on remand*, 2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025)
   ................................................................................................................ 8

*Price v. Socialist People's Libyan Arab Jamahiriya*,
   294 F.3d 82 (D.C. Cir. 2002) ................................................................. 12

*Thyssen-Bornemisza Collection Found. v. Cassirer*,
   584 U.S. 989 (2018) ................................................................................. 5

*TMR Energy, Ltd. v. State Property Fund of Ukraine*,
   411 F.3d 296 (D.C. Cir. 2005) ............................................................... 14

*United States v. Pink*,
   315 U.S. 203 (1942) ................................................................................. 5

*Will v. Michigan Dep't of State Police*,
   491 U.S. 58 (1989) ................................................................................. 12

**Other Authorities**

Carlos Vazquez, Cassirer *on Remand: Considering the Laws of Other Interested
   States*, TRANSNATIONAL LAW BLOG (August 24, 2023) ......................... 18

William S. Dodge, *International Comity in American Law*,
   115 COLUM. L. REV. 2071 (2015) ............................................................ 3

**Statutes and Rules**

28 U.S.C. §1606 ....................................................................................... 4

California Code of Civil Procedure §338(c) ............................................. *passim*

Fed. R. Civ. P. 44.1 ................................................................................... 2

Spanish Organic Law 6/1985 ..................................................................... 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **INTRODUCTION**

Plaintiffs-Appellants David Cassirer, *et al.*, hereby respond to the Kingdom of Spain's Motion for Leave to File Brief Amicus Curiae in Support of Defendant TBC, D.E. 689 ("Motion") and attachments including the Proposed Brief.  Because of the essential identity of interests between Spain and the Defendant Thyssen-Bornemisza Collection Foundation ("TBC"), such that Spain effectively stands in the role of a *de facto* party and not a true amicus, Plaintiffs take no position on whether Spain's Motion should be granted.  In any event, however, if the Court grants Spain's Motion, Spain's arguments are entitled to virtually no weight.

The standards for a federal court to determine "the appropriate weight" to be accorded to a foreign government's submission "on the meaning and interpretation" of its own law are set forth in *Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co., Ltd.*, 585 U.S. 33, 36, 43 (2018).[1]  The weight "will depend upon the circumstances; a federal court is neither bound to adopt the foreign government's characterization nor required to ignore other relevant materials." *Id.* at 43.  The Supreme Court established several criteria in this regard:

> Relevant considerations include the statement's clarity, thoroughness, and support; its context and purpose; the transparency of the foreign legal system; the role and authority of the entity or official offering the statement; and the statement's consistency with the foreign government's past positions.

*Id.*  Of particular relevance here, the Court held that "[w]hen a foreign government makes **conflicting statements, … or, as here, offers an account in the context of**

---

[1]    Spain cites to *Animal Science* and Fed. R. Civ. P. 44.1 in requesting that the Court "should accord respectful consideration to a foreign government's submission' regarding the interpretation and meaning of its own laws." Motion, D.E. 689 at 2. Consistent with that approach, Plaintiffs address Spain's submission in accordance with those authorities.

1  **litigation**, there may be cause for caution in evaluating the foreign government's

2  submission." *Id*.[2]

3      Although Spain acknowledges in its proposed Amicus brief, *see* D.E. 689-1

4  ("Prop. Br.") at 1 & n.2, that these are the applicable standards, it fails to address the

5  standards as applied to its own brief.  As shown below, when the standards are applied,

6  Spain's brief is entitled to virtually no weight in the context of this case and under Fed.

7  R. Civ. P. 44.1.

8      As in several previous *amicus* submissions, Spain demands "respectful

9  consideration" of its views. Motion at 2, citing *Animal Science*, 585 U.S. at 36.  Yet

10  Spain completely ignores all of the interests of the United States and of California, as

11  well as of the Cassirer family, that are at issue in this case.  It likewise ignores its own

12  express commitments under multiple treaties, international agreements and policy

13  statements which call for Nazi-looted art and other cultural property to be returned to

14  its rightful owners.  In so doing, Spain's brief and the accompanying "statement of its

15  Undersecretary of the Ministry of Culture Ms. María del Carmen Páez Soria (the

16  'Ministry Report')," Prop. Br. at 1, not only fail to meet the formal requirements of

17  *Animal Science,* but ignore the glaring disconnect between Spain's claims to being a

18  "Rule of Law State" that is "fully respectful of Human Rights and International Law"

19  and "the sovereignty of the other States of the International Community," D.E. 689-2

20  at pdf-3, and this Court's recognition, in its 2019 decision awarding the Painting to

21  TBC, that "TBC's refusal to return the Painting to the Cassirers is inconsistent with the

22  Washington Principles and the Terezin Declaration.  However, the Court . . . cannot

23  force the Kingdom of Spain or TBC to comply with its moral commitments." *Cassirer*

24  *v. Thyssen-Bornemisza Collection Found*., 2019 WL 13240413, at *26 (C.D. Cal. Apr.

25  30, 2019)*. See* pages 9–12 below.

26  ────────────────

27  [2] Throughout this brief, all emphases are added and internal citations omitted.

28

1    Spain's argument that "AB 2867 violates principles of international comity,"
2    Prop. Br. at 2, is similarly misplaced.  International comity is not itself a legal doctrine,
3    but rather a principle that underlies a number of specific legal doctrines, including
4    sovereign immunity and choice of law. *See* William S. Dodge, *International Comity in*
5    *American Law*, 115 COLUM. L. REV. 2071 (2015).  Spain seems to suggest that
6    international comity requires application of Spanish law regardless of California's
7    choice-of-law rules, but that is wrong.

8    As the Supreme Court held in the very case upon which Spain relies, Prop. Br.
9    at 2–3, "'Comity,' in the legal sense, is *neither a matter of absolute obligation*, on the
10   one hand, nor of mere courtesy and good will, upon the other." *Hilton v. Guyot*, 159
11   U.S. 113, 163–64 (1895).  Rather, choice-of-law is governed by state law, *see Klaxon*
12   *Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941), including in cases against
13   foreign nations and their agencies or instrumentalities under the Foreign Sovereign
14   Immunities Act, *see Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107,
15   115–16 (2022) ("*Cassirer V*").  International comity principles do not authorize the
16   Court to override the mandated application of California's choice-of-law rules.

17   *Cassirer V* unanimously held that under 28 U.S.C. §1606, a federal court must
18   apply the same state choice-of-law rule in a case under the FSIA as it would apply in a
19   diversity action, because that "is the only way to ensure—as Section 1606 demands—
20   that [TBC], although a Spanish instrumentality, will be liable in the same way as a
21   private party." 596 U.S. at 115.  The applicable California choice-of-law rule is now
22   established by CCP §338(c)(6), by virtue of the State's 2024 enactment of AB 2867,
23   which the Supreme Court ordered to be considered in this case:

24       Petition for writ of certiorari granted. Judgment vacated, and case
25       remanded to the United States Court of Appeals for the Ninth Circuit for
         further consideration in light of Assem. Bill 2867, 2023–2024 Reg. Sess.
26       (Cal. 2024).

27   *Cassirer v. Thyssen-Bornemisza Collection Found.*, 145 S. Ct. 1331 (2025).

28

The Supreme Court has made clear that in applying the FSIA, federal courts cannot add any judicial "gloss" to its enumerated statutory requirements, such as "international comity" or other doctrines based on the alleged sovereign interests raised in Spain's brief. *See CC/Devas (Mauritius) Ltd. v. Antrix Corp., Ltd., 605 U.S. 223, 235 (2025)* (reversing Ninth Circuit's imposition of a constitutional due process requirement for personal jurisdiction into the FSIA because "reading such a requirement into the statute would upset the 'carefully calibrated' system Congress chose").

## **ARGUMENT**

## SPAIN'S AMICUS SUBMISSION IS ENTITLED TO MINIMAL OR NO WEIGHT IN DECIDING THE PARTIES' SUMMARY JUDGMENT MOTIONS

### A. Spain's Ministry of Culture Has No "Role" or "Authority" with Respect to Interpretation of the Spanish Civil Code and Has Evident Bias Due to Its Control of TBC

### 1. The author of Spain's "Ministry Report" lacks authority to opine on the Spanish Civil Law or International Law

*Animal Science* directs a reviewing court to consider "the role and authority of the entity or official offering the statement" concerning foreign law. 585 U.S. at 43. Although Spain's Amicus submission is filed by U.S. counsel in the name of the Kingdom of Spain, the substance of the proposed Brief consists largely of counsel's summary of a "Ministry Report" which it "fully incorporates" into the brief, and a copy and English translation of the three-page "Report."

The Ministry Report is signed by Ms. María del Carmen Páez Soria, the Undersecretary of the Ministry of Culture. However, Spain's submission provides no information as to the legal basis for either the Ministry or Ms. Páez Soria offering any opinions or interpretations concerning international law or general provisions of

Spanish law such as the Civil Code.  Indeed, the reason the Report cites no such authority is because it does not exist.[3]

On the other hand, as has previously been shown in this case, Spain's "Council of State, whose members include a number of jurists, would be the most appropriate body to provide any official opinions on Spanish law, if they were to be relied upon by a foreign court."[4]  A brief filed by the Ministry "is only an internal report under Spanish law and does not amount to an official declaration by the Kingdom of Spain of the meaning and application of . . . the Spanish Civil Code."  2018 Jewish Communities Br. at 4, 6–7.  Unlike the Ministry of Culture, the Council of State is "separate from the Government in order to guarantee its objectivity and independence," and even then "the reports of the Council shall not be binding" under Spanish law and the Spanish courts regularly disregard such opinions. *Id.* at 9–10.[5]  Given the Ministry's lack of any

---

[3] Ms. Páez Soria refers to "the powers conferred" upon her by two statutes that relate to the organizational structure of the Ministry of Culture, and to the general powers of undersecretaries of government ministries. D.E. 689-2 at pdf-3.  Review of these laws, however, shows that the undersecretary's power is limited to giving legal advice concerning the Ministry's regulatory and administrative operations.  The laws do not grant any authority to provide authoritative interpretations of international law or general provisions of Spanish law such as the Civil Code. *See Animal Science*, 585 U.S. at 44–46 (distinguishing *United States v. Pink*, 315 U.S. 203 (1942) on grounds that it involved a declaration interpreting Russian law "obtained by the United States through official 'diplomatic channels'" from the Soviet Union's "Commissariat for Justice"— not, as here, from a ministry having no general authority over legal matters for the nation (emphasis omitted)).

[4] Brief for Amici Curiae Comunidad Judía de Madrid and Federación de Comunidades Judías de España ("2018 Jewish Communities Br.") at 6–10 (Apr. 6, 2018), in *Thyssen-Bornemisza Collection Found. v. Cassirer*, 584 U.S. 989 (2018), citing Article 5 of Spanish Organic Law 6/1985.

[5] The questionable status of the Ministry and Ms. Páez Soria in offering legal interpretations of Spanish and international law stands in sharp contrast to the authority of the Chinese Ministry of Commerce whose legal opinion was at issue in the *Animal*

official status as an interpreter of Spanish law—in contrast to the Chinese ministry whose views were considered by the Supreme Court in *Animal Science* only after a finding that Chinese ministry had official responsibility for the matter at issue, *see* notes 3 and 5 above—its views are entitled to no weight.

### 2. The Report is compromised by the Spanish government's control of and identity of interests with TBC

Separately, the weight of the Ministry Report is substantially compromised by the pervasive involvement of the Ministry and of Spain in the creation and control of TBC. Spain's submissions fail to disclose that the Minister of Culture, Ms. Páez Soria's immediate superior, serves as the President of TBC's Board of Trustees.[6]  Ms. Páez Soria herself is an ex officio member of the TBC Board, eight of whose twelve members are government officials or appointed by the Spanish Government. *Id*. Moreover, in recent years, the Ministry of Culture paid tens of millions of euros to subsidize TBC's operations, over half of its budget.[7]  In other words, the Ministry

---

*Science* decision. There, the Supreme Court analyzed the ministry's status under Chinese law and concluded that the ministry was "the highest administrative authority in China authorized to regulate foreign trade," a subject that was directly at issue in the plaintiffs' price-fixing claims against Chinese manufacturers of Vitamin C. 585 U.S. at 37.  The ministry provided a detailed factual and legal description of the history and practice of its delegation of authority to "regulate Vitamin C exports" and establish "a regulatory pricing regime mandated by the government of China." *Id*.  Yet even with that level of authority, the Supreme Court held that the ministry's legal opinion was entitled only to "respectful consideration." *Id.* at 36.

[6] *See* https://www.museothyssen.org/en/transparency-site/institutional-organisational-information/organisational/structure; https://www.museothyssen.org/en/node/8971.

[7] *See, e.g.*, Museo Nacional Thyssen-Bornemisza, *Annual Activities & Sustainability Report 2023* at 71 (in 2023, Ministry paid €18,567,000 out of TBC's total income of €32,708,000),    https://www.museothyssen.org/sites/default/files/document/2024-11/Memoria%20Museo%20Thyssen%202023%20EN%20Accesible.pdf

which prepared the Report is responsible for the operation of TBC and has a large proprietary interest in its success.

Moreover, as the Supreme Court recognized, "the Kingdom of Spain created and controlled [TBC]." *Cassirer V*, 596 U.S. at 111. Spain admits that it "has an unquestionable interest in the subject of the ownership of the painting," and cites its funding for the purchase of the Baron's collection and providing the museum. D.E. 689-2 at pdf-3–4; *see also* p. 13–14 below.

Given the pervasive involvement of the Spanish government, and particularly the Ministry of Culture, in the creation, funding, responsibility for, and control over TBC, as well as the absence of authority for the Ministry to provide legal opinions concerning general provisions of international and Spanish law, and the absence of meaningful legal analysis in the Ministry Report, the Report should be accorded no weight.

**B.** **Spain's Submission of the Ministry Report in the Context of Litigation Makes Its Value Highly Questionable**

*Animal Science* instructs that when a foreign government "offers an account in the context of litigation, there may be cause for caution in evaluating the foreign government's submission." 585 U.S. at 43. Here, Spain's submission is made in the context of litigation and, as shown below, is inconsistent with numerous pronouncements by the Spanish government in non-litigation contexts.

Moreover, Spain's use of careless and overheated language, and its failure even to acknowledge any interests but its own desire to keep the Painting, betray that it is purely seeking a litigation outcome, not presenting thoughtful and reasoned information to assist the Court.

For example, Spain refers to the "patently unconstitutional and discriminatory amendment to Section 338." Prop. Br. at 2. Yet the brief provides no support for this sweeping claim, which amounts to accusing the Legislature and Governor of California

of bad faith, despite Spain's claiming to "respect[] the sovereignty" of other governments. D.E. 689-2 at pdf-3. Even TBC's briefs do not go so far as to claim "patent" unconstitutionality, and there is nothing "discriminatory" about a law which applies equally to every museum (and other covered defendant) in California and elsewhere in the world.

By focusing on its own interests to the exclusion of all others in its single-minded pursuit of litigation victory, Spain also ignores the "sovereignty" of the United States embodied in, among many other things, the FSIA, the HEAR Act, and numerous other treaties, statutes and policy pronouncements (*see* pp. 16–17 below). It also ignores California's long-established State interests in protecting rightful owners of stolen property, discouraging theft and trafficking in stolen artworks, and upholding the ancient common-law principle that a thief can never transfer good title to stolen property. *See* n. 20 below; D.E. 682 at 8–10; D.E. 692 at 20, 22, 26–28; Party-In-Intervention Attorney General Rob Bonta's Supplemental Brief, D.E. 722, at 12-15, 20-23.

Accordingly, Spain's submission should be afforded little or no weight in the Court's analysis. *See, e.g., In re Grand Jury Subpoena*, 749 F.App'x 1, 4 (D.C. Cir. 2018) ("the submissions from the Corporation's own counsel and—later—a regulator from Country A seeking to explain the Corporation's atextual interpretation lack critical indicia of reliability"); *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F.Supp.3d 257, 280 (S.D.N.Y. 2020) ("[T]he Court cannot ignore that the Republic's submission has been offered specifically for the purposes of this litigation. . . . Given the circumstances surrounding the Republic's submission, the Court is duly cautious of the views it has expressed and is not persuaded."), *vacated and remanded on other grounds*, 106 F.4th 263 (2d Cir. 2024), *on remand*, 2025 WL 2675871, *25 (S.D.N.Y. Sept. 18, 2025) ("The Court remains duly cautious of the views the Republic expresses in its *amicus* brief, and ultimately does not defer to these views.").

Furthermore, Spain's participation in acquiring the Baron's collection and establishing TBC (which it continues to control) is not the kind of *sovereign* interest that is worthy of special consideration by the Court.  Spain's interest in this regard is not materially different from the interest of a private defendant, in that it seeks to avoid the loss through litigation of its investment of time, energy, and money.  As the Supreme Court held in this case, under the FSIA "[a] foreign state or instrumentality in an FSIA suit is liable just as a private party would be." *Cassirer V*, 596 U.S. at 117.  Spain's claim for special consideration as a sovereign should be rejected, particularly in light of its flouting of its sovereign obligations as discussed below.

## C. **Spain's Submission Has Minimal Value Because It Conflicts with Numerous Other Statements and Actions by Spain**

*Animal Science* requires consideration of the "consistency" of an amicus' statements about the matter at issue "with the foreign government's past positions." 585 U.S. at 43.  Applying this standard, Spain's Brief has virtually no credibility. Aside from a passing denial of infringing "international treaties or conventions," D.E. 689-2 at pdf-5, the Ministry Report fails to acknowledge Spain's formal commitments relating to human rights and Holocaust victims, much less explain how its present litigation position can be reconciled with those edicts.

Spain provides no analysis whatever of the many international laws and conventions to which Spain is a party, and which call for the return of Nazi looted art to its rightful owners and for ensuring that such disputes are resolved on the merits.[8]

---

[8] The Ministry Report is misleading in claiming that the 2018 trial in this Court was "on the merits of the case" (D.E. 689-2 at 4).  When the phrase "on the merits" is used in the context of Holocaust victim claims—including in international edicts and in the legislative history of §338(c)(6) and the HEAR Act—it is referring to whether the artwork in question in fact belonged to the plaintiffs or their ancestors and was looted by the Nazis.  It does not refer to the fact that in this case a trial was held, limited solely to the issue whether TBC was an "encubridor" to the Nazis' theft—that is, whether

9

Spain freely bound itself to these principles which it pledged to implement, yet it now ignores them.  Spain and the United States are parties to the 1899 Hague Convention, which prohibits pillage and seizure of works of art in Articles 46, 47, and 56, and requires that legal proceedings should redress seizures of artworks.[9]  In addition, Spain is a party to:

- The 1970 UNESCO Convention on Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property.  The signatory countries, including Spain, undertake to prevent "illicit import or export of [cultural] property … [and] "facilitat[e] the earliest possible restitution of illicitly exported cultural property to its rightful owner." Art.13.[10]

- The 1998 Washington Conference Principles on Nazi-Confiscated Art ("Washington Principles"),[11] and June 30, 2009 Terezin Declaration on Holocaust Era Assets and Related Issues ("Terezin Declaration"), in which participating countries (including Spain) vow to ensure that claims for Nazi-confiscated art be resolved "on the facts and merits."[12]

---

TBC had actual knowledge that the Painting was stolen.  That issue was significant only because it determined whether the adverse possession period under Spanish law was six or 26 years. *See Cassirer*, 2019 WL 13240413 at *20.  The true merits issues—that the Nazis expropriated the Painting that Lilly Cassirer owned—are undisputed. *Id. at *2*.

[9] https://ihl-databases.icrc.org/en/ihl-treaties/hague-conv-ii-1899.  The United States also is a party to the 1907 Hague Convention, which contains the same articles 46, 47, and 56 as the 1899 Convention.  https://ihl-databases.icrc.org/en/ihl-treaties/hague-conv-iv-1907

[10] https://www.unesco.org/en/legal-affairs/convention-means-prohibiting-and-preventing-illicit-import-export-and-transfer-ownership-cultural

[11] https://www.state.gov/washington-conference-principles-on-nazi-confiscated-art/

[12] https://www.state.gov/prague-holocaust-era-assets-conference-terezin-declaration/

- Parliamentary Assembly of the Council of Europe (of which Spain is a member), Resolution 1205 of November 4, 1999, calling for the restitution of looted Jewish cultural property.[13]

- Vilnius Forum on Holocaust Era Looted Cultural Assets, Declaration of October 5, 2000, asking "all governments to undertake every reasonable effort to achieve the restitution of cultural assets looted during the Holocaust era to the original owners or their heirs." Spain endorsed the Declaration.[14]

- European Parliament Resolution of December 17, 2003, calling on member states, including Spain, to "be mindful that the return to rightful claimants of art objects looted as part of crimes against humanity is a matter of great interest" pursuant to Article 1 of Protocol 1 to the European Convention of Human Rights."[15]

- The European Union, of which Spain is a member, adopted sweeping new regulations in 2019 for application throughout the EU that will tightly control trade in cultural property. Regulation (EU) 2019/880.[16]

These repeated statements in recent years of Spain's national policies and interests (including after this case was filed) were made in circumstances where Spain had no reason to act other than in accordance with its understanding of fundamental human rights. But now, when faced in litigation with the prospect of its instrumentality TBC losing possession of a valuable artwork, Spain focuses its Proposed Brief solely on the supposed primacy of property rights.

---

[13] https://assembly.coe.int/nw/xml/XRef/Xref-XML2HTML-en.asp?fileid=16726&lang=en

[14] https://www.lootedartcommission.com/vilnius-forum; https://www.lootedart.com/MG8D3S66604

[15] https://eur-lex.europa.eu/resource.html?uri=cellar:93c83c0c-33ec-4ca9-9b9a-2df71b87a000.0004.02/DOC_115&format=PDF

[16] https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:32019R0880

The glaring inconsistency between Spain's expression of its national interests in adopting these international agreements and protocols, in contrast to its insistence here on self-serving application of its Civil Code concerning property rights (adopted in the Nineteenth Century, long before the Nazi depredations that gave rise to the commitments that Spain more recently embraced)—without even acknowledging the existence of other interests under Spanish, international, U.S., and California law—is another reason Spain's submission is entitled to virtually no weight.

### D. Spain's Litigation Position Lacks Clarity, Thoroughness, and Support, which Further Diminishes Its Weight

In evaluating a foreign government's submission concerning the meaning and interpretation of its own laws, a court must consider the "clarity, thoroughness, and support" for the government's position. *See Animal Science*, 585 U.S. at 34.  Applying these critical factors, Spain's submission falls short in multiple respects.

#### 1.    Meritless Claim of "Vested Interest"

Spain's Brief argues that the "Spanish State . . . has a vested property interest in the Painting." Prop. Br. at 3.  But even if Spain had a "vested property interest" (which it does not), it would not be entitled to the due process protection which it claims because "foreign states are not 'persons' protected by the Fifth Amendment." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002)), citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989) ("in common usage, the term 'person' does not include the sovereign").

Spain's argument also completely undercuts the claim by both TBC and Spain that there is any significance to the alleged formality that TBC "is an entity with its own legal personality and independent of the General State Administration." D.E. 689-2 at pdf-4. *See* D.E. 693 at 4–7.  Spain admits that TBC is "a Spanish instrumentality."

Prop. Br. at 3.  The Ministry Report makes clear, as this Court has found,[17] that TBC would never have existed, and never would have acquired the Painting, had it not been created, funded, and controlled by the Spanish government.  Consequently, TBC has no due process rights because Spain "so 'extensively control[s]' the instrumentality 'that a relationship of principal and agent is created.'" *See* p. 6–7 above; *Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 582 F.3d 393, 400 (2d Cir. 2009) (quoting *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629, 632 (1983).  The record demonstrates that Spain "extensively controls" TBC for purposes the acquisition and holding of the Painting.[18]

It is ludicrous for Spain and TBC to argue that an entity which never would have existed or bought the Painting absent Spain's collaboration with the Baron, and which is still controlled by the Spanish government, should be treated as an independent entity for due process purposes.  *See, e.g., TMR Energy, Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 302 (D.C. Cir. 2005) (where defendant was created by a parliamentary resolution and governed by legislative acts, with its chairman appointed

---

[17] *See Cassirer*, 2019 WL 13240413 *9, where this Court made findings showing Spain's extensive control over creation of TBC (including by imposing "onerous" detailed requirements dictating how TBC must display, care for, maintain, and promote the collection), and funding of TBC's purchase of the Baron's collection, including the Painting, for $350 million.

[18] In its January 9, 2026 Brief-in-Intervention, the State of California detailed "evidence in the record and proffered facts to show that Spain has exerted extensive control over Defendant creating an agency relationship.  As such, Defendant can claim no due process rights."  *See* D.E. 722 at 8, 9–11.  Similarly, in a 2016 Amicus brief in the Ninth Circuit, the State of California  presented a meticulously detailed compilation of record evidence showing "that the Foundation operated essentially as Spain's agent with respect to the acquisition of the painting at issue, and that it continues to operate as Spain's agent with respect to the painting's possession, maintenance, and display." Brief for Amicus Curiae State of California, D.E. 36 at 17 (Jan. 26, 2016), in *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951 (9th Cir. 2017).

by the government and expenses paid from the state budget, then "from these structural features it is apparent that [defendant] is an agent of the State, barely distinguishable from an executive department of the government and should not be treated as an independent juridical entity").

Even if TBC were entitled to due process protections, the argument advanced by Spain (and TBC) regarding the "retroactive application of" §338(c)(6) (Prop. Br. at 3) is both meritless and circular.  It is meritless because retroactive application of new laws to pending litigation when directed by the legislature (as it is here) does not violate due process. D.E. 682 at 10–11; D.E. 692 at 8–16; D.E. 694 at 6–8.  It is circular because the only way Spain can claim that title to the Painting allegedly had vested in TBC by the time the Cassirers sought its return is by applying Spanish law. *See* D.E. 689-2 at pdf-4.  But that argument assumes the outcome of the very issue that is now before the Court under the Supreme Court's remand order—whether California or Spanish substantive law applies under California choice-of-law rules as established by AB 2867.  And if, as Plaintiffs contend, California law applies, then TBC never had legal title to the Painting, and therefore there is no interference with vested property rights.

### 2.    <u>Lack of Good Faith and Proper Investigation</u>

Spain argues, in direct contravention of this Court's findings, that "the trial held in the United States on the merits [sic] established beyond doubt that [TBC] had no knowledge of the circumstances under which the painting was stolen in the past, and . . . recognized the diligent pre-acquisition investigation carried out by the Kingdom of Spain and [TBC]" and that TBC possessed the Painting "in good faith." D.E. 689-2 at pdf-4–5.

These statements are demonstrably false and further reduce any weight to which Spain's submission might be entitled. This Court's actual findings and conclusions were as follows:

> [B]ecause the Baron did not undertake any reasonable and suitable measures, such as contacting Rewald or another art expert to allay any suspicions he may (and should) have had, the Court concludes that the **Baron did not possess the Painting in good faith** and thus the Baron (and Favorita) **did not acquire good title to the Painting under Swiss law**. Accordingly, because the Baron (and Favorita) did not have good title to the Painting at the time of TBC's purchase, the Court concludes that **TBC did not become the lawful owner of the Painting** via the 1993 Acquisition Agreement.

*Cassirer*, 2019 WL 13240413, at *19.

The Court further found that Spain "**conducted no investigation** of the Painting's provenance or title," despite "the **presence of the 'red flags'**" indicating likely Nazi theft. *Id.* at *8, *22. The Court ultimately ruled against Plaintiffs' ownership claim only because, under its reading of Spanish law relating to an "encubridor," "although [TBC's] failing to investigate the provenance of the Painting may have been **irresponsible under these circumstances**, the Court concludes that it certainly was not criminal." *Id.* at *22. These findings, including that TBC may have acted irresponsibly but without *criminal* intent (*i.e.*, actual knowledge that the Painting was stolen) refute Spain's misrepresentations of "diligent pre-acquisition investigation" and "good faith."

Spain claims that application of §338(c)(6) "seriously compromises the principle of legal certainty," for persons "acting . . . within the territory of Spain in the legitimate confidence of the full validity of the laws of Spain." D.E. 689-2 at pdf-4. But this wholly ignores the Court's finding that there was nothing "legitimate" about the Baron's purchase and later sale of the Painting, which *did not even convey good title to TBC*. *Cassirer*, 2019 WL 13240413, at *19. Moreover, the findings preclude any claim of good faith by TBC, given its likely "irresponsible" conduct verging on willful blindness.

Although the interests that Spain asserts in protecting contractual and property rights are generally legitimate, in the particular circumstances here Spanish law is being

abused to effectively validate what might well be called "art laundering," in the sense that Spain argues the passage of time under the acquisitive prescription doctrine "washed" the Painting of its tainted title (albeit without Plaintiffs' knowledge and contrary to the interests of the United States as expressed in the HEAR Act and California in §338(c)(3)).  Spain is seeking to defend the indefensible—using its antiquated general property law to divest the rightful owners of title before the owners ever learned of the Painting's whereabouts.  This would have been impossible under the laws of every other jurisdiction that had a connection with the Painting, [19] thus refuting Spain's claim that its version of adverse possession is "comparable to those governing the legal systems of the most developed countries." D.E. 689-2 at pdf-5.

### 3.    Failure to Respect the Sovereignty of Other States

Spain claims to be "fully respectful of Human Rights and International Law," and "the sovereignty of the other States of the International Community." D.E. 689-2 at pdf-3.  But its submission ignores the express interests of the United States and California embodied in decades of laws and policies, including the HEAR Act and §338(c)(6), as well as the multiple international agreements to which Spain is a party.  As Plaintiffs have demonstrated, these treaties, statutes, rules, and international agreements embody government policies to protect the substantive rights of the owners of stolen artworks (and specifically Nazi-looted works in the HEAR Act) by preventing

---

[19] *See* Carlos Vazquez, Cassirer *on Remand: Considering the Laws of Other Interested States*, TRANSNATIONAL LAW BLOG (August 24, 2023), https://tlblog.org/cassirer-on-remand-considering-the-laws-of-other-interested-states/ ("Germany's law allows acquisitive prescription in ten years, but only if the property was possessed in good faith . . . . As the district court held in this case, the Baron did not acquire title to the property under Swiss law of acquisitive prescription by virtue of his possession of the painting because he did not possess the painting in good faith . . . . [T]he painting later spent time in California, Missouri, and New York. The laws of Missouri and New York on acquisitive prescription are in all relevant respects the same as California's.")

forfeiture of ownership where the victims lack actual knowledge of their claim. *See, e.g.*, D.E. 682 at 18–22; D.E. 692 at 24–26.  Those government interests are no less weighty because the legislatures implemented them within the framework of statutes of limitations. *See* Brief of Amicus Curiae State of California, D.E. 97 at 3, 9, 10-15 (July 5, 2022), in *Cassirer v. Thyssen-Bornemisza Collection Found.*, 69 F.4th 554 (9th Cir. 2023).[20]

---

[20]  The Legislative Findings in AB 2867 describe California's decades-long effort to impose an "actual discovery" requirement for accrual of claims to recover stolen property and to validate court precedents such as *Naftzger v. American Numismatic Soc'y*, 42 Cal.App.4th 421 (1996), which required actual discovery and "rejected constructive discovery in stolen property cases." AB 2867 (D.E. 687-1) §1(c). For example, in 2010 the Legislature adopted an actual discovery rule in response to a Ninth Circuit decision. That statute provided that "'[a]ctual discovery' . . . does not include constructive knowledge imputed by law." §338(c)(3)(C)(i).

The Legislative Findings in AB 2867 further explain that §338(c)(6) reaffirms the 2010 legislation and "effectuates California's established laws and public policies against theft and trafficking in stolen property; precluding a thief from passing good title to any subsequent purchaser . . . ; and precluding the true owners of stolen property from being divested of title without actual knowledge of their rights in and the location of the property." AB 2867 (D.E. 687-1) at §1(k).

The Findings describe the Ninth Circuit's decision in *Cassirer v. Thyssen-Bornemisza Collection Found.*, 89 F.4th 1226 (9th Cir. 2024) as requiring legislative action because it "refused to credit California's laws and interests supporting owners of stolen art, including its rejection of 'constructive discovery,'" the lynchpin of Spain's acquisitive prescription rule. AB 2867 (D.E. 687-1) at §1(d). The Legislature further described the purpose and intent of the statute:

(f) Mandating California substantive law in stolen art cases will discourage art theft and trafficking in stolen art, and will encourage integrity and diligence in the art market. Further, mandating California substantive law will draw a clear line of liability in litigation, eliminate costly defense tactics, and encourage settlements.

(g) It is the intent of the Legislature to align California law with federal laws, policies, and international agreements, which prohibit pillage and

Spain's submission also should be viewed with great skepticism because it describes a "hypothetical judgment" for Plaintiffs as being "in favor of a ***third party.***" based on the law "of a territory outside of [TBC's purchase] transaction." D.E. 689-2 at pdf-4.  But the Cassirers are not "third part[ies]."  Lilly Cassirer indisputably owned the Painting when it was expropriated by the Nazis as she fled Germany during the Holocaust.  Plaintiff David Cassirer is Lilly's great-grandson, the sole surviving member of Lilly's family, and the son of Claude Cassirer, the original plaintiff in this action before his death.  Labeling the Cassirers as "third parties" attempts to dehumanize this history as Spain single-mindedly pursues its financial interests over all else at stake in this action.

Similarly, California played a critical role in the Painting's provenance.  It is where the Painting was first illegally transferred from Germany without a license in violation of U.S. Military Law and sold twice thereafter, *see* Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law, D.E. 682-2 at 7, 8, 16, 18–21, 22, and the place where Claude Cassirer lived for thirty years before (and after) TBC's acquisition of the Painting, including when he first learned the Painting's whereabouts and his requests for its return were rebuffed by TBC. *See id.* at 16–17.

Spain's failure to acknowledge, much less address, these interests of California, the United States, and the Cassirer family further demonstrates a lack of "clarity, thoroughness, and support" in its Amicus submission.

---

seizure of works of art and cultural property, and call for restitution of seized property.

*Id.* at §1(f), (g); *Id.* §1(h) ("mandating application of California substantive law will reinforce the HEAR Act's preclusion of defenses at law 'relating to the passage of time'").

## **CONCLUSION**

For the foregoing reasons, Spain's Amicus submission, if accepted, should be accorded minimal or no weight.

Dated:  February 6, 2026

Respectfully submitted,

**KENDALL BRILL & KELLY LLP**

By:  */s/ Jeffrey M. Chemerinsky*

Laura W. Brill (Bar No. 195889)
Jeffrey M. Chemerinsky (Bar No. 270756)
10100 Santa Monica Blvd.
Los Angeles, CA 90067
Telephone: (310) 556-2700
Facsimile: (310) 556-2705

**BOIES SCHILLER FLEXNER LLP**
John J. Kucera (Bar No. 274184)
Daniel G. Boyle (Bar No. 332518)
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: (213) 629-9040
Facsimile: (213) 629-9022

David Boies (admitted *pro hac vice*)
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

David A. Barrett (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Stephen N. Zack (admitted *pro hac vice*)
100 SE Second Street, Suite 2800

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Miami, FL 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307

Scott E. Gant
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

**DUBBIN & KRAVETZ, LLP**
Samuel J. Dubbin (admitted *pro hac vice*)
1200 Anastasia Avenue, Suite 300
Coral Gables, FL 33134
Telephone: (305) 371-4700
Facsimile: (305) 371-4701

*Attorneys for Plaintiffs*
DAVID CASSIRER, *et al.*

1

## <u>CERTIFICATE OF COMPLIANCE</u>

2

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains

3

19 pages, which complies with the 25-page limit set by court order dated November 6,

4

2018 (D.E. 379).

5

6

Dated:  February 6, 2026

7

8

By:  /s/ *Jeffrey M. Chemerinsky*

9

Jeffrey M. Chemerinsky (Bar No.
270756)

10

11

*Attorney for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28