# EXHIBIT A

Patrick T. Byrne, State Bar No. 279459
p.byrne@bcremades.com
B. CREMADES Y ASOCIADOS
Calle Goya 18, 2º
28001 Madrid, Spain
Tel.: +34 914 237 200
Attorneys for Amici Curiae

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DAVID CASSIRER, *et al.*<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>THYSSEN-BORNEMISZA COLLECTION FOUNDATION, and agency or instrumentality of the Kingdom of Spain,<br><br>　　　　　Defendant. | CASE NO: 2:05-CV 05-3459-JWF (Ex)<br><br>**BRIEF OF AMICI CURIAE COMUNIDAD JUDÍA DE MADRID AND FEDERACIÓN DE COMUNIDADES JUDÍAS DE ESPAÑA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO SPAIN'S MOTION TO FILE AMICUS BRIEF**<br><br>Assigned to:<br>Hon. John F. Walter<br><br>Trial: March 30, 2026<br>Time: 1:30 p.m.<br>Courtroom: 7A |

# <u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ............................................................................... iv

I. INTRODUCTION ........................................................................................ 1

II. ARGUMENT .............................................................................................. 2

    A. The Kingdom of Spain's Status as Amicus Curiae is Questionable ........................................................................................ 2

        1. Spain and TBC Lack Any Meaningful Independence ............................ 2

        2. Spain's Proposed Brief Relies Almost Exclusively on the Report of a Member of TBC's Board of Trustees........................................ 5

    B. Neither a State Attorney nor the Undersecretary for the Ministry of Culture has the Authority to Provide Official Interpretations of Spanish Law.......................................................................................... 6

        1. The Only Non-Judicial Body with the Authority to Issue Interpretations of Spanish Law is the Spanish Council of State ................. 7

        2. A State Attorney is Limited to Consultive Functions, Not Legal Interpretation ......................................................................................... 7

        3. The Undersecretary for the Ministry of Culture, as a Member of TBC's Board of Trustees, Lacks Any Authority to Provide Guidance on Spanish Law .......................................................................................... 8

        4. Even if the Ministry Report and Prior Reports are Accepted as Representing the Views of the Kingdom of Spain, Such Views Should be Afforded Minimal Weight.......................................................................... 8

    C. Spain's Recent Actions with Respect to Other Looted Artwork Demonstrate that its Governmental Interests are not Impinged by Applying California Substantive Law ..................................................................... 9

        1. Spain's Current Minister of Culture has Admitted that the Painting Should be Returned in Line with Spanish Policy....................................... 10

ii

2. Spain is Currently Returning Artwork Stolen During the Spanish Civil War ............................................................................................ 10

3. Spain Recently Returned Artwork Stolen from Poland During WWII ...................................................................................................... 11

4. Spain Has No Interest in Becoming a Safe Haven for Looted Artwork .................................................................................................. 12

D. Return of the Painting is Directly in Line with Spain's Numerous International Commitments ...................................................................... 13

1. Hague Convention of 1899 .................................................................. 13

2. The Washington Principles .................................................................. 14

3. The Terezin Declaration ...................................................................... 15

4. The UNESCO Convention on Means Prohibiting the Illicit Import, Expert and Transfer of Ownership of Cultural Property .......................... 16

5. Parliamentary Assembly of the Council of Europe .............................. 17

6. Vilnius Forum on Holocaust Era Looted Cultural Assets .................... 17

7. European Parliament Resolution of December 17, 2003 ...................... 18

8. Regulation (EU) 2019/880 of the European Parliament and the Council of 17 April 2019 ......................................................................... 18

E. Spain has No Strong Interest in Applying Article 1955 of the Spanish Civil Code in this Case ................................................................................ 19

III. CONCLUSION ...................................................................................... 20

EXHIBIT 1 – TRANSCRIPT OF SOLANA INTERVIEW ..................... 3:17, 5:19

EXHIBIT 2 – TRANSLATION OF EL ESPAÑOL ARTICLE ......................... 10:7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
585 U.S. 33 (2018)..................................................................................... 6

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
824 F. App'x 452 (9th Cir. 2020)........................................................... 1

*Miller-Wohl Co. v. Comm'r of Labor & Indus. Of Mont.*,
694 F.2d 203 (9th Cir. 1982) ................................................................. 6

**Treaties and International Agreements**

Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property, *UNESCO*, 14 Nov. 1970 .......... 16

European Parliament texts adopted on 17 December 2003 .................................. 18

International Committee of the Red Cross. (1899). *Convention (II) with Respect to the Laws and Customs of War on Land and its annex: Regulations concerning the Laws and Customs of War on Land*, The Hague, 29 July 1899 ...................... 13, 14

Parliamentary Assembly of the Council of Europe, Resolution 1205 of November 4, 1999 ............................................................................................ 17

Regulation (EU) 2019/880 of the European Parliament and Council of the European Union of 17 April 2019 .......................................................................... 18

The Hague Conventions and Declarations of 1899 and 1907: Accompanied by Tables of Signatures, Ratifications and Adhesions of the Various Powers and Texts of Reservations. Carnegie Endowment for International Peace, 1915 ............. 13, 14

Vilnius Forum on Holocaust Era Looted Cultural Assets, Declaration of October 5, 2000 ...................................................................................... 17

Washington Conference Principles on Nazi-Confiscated Art, U.S. DEP'T OF STATE (Dec. 3, 1998) ........................................................................... 15

**Press Articles**

Anna Hackett, "Spain returns historical paintings stolen from Poland during
WWII," *Notes from Poland*, January 26, 2023 ....................................................... 11

Emma Pinedo, "Prado lists artworks seized during Spanish Civil War, eyes
restitution," *Reuters*, September 20, 2022................................................................ 10

European Commission, Communication from the Commission to the European
Parliament, the Council, the European Economic and Social Committee and the
Committee of the Regions on the EU Action Plan against Trafficking in Cultural
Goods, December 13, 2022 ....................................................................................... 16

European Commission, Combatting trafficking in cultural goods, Culture &
Creativity – Cultural Heritage in EU Policies, accessed February 20, 2026 ......... 12

Fernando Díaz de Quijano & Jamie Cedillo, "Urtasun, 100 días en la picota: las
polémicas del ministro de Cultura, del colonialismo a los toros," *El Español*,
February 29, 2024 ..................................................................................................... 10

Gareth Harris, "Spain's Prado museum releases list of works with murky civil war
and Francoist provenance," *The Art Newspaper*, September 23, 2022.................. 10

Sam Jones, "Spanish artwork seized by Franco regime returned to rightful owners,"
*The Guardian*, December 15, 2024 .......................................................................... 11

Venessa Gera, "Spanish museum returns 2 paintings looted by Nazis to Poland,"
*AP News*, January 25, 2023 ...................................................................................... 11

**Other Authorities**

Composición del Patronato y perfil de sus miembros, Thyssen-Bornemisza National
Museum, updated on February 20, 2026 ..................................................................... 6

Annual Activities & Sustainability Report 2023, Museo Nacional Thyssen-
Bornemisza, ............................................................................................................... 3

Spain – UNESCO Country Profile, *UNESCO*, accessed February 18, 2026......... 16

1    **I.        INTRODUCTION**

2          This case relates to the recovery by Plaintiffs David Cassirer, et al.,

3    (collectively the "**Plaintiffs**") of the painting "*Rue St. Honoré, après midi, effet de*

4    *pluie*" by Camille Pissarro (1897) (the "**Painting**"). It is undisputed that the

5    Painting was looted by the Nazis in 1939 from David Cassirer's great-grandmother,

6    Lilly. D.E. 621 at 20.

7          Amici Curiae Comunidad Judía de Madrid and Federación de Comunidades

8    Judías de España ("**Amici**") have been involved in this case for over nine years,

9    having *amici curiae* briefs previously accepted by this Court, the Ninth Circuit (six

10    times) and the U.S. Supreme Court (three times), with the courts referencing

11    Amici's arguments on multiple occasions. *See*, *e.g.*, D.E. 621 at 30-31; *Cassirer v.*

12    *Thyssen-Bornemisza Collection Found.*, 824 F. App'x 452, 455 (9th Cir. 2020).

13          The substance of Amici's briefs has varied as this case has evolved. While

14    Amici have previously addressed the application of certain Spanish laws when that

15    question was considered by the courts, they have recently presented briefing to the

16    U.S. Supreme Court regarding the alleged interest of the Kingdom of Spain in

17    applying Spanish law in the context of California choice-of-law rules.

18          This Court is now tasked with applying those choice-of-law rules in light of

19    the passage of California Assembly Bill 2867, which mandates the application of

20    California substantive law to this case.  With this brief, Amici hope to provide this

21    Court with information relevant to the analysis of certain issues raised in the

22    summary judgment papers, specifically the argument of Defendant Thyssen-

23    Bornemisza Collection Foundation ("**TBC**") and the Kingdom of Spain that

24    application of California substantive law in this case would damage Spain's

25    sovereign interest in the application of Article 1955.

26

27

28

1

## II.    __ARGUMENT__

For the reasons set forth below, the Kingdom of Spain has no significant interest in applying Spanish law to this dispute. On the contrary, Spain's own actions and statements over the past several decades, including up until the present time, make clear that the public policies of the Kingdom of Spain are not harmed by the application of California law because the return of Nazi-looted art to rightful owners is directly in line with official Spanish policy.

While the Kingdom of Spain now argues otherwise, the argument in Spain's proposed amicus brief, and TBC's arguments based on the alleged injury to Spain's interests by application of California substantive law under CCP §338(c)(6), do not stand up to scrutiny. The arguments in Spain's proposed amicus curiae brief should not be afforded any weight because they are made by TBC's own leadership as opposed to a third party "friend of the Court," and they purport to present interpretations of Spanish law by persons who lack competence to do so on behalf of the Spanish state under the Spanish legal system. In this regard, the Kingdom of Spain is functionally identical to TBC, so its "amicus" brief is simply a cumulative argument by TBC.

### A. The Kingdom of Spain's Status as Amicus Curiae is Questionable

### 1. Spain and TBC Lack Any Meaningful Independence

As detailed in Plaintiffs' submissions and the Party-in-intervention Rob Bonta's Supplemental Brief,[1] Spain comprehensively controls TBC, rendering it anything but independent.

This reality is readily apparent from TBC's governing structure.[2] TBC is governed by a Board of Trustees, the President of which is the acting Minister of

---

[1] *See*, *e.g.*, D.E. 724 at 6-7.
[2] https://www.museothyssen.org/en/transparency-site/institutional-organisational-information/organisational/governing

2

Culture of Spain. *Id.* The Board then consists of twelve members, eight of whom are either current Spanish government officials[3] or government appointees. *Id.* This Court found that Spain "entirely funded" TBC's purchase of the Thyssen-Bornemisza Collection (the "**Collection**") in the amount of $338,216,958.09, and paid an additional $200 million for "the refurbishment of the Palace Villahermosa and its use for the Museum on a permanent basis." D.E. 621 at 12-14.

This Court also observed that Spain imposed "onerous" requirements dictating how TBC must display, maintain, and promote the Collection. D.E. 621 at 12. Spain in recent years has contributed tens of millions of euros to TBC's operating budget, exceeding half of TBC's annual income.[4] TBC is thus controlled and operated by the Spanish State and cannot realistically be considered independent.

This is especially the case concerning TBC's actions with respect to the Painting, as was recently confirmed by its own Chief Curator and Artistic Director, Guillermo Solana, who gave a public interview in which he admitted that all decisions relating to the Painting at issue in this case are controlled by the Spanish government.[5] In the interview, titled "Art in Dialogue," the host asked Mr. Solana about "that thorny subject of the famous Pissarro." Some of the Director's statements deserve particular attention, with pertinent excerpts provided here:

---

[3] Members of TBC's Board of Trustees include the Minister of Culture, the Undersecretary of Culture, the Director General of Cultural Heritage and Fine Arts, the Secrtary of State for Budgets and Expenditures, and the Secretary of State for Culture. *Id.*

[4] Museo Nacional Thyssen-Bornemisza, *Annual Activities & Sustainability Report 2023* 71, https://www.museothyssen.org/sites/default/files/document/2024-11/Memoria%20Museo%20Thyssen%202023%20EN%20Accesible.pdf (last visited Oct. 20, 2025) (TBC is paid an annual subsidy of €18,567,000 by Spain's Ministry of Culture, out of total income of €32,708,000 in 2023).

[5] A certified translation of relevant portions of the interview is attached to the this brief as Exhibit 1.

***Solana***: *From a moral point of view, it could have been handled differently, with negotiations with the family, thinking of ways to compensate them, and in fact…*

***Host***: *And was that considered?*

***Solana***: *Ultimately – no, it was never considered because -- and I want to say that, <u>these decisions have always been decisions of the Spanish government, . . . not of the Thyssen management</u>. <u>it has always been the government of Spain that decided to go to trial in the United States to defend the property</u>…*

*…*

***Host***: *…I understand, as you said, that it is not even a decision that is in your hands.*

***Solana***: <u>*It has never been an autonomous decision of the Thyssen-Bornemisza Collection Foundation or of the Thyssen-Bornemisza Museum. It has been a decision made by the government of Spain, on behalf of the Spanish State, which is the owner of the property.*</u>

As can be seen from this transcript, in a candid public interview unconstrained by its litigation objectives, even TBC does not consider itself independent from the Kingdom of Spain as it pertains to the fate of the Painting. Instead, Mr. Solana makes clear that while TBC holds the Painting, it is the Spanish government that is ultimately in charge of all decisions regarding its future and this litigation. Due to the lack of any meaningful level of independence from TBC, Spain's amicus curiae brief should not be afforded any weight.

Mr. Solana's confirmation of Spain's control over TBC's actions is also important because of the parties' respective positions over whether, under U.S. law, TBC has due process rights as an instrumentality of the Kingdom of Spain. The Cassirers and the State of California argue that Spain so extensively controls TBC that a relationship of principal and agent is created, such that TBC lacks due

process rights under the U.S. Supreme Court decision in *First National City Bank v. Banco Para El Comercio Exterior de Cuba ("**Bancec**")*, 462 U.S. 611 (1983). D.E. 692, at 8-10; D.E. 722 at 6-11.

TBC strenuously resists the argument in its Reply brief of November 12, 2025, D.E. 693, at 4-7, arguing that "Plaintiffs' have not (and cannot) show Spain 'exercises significant and repeated control over [the Foundation's] day-to-day operations.'" *Id*., at 7. TBC adds: "the only evidence of the Foundation's day-to-day operations shows it was 'established by the Spanish government as a non-profit, private cultural foundation to promote and provide services for art' and that it has operated independently to perform this role since its founding." *Id*. TBC's Reply brief concludes: "Plaintiffs have not submitted *any* evidence to rebut the Foundation's presumed, separate legal status . . . ." *Id.*

Yet two weeks after TBC filed its Reply brief in this Court asserting its independent status, Mr. Solana appeared in a public interview in which he admitted that all decisions concerning the Painting "<u>have always been decisions of the Spanish government, not of the Thyssen management</u>. . . . <u>It has never been an autonomous decision of the Thyssen-Bornemisza Collection Foundation or of the Thyssen-Bornemisza Museum. It has been a decision made by the government of Spain, on behalf of the Spanish State</u>…."[6]

## 2. Spain's Proposed Brief Relies Almost Exclusively on the Report of a Member of TBC's Board of Trustees

Beyond the general lack of independence between the Kingdom of Spain and TBC in this case, Spain has submitted an amicus curiae brief which relies almost exclusively on a "Ministry Report" drafted, in essence, by TBC itself. D.E. 684-1.

The "Ministry Report" consists of a statement by Ms. María del Carmen Páez Soria, Spain's Undersecretary for the Ministry of Culture. D.E. 684-2. Quite

---

[6] *See* Exhibit 1.

1  critically, Ms. Páez Soria, in her role as Undersecretary for the Ministry of Culture,

2  sits on TBC's Board of Trustees.[7] This report therefore comes directly from TBC,

3  masquerading as the representation of an interested third party.

4      While the general principle is well known, the Ninth Circuit has made plainly

5  clear that "[a]n amicus curiae is not a party to litigation." *Miller-Wohl Co. v.*

6  *Comm'r of Labor & Indus. Of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982). Since

7  Spain's proposed brief comes directly from a member of TBC's governing board

8  (*i.e.*, a party in this litigation), it should be afforded no weight.

9      **B. Neither a State Attorney nor the Undersecretary for the Ministry of**

10     **Culture has the Authority to Provide Official Interpretations of**

11     **Spanish Law**

12     The Kingdom of Spain relies on *Animal Science Products, Inc. v. Hebei*

13  *Welcome Pharm.*, 585 U.S. 33 (2018), in requesting that this Court accord

14  significant weight to its proposed amicus curiae brief as well as the four prior

15  reports previously submitted, considering them as definitive statements of its own

16  interest and potential injury in this case. *See*. D.E. 684-1 at 1.

17     In *Animal Science*, the Court observed that one of the relevant considerations

18  for the purpose of affording weight concerns "the role and authority of the entity or

19  official offering the statement." 585 U.S. at 34.

20     The proposed brief here relies almost exclusively on the aforementioned

21  Ministry Report, and the previous amic*us* briefs that Spain cites in its submission

22  likewise relied heavily on legal opinions provided by a State Attorney of the

23  Spanish Ministry of Culture. *See*, *e.g.*, D.E. 684-1 at 1, 684-2 at pdf-3-5, 684-3 at

24  pdf-14-21, 684-4 at pdf-35-43.

25     Both the Ministry Report and its prior State Attorney opinions improperly

26

27  ───────────────

[7] https://www.museothyssen.org/en/transparency-site/institutional-organisational-

28  information/organisational/governing

purport to provide this Court with the Kingdom of Spain's official interpretations of various Spanish laws. This is not permitted under the Spanish legal system, and they should thus be afforded no weight.

### 1. The Only Non-Judicial Body with the Authority to Issue Interpretations of Spanish Law is the Spanish Council of State

The Spanish Council of State is the highest consultative body for the Spanish government and, unlike a State Attorney or the Undersecretary for the Ministry of Culture, is recognized by the Spanish Constitution: "[t]he Council of State *is the supreme consultative body of the Government*."[8] As a result, the Council of State, whose members include a number of jurists, would be the appropriate body to provide any official opinions on Spanish law if they were to be relied upon by a foreign court. *Id.*

Accordingly, Spain's reliance on the Ministry Report and legal opinions of State Attorneys to provide the State's interpretations of its laws is inappropriate.

### 2. A State Attorney is Limited to Consultive Functions, Not Legal Interpretation

Nowhere in Spanish law is a State Attorney given the power to provide an official declaration or interpretation of Spanish law. *Id*., at 6-11. Spain's previous State Attorney reports were instead the exercise of the State Attorney's consultative function for the Spanish Ministry of Culture (which in turn controls TBC). *Id.*

A State Attorney is not authorized under Spanish law to issue any interpretation that is binding or of a definitive nature. *Id.* The opinion of the State Attorney has been explicitly characterized as merely optional and "not binding." *Id.* at 8.

As such an opinion is not considered an official reflection of Spanish law

---

[8] Brief of Amici Comunidad Judía de Madrid and Federación de Comunidades Judías de España, *Cassirer v. Thyssen-Bornemisza Collection Found.*, No. 17-1245 (U.S. filed Apr. 6, 2018), at 8-11 (emphasis added).

under Spain's own legal system, it cannot be the case that such reports deserve the
type of substantial deference before U.S. courts that the Kingdom of Spain now
seeks. That is to say, the Spanish State Attorney reports cannot reasonably be
afforded better treatment in U.S. courts than they are afforded in Spanish courts.

### 3.  The Undersecretary for the Ministry of Culture, as a Member of TBC's Board of Trustees, Lacks Any Authority to Provide Guidance on Spanish Law

While the State Attorney has at least a consultive function with respect to the
interpretation of law, the Undersecretary for the Ministry of Culture lacks any
authority whatsoever to convey any aspect of the Spanish legal system. This would
normally beg the question as to why the Kingdom of Spain would choose to rely on
such an individual for the basis of its proposed brief, but the answer here is clear.
As a member of TBC's Board of Trustees, Ms. Páez Soria is in the unique position
of purporting to argue from the perspective of a non-party in her role as the
Undersecretary for the Ministry of Culture, while being guided by her role on
TBC's governing board.

Because Ms. Páez Soria's position does not lend her the authority to opine on
Spanish law, her "Ministry Report" deserves no meaningful consideration.

### 4.  Even if the Ministry Report and Prior Reports are Accepted as Representing the Views of the Kingdom of Spain, Such Views Should be Afforded Minimal Weight

The Ministry Report discusses the legal issues at hand in a manner that seeks
to portray the Kingdom of Spain as generally interested in applying its laws in a
particular, theoretical scenario (*e.g.*, "[t]he hypothetical application of the laws of
another State to determine the validity of the ownership of an asset acquired by a
Spanish person under a purchase agreement entered into in Spain…"). D.E. 684-2
at 4. As it pertains to Spain, this case hardly represents merely a theoretical

application of laws to determine ownership of chattel.

Instead, as made crystal clear by TBC's own Director, Spain is the ultimate owner of the Painting and responsible for all decisions made with respect to the Painting's ultimate fate. As a result, while the Ministry Report contends that Spain is generally concerned with how property law is applied to various transactions within its borders, in reality it is pleading for its own continued possession (and claimed ownership) of a valuable piece of artwork that was looted during the Holocaust. That circumstance completely differentiates this case from the general run of private and commercial chattel sales that are governed by Section 1955.

As a consequence, the proposed brief, including the Ministry Report, as well as the four prior reports submitted by Spain, should be afforded no weight. In the context of this case, Spain and TBC are one in the same, seeking to knowingly hold onto possession of the looted Painting. Spain's contention that its opinions reflect the sanctity of the 1889 acquisitive prescription property law lacks credibility.

## C. Spain's Recent Actions with Respect to Other Looted Artwork Demonstrate that its Governmental Interests are not Impinged by Applying California Substantive Law

Despite Spain's position in this particular case, governmental actions in recent years with respect to other looted artwork confirm that its public policy interests are not impinged by the application of California law and the return of the Painting to the rightful heirs. This point was emphasized in Amici's February 3, 2025 U.S. Supreme Court brief,[9] but is recapped here for the Court's convenience.

---

[9] Brief of Amici Comunidad Judía de Madrid and Federación de Comunidades Judías de España, *Cassirer v. Thyssen-Bornemisza Collection Found.*, No. 24-652 (U.S. filed Feb. 3, 2025), at 15-19.

**1. Spain's Current Minister of Culture has Admitted that the Painting Should be Returned in Line with Spanish Policy**

Mere days after the Ninth Circuit published its January 9, 2024 decision concluding that, under Spanish law, TBC would be the rightful owner to the Painting, Spain's current Minister of Culture (and also the President of TBC's Board of Trustees) openly acknowledged that he "would have handled differently" the dispute surrounding the Painting.[10] More specifically, the Ministry of Culture team "considers that the case could have been handled differently within the framework of international agreements on seizures of works of art by the Nazi regime…." *Id.*

This acknowledgement demonstrates that protecting the ownership of those possessing Nazi-looted art directly contradicts Spanish public policy as interpreted by the very governmental entity entrusted with the management of TBC.

**2. Spain is Currently Returning Artwork Stolen During the Spanish Civil War**

Consistent with its international commitments (see, *infra*, § II(D)) and the approach of California substantive law, Spain itself has embarked on an effort to return artwork and other assets seized during the Spanish Civil War.

This has included the world famous, government-run Museo del Prado launching an initiative designed to identify artwork in its possession that was looted during the Spanish Civil War for return to the rightful owners.[11]

As a result, in 2024, the Spanish Ministry of Culture (which again operates

---

[10] https://www.elespanol.com/el-cultural/20240229/urtasun-dias-picota-polemicas-ministro-cultura-colonialismotoros/836166635_0.html (English translation of relevant section attached to this brief as Exhibit 2).

[11] https://www.reuters.com/world/europe/prado-lists-artworks-seized-duringspanish-civil-war-eyes-restitution-2022-09-20/; https://www.theartnewspaper.com/2022/09/23/spains-prado-museum-releases-list-of-works-with-murky-civil-war-and-francoist-provenance

TBC) published an online list of more than 5,126 works of art stolen by the regime of Francisco Franco to help people reclaim their family property which had ended up in various museums, collections and institutions.[12] These items include paintings, sculptures and jewelry. *Id.*

In early December 2024, Spain returned the first of these looted works in a ceremony held at the National Library of Spain. *Id*. In doing so, the Spanish Minister of Culture (and also President of TBC's Board of Trustees), said "[w]e're opening the doors to returning those pieces that can be identified to their rightful owners." *Id.*

These efforts again display Spain's acknowledged interest in ensuring the return of looted artwork.

### 3. Spain Recently Returned Artwork Stolen from Poland During WWII

In 2019, two paintings stolen from Poland during World War II were discovered in the Provincial Museum of Pontevedra in Spain.[13] In December 2022, the Spanish Ministry of Culture granted a restitution request. *Id.* This despite the fact that the museum had received the paintings from one of its major benefactors, who had reportedly acquired them at a gallery in Madrid or Barcelona in the 1970s. *Id.* The director of the museum said at the time that the illegal origin of the paintings had been "completely unknown," and that he was glad that "justice" was being done by returning them to their rightful owner.[14]

There is a striking resemblance to the case at hand, where a museum operated by the Spanish Ministry of Culture acquired Nazi-looted art through a major

---

[12] https://www.theguardian.com/world/article/2024/jun/12/spain-publishes-list-of-art-seized-during-civil-war

[13] https://apnews.com/article/poland-government-germanyec1c7672f3ca80c46096cebdbaabaf3f

[14] https://notesfrompoland.com/2023/01/26/spainreturns-historical-paintings-stolen-from-poland-during-wwii/

benefactor, with the illicit origins ultimately coming to light. The only differences, however, are: (1) the illicit nature of the Painting in this case was apparent from the start, as this Court acknowledged the presence of numerous "red flags," including one that it agreed was "like filing off the serial number on a stolen gun," *see* D.E. 621 at 21; and (2) despite confirming the illicit nature, the Spanish Ministry of Culture in this case has so far refused to return the Painting.

### 4. Spain Has No Interest in Becoming a Safe Haven for Looted Artwork

By arguing that Spain has substantial interests in assuring that acquirors of artwork stolen during violent atrocities are granted clear title after a minimal period of possession, the Kingdom of Spain is in essence saying that it has an interest in positioning itself as one of the global centers for stolen art – including the many pieces looted during wartime aggression. It is unquestionably *not* the case that Spain has any interest in assuming this role.

The European Commission has recognized that the looting of art is a common, unfortunate tactic used by those engaged in terrorism and wartime aggression.[15] This has been seen in conflicts in the Middle East (*e.g.*, Syria, Iraq and Libya) and is currently being witnessed in Ukraine. The European Commission's recent recognition of this fact was in the context of an EU plan to "deter criminals effectively, to address evolving security threats and to protect cultural heritage." *Id.*

It would be unreasonable to conclude that Spain, as a proud democratic

---

[15] https://eur-lex.europa.eu/legalcontent/EN/TXT/HTML/?uri=CELEX%3A52022DC0800 ("Trafficking in cultural goods is a lucrative business for organised crime, and in some cases for conflict parties and terrorists. This is due in particular to the low risk of detection, the potential for high margins, and the attractive size of the licit and illicit markets, driven by a stable to increasing global demand from collectors, investors and museums.")

country in the European Union, has any interest in providing a safe haven for artwork looted through terrorism, war or genocide. The application of Section 1955 in this context, however, would enable looters of artwork through violent aggression to safely profit from such heinous acts by finding buyers in Spain – buyers that can feel secure in their ability to obtain good title with relative ease.

### D. Return of the Painting is Directly in Line with Spain's Numerous International Commitments

For over a century, Spain has been unequivocal in its endorsements and ratifications of international agreements calling for the return of pillaged private property, and, for the past 50+ years, conventions calling for the return of Nazi-looted artwork. These were discussed at length before the U.S. Supreme Court, and Amici respectfully refer the Court to that discussion while also addressing each in turn below.[16]

### 1. Hague Convention of 1899

On September 4, 1900, <u>eleven years after the enactment of Article 1955 of the Spanish Civil Code</u>, Spain ratified the Hague Convention of 1899 (the "**Hague Convention**").[17]

The Hague Convention contained certain articles that displayed Spain's unequivocal commitment to the prevention of the transfer of title in cases such as this one, despite the existence of Article 1955 of the Spanish Civil Code for application in wholly distinguishable scenarios involving ordinary chattel transactions. A few such articles are worth reproducing here:

> Article 46 - Family honors and rights, individual lives and

---

[16] Brief of Amici Comunidad Judía de Madrid and Federación de Comunidades Judías de España, *Cassirer v. Thyssen-Bornemisza Collection Found.*, No. 24-652 (U.S. filed Feb. 3, 2025), at 6-15.

[17] https://dn790003.ca.archive.org/0/items/hagueconventions00inte_0/hagueconventions00inte_0.pdf

private property, as well as religious convictions and liberty, must be respected. Private property can not be confiscated.[18]

Article 47 - Pillage is formally prohibited.[19]

Article 56 - The property of the communes, that of religious, charitable, and educational institutions, and those of arts and science, even when State property, shall be treated as private property.

All seizure of, and destruction, or intentional damage done to such institutions, to historical monuments, works of art or science, is prohibited, and should be made the subject of proceedings.[20]

Spain's decision to ratify the Hague Convention shortly after its enactment of Article 1955 evidences the reality that it was never intended to be used to claim good title over looted artwork, obtained through pillage, as by the Nazis here. The Hague Convention instead makes it clear that such property must receive a heightened level of protection.[21]

## 2. The Washington Principles

In December 1998, forty-four countries, including Spain, committed to the Washington Principles on Nazi-Confiscated Art (the "**Washington Principles**").[22]

---

[18] https://ihl-databases.icrc.org/en/ihl-treaties/hague-conv-ii-1899/regulations-art-46?activeTab=

[19] https://ihl-databases.icrc.org/en/ihl-treaties/hague-conv-ii-1899/regulations-art-47?activeTab=

[20] https://ihl-databases.icrc.org/en/ihl-treaties/hague-conv-ii-1899/regulations-art-56?activeTab=

[21] As the California Legislature found in enacting CCP §338(c)(6), the mandate to apply California substantive law in stolen art cases "aligns California law with federal laws, federal policies, and international agreements prohibiting pillage and seizure of works of art and cultural property and calling for restitution of seized property, as embodied in the Hague Convention of 1907 (and 1899)," the 1970 UNESCO Convention, and related international agreements. AB 2867, Section 1(k).

[22] https://www.state.gov/washington-conference-principles-on-nazi-confiscated-art/

As this Court has recognized, these principles:

> "appeal to the moral conscience of participating nations and recognize: 'If the pre-War owners of art is found to have been confiscated by the Nazis and not subsequently restituted, or their heirs, can be identified, steps should be taken expeditiously to achieve a just and fair solution, recognizing that this may vary according to the facts and circumstances surrounding a particular case.'"

D.E. 621 at 33.

This binding international commitment unequivocally calls for Spain to return the Painting in line with the application of California law.

### 3. The Terezin Declaration

In 2009, forty-six countries, including Spain, reaffirmed their commitment to the Washington Principles by signing the Terezin Declaration on Holocaust Era Assets and Related Issues (the "**Terezin Declaration**"),[23] which, as this Court noted:

> "reiterated that the Washington Principles 'were based upon the moral principle that art and cultural property confiscated by the Nazis from Holocaust (Shoah) victims should be returned to them or their heirs, in a manner consistent with national laws and regulations as well as international obligations, in order to achieve just and fair solutions.' The Terezin Declaration also 'encouraged all parties including public and private institutions and individuals to apply [the Washington Principles] as well."

D.E. 621 at 33. Spain's signing of the Terezin Declaration reinforced its public policy that Nazi-looted art should be returned to the rightful heirs.

---

[23] https://www.state.gov/prague-holocaust-era-assets-conference-terezindeclaration/

15

### 4. The UNESCO Convention on Means Prohibiting the Illicit Import, Expert and Transfer of Ownership of Cultural Property

The UNESCO Convention on Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property was signed in Paris on November 17, 1970 (the "**Convention**")[24] and ratified by Spain in 1986,[25] making it part of the Spanish legal system and binding Spain to the principles contained therein.

The Convention itself indicates the binding nature of its provisions, with the EU referring to the Convention as the "most important" instrument "regulat[ing] the fight against illicit trafficking of cultural goods internationally."[26]

Article 2.1 of the Convention establishes that:

> "[t]he State Parties to this Convention recognize that the illicit import, export and transfer of ownership of cultural property is one of the main causes of the impoverishment of the cultural heritage of the countries of origin of such property and that international cooperation constitutes one of the most efficient means of protecting each country's cultural property against all the dangers resulting there from."[27]

Accordingly, the Convention, as a ratified, legally binding international agreement, directly obligates Spain to facilitate the restitution of illicitly exported cultural property to the rightful owners – in this case the Plaintiffs.

---

[24] https://www.unesco.org/en/legal-affairs/convention-means-prohibiting-and-preventing-illicit-import-export-and-transfer-ownership-cultural
[25] https://en.unesco.org/countries/spain
[26] https://culture.ec.europa.eu/cultural-heritage/cultural-heritage-in-eupolicies/protection-against-illicit-trafficking
[27] https://www.unesco.org/en/legal-affairs/convention-means-prohibiting-and-preventing-illicit-import-export-and-transfer-ownership-cultural

### 5.  Parliamentary Assembly of the Council of Europe

In 1999, the Parliamentary Assembly of the Council of Europe, of which Spain is a Member State, passed Resolution 1205, which specifically addressed looted Jewish cultural property.[28] Among other statements, Resolution 1205 provided:

> "One essential part of the Nazi plan to eradicate the Jews was the destruction of the Jewish cultural heritage of movable and immovable property, created, collected or owned by Jews in Europe."

> "This involved the systematic identification, seizure and dispersal of the most significant private and communal Jewish property."

> "Bodies in receipt of government funds which find themselves holding looted Jewish cultural property should return it."

This Resolution also unquestionably calls for the Painting to be returned in line with California law.

### 6.  Vilnius Forum on Holocaust Era Looted Cultural Assets

In October 2000, the Vilnius International Forum took place under the auspices of the Council of Europe, of which Spain is a Member State, with the participating governments agreeing to a declaration concerning Nazi-confiscated art.[29] This declaration included, *inter alia*, a call for "all governments to undertake every reasonable effort to achieve the restitution of cultural assets looted during the Holocaust era to the original owners or their heirs," which would be accomplished by returning the Painting here. *Id.*

---

[28] https://assembly.coe.int/nw/xml/XRef/Xref-XML2HTMLen.asp?fileid=16726&lang=en
[29] https://www.lootedartcommission.com/vilnius-forum

17

1

### 7.  European Parliament Resolution of December 17, 2003

2          Recognizing that litigants "have often been confronted with difficult

3    problems due to conflicts of law, varying prescriptive periods and other

4    difficulties," this European Parliament resolution called on Member States

5    (including Spain):

6

7              "to make all necessary efforts to adopt measures to ensure the
               creation of mechanisms which favour the return of [Nazi-
8              looted property] and to be mindful that the return to rightful
               claimants of art objects looted as part of crimes against
9              humanity is a matter of general interest for the purposes of
               Article 1 of Protocol 1 to the European Convention of Human
10             Rights."[30]

11

12         This again highlights the extent to which Spain has committed itself to the

13   return of Nazi-looted art.

14         ### 8.  Regulation (EU) 2019/880 of the European Parliament and the

15             Council of 17 April 2019

16         While this Regulation (EU) 2019/880 addressed various aspects regarding

17   the introduction and the import of cultural goods, it contained certain conclusions

18   binding on the member-States, including Spain, such as:

19             "As long as it is possible to engage in lucrative trade in
               illegally excavated cultural goods and to profit therefrom
20             without any notable risk, such excavations and pillaging will
               continue."
21

22             "The Union should accordingly prohibit the introduction into
23             the customs territory of the Union of cultural goods
               unlawfully exported from third countries, with particular
24             emphasis on cultural goods from third countries affected by
               armed conflict, in particular where such cultural goods have
25             been illicitly traded by terrorist or other criminal
26

27   _____
     [30] https://www.europarl.europa.eu/doceo/document/TA-5-2003-12-
28   17_EN.html?redirect

18

organisations."[31]

This is yet another example of how Spain's interests, as a member-State of the EU, align with California law in this case, and would actually be hampered by application of Spanish civil code provisions from the 19th century.

### E. Spain has No Strong Interest in Applying Article 1955 of the Spanish Civil Code in this Case

Article 1955 of the Spanish Civil Code was enacted in 1889, over 50 years before the Holocaust and 120 years before Spain reaffirmed its commitment to the Washington Principles. In the 135 years since Article 1955 was enacted, it has never been amended.[32] It is therefore clear that this statute was not enacted to deal with the historically unique circumstances of the devastating massacre and widespread looting displayed by the Nazi regime, or the atrocities subsequently committed by terrorist organizations and other wartime aggressors which would result in additional illicit artworks entering Spain under this outdated provision.

Until this dispute, Article 1955 had never been used to justify a property right claim based on wartime looting, as this was obviously not the purpose of this statute. This conclusion is buttressed by the fact that <u>eleven years</u> after enacting Article 1955, Spain ratified the 1899 Hague Convention, which prohibits seizure of works of art in conflict, and provides that seized art "should be subject of proceedings."[33]

Spain's policies over the past half century have acknowledged the distinction between everyday chattel transactions, to which Article 1955 was meant to apply, and items looted during terrorism, genocide and wartime aggression. Applying

---

[31] https://eur-lex.europa.eu/legalcontent/EN/TXT/?uri=CELEX%3A32019R0880

[32] *See* Brief of Amici Curiae Comunidad Judía de Madrid and Federación de Comunidades Judías de España, No. 19-55616 (9th Cir. filed Mar. 4, 2022) at 11.

[33] *See*, *supra*, § II(D)(1).

Article 1955 in this case would directly contradict Spain's stated public policy, which instead actually aligns with California substantive law, the EU and the international community at large.

### III.    CONCLUSION

For the reasons set forth above, Amici respectfully request that this Court apply California substantive law in this case pursuant to California Assembly Bill 2867 and finally reunite the Painting with the rightful owners.

* * *

DATED: February 24, 2026                Respectfully submitted,


                                        By: *s/ Patrick T. Byrne*
                                        Patrick T. Byrne
                                        B. CREMADES Y ASOCIADOS
                                        Goya, 18, 2d Floor
                                        28001 Madrid
                                        Kingdom of Spain
                                        Attorneys for Amici Curiae