# Exhibit A

**COMPLEX APPELLATE LITIGATION GROUP LLP**
Mary-Christine Sungaila (No. 156795)
    mc.sungaila@calg.com
Michael von Loewenfeldt (No. 178665)
    michael.vonloewenfeldt@calg.com
620 Newport Center Drive, Suite 1100
Newport Beach, CA 92660
Tel: (949) 991-1900
Fax: (415) 726-2527

Attorneys for *Amici Curiae*
Monuments Men and Women Foundation;
StandWithUs; Jamie Kastner; Laura Baron Kastner;
Dr. David Milch Foundation

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DAVID CASSIRER, *et al.*,<br><br>                Plaintiffs,<br><br>v.<br><br>THYSSEN-BORNEMISZA COLLECTION FOUNDATION, an agency or instrumentality of the Kingdom of Spain,<br><br>                Defendant. | CASE NO. CV 05-03459-JFW (Ex)<br>Hon. John F. Walter<br><br>**AMICI CURIAE BRIEF OF MONUMENTS MEN AND WOMEN FOUNDATION, STANDWITHUS, JAMIE KASTNER, LAURA BARON KASTNER, AND DR. DAVID M. MILCH FOUNDATION IN SUPPORT OF PLAINTIFFS**<br><br>Date:  March 30, 2026<br>Time:  1:30 p.m.<br>Courtroom: 7A |

1

# Table of Contents

Table of Authorities .................................................................... 3

Interests of the *Amici Curiae* ..................................................... 7

*Amici Curiae* Brief in Support of Plaintiffs ............................. 10

    I.    Introduction ............................................................ 10

    II.   The Nazis' Campaign of Art Theft and the World's Early
         Response to It .................................................... 12

    III.  The Policy of the United States and the Majority of the
         International Community Favors the Return of Art Stolen
         by the Nazis ....................................................... 16

    IV.  Conclusion .......................................................... 23

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Authorities

## Cases

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
   596 U.S. 107 (2022) (*Cassirer V*) ................................................ 10, 11

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
   69 F.4th 554 (9th Cir. 2023) (*Cassirer VI*) ..................................... 11

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
   89 F.4th 1226 (9th Cir. 2024) (*Cassirer VII*)............................. 10, 11

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
   145 S. Ct. 1331 (2025) (*Cassirer VIII*)............................................ 10

*Erie R.R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ............................................................................ 11

*In re Marriage of Fellows*,
   39 Cal. 4th 179 (2006) ...................................................................... 11

*People v. Bunn*,
   27 Cal. 4th 1 (2002) .......................................................................... 11

## Statutes

Cal. Code Civ. Proc. § 338 ...................................... 10, 11, 22, 23

California Assembly Bill 2867,
   2023-24 Assemb., Reg. Sess. (Cal. 2024)..................... 10, 11, 12, 23

Holocaust Expropriated Art Recovery Act of 2016,
   Pub. L. No. 114-308, 130 Stat. 1524 (2016) ................................... 22

Holocaust Victims Redress Act,
   Pub. L. No. 105-158, 112 Stat. 15 (1998) ....................................... 22

Justice for Uncompensated Survivors Today Act of 2017,
   Pub. L. No. 115-171, 132 Stat. 1288 (2018) ................................... 22

U.S. Military Law No. 52, 12 Fed. Reg. 2189, 2196 (Apr. 3, 1947), 10
   C.F.R., 1947 Supp. § 3.15 (1947) ..................................................... 16

## Other Authorities

1899 Convention Between the United States of Am. & Certain Powers,
   with Respect to the L. & Customs of War on Land.,
   32 Stat. 1803 (Apr. 11, 1902) ........................................................... 17

Amici Curiae Brief in Support of Plaintiffs

1907 Convention Between the United States & Other Powers
    Respecting the L. & Customs of War on Land.,
    36 Stat. 2277 (Feb. 28, 1910) ............................................................ 17

1943 Inter-Allied Declaration Against Acts of Dispossession Committed
    in Territories Under Enemy Occupation of Control,
    https://history.state.gov/historicaldocuments/frus1943v01/d456 . 18

*2009 Terezin Declaration on Holocaust Era Assets and Related Issues*
    (June 30, 2009) U.S. Dep't of State, Office of the Special Envoy for
    Holocaust Issues, https://www.state.gov/prague-holocaust-era-
    assets-conference-terezin-declaration/ ........................................... 21

Orna Artal, *Rethinking the Application of Laches to Future Nazi-Era
    Art Restitution Claims Under the HEAR Act*,
    25 N.Y. State Bar Ass'n J. 1 (Winter 2020) ............................. 13, 14

*Best Practices for the Washington Principles on Nazi-Confiscated Art*
    (Mar. 5, 2024) U.S. Dep't of State, Office of the Special Envoy for
    Holocaust Issues, https://www.state.gov/office-of-the-special-
    envoy-for-holocaust-issues/best-practices-for-the-washington-
    conference-principles-on-nazi-confiscated-art ................................ 21

*Civilian Agency Records RG 239*, National Archives,
    https://www.archives.gov/research/holocaust/finding-
    aid/civilian/rg-239.html.................................................................... 18

Stephen W. Clark, *Selected World War II Restitution Cases*,
    SJ049 ALI-ABA 311 (2004)............................................................ 13

Paulina McCarter Collins, *Has the "Lost Museum" Been Found?
    Declassification of Government Documents and Report on
    Holocaust Assets Offer Real Opportunity to "Do Justice" for
    Holocaust Victims on the Issue of Nazi-Looted Art*,
    54 Me. L. Rev. 115 (2002) .............................................................. 13

Convention for the Protection of Cultural Property in the Event of
    Armed Conflict with Regulations for the Execution of the
    Convention (May 14, 1954), https://www.unesco.org/en/legal-
    affairs/convention-protection-cultural-property-event-armed-
    conflict-regulations-execution-convention#item-3......................... 19

Convention on the Means of Prohibiting and Preventing the Illicit
    Import, Export and Transfer of Ownership of Cultural Property
    (Nov. 14, 1970), https://www.unesco.org/en/legal-
    affairs/convention-means-prohibiting-and-preventing-illicit-
    import-export-and-transfer-ownership-cultural ............................ 20

Charles de Visscher, "International Protection of Works of Art and
    Historic Monuments" in *Law, Ethics and the Visual Arts*
    (Merryman et al. eds., 5th ed. 2007) ................................................ 12

Raymond J. Dowd, *Taking the Profit out of War: Why International law*
    *Requires Restitution of Nazi-Looted Art Taking the Profit out of*
    *War: Why International law Requires Restitution of Nazi-Looted*
    *Art*, 94 Fordham Law L. Rev. Online 1, 16 (March 2026) ............ 22

Hector Feliciano, *The Lost Museum: The Nazi Conspiracy to Steal the*
    *World's Greatest Works of Art* (1997) .............................................. 14

Barbara File, *This Weekend in Met History: April 2* (April 1, 2011),
    https://www.metmuseum.org/perspectives/this-weekend-in-met-
    history-april-2............................................................................... 19

Final Act of the United Nations Monetary and Financial Conference
    (July 1944) Resolution VI,
    https://timeline.worldbank.org/content/dam/sites/timeline/docs/mi
    grated/event01-brettonwoods-finalact-1849790.pdf ...................... 19

Janet Flanner, *Annals of Crime: The Beautiful Spoils*,
    New Yorker, Feb. 22, 1947 ............................................................. 15

Janet Flanner, *Annals of Crime: The Beautiful Spoils*,
    New Yorker, Mar. 1, 1947................................................................. 15

Janet Flanner, *Annals of Crime: The Beautiful Spoils*,
    New Yorker, Mar. 8, 1947................................................................. 15

Ardelia R. Hall, *The Recovery of Cultural Objects Dispersed During*
    *World War II* 339 (Aug. 27, 1951)
    U.S. Dep't of State Bulletin ....................................................... 15, 16

Alexander Herman, *Restitution: The Return of Cultural Artefacts*
    (Lund Humphries 2021)................................................................... 20

Alexandra Minkovich, *The Successful Use of Laches in World War II-*
    *Era Art Theft Disputes: It's Only a Matter of Time*,
    27 Colum. J.L. & Arts 349 (2004)................................................... 13

Marilyn E. Phelan, *Scope of Due Diligence Investigation in Obtaining Title to Valuable Artwork*, 23 Seattle U. L. Rev. 631 (2000)... 13, 14

Anthi Helleni Poulos, *The 1954 Hague Convention for the Protection of Cultural Property in the Event of Armed Conflict: An Historic Analysis*, 28 Int'l J. Legal Info. 1 (2000) ............................ 12, 16, 19

*Records of the American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas*, National Archives, https://www.archives.gov/research/guide-fed-records/groups/239.html ................................ 18

Katharine N. Skinner, *Restituting Nazi-Looted Art: Domestic, Legislative and Binding Intervention to Balance the Interests of Victims and Museums*, 15 Vand. J. Ent. & Tech. L. 673 (2013) ......................... 17

Francis Henry Taylor, *Europe's Looted Art: Can It Be Recovered?*, N.Y. Times, Sept. 19, 1943................................................ 15

*The Holocaust Expropriated Art Recovery Act—Reuniting Victims with Their Lost Heritage: Hearing on S. 2763 The Holocaust Expropriated Art Recovery Act Before the S. Comm. on the Judiciary, Subcomm. on the Constitution and Subcomm. on Oversight, Agency Action, Federal Rights and Federal Courts*, 114th Cong. 2 (2016) ....................................... 14

*Vilnius Forum Declaration* (Oct. 5, 2000), https://www.lootedart.com/MFV7EE39608 .................................. 21

*Washington Conference Principles on Nazi-Confiscated Art* (Dec. 3, 1998) U.S. Dep't of State, Office of the Special Envoy for Holocaust Issues, https://www.state.gov/washington-conference-principles-on-nazi-confiscated-art/........................................... 20, 21

David Wissbroeker, *Six Klimts, a Picasso & a Schiele: Recent Litigation Attempts to Recover Nazi Stolen Art*, 14 DePaul J. Art, Tech. & Intell. Prop. L. Rev. 39 (2004)............. 13

# Interests of the *Amici Curiae*[1]

The Monuments Men and Women Foundation ("the Foundation") is a nonprofit organization, created to raise worldwide awareness about the men and women who served in the Monuments, Fine Arts, and Archives section of the U.S. and Allied militaries' Civil Affairs division during and after World War II; to honor their achievements; and to complete their unfinished mission of returning missing art to the rightful owners.  Further information about the Foundation and its mission can be found at http://www.mmwf.org/.  The issues in the pending motion are central to the Foundation's mission, and the Foundation previously filed amicus briefs in this matter in both the Ninth Circuit and United States Supreme Court.

StandWithUs is a California-based organization advocating against antisemitism.  The StandWithUs Holocaust Education Center (HEC), headquartered in Los Angeles, brings interactive Holocaust education programs, films and curriculum to schools and communities across North America, through in-person and virtual platforms.  The HEC's custom-made, interdisciplinary programs are meant to proactively educate students about the Holocaust and also respond to instances of antisemitism experienced by students at specific schools or communities.  The HEC works affirmatively to address the widespread deficiencies in information about the Holocaust, and to counter the antisemitism connected with Holocaust denial and distortion.  Further

---

[1]     No counsel for a party wrote this brief in whole or in part, and no counsel or party made a monetary contribution intended to find the preparation or submission of this brief.  No person other than the *amici curiae*, their members, or their counsel made a monetary contribution intended to fund its preparation or submission.

1 | information about StandWithUs and its mission can be found at
2 | www.standwithus.com.

3 |     Jamie Kastner and Laura Baron Kastner are the director/
4 | producer team behind The Spoils, a feature documentary about current
5 | controversies surrounding the restitution of Nazi-era looted art, focused
6 | on the collection of German-Jewish art dealer Max Stern, who was
7 | forced to liquidate his family's Düsseldorf gallery in a forced Nazi "Jew
8 | auction" in 1937, paying the proceeds to the Nazis and barely escaping.
9 | Landing penniless in Montreal he rose to become Canada's most
10 | successful art dealer.  A restitution project in his name has become one
11 | of the world's most successful.  The film documents two restitution
12 | claims against Düsseldorf and two botched attempts by the city to hold
13 | exhibitions in Stern's honor, exposing the heart of the current crisis in
14 | the art world around the restitution of Nazi-looted art.  After
15 | premiering at the Munich International Film Festival in 2024 the film
16 | has gone on to play in more than a dozen additional festivals around the
17 | world to great media and critical acclaim.  Jamie Kastner has directed
18 | 11 other feature documentaries, including There Are No Fakes (2019),
19 | which uncovered "the largest art fraud in the world" operating in
20 | Canada's far north, credited by Canadian police with inspiring them to
21 | launch an investigation into the fraudulent reproduction of paintings of
22 | legendary Indigenous painter Norval Morrisseau, leading to 8 arrests,
23 | 40 charges laid, and the seizure of more than 1,000 fake paintings in
24 | 2023.

25 |     The Dr. David M. Milch Foundation is a nonprofit organization
26 | dedicated to arts for change and youth mentoring.  Among its core focus
27 | areas is combating antisemitism, hate, and historical distortion through
28 | art, education, and immersive storytelling.  The Milch Foundation's

flagship program, Lives Eliminated, Dreams Illuminated (LEDI), focuses on education about the Holocaust and dangerous recent escalation of antisemitism.  LEDI has served thousands of students in person and virtually across Florida, New England, New York, and New Jersey, partnering with schools, educators, and national organizations to provide structured Holocaust and antisemitism education grounded in historical accuracy, emotional resonance, and contemporary relevance.

1

## *Amici Curiae* Brief in Support of Plaintiffs

2

## I.   Introduction

3    For two decades, the parties in this case have litigated whether

4    plaintiffs are entitled to the return of a Camille Pissarro painting, *Rue*

5    *Saint Honoré, après midi, effet de pluie*, stolen from Lilly Cassirer by

6    the Nazis in 1939, and currently held by defendant Thyssen-

7    Bornemisza Collection Foundation.  For the last decade that dispute

8    has turned on which law governs: the law of California or the law of

9    Spain.  The United States Supreme Court has twice reversed a

10   determination that the law of Spain applies, first to require application

11   of California's choice of law rules and most recently in light of the

12   statutory choice of law rule California enacted in AB 2867, codified at

13   California Code of Civil Procedure section 338(c)(6).  *Cassirer v.*

14   *Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 114–15 (2022)

15   (*Cassirer V*); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 145 S.

16   Ct. 1331 (2025) (*Cassirer VIII*).

17   All parties to this case agree that the plain language of section

18   338(c)(6) requires the application of substantive California law to this

19   dispute.  It is also undisputed that under substantive California law,

20   the Thyssen-Bornemisza Collection Foundation has no valid title to the

21   stolen painting because "thieves cannot pass good title to anyone," and

22   thus plaintiffs are entitled to its return.  *Cassirer v. Thyssen-*

23   *Bornemisza Collection Found.*, 89 F.4th 1226, 1235 (9th Cir. 2024)

24   (*Cassirer VII*), *judgment vacated*, *Cassirer VIII*, 145 S. Ct. 1331.

25   Indeed, the express purpose of the California Legislature in enacting

26   section 338(c)(6) was to reverse the Ninth Circuit's prior decision in this

27

28

case to apply the law of Spain as contrary to California's public policy, national policy, and international law.  AB 2867, § 1(d).[2]

The Thyssen-Bornemisza Collection Foundation, however, has argued to this Court that application of California Code of Civil Procedure section 338(c)(6) is somehow inconsistent with federal law and policy.  *E.g.*, Dkt. 681-1 at 30–38.  But that argument ignores the express direction of the United States Supreme Court that California choice of law rules be applied to this case, *Cassirer V*, 596 U.S. 107, 114–15, and that the application of those rules needed to be reconsidered after the enactment of section 338(c)(6).  *Cassirer VII*, 145 S. Ct. 1331.[3]  It is also entirely incorrect.  As the California Legislature recognized in AB 2867, the new statute requiring application of substantive California law "aligns California law with federal laws, federal policies, and international agreements prohibiting pillage and seizure of works of art and cultural property and calling for restitution of seized property, as embodied in the Hague Convention of 1907 (and 1899), the UNESCO 1970 Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of

---

[2]    Absent a constitutional limitation, the California Legislature "may certainly amend a statute to overrule a judicial decision," *In re Marriage of Fellows*, 39 Cal. 4th 179, 185 (2006), and apply the change in law "to both pending and future cases."  *People v. Bunn*, 27 Cal. 4th 1, 17 (2002).  "[W]hether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern."  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

[3]    The Ninth Circuit also recognized that this question was governed by California law when it certified the question to the California Supreme Court and agreed to be bound by that court's decision.  *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 69 F.4th 554, 571 (9th Cir. 2023) (*Cassirer VI*).

Amici Curiae Brief in Support of Plaintiffs

Cultural Property, the National Stolen Property Act of 1934, the Holocaust Victims Redress Act, the Holocaust Expropriated Art Recovery Act of 2016, and related federal executive branch policies and international agreements."  AB 2867, § 1(k).

## II.    The Nazis' Campaign of Art Theft and the World's Early Response to It

Throughout history, "[w]ar has exposed historic monuments and works of art to two principal dangers: the danger arising out of the practice of taking spoils during or at the close of hostilities, and the danger of destruction from acts of war, especially artillery action and aerial bombardment."  Charles de Visscher, "International Protection of Works of Art and Historic Monuments" in *Law, Ethics and the Visual Arts* 1, 1 (Merryman et al. eds., 5th ed. 2007).  From the time of the ancient Greeks through the Napoleonic wars, plunder by an invading army was commonly accepted.  Anthi Helleni Poulos, *The 1954 Hague Convention for the Protection of Cultural Property in the Event of Armed Conflict: An Historic Analysis*, 28 Int'l J. Legal Info. 1, 5–13 (2000) (hereinafter *1954 Hague Convention Historical Analysis*).  The Nazis' mistreatment of the Jews, including the Cassirer family and the confiscation of their painting, epitomized a new, third type of danger: targeted annihilation of a people through destruction and a re-engineering of cultural heritage.

During the Nazis' ascension to power and the war-torn years that followed, the seizure of art became a weapon – a way that the Nazi government could achieve its "Final Solution" to eradicate Jewish people and culture.  Alexandra Minkovich, *The Successful Use of Laches in World War II-Era Art Theft Disputes: It's Only a Matter of Time*, 27

Colum. J.L. & Arts 349, 352 (2004).  "[F]or Hitler, both the acquisition and cleansing of art was a central part of his plan for a pure Germanic race, his goal being 'to eradicate a race by extinguishing its culture as well as its people.' "  Paulina McCarter Collins, *Has the "Lost Museum" Been Found? Declassification of Government Documents and Report on Holocaust Assets Offer Real Opportunity to "Do Justice" for Holocaust Victims on the Issue of Nazi-Looted Art*, 54 Me. L. Rev. 115, 125 (2002).  As a result, the "prelude to the largest mass murder in modern history was the largest robbery ever carried out."  Orna Artal, *Rethinking the Application of Laches to Future Nazi-Era Art Restitution Claims Under the HEAR Act*, 25 N.Y. State Bar Ass'n J. 1, 1–2 (Winter 2020).

During World War II, between "one-fourth and one-third of Europe's artistic treasure trove was pillaged by the Nazis in an effort to realize Hitler's vision for Germany as the cultural center of Europe."  David Wissbroeker, *Six Klimts, a Picasso & a Schiele: Recent Litigation Attempts to Recover Nazi Stolen Art*, 14 DePaul J. Art, Tech. & Intell. Prop. L. Rev. 39, 40 (2004).  "[M]ore than 100,000 pieces of art, worth at least $10 billion in total, are still missing from the Nazi era."  Marilyn E. Phelan, *Scope of Due Diligence Investigation in Obtaining Title to Valuable Artwork*, 23 Seattle U. L. Rev. 631, 660 (2000).  As former U.S. Ambassador to Austria and former chair of the Metropolitan Museum of Modern Art in New York, Ronald Lauder, put it: "because of these large numbers, every institution, art museum and private collection [likely] has some of these missing works."  *Id.*  Many of these art pieces have found their way into American collections.  See Stephen W. Clark, *Selected World War II Restitution Cases*, SJ049 ALI-ABA 311 (2004) (listing Nazi-looted art that has appeared in the Los Angeles County

Museum of Art, The Met, the Seattle Art Museum, the Art Institute of Chicago, and other prominent museums).

"Beyond art directly looted by the Nazi officials, hundreds if not thousands of valuable works of art were procured" from profiteers who preyed on, and extracted "unconscionable economic advantage from" desperate victims of Nazi persecution who sold the artworks in "fire sales." Artal, *supra*, at 1. Holocaust-era art recovery claims therefore include not only, for example, art that "a Nazi soldier" took "from a Jewish family's apartment," but also art that a "Jewish persecutee" sold below its true value "while fleeing for his life." *The Holocaust Expropriated Art Recovery Act—Reuniting Victims with Their Lost Heritage: Hearing on S. 2763 The Holocaust Expropriated Art Recovery Act Before the S. Comm. on the Judiciary, Subcomm. on the Constitution and Subcomm. on Oversight, Agency Action, Federal Rights and Federal Courts*, 114th Cong. 2 n.3 (2016) (statement of Agnes Peresztegi).

After the War, the United States became one of the "consumer countr[ies]" for art displaced during the Holocaust, as purchasers here embraced the traditionally "lackadaisical 'ask no questions' commercial conventions of the international art trade." Phelan, *supra*, at 660–662. Indeed, many art dealers facilitated the trafficking; they bought looted art from the Nazis at bargain prices and then resold it for a handsome profit in thriving wartime art markets. *See* Hector Feliciano, *The Lost Museum: The Nazi Conspiracy to Steal the World's Greatest Works of Art* 118–19, 122–54 (1997) (describing the booming Paris art market during the war, fueled by confiscated art and "the sudden arrival of large numbers of German buyers with deep pockets").

The Nazis' spoliation of Jewish treasures was common knowledge in the international community and the art world both during and after

the war.  As early as 1943, the then-Director of The Met acknowledged that Holocaust-era artworks were coming to the United States and admonished his museum brethren:  "Private individuals might continue to operate in a 'black market' of antiquities in which no questions [are] asked, but public institutions . . . [should] not very well connive in the liquidation of the artistic patrimony of Europe and act as public receivers of stolen goods."  Francis Henry Taylor, *Europe's Looted Art: Can It Be Recovered?*, N.Y. Times, Sept. 19, 1943.  In 1947, *The New Yorker* published a three-part series by renowned cultural commentator Janet Flanner detailing the massive scope of the Nazi government's theft of Jewish and other "degenerate" art.  Janet Flanner, *Annals of Crime: The Beautiful Spoils*, New Yorker, Feb. 22, 1947, at 31; Janet Flanner, *Annals of Crime: The Beautiful Spoils*, New Yorker, Mar. 1, 1947, at 33; Janet Flanner, *Annals of Crime: The Beautiful Spoils*, New Yorker, Mar. 8, 1947, at 38.

In 1950, Ardelia Hall, a Fine Arts and Monuments Advisor to the State Department, circulated a letter "to American universities, museums, libraries, art dealers and book sellers, asking for their continued cooperation in the recovery of dispersed cultural property." Ardelia R. Hall, *The Recovery of Cultural Objects Dispersed During World War II* 339 (Aug. 27, 1951) U.S. Dep't of State Bulletin.  One year later, the State Department published a bulletin written by Ms. Hall in which it again called for assistance "in identifying cultural objects improperly dispersed during World War II" and "prevent[ing] the transfer of looted objects from one country to another."  *Id*. at 339–40. The State Department reminded those entities that "[t]he introduction of looted objects into the United States is . . . contrary to the general policy of [the U.S.] Government," and that "[i]t is, of course, an

undeniable fact that works of art lost through the Nazi depredations of European countries, which shocked the civilized world, will never be saleable." *Id.* at 339. Ms. Hall worked tirelessly for years to promote the location and return of stolen art to its rightful owners.[4]

The record in this case is an example of just such illicit trade. U.S. Military Law No. 52 of the post-war Allied Military Government of Germany declared "null and void" "[a]ny prohibited transaction effected without a duly issued license or authorization from Military Government" and prohibited "any transfer, contract or other arrangement made . . . with the intent to defeat or evade . . . the restitution of any [such] property to its rightful owner." U.S. Military Law No. 52, 12 Fed. Reg. 2189, 2196 (Apr. 3, 1947), 10 C.F.R., 1947 Supp. § 3.15 (1947). According to a bill of sale in the record, on July 18, 1951, the Frank Perls Gallery of Beverly Hills arranged to sell the Painting to Sidney Brody, an art collector in Los Angeles, for $14,850. Dkt. 682-2, at 8. A later invoice refers to the purported seller as "Dr. M. Urban Collection, Munich." *Id.* There is no evidence that the export license required by U.S. Military Law 52 was obtained.

## III. The Policy of the United States and the Majority of the International Community Favors the Return of Art Stolen by the Nazis

The United States was one of the first countries to prohibit plunder of cultural property in the Lieber Code, promulgated by President Lincoln during the Civil War and persisting thereafter in U.S. military law. *1954 Hague Convention Historical Analysis* at 13–14.

---

[4]    https://www.monumentsmenandwomenfnd.org/monuments-men-and-women/ardelia-hall (last visited Feb. 27, 2026).

1   Since the early twentieth century, international laws and norms
2   accepted by Spain, the United States, and other countries delegitimize
3   trade in stolen cultural property; it has become scandalous *to acquire or*
4   *retain* objects of dubious provenance.  *See* Katharine N. Skinner,
5   *Restituting Nazi-Looted Art: Domestic, Legislative and Binding*
6   *Intervention to Balance the Interests of Victims and Museums*, 15 Vand.
7   J. Ent. & Tech. L. 673, 697, n.168 (2013) ("[T]he Art Institute of
8   Chicago, the Detroit Institute of the Arts, the Metropolitan Museum of
9   Art, and the Museum of Modern Art[ ] have all returned pieces to the
10  heirs of Holocaust victims").

11          Following the lead set by the United States in the Lieber Code,
12  the Hague Conventions of 1899 and 1907 on Land Warfare forbid
13  pillage and require restitution of civilian property looted during
14  wartime.  1899 Convention Between the United States of Am. &
15  Certain Powers, with Respect to the L. & Customs of War on Land., 32
16  Stat. 1803 (Apr. 11, 1902); 1907 Convention Between the United States
17  & Other Powers Respecting the L. & Customs of War on Land., 36 Stat.
18  2277 (Feb. 28, 1910) (collectively The Hague Conventions).  Both were
19  ratified by the President of the United States upon the advice of the
20  Senate, and the Kingdom of Spain is a signatory to the 1899
21  Convention.  Article 28 of the Hague Conventions prohibits "pillage of a
22  town or place," and Article 46 prohibits confiscation of private property.
23  Article 56 provides that even state-owned works of art must be treated
24  as private property, and all seizure of works of art "is forbidden, and
25  should be made the subject of legal proceedings."  *Id.*[5]

26
27
28  [5]      While the 1907 Convention expanded on the 1899 Convention in
    other respects, these Articles exist in both.

1    The policy of the United States to recover and return such stolen

2   art has been carried out since 1943.  That year, President Roosevelt

3   created the American Commission for the Protection and Salvage of

4   Artistic and Historical Monuments in War Areas chaired by Associate

5   Justice Owen J. Roberts (the "Roberts Commission").  *Records of the*

6   *American Commission for the Protection and Salvage of Artistic and*

7   *Historic Monuments in War Areas*, National Archives.[6]  This was

8   consistent with the 1943 Inter-Allied Declaration Against Acts of

9   Dispossession Committed in Territories Under Enemy Occupation of

10  Control, which reaffirmed that transfer of looted property would be

11  considered invalid even for "transactions apparently legal in form, even

12  when they purport to be voluntarily effected."[7]  These policies were

13  implemented by, among others, the heroic members of the Monuments,

14  Fine Arts, and Archives section of the U.S. and Allied militaries' Civil

15  Affairs division.  *Civilian Agency Records RG 239*, National Archives.[8]

16  From 1945 to 1951, the Monuments Men and Women located and

17  returned over 3.5 million stolen works of art and cultural artifacts.[9]

18      This policy of returning war looted art to its rightful owners was

19  further made part of U.S. law in 1944 in the agreements following the

20  Bretton Woods Conventions.  Resolution VI of those agreements,

21  "Enemy Assets and Looted Property," requires signatories, including

---

6    https://www.archives.gov/research/guide-fed-records/groups/239.html (last visited Feb. 26, 2026).

7    https://history.state.gov/historicaldocuments/frus1943v01/d456 (last visited Feb. 26, 2026).

8    https://www.archives.gov/research/holocaust/finding-aid/civilian/rg-239.html (last visited Feb. 26, 2026).

9    https://www.nationalww2museum.org/visit/museum-campus-guide/liberation-pavilion/first-floor/monuments-men (last visited February 26, 2026).

the United States, to take steps "preventing the liquidation of property looted by the enemy, locating and tracing ownership and control of such looted property, and taking appropriate measures with a view to restoration to its lawful owners."  Final Act of the United Nations Monetary and Financial Conference (July 1944) Resolution VI.[10]  After the war ended, General Eisenhower emphasized the continuing work of locating and returning art looted by the Nazis in his speech to the Metropolitan Art Museum on April 2, 1946, noting that "[s]ome of this has been restored.  Some, not easy to identify, is still under the care of the captors."[11]

These policies were further solidified in 1954 at UNESCO's first conference which resulted in the Hague Convention for the Protection of Cultural Property in the Event of Armed Conflict.  *1954 Hague Convention Historical Analysis* at 36.  Article 4 point 3 of the 1954 Convention requires signatories to prevent theft of cultural property and "refrain from requisitioning movable cultural property situated in the territory" of another signatory.[12]  Spain ratified that Convention in July 1960.  *Id.*  The international community reiterated its commitment to recovery of looted cultural property in 1970 in the Convention on the

---

[10]    https://timeline.worldbank.org/content/dam/sites/timeline/docs/migrated/event01-brettonwoods-finalact-1849790.pdf (last visited Feb. 26, 2026).

[11]    Barbara File, *This Weekend in Met History: April 2* (April 1, 2011), https://www.metmuseum.org/perspectives/this-weekend-in-met-history-april-2 (last visited Feb. 26, 2026).

[12]    Convention for the Protection of Cultural Property in the Event of Armed Conflict with Regulations for the Execution of the Convention (May 14, 1954), https://www.unesco.org/en/legal-affairs/convention-protection-cultural-property-event-armed-conflict-regulations-execution-convention#item-3 (last visited February 26, 2026).

Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property (Nov. 14, 1970).[13]  The state parties to the Convention – including the United States and Spain – agreed to "help[ ] . . . make the necessary reparations" of stolen cultural property and to "undertake, consistent with the laws of each State[,]" the return of cultural property, and to "admit actions for recovery of lost or stolen items of cultural property brought by or on behalf of the rightful owners."  *Id.* at art. 2, 13.  The commitment to combat illicit trade in stolen cultural property has thus become the established international norm.  Alexander Herman, *Restitution: The Return of Cultural Artefacts* 75 (Lund Humphries 2021).

In the context of this larger recognition in U.S. and international law of the impropriety of looting cultural artifacts, the need to remedy the evils of the Nazi regime by returning stolen art to its rightful owners (as in this case) has drawn special attention.  The 1998 Washington Conference on Holocaust-Era Assets, organized and hosted by the State Department, led to 44 nations – including Spain – signing the Washington Principles.  *See Washington Conference Principles on Nazi-Confiscated Art* (Dec. 3, 1998) U.S. Dep't of State, Office of the Special Envoy for Holocaust Issues.[14]  The Washington Principles (and successive declarations in the Vilnius Forum Declaration in 2000 and the Terezin Declaration in 2009) call on participating nations to set aside legal formalities in pursuit of reaching "just and fair solution[s]"

---

[13]    https://www.unesco.org/en/legal-affairs/convention-means-prohibiting-and-preventing-illicit-import-export-and-transfer-ownership-cultural (last visited Feb. 26, 2026).

[14]    https://www.state.gov/washington-conference-principles-on-nazi-confiscated-art/ (last visited February 26, 2026).

in Holocaust cases.  *Id.*; *Vilnius Forum Declaration* (Oct. 5, 2000)[15];
*2009 Terezin Declaration on Holocaust Era Assets and Related Issues*
(June 30, 2009) U.S. Dep't of State, Office of the Special Envoy for
Holocaust Issues.[16]  The Washington Principles reflect the signatories'
agreement that these claims should be resolved on their merits, rather
than on technicalities like the passage of time.  These principles were
again reaffirmed by 34 nations, including the United States, in the Best
Practices adopted in 2024. *Best Practices for the Washington Principles
on Nazi-Confiscated Art* (Mar. 5, 2024) U.S. Dep't of State, Office of the
Special Envoy for Holocaust Issues.[17]

The 2024 Best Practices are not merely toothless principles but
reflect longstanding United States and international law requiring the
restitution of private property stolen during war, and in particular by
the Nazis.  In fact, there is an emerging body of important international
law scholarship demonstrating that agreements such as the Best
Practices, "although styled as legally nonbinding, should be afforded
substantial legal deference as an informal agreement," which "tend to
establish customary international practices and often have powerful
legal and practical effects."  Raymond J. Dowd, *Taking the Profit out of
War: Why International law Requires Restitution of Nazi-Looted Art
Taking the Profit out of War: Why International law Requires*

---

[15]    https://www.lootedart.com/MFV7EE39608 (last visited Feb. 26, 2026).

[16]    https://www.state.gov/prague-holocaust-era-assets-conference-terezin-declaration/ (last visited Feb. 26, 2026).

[17]    https://www.state.gov/office-of-the-special-envoy-for-holocaust-issues/best-practices-for-the-washington-conference-principles-on-nazi-confiscated-art (last visited Feb. 26, 2026).

*Restitution of Nazi-Looted Art*, 94 Fordham Law L. Rev. Online 1, 16 (2026).

The federal government has similarly continued to enact legislation to protect the rights of victims of the Nazi regime, including:

- the Holocaust Victims Redress Act, Pub. L. No. 105-158, 112 Stat. 15 (1998), which recognized that "consistent with the 1907 Hague Convention, all governments should undertake good faith efforts to facilitate the return of private and public property, such as works of art, to the rightful owners in cases where assets were confiscated from the claimant during the period of Nazi rule and there is reasonable proof that the claimant is the rightful owner." *Id.* § 202, 112 Stat. at 17–18.

- the Holocaust Expropriated Art Recovery Act of 2016, Pub. L. No. 114-308, 130 Stat. 1524 (2016) (codified at 22 U.S.C. § 1621 note), which reaffirmed these principles and reopened statutes of limitation to allow victims to sue for recovery of their property; and,

- the Justice for Uncompensated Survivors Today Act of 2017, Pub. L. No. 115-171, 132 Stat. 1288 (2018), which requires the State Department to report on the extent to which European Countries are honoring their treaty commitments to identify and return Holocaust-era assets.

The Foundation's argument that section 338(c)(6) is inconsistent with federal law ignores this substantial history and the numerous commitments and efforts the United States has made to prohibit the wartime theft of art and return looted art to its rightful owners. The California Legislature's assessment that the newly enacted Code of

Civil Procedure section 338(c)(6) "align[s] California law with federal laws, policies, and international agreements" (AB 2867, § 1(g) & (k)) is thus entirely correct.

## IV.    Conclusion

Responding to the Ninth Circuit's prior "*Erie* Guess" about California law in this action, the California Legislature made clear in AB 2867, enacting Code of Civil Procedure section 338(c)(6), that California's substantive law should apply to this dispute.  Nothing in federal law or policy prevents California from establishing the applicable choice of law rule or applying its own substantive law to protect the victims of Nazi aggression against the claims of current holders of the victims' stolen art.  The Court should grant plaintiffs' motion for summary judgment and deny the motion filed by the Thyssen-Bornemisza Collection Foundation.

Respectfully submitted,

**COMPLEX APPELLATE LITIGATION GROUP LLP**

Dated:  March 2, 2026            */s/ Mary-Christine Sungaila*
Mary-Christine Sungaila
Attorney for *Amici Curiae*
Monuments Men and Women
Foundation, StandWithUs, Jamie
Kastner, Laura Baron Kastner, and
the Dr. David M. Milch Foundation