# EXHIBIT A

Duane Morris LLP
Benjamin G. Shatz (Cal. Bar 160229)
BGShatz@DuaneMorris.com
865 S. Figueroa Street, Suite 3100
Los Angeles, CA 90017-5450
(213) 689-7439, Fax: (213) 403-5857
Attorney for *Amici Curiae* The 1939 Society,
American Jewish Committee, ART ASHES,
Bet Tzedek, Simon Wiesenthal Center,
Holocaust Survivors Foundation USA, and
Jewish Federations of North America

Rajika L. Shah (Cal. Bar 232994)
Rajika.Shah@LLS.edu
Director, Loyola Justice for Atrocities Clinic,
and Visiting Associate Professor
LMU Loyola Law School
919 Albany Street, Los Angeles, CA 90015
(213) 736-8348, Fax: (213) 480-6805
Attorney for Loyola Justice for Atrocities Clinic

*Counsel continued on next page*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DAVID CASSIRER, et al., | Case No.: 2:05-cv-03459-JFW (Ex) |
| Plaintiffs, | |
| v. | ***AMICI CURIAE* AND HOLOCAUST SCHOLARS' BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| THYSSEN-BORNEMISZA COLLECTION FOUNDATION, an agency or instrumentality of the Kingdom of Spain, | Date: March 30, 2026<br>Time: 1:30 p.m.<br>Courtroom: 7A<br>Judge: The Honorable John F. Walter |
| Defendant. | |

Michael J. Bazyler (Cal. Bar 84398)
Bazyler@Chapman.edu
Professor of Law and The 1939 Society Law Scholar in Holocaust
and Human Rights Studies
Dale E. Fowler School of Law, Chapman University
1 University Drive, Orange, CA 92866-1005
(310) 926-0149, Fax: (310) 829-6012
Attorney for The 1939 Society and Holocaust Scholars

Stanley A. Goldman (Cal. Bar 65957)
Stanley.Goldman@LLS.edu
Professor of Law and Founding Director,
Center for the Study of Law and Genocide
LMU Loyola Law School
919 Albany Street, Los Angeles, CA 90015
(213) 736-1092, Fax: (213) 480-6805
Attorney for Center for the Study of Law and Genocide

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................ 1

ARGUMENT ........................................................................................... 4

    I.    Transactions In Nazi-Looted Art Are Not Ordinary Commercial
        Transactions ................................................................................. 4

    II.    Application Of Spanish Law In This Case Contravenes
        The Express Intent Of California, The United States,
        And The International Community. ................................................ 7

        A.    New CCP § 338(c)(6) Mandates that California
                Substantive Law Applies Here ..................................... 8

        B.    The Legal and Moral Imperatives Align under
                California Law. ............................................................ 10

        C.    California Law Aligns with Federal Law and International
                Agreements Calling for Restitution of Nazi-Looted Art. ........... 11

    III.    CONCLUSION ............................................................................ 13

APPENDIX FULL LIST OF *AMICI CURIAE* ........................................ 16

# TABLE OF AUTHORITIES

## Cases

*Cassirer v. Thyssen-Bornemisza Collection Found.*
  596 U.S. 107 (2022)...........................................................................9

*Cassirer v. Thyssen-Bornemisza Collection Found.*
  107 F.4th 882 (9th Cir. 2024) ........................................................ 8-9

*Cassirer v. Thyssen-Bornemisza Collection Found.*
  2019 WL 13240413 (C.D. Cal. 2019) ...........................................6, 10

*Cassirer v. Thyssen-Bornemisza Collection Found.*
  89 F.4th 1226 (9th Cir. 2024) ........................................................8, 13

*Grunfeder v. Heckler*
  748 F.2d 503 (9th Cir. 1984) ...............................................................2

*Republic of Austria v. Altmann*
  541 U.S. 677 (2004).............................................................................2

*Von Saher v. Norton Simon Museum*
  592 F.3d 954 (9th Cir. 2010) .............................................................10

## Statutes & Legislative History

28 U.S.C. § 1606...................................................................................9

Holocaust Victims Redress Act,
  PL 105-158, 112 Stat. 15 (Feb. 13, 1998) .........................................11

Cal. Code Civ. Proc. § 338 .................................................................10

Cal. Code Civ. Proc. § 338(c)(3) ........................................................10

Cal. Code Civ. Proc. § 338(c)(6) ..........................................................9

Assem. Bill 2867, 2024-2025 Reg. Sess. (Cal. 2024), § 1(b)................10

Assem. Bill 2867, 2024-2025 Reg. Sess. (Cal. 2024), § 1(e) ...............10

Assem. Bill 2867, 2024-2025 Reg. Sess. (Cal. 2024), § 1(f) ...............10

Assem. Bill 2867, 2024-2025 Reg. Sess. (Cal. 2024), § 1(k)..................................13

S. Rep. 114-394, 1-2 (Dec. 6, 2016) .................................................. 11-12

*Washington Conference Principles on Nazi-Confiscated Art*,
    U.S. Dep't of State ................................................................12

### Articles & Books

Götz Aly, *Hitler's Beneficiaries: Plunder, Racial War,*
    *and the Nazi Welfare State* (2008) .............................................5

Yitzhak Arad, *Belzec, Sobibor, Treblinka: The Operation Reinhard*
    *Death Camps* (1987) ............................................................5

David M. Crowe, *The Holocaust: Roots, History, and Aftermath* (2022).................5

Raymond J. Dowd, *Taking The Profit Out Of War: Why International Law*
    *Requires Restitution Of Nazi-Looted Art*, 94 Fordham L. Rev. Online
    (forthcoming March 2026)........................................................12

Saul Friedländer, *A Fundamental Crime*, K.: Jews, Europe, the XXIst Century
    (Sept. 9, 2021) ................................................................7

Saul Friedländer, "Ideology and Extermination: The Immediate Origins
    of the Final Solution," in *Lessons & Legacies: The Holocaust and Justice*
    vol. 5 (Ronald Smelser, ed. 2002) .............................................5

Saul Friedländer, *The Years of Extermination: Nazi Germany and the Jews,*
    *1939-1945* (2008) ............................................................13

Simon Goodman, *The Orpheus Clock* (2015) .........................................6

Hon. Robert H. Jackson, Opening Statement at The Int'l Military Tribunal
    (Nov. 21, 1945) ............................................................ 10-11

Mark Labaton, *More than a 'Drop of Justice:' How Nazi-looted Art Cases Promote*
    *'Transitional Justice' and Why these Cases Still Matter*, 13 Notre Dame J. of
    Int'l & Comp. L. 1, 3 (2023) (citing William D. Cohen, *Five Countries Slow to*
    *Address Nazi-looted Art, U.S. Expert Says*, N.Y. Times (Nov. 28, 2018))..........7

Leonard Mosley, *The Reich Marshall* (1974).........................................6

Jonathan Petropoulos, *Art as Politics in the Third Reich* (1996) ..................6

---

Robert N. Proctor, *The Nazi War on Cancer* (1999) .................................................7

Timothy Snyder, *Black Earth: The Holocaust As History
    and as Warning* (2015) ...........................................................................5

*Amici* The 1939 Society, American Jewish Committee, ART ASHES, Bet Tzedek, Center for the Study of Law and Genocide, Holocaust Scholars, Holocaust Survivors Foundation USA, Jewish Federations of North America, Loyola Justice for Atrocities Clinic, and Simon Wiesenthal Center respectfully submit this brief supporting Plaintiffs David Cassirer et al.[1]

## INTEREST OF *AMICI CURIAE*

**The 1939 Society**, formed in 1952 as The 1939 Club, is one of the oldest and largest organizations of Holocaust survivors and descendants in the United States. Its members and officers have included Jews that appeared on Schindler's list, including former president Paul Page, a survivor of Schindler's factory who convinced Thomas Keneally to write the book Schindler's List and Steven Spielberg to make the film based on it. In 1978, the organization created the very first chair in Holocaust studies in the United States at UCLA, now called The 1939 Society Samuel Goetz Chair in Holocaust Studies, named after one of our former presidents who pioneered Holocaust education in the United States. Twenty-one years ago, the Society initiated a Holocaust Art and Writing Contest at Chapman University for middle and high school students across the country, indeed, across the world. Between 7,000 and 8,000 students participate annually. Like tens of thousands of other Holocaust survivors, Page and Goetz died while awaiting some measure of compensation for the wrongs they suffered.

With all but one of the original members now deceased, and the remaining survivors past their golden years, the Society now consists of children and grandchildren of survivors and their supporters. Its primary mission is to develop Holocaust remembrance and education, and counter increasing Holocaust denialism.

The **American Jewish Committee**, founded in 1906, is a leading global Jewish advocacy organization with offices around the world and the United States. Its mission is

---

[1] No party or party's counsel authored any portion of this brief; no one other than *amici* or their counsel contributed any money to fund this brief or aid in its preparation or submission.

to safeguard the welfare and security of Jews; to strengthen the basic principles of democracy and pluralism around the world; and to enhance the quality of Jewish life.

**ART ASHES** ("Art Restitution to Assist Survivors of the Holocaust Emergency Services") is a nonprofit foundation that funds the field of artwork restitution, identifying objects stolen during the Holocaust and acknowledging the families and heirs who are the rightful owners of such art. ART ASHES supports researchers and attorneys working in the field of restitution, along with claimants and heirs, to tell the story of each artwork, the original collectors, and the history of Nazi looting. In acknowledgment of the many Holocaust Survivors still living, the Foundation asks successful claimants to donate a portion of any sale proceeds to nonprofit organizations assisting Holocaust Survivors who live in poverty. Approximately 50,000 Holocaust Survivors live in or near poverty and require financial assistance for everyday needs such as food, rent, and utilities, and do not receive the medical, dental, mental health, and long-term care they need.

**Bet Tzedek** (Hebrew for "House of Justice"), an internationally recognized force in poverty law, was founded in 1974 to achieve full and equal access to justice for all vulnerable members of its community. Bet Tzedek is widely respected for its expertise on Holocaust reparations and has represented over 5,000 survivors in reparations claims, free of charge. Bet Tzedek litigated the landmark case *Grunfeder v. Heckler*, 748 F.2d 503 (9th Cir. 1984) and has been amicus in many Nazi-confiscated art cases, including *Republic of Austria v. Altmann*, 541 U.S. 677 (2004).

The **Center for the Study of Law & Genocide** at LMU Loyola Law School, Los Angeles was inaugurated in 2008, the 60th anniversary year of the adoption of the 1948 Convention on the Prevention and Punishment of the Crime of Genocide. The Center is uniquely the first of its kind at any U.S. law school to focus on legal aspects of, approaches to, and solutions for genocide and mass atrocities. Through intellectual research and practical advocacy, the Center focuses on the remedies and victims of genocide and mass atrocities, aiming to help survivors achieve justice.

---

*Amici curiae* **Holocaust Scholars** (Omer Bartov, Michael S. Bryant, Lauren Fielder, Peter Hayes, Michael J. Kelly, Stanley W. Levy, Robert J. Williams) are academic specialists on the history of the Holocaust, which ran from January 30, 1933 through at least May 9, 1945. *Amici* have an important interest in ensuring that the historical issues presented are understood fully and comprehensively, including so as to prevent misunderstandings and distortions of Holocaust history. *Amici* respectfully submit this brief to provide a precise and historically accurate context for assessing how the looting of art during the Holocaust—the comprehensive persecution and genocide of the Jews—unfolded.

The **Holocaust Survivors Foundation USA** is a national coalition of Holocaust survivors and survivor groups. HSF leaders have testified often before Congress about restitution issues, open Holocaust records and archives, and the widespread suffering that tens of thousands of survivors endured after the Holocaust due to the unique crimes of the Nazi regime.

**Jewish Federations of North America** are the largest collective Jewish philanthropy in North America and raise and distribute more than $2 billion annually and through planned giving and endowment programs to support flourishing Jewish communities domestically, in Israel, and in 70 countries around the world.

Through partnerships with NGOs, prosecutors, tribunals, and advocates, the **Justice for Atrocities Clinic at LMU Loyola Law School**, Los Angeles, seeks to hold perpetrators of mass atrocities legally accountable and work toward reparations for victims and survivors of international atrocity crimes—genocide, crimes against humanity, war crimes—and serious human rights abuses. The LJAC engages students in claims-based legal work in a wide range of domestic and international tribunals.

The **Simon Wiesenthal Center** is a leading international Jewish human rights organization founded in 1977 by Rabbi Marvin Hier. It is named in honor of the famed Holocaust survivor and Nazi-hunter, Simon Wiesenthal who devoted his entire life after World War II to bringing 1,100 Nazi War Criminals before the bar of justice. The SWC

confronts antisemitism, hate, and terrorism, supports the democratic state of Israel, defends the safety of Jews worldwide, and teaches the lessons of the Holocaust to new generations. The SWC is an accredited Non-Governmental Organization at the United Nations, UNESCO, OSCE, Organization of American States, Latin American Parliament, and Council of Europe. Headquartered in Los Angeles, SWC has offices in New York, Chicago, Miami, Toronto, Paris, Jerusalem, and Buenos Aires. Moriah Films is the two-time Academy Award®-winning film division of the SWC. The Museum of Tolerance, founded in 1993, is the SWC's educational arm.

*Amici* have previously submitted briefs supporting Plaintiffs in this case to the Supreme Court in 2021 and 2025, and to the U.S. Court of Appeals for the Ninth Circuit in 2023 and 2024. *Amici* now respectfully file this brief in support of Plaintiffs' motion for summary judgment.

## ARGUMENT

The express policies of California, the United States, and the international community all endeavor to return stolen works of art—and Nazi-looted art in particular—to its rightful owners. The restoration of the valuable Pissarro painting *Rue St. Honoré, Afternoon, Effect of Rain* (the "Painting") to the rightful Jewish heirs through the application of California law is consistent with and promotes Spain's current declared policy to acknowledge and reverse confiscations from the World War II period, i.e., return looted art to the original owners or their heirs.

Accordingly, *amici* urge this Court to grant summary judgment in favor of Plaintiffs and return the Painting to its rightful owners.

## I.    Transactions In Nazi-Looted Art Are Not Ordinary Commercial Transactions.

Renowned Holocaust historian Saul Friedlander explains:

> Only one group was hounded all over the continent, to the very last individual, to the very last day of German presence: the Jews. . . .
>
> [W]e are brought back to a peculiar brand of apocalyptic anti-

Semitism, the extraordinary virulence of which remains the only
way of explaining both the physical onslaught against *all* Jews
living within German reach and against *any* part of human culture
created by Jews."

Saul Friedländer, "Ideology and Extermination: The Immediate Origins of the Final
Solution," in *Lessons & Legacies: The Holocaust and Justice* vol. 5, 34 (Ronald Smelser,
ed. 2002) (italics original).[2] An important creator of such Jewish culture in 19th century
in Europe was the great Impressionist Jewish painter Jacob Abraham Camille Pissarro
(known as Camille Pissarro).

Part and parcel of the Third Reich's campaign of extermination and cultural
destruction was to loot Jews of their possessions. David M. Crowe, *The Holocaust:
Roots, History, and Aftermath* 120-125 (2022). Lilly Cassirer was not just an art collector
living in ordinary times, but a Jew who gave up her precious Pissarro to the Nazis to save
her life. If she had not, she would have been shipped off in a cattle car from Nazi
Germany to one of the Nazi concentration camps established in German-occupied
Poland, where she surely would have perished. Yitzhak Arad, *Belzec, Sobibor, Treblinka:
The Operation Reinhard Death Camps* (1987). If there were ever a case of dispossession
by duress, this is it. And Lilly Cassirer was by no means alone. The Reich's program of
dispossession was both widespread and systematic. The Oxford Handbook of Holocaust
Studies explains: "By the summer of 1939, the Third Reich reduced German Jews to
penury and pocketed at least 3 billion of the 7.1 billion reichmarks in property that they

---

[2] *See also* Timothy Snyder, *Black Earth: The Holocaust As History and as Warning* 327
(2015) ("The Holocaust was different from other episodes of mass killing or ethnic
cleansing because German policy aimed for the murder of every Jewish child, woman
and man.").

had registered the previous year." *The Oxford Handbook of Holocaust Studies* 544 (Peter Hayes and John K. Roth, eds., 2010).[3]

Jewish fire sales to art dealers were not routine, commercial transactions. Nazi officers were obsessed with art and wanted to accumulate it, which sent art market profiteers into a frenzy. Jonathan Petropoulos, *Art as Politics in the Third Reich* (1996). Imprisonment of family members was used as a bargaining chip for sales. Simon Goodman, *The Orpheus Clock* 191, 270 (2015). As for the middlemen profiteering, Hermann Göring did not care whether the art dealers were sympathizers or not—or even Jewish. Leonard Mosley, *The Reich Marshall* 263 (1974) (relating how Göring instructed part-Jewish dealer Bruno Lohse to deal with the "great many" Jewish art dealers and "forget about the racial background of the dealers with whom you come in contact").

Several years onward from the initial Nazi confiscation, Baron Hans Heinrich Thyssen-Bornemisza (the "Baron") was not just an ordinary buyer of a valuable painting. As this Court has found, the Baron had knowledge of the art market, pored over catalogues and art books before purchasing art works, and employed curators and other experts to assist him in evaluating the works he was interested in acquiring. Indeed, "[t]he Baron was undoubtedly aware that there had been massive looting of art by the Nazis, and it was 'generally known' that the Baron's family (although not the Baron specifically) had a history of purchasing art and other property that had been confiscated by the Nazis." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 2019 WL 13240413, *4 (C.D. Cal. 2019).

The Nazi confiscation of personal property, including works of art from Jews during the Holocaust, was a concerted plan of the Nazi government to annihilate all of Europe's 11 million Jews and eliminate all traces of their existence and influence from the world: Because Jews were considered subhuman and a cancer on humanity and civilization, Jews had to be stripped of all dignity, humanity, and property (real and

---

[3] *See also* Götz Aly, *Hitler's Beneficiaries: Plunder, Racial War, and the Nazi Welfare State* (2008).

personal, including artwork), and then exterminated. The Nazi government annihilated over 6 million Jews, including over 1.5 million Jewish children. The Nazi confiscation of personal property from Jews during the Holocaust, specifically including art, was part and parcel of the concerted Nazi plan of Jewish annihilation.[4] Moreover, the staggering number of artworks stolen from Jews—up to "600,000 artworks, close to 20% of which has been repeatedly resold [and] were never returned to that arts' rightful owners"[5]— enabled "[d]ealers, collectors, and museum curators . . . [to] snatch up looted art at 'bargain prices.'"[6]

## II. Application Of Spanish Law In This Case Contravenes The Express Intent Of California, The United States, And The International Community.

*Amici*, all of whom are experts in Holocaust restitution and reparations, file this brief in the belief that, beyond the indisputable moral dimension here, this case presents a legal issue on which the California legislature, the United States legislative and executive branches, and the international community are all aligned. These governmental entities have all recognized the importance of returning Nazi-looted art back to its rightful owners or their heirs.

---

[4] *See generally* Robert N. Proctor, *The Nazi War on Cancer* (1999); *see also* Saul Friedländer, *A Fundamental Crime*, K.: Jews, Europe, the XXIst Century (Sept. 9, 2021), at https://k-larevue.com/en/saul-friedlander-a-fundamental-crime/.

[5] Mark Labaton, *More than a 'Drop of Justice:' How Nazi-looted Art Cases Promote 'Transitional Justice' and Why these Cases Still Matter*, 13 Notre Dame J. of Int'l & Comp. L. 1, 3 (2023) (citing William D. Cohen, *Five Countries Slow to Address Nazi-looted Art, U.S. Expert Says*, N.Y. Times (Nov. 28, 2018), at https://www.nytimes.com/2018/11/26/arts/design/five-countries-slowto-address-nazi-looted-art-us-expert-says.html).

[6] *See* Labaton *supra* note 5, at 4 (citing, inter alia, Jennifer A. Kreder, *Fighting Corruption of the Historical Record: Nazi-Looted Art Litigation*, 61 Kan. L. Rev. 75 (2012) ("Museums knowingly acquired or accepted donations of paintings that were— or very likely were—stolen directly from Jews or sold by Jews under duress. Not caring does not equate to not knowing. The law dictates that such transfers were and still are void.")).

---

**A.      New CCP § 338(c)(6) Mandates that California Substantive Law Applies Here.**

The legal issue to be decided in this decades-long case is whether to apply California law, which does not allow a thief to pass good title, or Spanish law, which permits title to pass even for stolen goods when acquired by adverse possession. Which law applies determines ownership of the Painting which all parties agree was "legally confiscated" from Lilly Cassirer by Nazi Germany. Under California substantive law, the painting must be returned to the Cassirers.

The moral dimension of this case is undeniable. Concurring in the 2024 Ninth Circuit opinion, Judge Callahan lamented: "Sometimes our oaths of office and an appreciation of our proper roles as appellate judges require that we concur in a result *at odds with our moral compass*." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 89 F.4th 1226, 1246 (9th Cir. 2024) ("*Cassirer VII*") (Callahan, J., concurring) (emphasis added).

Reflecting Judge Callahan's sentiment, Judge Graber went further in her statement dissenting from the Ninth Circuit's denial of rehearing en banc, and demonstrated in detail the court's failure to credit California's laws and policies in its application of California's common law choice-of-law framework, as well as the implications of treating this case as if it simply involved an ordinary commercial transaction: "The world is watching. We should reach the result that is both *legally compelled and morally correct*. I am deeply disappointed by this court's decision, which has the unnecessary effect of perpetuating the harms caused by Nazis during World War II." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 107 F.4th 882, 884 (9th Cir. 2024) ("*Cassirer VIII*") (Graber, J., dissenting) (emphasis added).

Crucially, Judge Graber emphasized that Plaintiffs deserve their unjustly confiscated art back not just for moral reasons, but also as a matter of law: "The moral dimension of this case does not dictate the legal result. I agree fully with Judge Callahan that, if the law requires it, we must rule contrary to our moral compass. But, here, the law

points decidedly in the same direction as our moral compass. And the moral dimension of the case adds significant importance to our reaching the legally correct result." *Id*. at 892-93.

In 2022, the Supreme Court recognized that the Foreign Sovereign Immunities Act ("FSIA") did not bar Plaintiffs' action because, as the lower courts had held, "the Nazi confiscation of *Rue Saint-Honoré* brought [Cassirer's] suit against the Foundation within the expropriation exception" of the FSIA. *Cassirer v. Thyssen-Bornemisza Collection Found*., 596 U.S. 107, 112 (2022). In a concise opinion, the Supreme Court reversed the Ninth Circuit's choice-of-law analysis, which had incorrectly used the federal choice-of-law rule to conclude that Spanish law applied, and remanded for the application of California's choice-of-law rule. Although the Court did not decide the ultimate question of which jurisdiction's law applied, it noted that "the use of a federal choice-of-law rule in the courts below" could have "led to the Foundation keeping the painting when a private museum would have had to give it back." *Id*. at 116. In sum, the Court ruled: "The path of our decision has been as short as the hunt for *Rue Saint-Honoré* was long; our ruling is as simple as the conflict over its rightful owner has been vexed. A foreign state or instrumentality in an FSIA suit is liable just as a private party would be. See [28 U.S.C.] § 1606. That means the standard choice-of-law rule must apply. In a property-law dispute like this one, that standard rule is the forum State's (here, California's)—not any deriving from federal common law." *Id*. at 117.

Thereafter, the Ninth Circuit, purporting to apply California's common law choice-of-law test, again held that Spanish law applied. That opinion was flawed for a number of reasons, not the least of which is that it contravenes the collective will of the California legislature, the United States legislative branch, the United States executive branch, and the international community.

In the wake of the Ninth Circuit's *Cassirer VII* opinion, the California legislature enacted California Code of Civil Procedure ("CCP") § 338(c)(6), which provides that California substantive law applies in actions brought by California residents or their heirs

to recover stolen artworks held by museums, or covered by the federal Holocaust Expropriated Art Recovery ("HEAR") Act, i.e., Nazi-looted art. In its findings, the California legislature called out the *Cassirer VII* opinion for failing to acknowledge California's 2010 amendments to Section 338(c)(3), designed to correct the Ninth Circuit's 2010 opinion in *Von Saher v. Norton Simon Museum*, 592 F.3d 954 (9th Cir. 2010). The Legislative findings explain that in 2010, the Legislature rejected the "holding of the Ninth Circuit Court of Appeals in *Von Saher v. Norton Simon Museum* . . . that California law allowed theft victims' claims to be defeated based on 'constructive' rather than actual discovery; [and] amended Section 338 of the Code of Civil Procedure to allow an action to recover stolen art from a museum, gallery, auctioneer, or dealer to be filed within six years of actual discovery, and specifically defined 'actual discovery' to exclude 'any constructive knowledge imputed by law.'" Assem. Bill 2867, 2024-2025 Reg. Sess. (Cal. 2024), § 1(b).

The 2024 legislative findings further noted that the *Cassirer VII* "court applied Spain's law of acquisitive prescription or adverse possession, which is based on the principle of constructive notice that the California courts and legislature have rejected." Assem. Bill 2867, 2024-2025 Reg. Sess. (Cal. 2024), § 1(e).

The California legislature added that "[m]andating California substantive law in stolen art cases will discourage art theft and trafficking in stolen art, and will encourage integrity and diligence in the art market. Further, mandating California substantive law will draw a clear line of liability in litigation, eliminate costly defense tactics, and encourage settlements." Assem. Bill 2867, 2024-2025 Reg. Sess. (Cal. 2024), § 1(f).

**B.      The Legal and Moral Imperatives Align under California Law.**

The 2024 Ninth Circuit opinion cannot be divorced from the admonition of Supreme Court Justice Robert Jackson, Chief Counsel to the United States, in his opening remarks at the International Military Tribunal in Nuremberg, who explained that the Nazis "planned and intended conduct that involves *moral as well as legal wrong*." Hon. Robert H. Jackson, Opening Statement at The Int'l Military Tribunal (Nov. 21, 1945) at

---

¶ 13 (emphasis added). As the Nuremberg trials showed, the Nazis "organized plundering [of the Jews' possessions], planned it, disciplined it, and made it official just as [they] organized everything else, and then [they] compiled the most meticulous records to show that [they] had done the best job of looting that was possible under the circumstances." *Id*. at ¶ 140. Justice Jackson also aptly noted: "The refuge of the defendants can be only their hope that International Law will lag so far behind the moral sense of mankind that conduct which is crime in moral sense must be regarded as innocence in law. We challenge that proposition." *Id*. at ¶ 192.

This case tests whether our system is equal to Justice Jackson's challenge. As Justice Jackson anticipated, and Judge Graber showed, this is the case where the law and moral sense of humankind must stand together.

### C.    California Law Aligns with Federal Law and International Agreements Calling for Restitution of Nazi-Looted Art.

Much like California's recent law, the United States has passed several laws manifesting its intent to return Nazi-pillaged art to its lawful owners. For instance, Congress passed the Holocaust Victims Redress Act and stated its purpose as follows: "[C]onsistent with the 1907 Hague Convention, all governments should undertake good faith efforts to facilitate the return of private and public property, such as works of art, to the rightful owners in cases where assets were confiscated from the claimant during the period of Nazi rule and there is reasonable proof that the claimant is the rightful owner." Holocaust Victims Redress Act, PL 105-158, 112 Stat. 15 (Feb. 13, 1998).

Likewise, Congress enacted the Holocaust Expropriated Art Recovery Act ("HEAR Act"), recognizing that "the Nazis stole hundreds of thousands of artworks from museums and private collections throughout Europe. This systematic looting of the artwork and other cultural property of Jews and other persecuted groups—one of the Nazis' many crimes against humanity—has been described as the 'greatest displacement of art in human history.'" S. Rep. 114-394, 1-2 (Dec. 6, 2016). The express goals of the HEAR Act are "first, to ensure that laws governing claims to Nazi-confiscated art

---

and other property further United States policy as set forth in the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration; and, second, to ensure that claims to artwork and other property stolen or misappropriated by the Nazis are not unfairly barred by statutes of limitations but are resolved in a just and fair manner." *Id*. at 6.

The international community is also aligned on the importance of returning Nazi-looted art to its rightful owners. *See* Raymond J. Dowd, *Taking The Profit Out Of War: Why International Law Requires Restitution Of Nazi-Looted Art*, 94 Fordham L. Rev. Online (forthcoming March 2026) (on file with author). Both the United States and Spain, along with 42 other nations, have professed a commitment to restore Nazi-confiscated art to its rightful owners by signing the Washington Principles, which call on states to make "[e]very effort . . . to publicize art that is found to have been confiscated by the Nazis and not subsequently restituted in order to locate its pre-War owners or their heirs." *Washington Conference Principles on Nazi-Confiscated Art*, U.S. Dep't of State ¶ 5. Once the rightful owners or their heirs are identified, "steps should be taken expeditiously to achieve a just and fair solution." *Id*. at ¶ 8.

Additionally, both Spain and the United States, along with 44 other countries, have signed the Terezin Declaration, which reaffirms the Washington Principles. The Terezin Declaration recognizes "that art and cultural property of victims of the Holocaust (Shoah) and other victims of Nazi persecution was confiscated, sequestered and spoliated, by the Nazis, the Fascists and their collaborators through various means including theft, coercion and confiscation, and on grounds of relinquishment as well as forced sales and sales under duress, during the Holocaust era between 1933-45," and "all stakeholders to ensure that their legal systems or alternative processes . . . facilitate just and fair solutions with regard to Nazi-confiscated and looted art, and to make certain that claims to recover such art are resolved expeditiously and based on the facts and merits of the claims." *2009 Terezin Declaration on Holocaust Assets and Related Issues*, U.S. Dep't of State ¶ 3.

Indeed, in her concurrence, Judge Callahan noted that "Spain, having reaffirmed its commitment to the Washington Principles on Nazi-Confiscate Art when it signed the Terezin Declaration on Holocaust Era Assets and Related Issues, *should have voluntarily relinquished the Painting*." *Cassirer VII*, 89 F.4th at 1246 (Callahan, J. concurring) (emphasis added).

California law is now aligned with these "federal laws, federal policies, and international agreements prohibiting pillage and seizure of works of art and cultural property, and calling for restitution of seized property." Assem. Bill 2867, 2024-2025 Reg. Sess. (Cal. 2024), § 1(k).

## III.    CONCLUSION

In February 1933, less than one month after taking power, Adolf Hitler set forth the goal of the Third Reich:

> Whatever the present struggle may bring or *whatever its duration may be*, this will be its final outcome [the extermination of the Jews]. And only then, after the elimination of these parasites, the suffering world will attain a long period of understanding among nations and thus achieve true peace.[7]

California, the United States, and the international community all endeavor to return Nazi-looted art to its rightful owners. The restoration of the Painting to the very same Jewish heirs the Nazis considered to be "parasites" through the application of California law would finally bring an end to Hitler's vision and promote Spain's current efforts to acknowledge and rectify wrongs of its own authoritarian past.

///

///

///

///

---

[7] *See* Saul Friedländer, *The Years of Extermination: Nazi Germany and the Jews, 1939-1945*, at 594-95 (2008) (quoting Adolf Hitler) (emphasis added).

Accordingly, *amici* respectfully request that the Court grant summary judgment in favor of Plaintiffs and return the Painting to its rightful owners.

March 2, 2026                                    Respectfully submitted,

                                                */s/Benjamin G. Shatz*
                                                Benjamin G. Shatz
                                                BGShatz@DuaneMorris.com
                                                Duane Morris LLP
                                                865 S. Figueroa Street, Suite 3100
                                                Los Angeles, CA 90017-5450
                                                (213) 689-7439, Fax: (213) 403-5857
                                                Attorney for *Amici Curiae* American Jewish
                                                Committee, ART ASHES, Bet Tzedek,
                                                Holocaust Survivors Foundation USA,
                                                The 1939 Society, Simon Wiesenthal Center,
                                                and Jewish Federations of North America

                                                */s/Rajika L. Shah*
                                                Rajika L. Shah
                                                Rajika.Shah@LLS.edu
                                                Director, Loyola Justice for Atrocities Clinic,
                                                and Visiting Associate Professor
                                                LMU Loyola Law School
                                                919 Albany Street, Los Angeles, CA 90015
                                                (213) 736-8348, Fax: (213) 480-6805
                                                Attorney for Loyola Justice for Atrocities Clinic

                                                */s/Michael J. Bazyler*
                                                Michael J. Bazyler
                                                Bazyler@Chapman.edu
                                                Professor of Law and The 1939 Society Law
                                                Scholar in Holocaust and Human Rights Studies
                                                Dale E. Fowler School of Law,
                                                Chapman University
                                                1 University Drive, Orange, CA 92866-1005
                                                (310) 926-0149, Fax: (310) 829-6012
                                                Attorney for The 1939 Society
                                                and Holocaust Scholars

                                                */s/Stanley A. Goldman*
                                                Stanley A. Goldman
                                                Stanley.Goldman@LLS.edu
                                                Professor of Law and Founding Director,
                                                Center for the Study of Law and Genocide

1

LMU Loyola Law School
919 Albany Street, Los Angeles, CA 90015
(213) 736-1092, Fax: (213) 480-6805
Attorney for Center for the Study of Law
and Genocide

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX
## FULL LIST OF *AMICI CURIAE*

### **Organizations**

The 1939 Society

ART ASHES

American Jewish Committee

Bet Tzedek

Center for the Study of Law and Genocide, LMU Loyola Law School

The Holocaust Survivors Foundation USA

Jewish Federations of North America

Loyola Justice for Atrocities Clinic, LMU Loyola Law School

Samuel & Ida Kaiman Center for International Criminal Justice & Holocaust Studies at
    Creighton University School of Law

Simon Wiesenthal Center


### **Holocaust Scholars**[8]

Omer Bartov
Dean's Professor of Holocaust and Genocide Studies
Department of History, Vice Chair, Faculty Executive Committee
Faculty Fellow, Watson School of International & Public Affairs
Brown University


Michael S. Bryant
Professor of History and Legal Studies
Department of Politics, Law, & Society
Bryant University

---

[8] The positions taken in this brief by individual persons are those of *amici* alone and should not be attributed to any institution with which *amici* are or have been affiliated.

Lauren Fielder
Assistant Dean for Graduate and International Programs
Senior Lecturer
The University of Texas at Austin School of Law


Peter Hayes
Professor Emeritus; Professor of History and German,
Theodore Zev Weiss Holocaust Educational Foundation Professor of Holocaust Studies
Weinberg College of Arts & Sciences
Northwestern University


Michael J. Kelly, JD, LLM
Professor and Senator Allen A. Sekt Endowed Chair in Law
Director, Kaiman Center for Int'l Criminal Justice & Holocaust Studies
Creighton University School of Law


Stanley W. Levy
Founding National Director
Bet Tzedek Holocaust Survivors Justice Network

Robert J. Williams
CEO and Finci-Viterbi Chair, USC Shoah Foundation UNESCO Chair on Antisemitism and Holocaust Research, Advisor to the International Holocaust Remembrance Alliance

### Certificate of Compliance

Counsel of record for Amici, certifies that this brief contains **4,337** words, which complies with the 7,000 word limit of L.R. 11-6.1.

March 2, 2026                                        Respectfully submitted,

                                                     /s/Benjamin G. Shatz
                                                     Benjamin G. Shatz, BGShatz@DuaneMorris.com
                                                     Duane Morris LLP
                                                     865 S. Figueroa Street, Suite 3100
                                                     Los Angeles, CA 90017-5450
                                                     (213) 689-7439, Fax: (213) 403-5857
                                                     BGShatz@DuaneMorris.com
                                                     Attorney for *Amici Curiae* American Jewish
                                                     Committee, ART ASHES, Bet Tzedek,
                                                     Holocaust Survivors Foundation USA, Jewish
                                                     Federations of North America, The 1939 Society,
                                                     and Simon Wiesenthal Center