Thaddeus J. Stauber (Bar No. 225518)
tstauber@nixonpeabody.com
Aaron M. Brian (Bar No. 213191)
abrian@nixonpeabody.com
Zachary C. Osinski (Bar No. 358770)
zosinski@nixonpeabody.com
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071
Tel: (213) 629-6000
Fax: (213) 629-6001

Attorneys for Defendant
Thyssen-Bornemisza Collection Foundation

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID CASSIRER, AVA CASSIRER, and UNITED JEWISH FEDERATION OF SAN DIEGO COUNTY, a California non-profit corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> THYSSEN-BORNEMISZA COLLECTION FOUNDATION, an agency or instrumentality of the Kingdom of Spain, <br><br> Defendant. | Case No. 05-cv-03459-JFW (Ex) <br> Honorable John F. Walter <br><br> **DEFENDANT THYSSEN-BORNEMISZA COLLECTION FOUNDATION'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT ADDRESSING THE HOLOCAUST EXPROPRIATED ART RECOVERY ACT OF 2025** <br><br> Date: August 24, 2026 <br> Time: 1:30 p.m. <br> Crtrm: 7A |

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES..............................................1

INTRODUCTION ...................................................................................................1

UNDISPUTED FACTS RELEVANT TO THE FOUNDATION'S MOTION .......2

I.     Relevant Procedural Background....................................................................2

II.    Supplemental Statement of Undisputed Facts...............................................2

ARGUMENT ..........................................................................................................3

I.     The Presumption Against Extraterritoriality Constrains the 2025 HEAR Act's Application to This Case ......................................................................3

       A.     The Act Lacks a Clear Statement of Extraterritorial Intent .................4

       B.     The Act's Silence on Choice-of-Law Reinforces Its Domestic Limitation..............................................................................................6

       C.     This Case Involves an Impermissible Foreign Application of the Statute ...................................................................................................8

II.    International Law Principles Require a Limited Construction of the Act ......9

       A.     The *Charming Betsy* Canon Requires a Limited Construction of the Act ....................................................................................................9

       B.     Applying the Act to Displace Spanish Law Would Violate International Norms .................................................................................11

       C.     Selectively Displacing Components of Spain's Interlocking Civil Code Framework Would Violate the *Lex Rei Sitae* Rule and Create a "Hybrid Law" That Does Not Exist Under Spanish Law ....14

       D.     An Unrestrained Construction of the 2025 HEAR Act Could Result in Non-Enforcement of U.S. Judgments and International Discord ................................................................................................17

       E.     The Text of the 2025 HEAR Act Further Supports a Limited Construction .........................................................................................18

III.   An Overly Broad Construction of the Act Violates Article III.....................19

IV.    The Act Cannot Violate the Foundation's Due Process Rights ....................20

       A.     Retroactive Application of the 2025 HEAR Act Cannot Strip the Foundation of its Vested Property Rights.............................................21

       B.     The Fifth Amendment Limits Extraterritorial Application of Federal Substantive Law.......................................................................21

i

C. The Foundation Has Due Process Rights, as this Court has Found ... 22

D. An Overly Broad Construction of the Act Cannot Withstand Strict Scrutiny ................................................................................... 24

V. Spanish Substantive Law Continues to Govern and Forecloses Plaintiffs' Claims .......................................................................................... 25

A. The Foundation's Ownership of the Painting Rests on Substantive Property Rights, Not a "Defense Based on the Passage of Time" ..... 25

B. The 2025 HEAR Act Does Not Alter the Choice-of-Law Analysis ................................................................................... 26

VI. The Foundation is Immune From Suit Under the FSIA ............................. 27

VII. The 2025 HEAR Act Confirms That Section 338 Is Federally Preempted .. 29

CONCLUSION ................................................................................... 30

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abitron Austria GmbH v. Hetronic International, Inc.*,
600 U.S. 412 (2023) ....................................................................................... 3, 4, 8

*ARC Ecology v. U.S. Dep't of Air Force*,
411 F.3d 1092 (9th Cir. 2005) ............................................................................ 9

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989) .............................................................................. 27, 28, 29

*Arizona v. U.S.*,
567 U.S. 387 (2012) ........................................................................................... 29

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964) ........................................................................................... 12

*Bank Markazi v. Peterson*,
578 U.S. 212 (2016) ...................................................................................... 19, 20

*Bittner v. United States*,
598 U.S. 85 (2023) ............................................................................................. 18

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
581 U.S. 170 (2017) ........................................................................................... 17

*Boniface v. Viliena*,
145 F.4th 98 (1st Cir. 2025) .............................................................................. 18

*Campbell v. Holt*,
115 U.S. 620 (1885) ........................................................................................... 21

*Cancino Castellar v. McAleenan*,
388 F. Supp. 3d 1218 (S.D. Cal. 2019) ............................................................. 24

*Cassirer v. Kingdom of Spain*,
616 F.3d 1019 (9th Cir. 2010) (*en banc*).................................................... *passim*

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
737 F.3d 613 (9th Cir. 2013).............................................................................. 2

iii

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
    153 F. Supp. 3d 1148 (C.D. Cal. 2015) .................................................................. 2

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
    862 F.3d 951 (9th Cir. 2017) ................................................................................ 2

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
    2019 WL 13240413 (C.D. Cal. Apr. 30, 2019) ................................................... 2

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
    824 F. App'x 452 (9th Cir. 2020) ........................................................................ 2

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
    (No. 20-1566) (2021), 2021 WL 5513717, at *21-22 ........................................ 23

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
    596 U.S. 107 (2022) .............................................................................................. 2

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
    69 F.4th 554 (9th Cir. 2023) ................................................................................ 2

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
    89 F.4th 1226 (9th Cir. 2024) .............................................................................. 2

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
    107 F.4th 882 (9th Cir. 2024) .............................................................................. 2

*Dietz v. Bouldin*,
    579 U.S. 40 (2016) .............................................................................................. 20

*E.E.O.C. v. Arabian American Oil Co.*,
    499 U.S. 244 (1991) .............................................................................................. 7

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) .................................................................................... *passim*

*Federal Republic of Germany v. Philipp*,
    592 U.S. 169 (2021) ............................................................................................ 28

*Fuld v. Palestine Liberation Org.*,
    606 U.S. 1 (2025) ................................................................................................ 18

*Hartford Fire Ins. Co. v. California*,
    509 U.S. 764 (1993) (Scalia, J., dissenting) ..................................................... 7, 9

iv

*Jesner v. Arab Bank, PLC*,
    584 U.S. 241 ............................................................................. 12, 14

*Jones v. United States*,
    529 U.S. 848 (2000) ........................................................... 23, 24, 26

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013) ..................................................................... 4

*Lauritzen v. Larsen*,
    345 U.S. 571 (1953) .......................................................... 6, 10, 22

*Marbury v. Madison*,
    5 U.S. 137 (1803) ..................................................................... 19

*McCulloch v. Sociedad Nacional de Marineros de Honduras*,
    372 U.S. 10 (1963) ..................................................................... 9

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010) ........................................................ 3, 4, 5, 8

*Murray v. Schooner Charming Betsy*,
    6 U.S. 64 (1804) ........................................................ 9, 10, 11, 20

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) (plurality opinion) .................................... 19

*National Foreign Trade Council v. Natsios*,
    181 F.3d 38 (1st Cir. 1999), *aff'd sub nom.*, *Crosby v. Nat'l
    Foreign Trade Council*, 530 U.S. 363 (2000) ......................... 30

*Oetjen v. Cent. Leather Co.*,
    246 U.S. 297 (1918) ................................................................. 12

*Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*,
    808 F. Supp. 3d 609 (S.D.N.Y. 2025) .................................... 21

*Reno v. Flores*,
    507 U.S. 292 (1993) ................................................................. 24

*RJR Nabisco v. European Community*,
    579 U.S. 325 (2016) ........................................................... 3, 4, 9

v

*Schoeps v. Sompo Holdings, Inc.*,
    160 F.4th 815 (7th Cir. 2025), *cert. denied sub nom.*,
    2026 WL 1640875 (U.S. June 8, 2026).............................................................. 13

*Stern v. Marshall*,
    564 U.S. 462 (2011) ........................................................................................ 19

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) .................................................................................... 18, 19

*United States v. Atl. Rsch. Corp.*,
    551 U.S. 128 (2007) ........................................................................................ 18

*United States v. Davis*,
    905 F.2d 245 (9th Cir. 1990) ..............................................................20, 21, 22

*Von Saher v. Norton Simon Museum*,
    592 F.3d 954 (9th Cir. 2010) ......................................................................24, 29

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ........................................................................................24

*Yegiazaryan v. Smagin*,
    593 U.S. 533 (2023) .......................................................................................... 8

**Statutes**

Cal. Code Civ. Proc. § 338(c)(6) ................................................................2, 6, 29

Foreign Sovereign Immunity Act, 28 U.S.C. § 1330 *et seq.*............................*passim*

Holocaust Expropriated Art Recovery Act of 2025, Pub. L. No. 119-
    82, 140 Stat. 752 .........................................................................................*passim*

Holocaust Expropriated Art Recovery Act of 2016, Pub. L. No. 114
    308, 130 Stat. 1524 .....................................................................................*passim*

Spanish Civil Code, Articles 464, 1955, and 1956...............................14, 15, 16, 25

**Other Authorities**

Bill AB 2867, prepared for the Assembly Committee on Judiciary,
    April 27, 2024................................................................................................29

H.R. REP. 94-1487, 1976 U ......................................................................27, 28

Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 Harv. L. Rev. 1217, 1223 (1992) ...................... 21

Restatement (Third) of Foreign Relations Law of the United States § 403(1) (1986) ........................................................................................ 10

State Department Memorandum on Enforcement of Judgments, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl judicial-asst/Enforcement-of-Judgements.html ............................................................................................ 17

Terezin Declaration on Holocaust Era Assets and Related Issues, U.S. Dep't of State (June 30, 2009), https://www.state.gov/prague holocaust-era-assets-conference-terezin-declaration/ ............................... *passim*

Washington Conference Principles on Nazi-Confiscated Art, U.S. Dep't of State (Dec. 3, 1998), https://www.state.gov/washington conference-principles-on-nazi-confiscated-art/ ................................................ 3, 5

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant Thyssen-Bornemisza Collection Foundation ("Foundation") submits this supplemental brief, in further support of its motion for summary judgment, addressing the Holocaust Expropriated Art Recovery Act of 2025, Public Law 119-82, 140 Stat. 752 (the "2025 HEAR Act" or "Act").

**INTRODUCTION**

For over three decades, the Foundation has owned, possessed, publicly exhibited, and conserved Camille Pissarro's *Rue Saint-Honoré, après-midi, effet de pluie* (1897) ("Painting") in Madrid, Spain.  After a full trial, multiple Ninth Circuit appeals (including an *en banc* appeal), and review by the U.S. Supreme Court, the Foundation's vested property rights have been repeatedly confirmed.

On April 13, 2026, President Trump signed the Holocaust Expropriated Art Recovery Act of 2025.  The statute purports to eliminate certain defenses "based on the passage of time" and "non-merits discretionary" doctrines in claims to recover Nazi-looted art, and to expand the FSIA's expropriation exception for covered claims. The Foundation submits this supplemental brief to demonstrate that the 2025 HEAR Act does not alter the outcome of this case.

The Act does not—and constitutionally cannot—retroactively strip the Foundation of property rights that vested under Spanish law decades before the Act's passage.  Moreover, when properly construed, the Act does not displace the choice-of-law analysis that mandates the application of Spanish substantive law, as every court to examine this dispute has concluded.  And to the extent the Act is read more broadly, it violates the Due Process Clause of the Fifth Amendment, the presumption against extraterritoriality, the separation of powers doctrine, and principles of international law that U.S. courts are bound to respect.

Because the Act does not and cannot overcome these presumptions and constitutional defects, and because the Act has not altered the choice-of-law analysis that inescapably results in the application of Spanish law, Plaintiffs' claims fail as a

1

matter of law. For the reasons set forth below, and in the Foundation's prior briefing, the Court should accordingly grant summary judgment in the Foundation's favor.

## UNDISPUTED FACTS RELEVANT TO THE FOUNDATION'S MOTION[1]

### I.      Relevant Procedural Background[2]

After the parties fully briefed their pending motions for summary judgment in light of the 2024 amendments to California's Code of Civil Procedure § 338,[3] the U.S. Senate passed the Holocaust Expropriated Art Recovery Act of 2025 on December 10, 2025. The House passed the 2025 HEAR Act on March 16, 2026, and it was signed into law by the President on April 13, 2026. On its face, the Act specially modified the FSIA's expropriation exception—deeming any taking covered by section (a) of the Act sufficient to create jurisdiction under that exception—and purported to remove certain defenses and legal doctrines from consideration. After the 2025 HEAR Act was signed into law, this Court granted the parties' joint application for supplemental briefing to address the Act's potential applicability to this case. (*See* Dkt. 743.)

### II.      Supplemental Statement of Undisputed Facts

The following facts supplement the Foundation's previously filed statement of undisputed facts (Dkt. 693-1):

1.      The 2025 HEAR Act was signed into law on April 13, 2026. (Public Law 119-82, 140 Stat. 752.)

---

[1] The Foundation incorporates by reference the prior decisions in this case, which establish the undisputed facts and law of the case. *See Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010) (*en banc*); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613 (9th Cir. 2013); 153 F. Supp. 3d 1148 (C.D. Cal. 2015); 862 F.3d 951 (9th Cir. 2017); 2019 WL 13240413 (C.D. Cal. Apr. 30, 2019); 824 F. App'x 452 (9th Cir. 2020); 596 U.S. 107 (2022); 69 F.4th 554 (9th Cir. 2023); 89 F.4th 1226 (9th Cir. 2024); 107 F.4th 882 (9th Cir. 2024)

[2] The Foundation incorporates by reference the procedural history set forth in its prior summary judgment briefing. (*See* Dkt. 681-1; 691; 693; and 725.)

[3] The 2024 amendments to California's Code of Civil Procedure are referred to herein, collectively as "Section 338." *See* Cal. Code Civ. Proc. §§ 338(c)(6), 338.2

2

4.      The Act contains a "Rule of Construction" providing that "[n]othing in this Act shall be construed to create a civil claim or cause of action under Federal or State law." (*Id.* § 5(i).)

5.      The Act's "Purposes" are: (1) to "further United States policy as set forth in the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration"; and (2) to "ensure that claims to artwork . . . are not unfairly barred by statutes of limitations and other non-merits defenses but are resolved in a just and fair manner." (*Id.* § 3(1)-(2).)

6.      The Act is silent on choice-of-law and contains no provision altering the choice-of-law analysis that this Court and the Ninth Circuit previously applied.

7.      The Foundation's ownership of the Painting vested under Spanish law no later than June 21, 1999—more than twenty-six years before the Act's enactment—as this Court and the Ninth Circuit have repeatedly found. (*Cassirer, 153 F. Supp 3d at 1167*; *Cassirer, 89 F.4th 1226, 1230*.)

8.      No court has yet addressed the constitutionality of the 2025 HEAR Act.

## ARGUMENT

### I.      The Presumption Against Extraterritoriality Constrains the 2025 HEAR Act's Application to This Case

"It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco v. European Community, 579 U.S. 325, 335 (2016)*. The presumption against extraterritoriality "serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries . . . [and] reflects the more prosaic 'commonsense notion that Congress generally legislates with domestic concerns in mind.'" *Id.* at 335–36. Accordingly, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* at 335.

Under the two-step framework established in *Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010)*, and refined in *RJR Nabisco* and *Abitron Austria*

3

*GmbH v. Hetronic International, Inc.*, 600 U.S. 412 (2023), the Court first asks "whether the presumption against extraterritoriality has been rebutted" by "a clear, affirmative indication that [the statute] applies extraterritorially." *RJR Nabisco*, 579 U.S. at 337; *see also Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 126 (2013) (holding Alien Tort Statute ("ATS") lacked clear indication of extraterritorially despite the fact it purported to reach "'*any* civil action'" and that it "covers actions by aliens for violations of the law of nations"). If the presumption is not rebutted at step one, "the statute is not extraterritorial" and the Court must then determine "whether the case involves a domestic application of the statute" by ascertaining the statute's "focus" and asking whether "the conduct relevant to the statute's focus occurred in the United States[.]" *RJR Nabisco*, 579 U.S. at 337. "[I]f the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

## A. The Act Lacks a Clear Statement of Extraterritorial Intent

The 2025 HEAR Act contains no clear statement of extraterritorial intent. It does not declare that it applies to property located outside the United States, to conduct occurring entirely in foreign territory, or to the displacement of foreign substantive property law. As the Supreme Court has recognized, "[a]lthough 'a risk of conflict between the American statute and a foreign law' is not a prerequisite for applying the presumption against extraterritoriality where such a risk is evident, the need to enforce the presumption is at its apex." *RJR Nabisco*, 579 U.S. at 348 (internal citation omitted). Indeed, here, as has been firmly established through the Court's prior choice-of-law analysis, "the 'probability of incompatibility with the applicable laws of other counties is so obvious that if Congress intended such foreign application "it would have addressed the subject of conflicts with foreign laws and procedures."'" *Abitron*, 600 U.S. at 427 (quoting *Morrison*, 561 U.S. at 269).

DEFENDANT'S SUPPLEMENTAL BRIEF – 2025 HEAR ACT
Case No.: 05-cv-03459-JFW (Ex)

Instead of providing a clear statement of extraterritorial intent, the Act merely states that its "purpose" is to "further United States policy as set forth in the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration." 2025 HEAR Act § 3(1).  The Washington Principles[4], in turn, notably recognized that "***among participating nations there are differing legal traditions and that countries act within the context of their own laws***."   (Washington Principles, Intro.)   The Terezin Declaration [5] likewise emphasizes the need to "***tak[e] into account the different legal traditions***, [to] facilitate just and fair solutions with regard to Nazi-confiscated and looted art." (Terezin Declaration on Nazi Confiscated and Looted Art, para. 3.)  This statement, recognizing countries' differing legal traditions, is specifically referenced in the 2025 HEAR Act.  *See* Act § 2(5).  Because the Act has no clear statement of extraterritorial intent, and instead reflects and incorporates the importance of recognizing other countries' differing legal traditions, it must be interpreted as territorially limited. *Morrison*, 561 U.S. at 255 ("When a statute gives no clear indication of an extraterritorial application, it has none.").

Moreover, because the 2025 HEAR Act is primarily procedural and does not define the defenses it purports to eliminate—including adverse possession and laches—it creates vagueness and ambiguity when, as here, foreign law applies.  The Act's silence on choice-of-law exacerbates this problem, as do translation difficulties and fundamental differences between common law systems and code-based legal systems, like Spain's, where adverse possession is a substantive property right.[6]

---

[4] Washington Conference Principles on Nazi-Confiscated Art, U.S. Dep't of State (Dec. 3, 1998), https://www.state.gov/washington conference-principles-on-nazi-confiscated-art/ ("Washington Principles").

[5] Terezin Declaration on Holocaust Era Assets and Related Issues, U.S. Dep't of State (June 30, 2009), https://www.state.gov/prague holocaust-era-assets-conference-terezin-declaration/ ("Terezin Declaration").

[6] *See Cassirer*, 862 F.3d at 964 (holding "Article 1955 defense is a defense on the merits: that [the Foundation] has acquired title to the Painting based on Spain's property laws").

Moreover, what if the applicable law is French, Indian or Chinese: Would the outcome differ due to translation or legal system issues?  Absent a clear statement of extraterritorial intent or workable definitions of foreign legal concepts, the Act's ambiguities cannot be read in this case to selectively displace elements of Spanish or other foreign law that would otherwise provide the rule of decision.  The Act's purported elimination of certain defenses must therefore be read to apply only when American substantive law provides the rule of decision.

**B.    The Act's Silence on Choice-of-Law Reinforces Its Domestic Limitation**

"The purpose of a conflict-of-laws doctrine is to assure that a case will be treated n [*sic*] the same way under the appropriate law regardless of the fortuitous circumstances which often determine the forum." *Lauritzen v. Larsen*, 345 U.S. 571, 591-93 (1953) (holding "we can find no justification for interpreting the Jones Act to intervene between foreigners and their own law because of acts on a foreign ship not in our waters").  As the Ninth Circuit previously held in this case, "***HEAR does not alter the choice of law analysis*** this Court uses to decide which state's law will govern TBC's claim of title to the Painting based on acquisitive prescription." *Cassirer*, 862 F.3d at 964 (emphasis added).

Despite the heightened importance of choice-of-law analysis in FSIA cases (*see Cassirer*, 596 U.S. at 115-17), the Act does not provide any choice-of-law test or otherwise address the subject of potential conflicts with foreign laws, and expressly provides "[n]othing in this Act shall be construed to create a civil claim or cause of action under Federal or State law"—language carried over unchanged from the 2016 HEAR Act.  Likewise, the FSIA does not itself create a cause of action, and traditional choice-of-law analysis must therefore apply.  *Cassirer*, 596 U.S. at 113.

Although Congress was presumably aware of legislation like California's Section 338—which purports to provide a choice-of-law provision mandating the application of "California substantive law" in "any action brought by a California resident" (Cal. Code Civ. Proc. § 338(c)(6))—Congress did not address the subject

of conflicts with foreign laws and procedures in the 2025 HEAR Act. This omission is especially salient given the Supreme Court's decision in this case holding that "to determine the applicable substantive law . . . [this Court must use] whatever choice-of-law rule the court would use if the defendant were not a foreign-state actor, but instead a private party. Here, that means applying the forum State's choice-of-law rule, not a rule deriving from federal common law." *Cassirer*, 596 U.S. at 110.

As the Supreme Court has held, it is "reasonable to conclude that had Congress intended [the Act] to apply overseas, it would have addressed the subject of conflicts with foreign laws and procedures." *E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 256 (1991). The Supreme Court has also "repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to '*foreign* commerce' do not apply abroad." *Id.* at 251. Congress's failure to include any choice-of-law directive in the 2025 HEAR Act, despite the heightened importance of choice-of-law in FSIA and HEAR Act cases (*see Cassirer*, 596 U.S. at 114), confirms that the Act was not intended to displace foreign substantive law. Indeed, "***[n]o one would think federal law displaces the substantive rule of decision in [FSIA] suits***." *Cassirer*, 596 U.S. at 116 (emphasis added); *see also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815 (1993) (Scalia, J., dissenting) ("[I]n the absence of a contrary congressional direction," courts apply "principles of choice of law that are consonant with the needs of a general federal maritime law and with due recognition of our self regarding respect for the relevant interests of foreign nations[.]" "The controlling considerations" are "the interacting interests of the United States and of foreign countries") (quoting *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 382-83 (1959)).

Respect for foreign substantive law, as shown through the incorporated Washington Principles and Terezin Declaration, is thus integrated into the HEAR Act. Accordingly, the statute must be interpreted with these constraints in mind, and the presumption against extraterritoriality must apply. The choice-of-law analysis

7

that this Court and the Ninth Circuit previously conducted to determine that Spanish substantive law governs must still be followed and the Act's purported elimination of certain defenses must therefore be read to apply only when American substantive law provides the rule of decision. This is the only reading consistent with the presumption against extraterritoriality.

### C.   This Case Involves an Impermissible Foreign Application of the Statute

Under step two of the Supreme Court's extraterritoriality framework,[7] the Court determines whether "the conduct relevant to the statute's focus occurred in the United States, . . .[and thus] involves a permissible domestic application of the statute" or if "the relevant conduct occurred in another country, . . . [and therefore] involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Abitron*, 600 U.S. at 427 (cleaned up).

This case presents a prime example of an impermissible extraterritorial application. As the Ninth Circuit has already determined, the "sole contact to the dispute [is] the happenstance of the plaintiff's residence" and "none of the relevant conduct involving the Painting occurred in California." *Cassirer*, 89 F.4th at 1243 (emphasis added). The Painting has been located in Madrid, Spain for over three decades. The Foundation purchased the Painting in Spain in 1993, has exhibited it in Spain ever since, and its title to the Painting vested under Spanish law, with all relevant conduct and events occurring entirely within Spain's sovereign territory.

The Supreme Court has specifically cautioned against the extraterritorial application of U.S. substantive law to cases like this, where a plaintiff sues a foreign entity related to property or conduct in a foreign country. *See Morrison*, 561 U.S. at 283 n.11 (Stevens, J., concurring in judgment) (noting that in similar actions, where the plaintiff is foreign, "the odds of the [conduct] having a substantial connection to

---

[7] "'While "it will usually be preferable" to begin with step one, courts have the discretion to begin at step two 'in appropriate cases.'" *Yegiazaryan v. Smagin*, 593 U.S. 533, 542 n.2 (2023) (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407 (2018)).

8

the United States are low" and that "it might have been appropriate to incorporate one bright line into the Second Circuit's test, by categorically excluding such lawsuits from [Securities Exchange Act] § 10(b)'s ambit"); *RJR Nabisco*, 579 U.S. at 363 (Breyer, J., concurring) ("it has been argued that the [RICO] statute at issue does not extend to such a case").  Here, a claim was brought against an instrumentality of Spain regarding a painting physically present in Spain, which is also where the Painting was purchased, exhibited and where the Foundation's ownership rights vested. The negligible U.S. nexus to this dispute—the "fortuity" of Plaintiff's residence—cannot convert this fundamentally foreign dispute into a domestic application of the Act.

**II.      International Law Principles Require a Limited Construction of the Act**

Under the long-established *Charming Betsy* canon of statutory construction,[8] "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804). "'[T]he practice of using international law to limit the extraterritorial reach of statutes is firmly established in [the Supreme Court's] jurisprudence.'" *ARC Ecology v. U.S. Dep't of Air Force*, 411 F.3d 1092, 1103 (9th Cir. 2005) (citing *Hartford*, 509 U.S. at 818).  "This rule of statutory construction cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws.  It thereby helps the potentially conflicting laws of different nations work together in harmony—a harmony particularly needed in today's highly interdependent commercial world." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164–65 (2004).

**A.      The *Charming Betsy* Canon Requires a Limited Construction of the Act**

The Supreme Court has consistently applied the *Charming Betsy* canon to "avoid unreasonable interference with the sovereign authority of other nations." *F.*

---

[8] This canon is "'wholly independent' of the presumption against extraterritoriality." *Hartford*, 509 U.S. at 815.

*Hoffmann-La Roche Ltd.*, 542 U.S. at 4; *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 20–22 (1963); *Lauritzen,* 345 U.S. at 577 ("By usage as old as the Nation, . . . statutes have been construed to apply only to areas and transactions in which American law would be considered operative under prevalent doctrines of international law."); *The Apollon, Edon, Claim,* 22 U.S. 362, 370 (1824) ("The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens.  They can have no force to control the sovereignty or rights of any other nation, within its own jurisdiction . . . [and] must always be restricted in construction to places and persons, upon whom the Legislature have authority and jurisdiction.").

The text of the Act and the potential for interference with the sovereign authority of other nations requires a limited reading of the Act under this line of Supreme Court precedent.  First, the Act expressly notes the importance of "***taking into account the different legal traditions***" and is thus, at most, ambiguous as to whether it displaces foreign substantive property law.  (*See* Act § 2(5).)  Second, applying the Act to override Spanish property law would violate international law norms regarding prescriptive jurisdiction.  *See* Restatement (Third) of Foreign Relations Law of the United States § 403(1) (1986) ("a state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable").)  And third, reading the Act's provisions which purport to eliminate certain defenses based on the passage of time to apply only in cases governed by American substantive law is not only possible, but the most natural reading of the statute.  *F. Hoffmann-La Roche Ltd.*, 542 U.S. at 165 ("'act of congress ought never to be construed to violate the law of nations ***if any other possible construction remains***.'") (emphasis added)).

In *F. Hoffmann-La Roche Ltd,* a unanimous Supreme Court applied the *Charming Betsy* canon to narrow the reach of the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") in a foreign antitrust dispute, holding the

Sherman Act does *not* reach claims arising out of foreign anticompetitive conduct. The Court reasoned that applying U.S. antitrust law in such circumstances would create serious friction with the regulatory choices of other sovereign nations—many of which have their own antitrust regimes—and would "threaten interference with a foreign nation's ability to maintain the integrity of its own antitrust enforcement system." *Id.* at 165.  After citing *Charming Betsy*, the Court emphatically explained:

> No one denies that America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs. [. . .] [Then] why is it reasonable to apply those laws to foreign conduct *insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim?* Like the former case, application of those laws creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs.

*Id.* at 165 (emphasis original).  Next, in holding the FTAIA did not apply to plaintiffs' claim based solely on foreign conduct, the Supreme Court concluded:

> Congress might have hoped that America's antitrust laws, so fundamental a component of our own economic system, would commend themselves to other nations as well. ***But, if America's [regulatory] policies could not win their own way in the international marketplace for such ideas, Congress, we must assume, would not have tried to impose them, in an act of legal imperialism, through legislative fiat.***

*Id.* at 169 (emphasis added).

The same is true here.  Other jurisdictions, including Spain, have substantive property laws that are different from our own.  The Washington Principles and Terezin Declaration, incorporated into the Act's Purpose, pointedly remind us to recognize such differing legal traditions in these types of disputes.  The Court must accordingly construe the Act to operate within the bounds of established rules of statutory construction and international law, applying the Act's provisions which purport to eliminate substantive legal doctrines only when American substantive law provides the rule of decision.

**B. Applying the Act to Displace Spanish Law Would Violate International Norms**

The *lex rei sitae* rule—that property rights are governed by the law of the

11

DEFENDANT'S SUPPLEMENTAL BRIEF – 2025 HEAR ACT
Case No.: 05-cv-03459-JFW (Ex)

situs—is among the oldest and most universally recognized principles in private international law. *See generally Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 454 (1964) ("The basic rule that the law of the situs of property is the proper law to be applied in determining title in other forums, whether styled a rule of private international law or domestic conflict of law, is rooted in concepts firmly embedded in a consensus of nations on territorial sovereignty.") (White, J., dissenting). And as the Supreme Court has instructed, "'[e]very sovereign state is bound to respect the independence of every other sovereign state . . .'" and the "principle that the conduct of one independent government cannot be successfully questioned in the courts of another is as applicable to a case involving the title to property brought within the custody of a court, such as we have here, as it was held to be to the cases cited, in which claims for damages were based upon acts done in a foreign country, for it rests at last upon the highest considerations of international comity and expediency." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303 (1918) (holding that denying title to property would have required declaring that Mexican government's prior seizure of the property, within its own territory, was legally ineffective).

Pursuant to these principles of international law, the Court should construe the Act to avoid displacing the sovereign regulatory authority of Spain over property bought by its own agency or instrumentality within its own borders. As the Supreme Court has instructed, "federal courts must exercise 'great caution' before recognizing new forms of liability under [a federal statute]." *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 254; 265 (2018) (interpreting the ATS to find that "absent further action from Congress, it would be inappropriate for courts to extend ATS liability to foreign corporations" and reasoning, in part, that the "ATS is 'strictly jurisdictional' and does not by its own terms provide or delineate the definition of a cause of action for violations of international law").

In *Jesner*, the Court emphasized that "federal courts must exercise 'great caution' before recognizing new forms of liability under [a federal statute]" or

otherwise creating new substantive rights under federal common law. *See id.* at 265 ("That the ATS implicates foreign relations 'is itself a reason for a high bar to new private causes of action for violating international law.'"); *see also id.* (noting that "doing so is even more important in the realm of international law, where 'the general practice has been to **look for legislative guidance before exercising innovative authority over substantive law**'") (emphasis added).[9]

Here, the Act expressly provides that "[n]othing in this Act shall be construed to create a civil claim or cause of action under Federal or State law." Likewise, the FSIA—Plaintiffs' purported basis for jurisdiction in this case—"was **never 'intended to affect the substantive law determining the liability of a foreign state or instrumentality'** deemed amenable to suit." *Cassirer,* 596 U.S. at 114 (emphasis added). And as the Supreme Court previously held, the FSIA "requires the use of California's choice-of-law rule—because that is the rule a court would use in comparable private litigation." *Id.* at 115. Accordingly, Plaintiffs claims "**turn only on state or foreign property law, with no substantive federal component**." *Id.*

Despite these prior holdings interpreting the scope of the FSIA and HEAR with respect to Plaintiffs' claims—and despite the above established principles of international law that must inform this Court's construction of a federal statute—the 2025 HEAR Act did nothing to supplant the choice-of-law analysis that this Court and the Ninth Circuit previously found mandates application of Spanish law. *See Cassirer,* 89 F.4th at 1235-45. Nor did the legislature otherwise speak with the requisite clarity to support an interpretation of the 2025 HEAR Act that would justify the "unreasonable interference with the sovereign authority of other nations" (*F. Hoffmann-La Roche Ltd.*, 542 U.S. at 164) that would result from interpreting the

---

[9] *See also Schoeps v. Sompo Holdings, Inc.*, 160 F.4th 815 (7th Cir. 2025), *cert. denied sub nom.*, 2026 WL 1640875 (U.S. June 8, 2026) (federal court has no authority to imply a remedy unless that remedy is predicated on cognizable cause of action).

13

Act to displace Spanish substantive law, the *lex rei sitae* rule, and the law of any other nation anytime a claim is brought pursuant to the Act. Construing the Act in a manner that would, in essence, "recogniz[e] new forms of liability under [federal law]"—by disregarding Spanish substantive law and retroactively stripping the Foundation of its vested property rights—would be contrary to these long-established principles of international law; Congress simply hasn't spoken with the requisite clarity for this Court to exercise such "innovative authority over substantive law." *Jesner*, 584 U.S. at 265.

Reading the 2025 HEAR Act to override these nearly-universally recognized principles of international law—by retroactively invalidating property rights lawfully acquired under the law of the situs—would also place the United States at odds with the international legal order and invite reciprocal disregard of U.S. property law abroad. As the Supreme Court asked rhetorically in *F. Hoffmann-La Roche Ltd.*, 542 U.S. at 165: "Why should American law supplant, for example, Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers from anticompetitive conduct engaged in significant part by Canadian or British or Japanese or other foreign companies?" The answer, of course, is American law should not supplant foreign substantive law in such circumstances, as this Court and the Ninth Circuit have repeatedly held that such an outcome would significantly impair Spain's sovereign interest in "ensuring its laws will predictably regulate conduct that occurs within its border." *Cassirer*, 89 F.4th at 1242.

**C. Selectively Displacing Components of Spain's Interlocking Civil Code Framework Would Violate the *Lex Rei Sitae* Rule and Create a "Hybrid Law" That Does Not Exist Under Spanish Law**

If the Court were to read and apply the 2025 HEAR Act to selectively erase certain doctrines while leaving others intact, it would not merely be applying Spanish law in a modified form—it would invent an entirely new system of property law that exists nowhere in the Spanish Civil Code. Given the interlocking nature of the

14

Spanish Civil Code framework that governs this dispute, such an application of Spanish law in this case would be in direct violation of the *lex rei sitae* rule.

The Spanish Civil Code follows the Roman model to govern the process of transfer of property under Spanish law.[10]  The framework is not a series of disconnected provisions, but rather a carefully balanced legal framework that the Ninth Circuit held "must be read in its entirety" and "taken as a whole" (*Cassirer, 862 F.3d at 961, n.8; 981*): (i) Article 464 establishes the general rule for possession of movable property[11]; (ii) Article 1955 then provides the prescriptive "cure" that allows possession to ripen into ownership over time[12]; and (iii) Article 1956, in turn, balances Article 1955 by imposing heightened conditions where the possessor is a thief, accomplice, or accessory (Tolsada Dec. at ¶¶ 14-16).  The extinctive prescription rules of Article 1962 further reinforce this interlocking structure, providing that "'[a]ctions in rem on movable assets expire after six years from the loss of possession . . .' [which] refers to Article 1955 and the latter to Article 464 of the Civil Code for the case of 'public sale and those of robbery or theft.'"  (*Id.* ¶ 57.)

As Professor Tolsada explained, the Spanish legislature did not arrive at this framework accidentally.  Historically, under Roman law (on which Spanish law was modeled prior to the Civil Code), there was no way of curing certain title defects, either through the passage of time or otherwise.  In enacting the Civil Code of 1889, the legislature "wanted to end this endless uncertainty, allowing even the possessor with such a flawed title to acquire property."[13]  The Spanish Civil Code accordingly added elementary requirements—including Article 464's exception for "property

---

[10] *See* Direct Testimony Declaration of Mariano Yzquirdo Tolsada, November 20, 2018 ("Tolsada Dec."), at ¶ 12.

[11] *Cassirer*, 862 F.3d at 961, n.8 ("'Possession of movable property acquired in good faith is equivalent to title.  Notwithstanding the foregoing, any person who has lost movable property or has been deprived of it illegally may claim it from its possessor.'") (quoting Civil Code Article 464).

[12] *See* Tolsada Dec. at ¶ 13 (noting the Spanish doctrine of "usucapio exists 'just to purify that defective tradition, as a subsidiary way of acquiring the property'").

[13] Tolsada Dec. ¶ 17.

15

"deprived of [] illegally", the prescriptive cure of Article 1955, and the heightened conditions of Article 1956—which collectively form inseparable components of a single, deliberately calibrated legislative balance.

If this Court were to read the 2025 HEAR Act as Plaintiffs will undoubtably urge—that is, as forcing the application of Article 464's provision for property "deprived of [] illegally" while legislatively erasing the prescriptive cure of Article 1955 and the extinctive prescription of Article 1962—the Court would no longer be applying Spanish law.  It would be applying a mutant, hybrid system that no Spanish legislature ever enacted, that no Spanish court has ever recognized, and that exists nowhere in the Spanish Civil Code.  This is precisely the result that the Ninth Circuit foreclosed when it held that "the Spanish Civil Code must be read in its entirety, including those articles which provide that title to chattels may pass through qualified, extended possession, such as Article 1955." *Cassirer*, 862 F.3d at 961, n.8.  Reading Article 464 in isolation, while erasing the very provisions the Spanish legislature enacted to balance it, would amount not just to a fundamental misreading and misapplication of Spanish law, but rather a rewriting of the careful balance created by Spain's legislature in enacting its Civil Code.

Not only would such an interpretation of the Act violate the *lex rei sitae* rule and foregoing principles of international law, it is also precisely the kind of "legal imperialism" that the Supreme Court has consistently rejected. *F. Hoffmann-La Roche Ltd.*, 542 U.S. at 169.  The Spanish legislature made a sovereign determination about how to balance the competing interests of dispossessed owners and good-faith possessors of movable property when property disputes arise within its own borders. That determination is reflected in the interlocking text of Articles 464, 1955, 1956, and 1962.  Whether or not Congress would have struck the same balance is beside the point—"if America's [regulatory] policies could not win their own way in the international marketplace for such ideas, Congress, we must assume, would not have tried to impose them, in an act of legal imperialism, through legislative fiat." *Id.*

16

### D. An Unrestrained Construction of the 2025 HEAR Act Could Result in Non-Enforcement of U.S. Judgments and International Discord

In amending an otherwise procedural law that established a statute of limitations, Congress not only expanded jurisdiction over foreign sovereigns for a select category of claims—retroactively making it easier to hale foreign sovereigns and their agencies and instrumentalities into U.S. courts—but simultaneously purported to eliminate certain "non-merits discretionary bases for dismissal", including the act of state doctrine, international comity, and *forum non conveniens*. Historically, these doctrines have served as essential protections for foreign sovereigns when haled into U.S. courts, especially given the more liberal approach to foreign sovereign immunity than most other nations. Despite this more liberal approach, "a basic objective of the FSIA"—the only source of jurisdiction over foreign sovereigns and their agencies and instrumentalities—"is to follow international law principles, namely, that granting foreign sovereigns immunity from suit both recognizes the 'absolute independence of every sovereign authority' and helps to 'induc[e]' each nation state, as a matter of 'international comity,' to 'respect the independence and dignity of every other[.]'" *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 171 (2017).

Removing doctrines meant to safeguard respect for other nations will interfere with broader foreign relations and could erode foreign courts' willingness to enforce U.S. judgments. The State Department has identified the importance of comity in having U.S. judgments enforced by foreign courts: "In consequence, absent a treaty, whether the courts of a foreign country would enforce a judgment issued by a court in the United States depends upon the internal laws of the foreign country and international comity."[14] More recently, the Federal Government itself has questioned whether extending jurisdiction over entirely foreign disputes is constitutionally

---

[14] *See* State Department Memorandum on Enforcement of Judgments, available at https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl judicial-asst/Enforcement-of-Judgements.html

permitted. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 18 (2025) ("The Government cautions that [this maximalist theory of federal jurisdiction] is 'not easily confirmed as a historical matter,' and points to 'strong policy reasons . . . against reaching' it, including the possibility that other nations might respond in kind by haling Americans into their courts under expansive theories of jurisdiction.").

If U.S. courts were to apply the Act to override Spanish law or the law of any other nation with respect to property disputes and conduct taking place wholly within the territorial borders of foreign sovereigns, the possibility for international discord is obvious. Fortunately, a more limited construction is not only possible, but required "' . . . if any other possible construction remains.'" *See F. Hoffmann-La Roche Ltd.,* 542 U.S. at 165; *see also* Act § 6 (providing a severability provision for any "invalid" provisions of the Act). The Court should accordingly avoid sparking reciprocal denials of international comity and should construe the Act in a manner consistent with these international principles.

**E. The Text of the 2025 HEAR Act Further Supports a Limited Construction**

The text of the Act further requires a limited reading. "In construing a statute, courts also must consider 'Congress's statement of purpose.'" *Boniface v. Viliena,* 145 F.4th 98, 125 (1st Cir. 2025); *see also Bittner v. United States*, 598 U.S. 85, 98, n.6 (2023) ("'A preamble, purpose clause, or recital is a permissible indicator of meaning.'"). "It is [also] 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001); *see also United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 135 (2007) ("Statutes must 'be read as a whole'").

The Act's "Purpose" incorporates the Washington Principles, Terezin Declaration, and Holocaust Victims Redress Act—each of which expressly recognize "differing legal traditions" and the principle that "states act within the context of their own laws." 2025 HEAR Act § 3(1). The only other stated "Purpose" of the Act is

18

to "permit claims . . . to be decided on the merits." *Id.* §§ 3(2); 2(8). As the Ninth Circuit has repeatedly recognized in this case, "Article 1955 defense is a defense on the merits: that [the Foundation] has acquired title to the Painting based on Spain's property laws." *Cassirer, 862 F.3d at 964*. A construction of the Act that sweeps aside "differing legal traditions"—like Spain's Civil Code and otherwise applicable foreign substantive law—would prevent this case from being decided "on the merits" pursuant to Spain's property laws and would ignore entirely the Act's own stated Purposes, rendering these provisions "superfluous, void, or insignificant," contrary to "cardinal principle[s] of statutory construction." *TRW, 534 U.S. at 31*.

## III.    An Overly Broad Construction of the Act Violates Article III

Article III "mandates that '[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.'" *Stern v. Marshall, 564 U.S. 462, 482 (2011)* (quoting Article III, § 1, Constitution). Article III is an "inseparable element of the constitutional system of checks and balances" that "'both defines the power and protects the independence of the Judicial Branch.'" *N. Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 58 (1982)* (plurality opinion). "[T]he Framers considered it essential that 'the judiciary remain[] truly distinct from both the legislature and the executive'" and that "'"there is no liberty, if the power of judging be not separated from the legislative and executive powers."'" *Stern, 564 U.S. at 483* (quoting The Federalist No. 78, p. 466 (C. Rossiter ed. 1961)).

"It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison, 5 U.S. 137, 177 (1803)*. Thus, a statute that removes all defenses a party has previously used to defend an action, so as to pre-ordain the outcome regardless of the facts, violates Article III. As Chief Justice Roberts warned, such a law "violates the separation of powers … [n]o less than if [Congress] had passed a law saying 'respondents win[.]'" *Bank Markazi v. Peterson, 578 U.S. 212, 237 (2016)* (Roberts, C.J., dissenting).

19

Plaintiffs will undoubtably argue for such an impermissible and overly broad reading of the 2025 HEAR Act. However, the Act cannot be construed to dictate outcomes regardless of the facts. The Court must be permitted to fulfill its exclusive function to interpret the law using its well-established tools of statutory construction, including the foregoing *Charming Betsy* canon and presumption against extraterritoriality. To the extent the Act is read to retroactively expand jurisdiction to adjudicate this dispute, remove otherwise applicable defenses and substantive legal doctrines, and prevent the Court from dismissing this case based on its inherent authority to manage its docket,[15] the Act violates Article III. A "hypothetical" construction of the Act that would purport to prevent this Court from exercising its inherit authority to decide or not decide cases, and then dictate how such cases must be decided regardless of the applicable law, is nothing short of a legislative command that "Smith wins" – "of course, [such a] hypothesized law would be invalid[.]" *Bank Markazi*, 578 U.S. at 231. Because such an overly broad interpretation of the Act violates Article III, a more restrained construction is constitutionally required.

## IV.   The Act Cannot Violate the Foundation's Due Process Rights

As the Ninth Circuit has explained, "Only two restrictions exist on giving extraterritorial effect to Congress' directives. We require Congress make clear its intent to give extraterritorial effect to its statutes. And secondly, as a matter of constitutional law, we require that application of the statute to the acts in question not to violate the due process clause of the fifth amendment." *United States v. Davis*, 905 F.2d 245, 248 (9th Cir. 1990) (internal citation omitted).

---

[15] *See Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) ("this Court has long recognized that a district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases'").

**A. Retroactive Application of the 2025 HEAR Act Cannot Strip the Foundation of its Vested Property Rights**

The Supreme Court established in *Campbell v. Holt*, 115 U.S. 620, 623 (1885), that legislation which retroactively strips vested property rights violates the Due Process Clause:

> [I]n an action to recover real or personal property, where the question is as to the removal of the bar of the statute of limitations by a legislative act passed after the bar has become perfect, that such act deprives the party of his property without due process of law. The reason is that, by the law in existence before the repealing act, the property had become the defendant's. Both the legal title and the real ownership had become vested in him[.]

The Court has already applied this principle in this case, holding "to the extent that application of amended California Code of Civil Procedure § 338(c) would result in depriving the Foundation of its ownership of the Painting, the statute violates the Foundation's due process rights." *Cassirer*, 153 F. Supp. 3d at 1168. That holding was grounded on the undisputable fact that under Spanish law, "the Foundation acquired ownership of the Painting as of June 21, 1999, six years after it purchased the Painting." *Id.* at 1167.

If a state statute cannot retroactively strip the Foundation's vested property rights under the Fourteenth Amendment's Due Process Clause, neither can a federal statute do so under the Fifth Amendment. *Davis*, 905 F.2d at 248.

**B. The Fifth Amendment Limits Extraterritorial Application of Federal Substantive Law**

Not only does retroactively stripping vested property rights violate the Fifth Amendment Due Process Clause, but that same clause limits the extraterritorial application of federal law. *Davis*, 905 F.2d at 248; *see also* Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 Harv. L. Rev. 1217, 1223 (1992) ("the Fifth Amendment Due Process Clause limits federal actions in much the same manner that the Fourteenth Amendment Due Process Clause limits state actions"); *Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings*

21

*Ltd.*, 808 F. Supp. 3d 609, 619 (S.D.N.Y. 2025) (applying the Second Circuit's "sufficient nexus" test to determine "'determine[] whether the extraterritorial application of federal criminal law comport[s] with constitutional due process' under the Fifth Amendment"). As the Supreme Court recognized in *Lauritzen*, 345 U.S. 590-91: "We have held it a denial of due process of law when a state of the Union attempts to draw into control of its law otherwise foreign controversies, on slight connections, because it is a forum state." The same principle constrains federal extraterritorial legislation. *See*, *e.g.*, *Davis*, 905 F.2d at 248.

Due process requires, at a minimum, a sufficient nexus between the United States and the conduct, parties, or effects regulated by the proposed legislation. Retroactive application of the Act to strip a foreign sovereign's instrumentality of property rights acquired under its own domestic law and entirely within Spain's borders would violate the Fifth Amendment and the Foundation's due process rights. This is especially true, whereas here, "none of the relevant conduct occurred in California" or anywhere in the United States for that matter (*Cassirer*, 89 F.4th at 1243), the Painting is physically located in Spain, the Foundation's acquisition, possession and display of the Painting occurred entirely in Spain, and the Foundation's title vested under Spanish law twenty-six years before the 2025 HEAR Act's passage. Applying the Act extraterritorially to strip the Foundation—an agency and/or instrumentality of the Spanish government—of its vested property rights is plainly a violation of due process.

**C. The Foundation Has Due Process Rights, as this Court has Found**

The Foundation, as an agency or instrumentality of Spain, is entitled to due process protections if subject to suit under the FSIA. Section 1606 of the FSIA mandates that a foreign state "be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. The Supreme Court, in this case, has confirmed what this means: "So when a foreign state is not immune from suit, it is subject to the same rules of liability as a private party. Which

22

is just to say that the substantive law applying to the latter also applies to the former . . . ensur[ing] that a foreign state, if found ineligible for immunity, must answer for its conduct just as any other actor would." *Cassirer*, 596 U.S. at 114.

Moreover, this Court has already recognized that the Foundation possesses due process rights sufficient to challenge retroactive legislation that threatens its vested property interests when it found a prior version of Section 338 "would result in depriving the Foundation of its ownership of the Painting, [and therefore] the statute violates the Foundation's due process rights." *Cassirer*, 153 F. Supp. 3d at 1168. The United States Solicitor General, in its 2021 *Amicus* Brief to the Supreme Court, also recognized that constitutional safeguards—including the Due Process Clause—apply in FSIA cases to protect foreign sovereigns and their instrumentalities.[16]

Denying Defendants the due process protections that are available to private litigants would violate Section 1606's mandate of equal treatment. Further, the 2025 HEAR Act should not and cannot be read to force application of American substantive law on this otherwise entirely foreign controversy, and then retroactively strip the Foundation's vested property rights by removing substantive provisions of Spanish property law; construing and applying the 2025 HEAR Act to retroactively extinguish the Foundation's ownership rights—which vested under Spanish law no later than 1999—would violate the Foundation's due process rights. *Cassirer*, 153 F. Supp. 3d at 1168. To avoid striking the Act as unconstitutional, the Court must therefore adopt a more limited construction of the Act. *See Jones v. United States,* 529 U.S. 848, 857 (2000) ("'where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter'").

---

[16] *See* Brief for the U.S. as Amicus Curiae in Cassirer v. Thyssen-Bornemisza Collection Foundation (No. 20-1566) (2021), 2021 WL 5513717, at *21-22.

**D. An Overly Broad Construction of the Act Cannot Withstand Strict Scrutiny**

Were the Court to interpret and apply the 2025 HEAR Act to infringe a "fundamental" liberty interest—such as the Foundation's vested property rights—the Act must be "narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997); *Reno v. Flores*, 507 U.S. 292, 302 (1993); *Cancino Castellar v. McAleenan*, 388 F. Supp. 3d 1218, 1229 (S.D. Cal. 2019) ("The Fifth Amendment provides that '[n]o person shall . . . be deprived of life, liberty, or property, without due process of law' . . . [and] 'forbids the government to infringe certain "fundamental" liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest'").

This Court previously applied strict scrutiny to California's analogous legislation and found "no persuasive argument that the statute is narrowly tailored to serve a compelling state interest." *Cassirer*, 153 F. Supp. 3d at 1168.  The Court must reach the same conclusion here, as the 2025 HEAR Act, if construed based on Plaintiffs' position, would upset established international principles and the careful balance struck by Congress when it originally enacted the FSIA.  If the 2025 HEAR Act is construed as a blanket elimination of entire categories of substantive legal doctrines—with no case-by-case consideration of the property rights at issue, whether the possessor acted in good faith, whether the claim has any genuine U.S. nexus, or whether any other jurisdiction, like Spain, has a greater interest in having its law applied—it is not narrowly tailored.  Moreover, to upset these long-standing principles of foreign and international law solely to serve a small sub-set of potential claimants and create a "friendly forum" to litigate such claims belies any argument that the Act is narrowly tailored.  *See*, *e.g.*, *Von Saher v. Norton Simon Museum*, 592 F.3d 954, 965 (9th Cir. 2010).

The Court must avoid construing the Act in a manner that violates such established international and constitutional principles (*see Jones*, 529 U.S. at 857).

24

But if it were to adopt such an expansive reading, the Court must strike the Act as unconstitutional because it is not narrowly tailored to serve a compelling interest.

**V.    Spanish Substantive Law Continues to Govern and Forecloses Plaintiffs' Claims**

The Ninth Circuit has repeatedly held—applying both federal common law and California's choice-of-law test—that Spanish law governs this dispute.  After remand from the Supreme Court, the Ninth Circuit again concluded that Spanish law governs, finding Spain has the predominant interest because "the relevant conduct (TBC's purchase of the Painting and its display in the museum) occurred in Spain" and "California's governmental interest rests solely on the fortuity that Claude Cassirer moved to California in 1980." *Cassirer*, 89 F.4th at 1236, 1242.[17]

**A. The Foundation's Ownership of the Painting Rests on Substantive Property Rights, Not a "Defense Based on the Passage of Time"**

Under Article 1955 of the Spanish Civil Code, "'Ownership of movable property prescribes by three years of uninterrupted possession in good faith. Ownership of movable property also prescribes by six years of uninterrupted possession, without any other condition[.]'" *Cassirer*, 2019 WL 13240413, at 19* (quoting Article 1955).  This Court found, after a full trial, that the Foundation has possessed the Painting "as owner publicly, peacefully, and without interruption for more than 6 years (from 1993 to at least 1999)." *Id.*  The Court further found that "Plaintiffs have failed to demonstrate that [the Foundation] had actual knowledge that the Painting was stolen property." *Id.* at *21.

The Foundation's ownership under Article 1955 is not merely a procedural defense—it is a substantive property right under Spanish law.  As the expert opinion of Professors Calvo Caravaca and Yzquierdo Tolsada established, acquisitive prescription under Spanish law vests complete ownership in the possessor: "The

---

[17] For the reasons already briefed, this outcome is not altered by California's enactment of Section 338, which is unconstitutional both on its face and as applied to this case.  (*See* Dkt. 681-1; 691; 693; and 725.)

Foundation either acquired ownership of the Painting through sale and *traditio* . . . or it acquired ownership of the Painting through *usucapio*."[18]  Thus, under Spanish civil law, *usucapio* is a mode of acquiring ownership, alongside purchase and *traditio*, and is a substantive property right—not a procedural defense: "based on the facts at hand, even if the Foundation's acquisition of the Painting by virtue of the sale and purchase agreement could be challenged . . . the Foundation would have acquired ownership and thus a vested property interest in the Painting, in June 1996 or June 1999 at the latest."[19]  Moreover, this Court and the Ninth Circuit have confirmed that Article 1955 is a substantive property right that speaks to the merits of this dispute.  *See*, *e.g.*, *Cassirer*, 862 F.3d at 964 (holding "Article 1955 defense is a defense on the merits: that [the Foundation] has acquired title to the Painting based on Spain's property laws").  To avoid reading the Act to displace substantive foreign property rights, thereby creating constitutional concerns (*see Jones*, 529 U.S. at 857), the Act should be construed as operating within the boundaries of the forum's own law—not as retroactively overriding the substantive property law of a foreign sovereign.

**B. The 2025 HEAR Act Does Not Alter the Choice-of-Law Analysis**

As set forth above, the 2025 HEAR Act does not address choice-of-law issues or otherwise dictate which law provides the rule of decision.  As the Ninth Circuit held with respect to the original 2016 HEAR Act: "HEAR does not specify which state's rules of decision should govern the merits of claims involving art expropriated during the Holocaust.  HEAR simply supplies a statute of limitations during which such claims are timely.  Thus, ***HEAR does not alter the choice of law analysis***[.]"  *Cassirer*, 862 F.3d at 964 (emphasis added).  Nor does the Act create a civil claim or cause of action.  2025 HEAR Act, § 5(i).  Thus, courts remain bound by the same common-law choice-of-law principles that uniformly have directed application of

---

[18] *See* Declaration of Afonso-Luis Calvo Caravaca, March 23, 2015, Exhibit 50 (Dkt. 249-24) ("Expert Opinion of Caravaca and Tolsada"), at 41.

[19] *See id.*, at 4 (Dkt. 249-24).

Spanish law in this case. Moreover, the Act's own stated purposes repeatedly incorporate respect for foreign legal systems. Respect for foreign substantive law is thus integrated into the Act, which must be interpreted with these constraints in mind, reaffirming the need to apply Spanish law to this fundamentally foreign controversy.

## VI. The Foundation is Immune From Suit Under the FSIA

The Foundation reasserts—and does not waive—its immunity defense under the FSIA. The Foundation's sovereign immunity defense under the FSIA remains fully preserved and is unaffected by the 2025 HEAR Act for several independent reasons.[20]

First, the question whether the HEAR Act can expand FSIA jurisdiction is one of first impression that this Court must resolve. The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). The FSIA became law in 1976 only after an incredible amount of work and input from numerous stakeholders:

> H.R. 11315 is the product of many years of work by the Department of State and Justice, in consultation with members of the bar and the academic community. Study of possible legislation began in the mid-1960's. In the early 1970's, a number of draft bills were prepared and submitted for comment to many authorities and practitioners in the international law field. On January 31, 1973, a bill (H.R. 3493) was introduced in the 93d Congress, and referred to the Committee on the Judiciary. The bill H.R. 3493 was the subject of a subcommittee hearing on June 7, 1973. Although extensive advice had already been obtained from the private sector, in the course of the subcommittee's consideration it became apparent that a few segments of the private bar had not been fully consulted. It was pointed out that the 93d Congress bill contained some technical deficiencies which could be remedied-- particularly with respect to maritime cases and the jurisdictional provisions. The American Bar Association at the August 1976 meeting of its House of Delegates adopted a resolution urging approval of H.R. 11315. The letter of that association indicating its support is set out at the end of this report.

H.R. REP. 94-1487, 9-10, 1976 U.S.C.C.A.N. 6604, 6608 ("HISTORY OF THE BILL")

---

[20] The Foundation incorporates by reference its prior briefing on sovereign immunity in support of its summary judgment motion. (*See* Dkt. 681-1 at 6-7; 691 at 7-11; 693 at 2-4; 725 at 2-5)

27

The result was a law which held that, subject to existing international agreements, "a foreign state shall be immune from the jurisdiction of the courts of the United States and the States except as provided in sections 1605 to 1607." 28 U.S.C. 1604. The legislative history made clear:

> The FSIA "sets forth **the sole and exclusive standards** to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States. It is intended **to preempt any other State or Federal law** (excluding applicable international agreements) for according immunity to foreign sovereigns," and "prescribes . . . the jurisdiction of U.S. district courts in cases involving foreign states[.]"

H.R. REP. 94-1487, 12, 1976 U.S.C.C.A.N. 6604, 6610 (emphasis added); *see also Argentine Republic*, 488 U.S. at 435, n.3 (same).

Under this law, the expropriation exception required a violation of international law, specifically the international law of expropriation. *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 187 (2021). Congress has not changed this requirement. Instead, rather than amending the FSIA directly—as Congress did when it added the terrorism exception (28 U.S.C. § 1605A)—an ill-fitting provision was grafted onto the expiring HEAR Act which purports to expand the expropriation exception and rewrite international law for a subset of claims. Plaintiffs will presumably rely on these amendments to the Act to claim the expropriation exception is met and jurisdiction exists. That reading, however, would leave the domestic takings rule in place for all other claims brought under the FSIA's expropriation exception.

The Foundation is an agency or instrumentality of a foreign sovereign and as such is presumably immune from suit in the U.S. The FSIA is the *only* source of jurisdiction over the Foundation. Whether the 2025 HEAR Act can selectively, and partially, override FSIA's jurisdictional requirements is a question of first instance that should be resolved by this Court. We respectfully submit that the Act cannot override the FSIA's jurisdictional requirements, which "'sets forth **the sole and exclusive standards** to be used in resolving questions of sovereign immunity" and

28

which "***preempt[s] any other State or Federal law***." *Argentine Republic*, 488 U.S. at 438; 435, n.3 (emphasis added).

## VII.    The 2025 HEAR Act Confirms That Section 338 Is Federally Preempted

As the Foundation demonstrated in its prior briefing, California's Section 338 is federally preempted under both field and conflict preemption doctrines. (*See* Dkt. 681-1 at 22-30; 691 at 20-24; 693 at 12-15.) The enactment of the 2025 HEAR Act reinforces the Foundation's preemption arguments and demonstrates that the recovery of Nazi-era art is a matter within Congress's exclusive purview and confirms that this field remains exclusively occupied by the federal government.

By extending the HEAR Act's comprehensive federal framework to address the same subject matter of Section 338,[21] Congress has again confirmed that the restitution of Nazi-looted art remains within a matter of exclusively federal, not state, concern. Congress's decision to legislate comprehensively on these issues confirms that there is "no role for individual states to play in the restitution of Nazi-looted assets during and immediately following the war." *Von Saher*, 592 F.3d at 967.

Section 338 is also subject to conflict preemption because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. U.S.*, 567 U.S. 387, 399 (2012). The 2025 HEAR Act makes this conflict even more pronounced. The Act expressly incorporates the Washington Principles and Terezin Declaration into its statement of purpose, acknowledging that the resolution of these claims must take into account "differing legal traditions." Act § 2(5). Section 338, by contrast, mandates that "California substantive law shall apply" regardless of the interests of any other jurisdiction and "[n]otwithstanding any other law or prior judicial decision." (Cal. Code Civ. Proc. § 338(c)(6).) This categorical mandate to apply California law "directly contradicts the federal law's

---

[21] As briefed previously, Section 338 is "primarily concerned about art stolen by the Nazis during World War II, as the reference to the HEAR Act indicates." (Bill AB 2867, prepared for the Assembly Committee on Judiciary, April 27, 2024, at 2.)

encouragement of a multilateral strategy." *National Foreign Trade Council v. Natsios*, 181 F.3d 38, 68 (1st Cir. 1999), *aff'd sub nom.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).  Moreover, whereas the 2025 HEAR Act does not itself alter the choice-of-law analysis (*see* Point V.B, *supra*), Section 338 goes "substantially beyond both existing California law and the federal HEAR Act" by mandating the application of California law regardless of the facts, and regardless of whether the case involves wholly foreign conduct and parties.  Section 338 thus "regulates conduct not covered by the federal law and applies to parties, including foreign [parties], not covered by the federal law[,]" and "therefore has effects more inimical to foreign interests than those of the federal law." *Natsios*, 181 F.3d at 76-77 (holding where federal government "crafted a balanced, tailored approach to an issue, and the state law threatens to upset that balance, the state law is preempted").

In sum, Congress's enactment of the 2025 HEAR Act reaffirms the Foundation's prior arguments that Section 338 intrudes upon an area of exclusive federal authority.  Section 338's attempt to impose California law on this fundamentally foreign controversy is accordingly federally preempted and cannot withstand constitutional scrutiny.  Regardless, application of California law pursuant to Section 338 would violate the Foundation's due process rights, for the same reasons argued above and briefed previously.[22]

### CONCLUSION

For all the reasons stated above and briefed previously, this Court should grant the Foundation's motion for summary judgment.

---

[22] The Foundation otherwise incorporates its briefing addressing the Constitutionality of Section 338 to the extent relevant to the Court's interpretation and construction of the Act.  (*See* Dkt. 681-1; 691; 693; and 725.)

Dated: June 12, 2026

NIXON PEABODY LLP


By: */s/ Thaddeus J. Stauber*
Thaddeus J. Stauber
Aaron M. Brian
Zachary C. Osinski

Attorneys for Defendant
Thyssen-Bornemisza Collection
Foundation

31