Thaddeus J. Stauber (Bar No. 225518)
tstauber@nixonpeabody.com
Aaron M. Brian (Bar No. 213191)
abrian@nixonpeabody.com
Zachary C. Osinski (Bar No. 358770)
zosinski@nixonpeabody.com
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071
Tel: (213) 629-6000
Fax: (213) 629-6001

Attorneys for Defendant
Thyssen-Bornemisza Collection Foundation

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DAVID CASSIRER, AVA CASSIRER, and UNITED JEWISH FEDERATION OF SAN DIEGO COUNTY, a California non-profit corporation,

Plaintiffs,

vs.

THYSSEN-BORNEMISZA COLLECTION FOUNDATION, an agency or instrumentality of the Kingdom of Spain,

Defendant.

Case No. 05-cv-03459-JFW (Ex)
Honorable John F. Walter

**DEFENDANT THYSSEN-BORNEMISZA COLLECTION FOUNDATION'S OPPOSITION TO THE U.S.'S INTERVENTION BRIEF ADDRESSING THE CONSTITUTIONALITY OF THE HOLOCAUST EXPROPRIATED ART RECOVERY ACT OF 2025**

Date: October 26, 2026
Time: 1:30 p.m.
Crtrm: 7A



4918-4822-7288.4

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ........ 1

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. Application of the 2025 HEAR Act to This Case Would Retroactively Deprive the Foundation of its Vested Property Rights in Violation of the Fifth Amendment ........ 3

  A. Under *Campbell v. Holt*, Legislation That Retroactively Divests Vested Property Rights Violates Due Process ........ 4

  B. Depriving the Foundation of its Vested Property Rights Would Likewise Violate California Law ........ 6

II. The 2025 HEAR Act Cannot Deprive the Foundation of Vested Property Rights Without Violating Article III ........ 7

  A. Congress Cannot Convert Article 1955 Into a "Non-Merits" Defense Without Invading the Province of the Judiciary ........ 7

  B. Because the Act Expressly Disclaims Any Federal Right or Remedy, Spanish Law Must Still Supply the Rule of Decision ........ 8

  C. The Government's Authorities are Readily Distinguishable ........ 11

III. The 2025 HEAR Act Cannot Compel Application of U.S. Substantive Law Extraterritorially in This Case ........ 13

  A. The Act Lacks a Clear Statement of Extraterritorial Intent ........ 13

  B. The Fifth Amendment Limits Extraterritorial Application of Federal Substantive Law ........ 16

  C. The Government Conflates the FSIA's Commercial-Activity Nexus Requirement with the Nexus Due Process Requires ........ 17

IV. At a Minimum, the 2025 HEAR Act Should Be Construed to Avoid These Constitutional Limitations ........ 20

CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023) .......... 7

*Bank Markazi v. Peterson*, 578 U.S. 212 (2016) .......... 5, 11, 12, 13

*Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102 (1974) .......... 6

*Campbell v. Holt*, 115 U.S. 620 (1885) .......... 2, 4, 5, 22

*Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010) (*en banc*) .......... *passim*

*Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010) (en banc) .......... 1

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613 (9th Cir. 2013) .......... 1, 18

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 153 F. Supp. 3d 1148 (C.D. Cal. 2015); .......... 1

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951 (9th Cir. 2017) .......... 1

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 2019 WL 13240413 (C.D. Cal. Apr. 30, 2019) .......... 1

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 824 F. App'x 452 (9th Cir. 2020) .......... 1

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107 (2022); 69 F.4th 554 (9th Cir. 2023) .......... 1

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 89 F.4th 1226 (9th Cir. 2024) .......... 1

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
107 F.4th 882 (9th Cir. 2024)....................1

*Cassirer v. Thyssen-Bornemisza Collection Foundation,*
(No. 20-1566) (2021), 2021 WL 5513717, at *21-22....................19

*Cisco Sys., Inc. v. Doe I*,
146 S. Ct. 1882 (2026)....................3, 10, 11

*Estate of Taitmeyer*,
60 Cal. App. 2d 699 (1943)....................6

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
542 U.S. 155 (2004)....................20, 21, 22

*Granfinanciera, S. A. v. Nordberg*,
492 U.S. 33 (1989)....................8

*Jesner v. Arab Bank, PLC*,
584 U.S. 241 (2018)....................11

*Jones v. United States*,
529 U.S. 848 (2000)....................20, 22

*Kiobel v. Royal Dutch Petroleum Co.*,
569 U.S. 108 (2013)....................14, 15

*Lauritzen v. Larsen*,
345 U.S. 571 (1953)....................16, 20

*Lynch v. United States*,
292 U.S. 571 (1934)....................6

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803)....................2, 7, 8

*Miller v. McKenna*,
23 Cal. 2d 774 (1944) ....................6, 8

*Murray v. Schooner Charming Betsy*,
6 U.S. (2 Cranch) 64 (1804)....................3, 20, 21

*Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*,
808 F. Supp. 3d 609 (S.D.N.Y. 2025) ....................16

*Patchak v. Zinke*,
583 U.S. 244 (2018)....................12, 13

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)....................17, 18, 19

*RJR Nabisco v. European Community*,
579 U.S. 325 (2016)....................2, 13, 14

*Rosenblatt v. Cal. State Bd. of Pharmacy*,
69 Cal. App. 2d 69 (1945)....................6

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004)....................10, 11

*Stewart v. Keyes*,
295 U.S. 403 (1935)....................5

*United States v. Davis*,
905 F.2d 245 (9th Cir. 1990)....................16, 17, 18

*United States v. Klein*,
80 U.S. (13 Wall.) 128 (1871)....................12, 13

*United States v. Shi*,
525 F.3d 709 (9th Cir. 2008)....................18

*William Danzer & Co. v. Gulf & Ship Island R.R. Co.*,
268 U.S. 633 (1925)....................5

**Statutes**

18 U.S.C. § 2339B(d) ....................14

18 U.S.C. § 3261(a) ....................14

28 U.S.C. § 1605A(c) ....................9, 11

46 U.S.C. § 70503(b) ....................14

2025 HEAR Act....................*passim*

Cal. Code Civ. Proc. §§ 338(c)(6), 338.2 ....................6

Holocaust Expropriated Art Recovery Act of 2025, Public Law 119-82, 140 Stat. 752 (the "2025 HEAR Act" or "Act") ................................. *passim*

**Other Authorities**

Fifth Amendment ........................................................................................ *passim*

Seventh Amendment ........................................................................................ 7, 8

Fourteenth Amendment ........................................................................................ 16

Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 Harv. L. Rev. 1217, 1223 (1992) ...................... 16

U.S. Constitution, Article III ........................................................ 2, 7, 8, 12

# MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Thyssen-Bornemisza Collection Foundation ("Foundation") submits this memorandum of points and authorities in opposition to the brief filed by the Attorney General on behalf of the U.S. Government, who has intervened in this case for the limited purpose of defending the constitutionality of the Holocaust Expropriated Art Recovery Act of 2025, Public Law 119-82, 140 Stat. 752 (the "2025 HEAR Act" or "Act").

## INTRODUCTION

The Government—taking no position on the outcome of this case or how the Act should be applied—cannot (and does not) dispute that retroactive legislation may never deprive a party of its vested property rights without violating the Due Process Clause of the Fifth Amendment. The Government acknowledges and expressly assumes the Foundation has such due process rights, but then claims the Act is constitutional even though Plaintiff would have this Court apply the Act to retroactively strip the Foundation of its vested property rights in the Painting. As this Court has held, those rights vested under Spain's substantive property law no later than 1999, and well before the Act's enactment, based on the Foundation's decades-long public ownership, possession, and exhibition of Camille Pissarro's *Rue Saint-Honoré, après-midi, effet de pluie* (1897) ("Painting") in Madrid, Spain.[1]

The Government's defense of the Act rests on two, false and misleading premises: that the 2025 HEAR Act "merely precludes" the Foundation from relying on "non-merits defenses", and that no litigant has a vested property interest in the vitality of any "American common law" rule. Notably absent from the Government's

---

[1] The Foundation incorporates by reference the prior decisions in this case, which establish the undisputed facts and law of the case. *See* *Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010) (*en banc*); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613 (9th Cir. 2013); 153 F. Supp. 3d 1148 (C.D. Cal. 2015); 862 F.3d 951 (9th Cir. 2017); 2019 WL 13240413 (C.D. Cal. Apr. 30, 2019); 824 F. App'x 452 (9th Cir. 2020); 596 U.S. 107 (2022); 69 F.4th 554 (9th Cir. 2023); 89 F.4th 1226 (9th Cir. 2024); 107 F.4th 882 (9th Cir. 2024)

brief is any citation to *Campbell v. Holt*, 115 U.S. 620 (1885), the Supreme Court decision that has, for nearly 140 years, marked the constitutional boundary the Government now ignores. Equally absent is any acknowledgment of this Court's prior holding, in this very case, that retroactive legislation which "would result in depriving the Foundation of its ownership of the Painting . . . violates the Foundation's due process rights." The Government's silence on both points is telling, because each is dispositive.

The Foundation is not relying on "non-merits" defenses, or claiming a vested interest in a defense, a limitations period, or the continued vitality of any particular rule of American common law. The Foundation is relying on Spain's substantive property laws, which govern this dispute, and under which the Foundation has a vested property right in the Painting. As this Court and the Ninth Circuit have repeatedly found, the Foundation's property rights vested no later than June 21, 1999, more than twenty-six years before the Act's enactment. For this reason alone, the Act cannot be applied here to deprive the Foundation of its vested property rights.

The Government's reading of the Act fares no better under Article III. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). This Court and the Ninth Circuit have repeatedly held that "Article 1955 defense is a defense on the merits: that [the Foundation] has acquired title to the Painting based on Spain's property laws." Congress cannot relabel Spain's substantive property law as a "non-merits defense", and any attempt to do so invades this Court's role and duty to say what the law is.

The Government's brief further sidesteps the fundamental threshold problem in applying the Act extraterritorially: "It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco v. European Community*, 579 U.S. 325, 335 (2016). The Act is silent on whether Congress ***intended to apply U.S. substantive law extraterritorially***, and—having chosen not to create a federal cause of action—Congress left Plaintiffs'

claims to rest on either California or Spanish substantive law. And as this Court and the Ninth Circuit have repeatedly held, Spanish law supplies the rule of decision. To read the Act as both preserving Spanish law as the governing rule of decision *and* excising the single codified provision of Spanish law that resolves the merits of this dispute would require this Court to fashion a federal remedy that Congress has not provided — a result foreclosed by the Supreme Court's recent decision in *Cisco Sys., Inc. v. Doe I*, 146 S. Ct. 1882 (2026), and the Ninth Circuit's prior holding in this case that "the Spanish Civil Code must be read in its entirety . . . including those articles which provide that title to chattels may pass through qualified, extended possession, such as Article 1955." Moreover, even if Congress had supplied a federal cause of action, the Act still could not be constitutionally applied here to deprive the Foundation of its vested property rights.

For these reasons, and those set forth in the Foundation's prior briefing, the 2025 HEAR Act — properly construed — does not alter the outcome of this case. To the extent the Government urges a construction that would retroactively strip the Foundation of its vested property rights, override Spain's substantive property law, and dictate judgment in Plaintiffs' favor, that construction violates the Due Process Clause, the Takings Clause, Article III, the presumption against extraterritoriality, and the *Charming Betsy* canon of statutory construction. The Court should reject any such proposed reading of the Act, affirm its prior holdings recognizing the Foundation's vested property rights under Spanish substantive law, and grant summary judgment for the Foundation.

## ARGUMENT

### I. Application of the 2025 HEAR Act to This Case Would Retroactively Deprive the Foundation of its Vested Property Rights in Violation of the Fifth Amendment

The Government expressly "[a]ssum[es] that the Due Process Clause applies to Defendant" (U.S. Br. at 7), consistent with this Court's prior holding that the

Foundation's due process rights may not be violated by retroactive legislation that would strip its ownership of the Painting. *Cassirer*, 153 F. Supp. 3d at 1168. While intervening to defend the constitutionality of the 2025 HEAR Act, the Government otherwise takes no position on how application of the HEAR Act to this case would deprive the Foundation of its vested property rights, in violation of the Due Process Clause, nor does it otherwise take any position on how the Act *should* be applied in this case.

### A. Under *Campbell v. Holt*, Legislation That Retroactively Divests Vested Property Rights Violates Due Process

The Foundation does not claim a vested interest in a defense, a limitations period, or the continued vitality of any "American common law" rule. (*See* U.S. Br. at 9–10.) It claims title — ownership of the Painting that vested under Spain's substantive property law no later than June 21, 1999, more than twenty-six years before the Act's enactment. *Cassirer*, 153 F. Supp. 3d at 1167; *see also* *Cassirer*, 89 F.4th at 1230 ("Under Article 1955 of the Spanish Civil Code, ***ownership in personal property vests*** by prescription after either (1) three years of uninterrupted possession of the property in good faith, (2) or six years of uninterrupted possession, even absent good faith.") (emphasis added). The Fifth Amendment forbids Congress from retroactively extinguishing the Foundation's vested title in the Painting, and the Act cannot constitutionally be applied to do so.

The Supreme Court has long distinguished between two kinds of retroactive legislation affecting stale claims. A legislature may, consistent with due process, revive a *remedy* that had merely lapsed, because a defendant has no vested right in, for example, the bar of a statute of limitations. *Campbell v. Holt*, 115 U.S. 620, 628 (1885). But the Court drew a sharp and enduring line where the passage of time has done more than extinguish a remedy — where it has resulted in *vested rights and title* to property in the possessor:

> [I]n an action to recover real or personal property, where the question is as to the removal of the bar of the statute of limitations by a legislative

> act passed after the bar has become perfect, . . . such act deprives the party of his property without due process of law. The reason is that, by the law in existence before the repealing act, the property had become the defendant's. Both the legal title and the real ownership had become vested in him[.]

*Id.* at 623. As the Supreme Court held, in such a case, "***to give the act the effect of transferring this title to plaintiff would be to deprive him of his property without due process of law***." *Id.* (emphasis added).

The Supreme Court has reaffirmed this distinction repeatedly, both with respect to federal and state legislation. In *Stewart v. Keyes*, 295 U.S. 403 (1935), the Court recognized that once possession has "ripened into an unassailable title" under applicable law, that title is as complete as title acquired by any other means and cannot be divested by subsequent legislation, and that a subsequent federal law (the Act of Congress of April 12, 1926) "falls nothing short of an attempt arbitrarily to take property from one having a perfect title and to subject it to an extinguished claim of another." *Id.* at 417. And in *William Danzer & Co. v. Gulf & Ship Island R.R. Co.*, 268 U.S. 633 (1925), the Court held that where the passage of time had extinguished the underlying right itself — rather than merely the remedy — a later federal statute purporting to revive it (the Transportation Act of 1920) could "not be construed retroactively to create liability", as that would "deprive defendant of its property without due process of law in contravention of the Fifth Amendment." *Id.* at 637.

The Fifth Amendment's protection of vested property rights is not limited to the Due Process Clause. As the Supreme Court explained in the very decision on which the Government principally relies, "[t]he Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation.'" *Bank Markazi v. Peterson*, 578 U.S. 212, 228–29 (2016) (cited in U.S. Br. at 12-14). *Bank Markazi* thus confirms that, whatever latitude Congress enjoys to change rules governing pending litigation, that latitude stops when

Congress purports to strip vested property rights. The Court has also applied that limit, derived from the Takings Clause of the Fifth Amendment, to Congress directly: in *Lynch*, "Section 17 of the Economy Act was held to effect an unconstitutional taking of vested property rights in the beneficiaries created by [certain] insurance contracts." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 134–35 (1974) (discussing *Lynch v. United States*, 292 U.S. 571, 579 (1934)). The 2025 HEAR Act provides no compensation and identifies no public use; read as the Government urges, it would simply transfer title to the Painting from the Foundation to Plaintiffs by legislative fiat. Neither the Due Process Clause nor the Takings Clause of the Fifth Amendment permits that result.

### B. Depriving the Foundation of its Vested Property Rights Would Likewise Violate California Law

California law—the substantive law Plaintiffs ask this Court to apply through Section 338[2]—embraces these same principles. The California Supreme Court, citing *Campbell*, has explained that "a vested right, as that term is used in relation to constitutional guaranties, implies an interest which it is proper for the state to recognize and protect, and of which the individual may not be deprived arbitrarily without injustice." *Miller v. McKenna*, 23 Cal. 2d 774, 783 (1944) (citing, *inter alia*, *Campbell*, 115 U.S. 620).

California courts likewise hold that, although retrospective laws are not *per se* prohibited under the federal Constitution or the Constitution of California, "***a retrospective act may not be given effect to deprive one of a completely vested property right***." *Estate of Taitmeyer*, 60 Cal. App. 2d 699, 709 (1943) (emphasis added). Indeed, "'[t]he power of the legislature to impair such vested rights as are protected by constitutional guaranties has been repeatedly denied by the courts. . . .'" *Rosenblatt v. Cal. State Bd. of Pharmacy*, 69 Cal. App. 2d 69, 77 (1945) (Adams, J.,

[2] The 2024 amendments to California's Code of Civil Procedure are referred to herein, collectively as "Section 338." *See* Cal. Code Civ. Proc. §§ 338(c)(6), 338.2.

dissenting) (quoting 5 Cal. Jur., pp. 751, sec. 145). Thus, whether the Court looks to federal constitutional law or California law, the result is the same: neither Congress nor the California Legislature may pass a law that retroactively extinguishes the Foundation's completely vested title.

## II. The 2025 HEAR Act Cannot Deprive the Foundation of Vested Property Rights Without Violating Article III

The primacy of vested property rights in this analysis is as old as judicial review itself, and further demonstrates why the Act cannot deprive the Foundation of its vested property rights without also violating Article III of the U.S. Constitution.

### A. Congress Cannot Convert Article 1955 Into a "Non-Merits" Defense Without Invading the Province of the Judiciary

In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), Chief Justice Marshall found it necessary first to determine whether Marbury was "entitled to the possession of those evidences of office, which, being completed, *became his property*." *Id.* at 155 (emphasis added). "Only once it was established that a vested property right was at stake did the Court determine the remaining issues. ***Marbury* thus 'stand[s] for the importance of private right**.'" *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 198, n.2 (2023) (Thomas, J., concurring) (emphasis added). And "when private rights are at stake, full Article III adjudication is likely required. Private rights encompass 'the three "absolute" rights,' life, liberty, and property, 'so called because they "appertain and belong to particular men merely as individuals," not "to them as members of society or standing in various relations to each other"—that is, ***not dependent upon the will of the government***.'" *Id.* at 198 (emphasis added). Cases like this one, involving "core private rights [] must be adjudicated by Article III courts" and "merely labeling the deprivation of a core private right a 'civil penalty' cannot allow Congress . . . to circumvent constitutional requirements." *Id.* at 203-04 (citing *Granfinanciera, S. A. v. Nordberg*, 492 U.S. 33, 61 (1989) (holding "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by

relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity”)).

The Government’s argument that the “HEAR Act merely precludes [a] Defendant from relying on defenses that Congress deemed to be ‘non-merits defenses’” (U.S. Br. at 9), further underscores why such a reading of the Act would violate Article III. This Court and the Ninth Circuit have repeatedly emphasized that the Foundation’s “Article 1955 defense is a defense on the merits: that TBC has *acquired title to the Painting based on Spain’s property laws*.” *Cassirer*, 862 F.3d at 965; *Cassirer*, 2019 WL 13240413, at *20-22 (finding after a full trial on the merits of this dispute that the Foundation acquired title and vested rights under Spanish substantive law). For the same reason that “Congress cannot eliminate a party’s Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches” (*Granfinanciera*, 492 U.S. at 61), Congress cannot relabel Spain’s substantive law to be “merely” a “non-merits defense” without invading the “province and duty of the judicial department to say what the law is” (*Marbury*, 5 U.S. at 177).

Indeed, “[t]he question of what constitutes such a right is confided to the courts,” because “vested rights of property and contract rights are placed by the Constitution under the protection of the courts, where alone the questions of law and fact upon which they depend can be finally decided.” *Miller*, 23 Cal. 2d at 774, 783 (citing, *inter alia*, *Campbell*, 115 U.S. 620). And because the existence of a vested right is a question “confided to the courts” (*Miller*, 23 Cal. 2d at 783), the Government’s reliance on Congress’s characterization or re-labeling of acquisitive prescription as a “non-merits defense” is misplaced.

### B. Because the Act Expressly Disclaims Any Federal Right or Remedy, Spanish Law Must Still Supply the Rule of Decision

In its defense of the Act, the Government argues that in “any lawsuit covered by the HEAR Act, the plaintiffs still must establish the elements of their cause of

action." (U.S. Br. at 11.) But that assertion begs the dispositive question: what are the elements of Plaintiffs' claim to the Painting, and from what law do they derive? The 2025 HEAR Act supplies no answer, because it expressly provides that "[n]othing in this Act shall be construed to create a civil claim or cause of action under Federal or State law." (2025 HEAR Act § 5(i).) Congress plainly knows how to create a federal right of action when it intends to, as it did exactly that in the terrorism context. *See* 28 U.S.C. § 1605A(c) (providing an express "private right of action"). However, Congress chose not to create a federal right or remedy in amending the 2025 HEAR Act, further demonstrating why Spanish law still governs the merits of this dispute.

With no federal right of action, Plaintiffs' claims must rest on either California or Spanish law. And Spanish law still supplies the rule of decision under the choice-of-law analysis this Court previously conducted and the Ninth Circuit affirmed. *Cassirer*, 89 F.4th at 1236, 1242.[3] Here the Government's position collapses on itself: to apply Spanish law as the rule of decision, while simultaneously excising the single codified provision of Spanish law that resolves the merits of this dispute, would be to imply a federal remedy under the 2025 HEAR Act—a remedy that no Spanish legislature ever enacted, that no Spanish court has ever recognized, and that exists nowhere in the Spanish Civil Code. This is precisely the result that the Ninth Circuit foreclosed when it held that "the Spanish Civil Code ***must be read in its***

[3] For the reasons already briefed, this outcome is not altered by California's enactment of Section 338, which is unconstitutional both on its face and as applied to this case. (*See* Dkt. 681-1; 691; 693; and 725.)

Notably, the Government takes no position on (and does not even mention) Section 338, while simultaneously emphasizing the federal government's authority to regulate restitution of art expropriated or stolen from original owners during the Holocaust and its exclusive authority over matters of foreign affairs. (U.S. Br. at 3; 8-12.) In addition to the other constitutional challenges raised by the Foundation, the Government's intervention brief further bolsters the Foundation's preemption arguments with respect to Section 338, and, regardless, Section 338 cannot be constitutionally applied here to deprive the Foundation of its vested property rights in the Painting without violating the Foundation's due process rights, for the same reasons argued herein with respect to the 2025 HEAR Act.

***entirety***, including those articles which provide that title to chattels may pass through qualified, extended possession, such as Article 1955." *Cassirer*, 862 F.3d at 961, n.8 (emphasis added).

That result is further foreclosed by recent Supreme Court precedent that prevents this Court from fashioning a federal remedy that Congress has not created. The Supreme Court's decision last term, in *Cisco Sys., Inc. v. Doe I*, 146 S. Ct. 1882 (2026) confirms this point, where the Court held that "[w]hile our cases at one time permitted courts to provide redress if Congress remained silent, 'we have since ***rejected the practice of fashioning rights of action as we see fit***[.]" *Id.* at 1890 (internal citation omitted). In so holding, the Court reasoned "the power to create causes of action belongs to Congress," that "'[h]ome-grown causes of action are difficult to reconcile with the "Constitution's separation of legislative and judicial power[,]"'" and that the Court will not continue to "'indulge the fiction' that creating new ATS causes of action is sometimes appropriate." *Id.* at 1890.

The Court in *Cisco* abrogated its prior decision in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), where the Court held that the ATS does not permit a court to create a cause of action for arbitrary detention in violation of international law. *Id.* at 699. In so holding, the Court stressed that "'the ATS is a jurisdictional statute creating no new causes of action.' At the same time—and in considerable tension with the first point—[the Court] said that the ATS allows for the possibility of new, judicially created causes of action to enforce norms of international law." *Cisco*, 146 S. Ct. at 1887 (quoting in *Sosa*, 542 U.S. at 92 (2004)). However, after *Sosa* was decided, the Court "***firmly committed to the view that judicially created causes of action offend the separation of powers in almost every circumstance***" and "***virtually eliminated the practice of fashioning them***." *Cisco*, 146 S. Ct. at 1891 (emphasis added). After again emphasizing that "crafting new causes of action under the ATS 'raise[s] risks of adverse foreign policy consequences,' and intrudes on Congress's prerogative to create private rights of action" (*Cisco*, 146 S. Ct. at 1890), the Court

in *Cisco* "close[d] the door that *Sosa* cracked to judicially created ATS liability", finding "Courts cannot create new rights of action to remedy violations of international law[.]" *Id.* at 1892.

Post-*Cisco*, the law is clear: Courts may not fashion remedies Congress has not provided. And the restraint *Cisco* demands is heightened "in the realm of international law, where 'the general practice has been to look for legislative guidance before exercising innovative authority over substantive law.'" *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 265 (2018). The 2025 HEAR Act is even more explicit on this point than the ATS, providing that "[n]othing in this Act shall be construed to create a civil claim or cause of action under Federal or State law." (Act, § 5(i).) Likewise, under the FSIA—the purported basis for jurisdiction in this case—Plaintiffs' claims "turn only on state or foreign property law, with no substantive federal component." *Cassirer*, 596 U.S. at 114. To read the Act as barring application of Spanish law and Article 1955 to the merits of this dispute would both go against the Act's own stated purpose of ensuring claims are "resolved on the merits" (*id.*, § 2(a)) and the Supreme Court's instruction that courts may not fashion federal remedies Congress has not created. *Cisco*, 146 S. Ct. at 1891.

### C. The Government's Authorities are Readily Distinguishable

The Government relies heavily on *Bank Markazi* in support of its separation of powers arguments. (U.S. Br. at 12-14.) However, while the 2025 HEAR Act expressly disclaims the creation of any cause of action, the statute at issue in *Bank Markazi* operated in tandem with an express "private right of action" Congress had created for terrorism victims (*see* (28 U.S.C. § 1605A(c)) and was enacted to "authorize[] execution of judgments obtained under the FSIA's terrorism exception[.]" *Bank Markazi*, 578 U.S. at 217 (citing Terrorism Risk Insurance Act of 2002).

More fundamentally, *Bank Markazi* involved (i) assets *located in the United States*, (ii) belonging to a foreign sovereign *already adjudged liable* in separate

litigation, (iii) being made available for post-judgment execution by U.S. terrorism victims. In upholding that statute, the Court emphasized that "Congress and the President have, time and again, as exigencies arose, exercised control over claims against foreign states *and the disposition of foreign-state property in the United States*." *Id.* at 235. The Court's reasoning was expressly tethered to that domestic nexus; indeed, the statute "required the District Court to determine whether the assets were '***held in the United States***.'" *Id.* at 230, n.20 (emphasis added). The 2025 HEAR Act cannot be reconciled with these limitations. It does not deal with foreign-state property "in the United States" and purports to reach property in Spain—a painting physically located in Madrid, owned by a Spanish instrumentality, title to which vested under Spanish law decades ago.

The Government's reliance on *Patchak v. Zinke*, 583 U.S. 244 (2018) (U.S. Br. at 13–14) fares no better. The Court there "distinguish[ed] between permissible exercises of the legislative power and impermissible infringements of the judicial power . . . [using] the following rule: Congress violates Article III when it 'compel[s] . . . findings or results under old law[,]' . . . [but] does not violate Article III when it 'changes the law.'" *Patchak v. Zinke*, 583 U.S. at 250. That dichotomy exposes the flaw in the Government's position: Congress has not changed—and cannot change—the applicable law here, which is Spain's Article 1955. Instead, what the Government asks this Court to do is to interpret the Act to "compel a different result" under Spanish law, which is precisely the compulsion *Patchak* holds impermissible.

Both *Patchak* and *Bank Markazi* trace their governing rule to *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1871)—and *Klein* is fatal to the Government's reading of the Act. As the Supreme Court has since explained, "the statute in *Klein* infringed the judicial power, not because it left too little for courts to do, but because it attempted to direct the result without altering the legal standards governing the effect of a pardon—***standards Congress was powerless to prescribe***." *Bank Markazi*, 578 U.S. at 228 (emphasis added). The same is true here. Spain's Article 1955 is, by

definition, a provision of a foreign sovereign's Civil Code that "Congress is powerless to prescribe." Because the Foundation's rights in the Painting vested under Spanish law, and because Congress can neither repeal nor alter the applicable legal standards under Article 1955, any construction of the 2025 HEAR Act that directs judgment for Plaintiffs while displacing Article 1955 would do exactly what *Klein* prohibits: direct the result without lawfully altering the substantive legal standard. The Government's reliance on *Bank Markazi* and *Patchak* is therefore misplaced, and the Act cannot be constitutionally applied here without violating the Foundation's vested property rights under Spanish law.

## III. The 2025 HEAR Act Cannot Compel Application of U.S. Substantive Law Extraterritorially in This Case

In arguing the Act applies extraterritorially, the Government ignores the fundamental threshold problem: the 2025 HEAR Act is silent on whether Congress intended to apply U.S. substantive law extraterritorially. "It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco v. European Community*, 579 U.S. 325, 335 (2016). The presumption against extraterritoriality "serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries . . . [and] reflects the more prosaic 'commonsense notion that Congress generally legislates with domestic concerns in mind.'" *Id.* at 335–36. Accordingly, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* at 335.

### A. The Act Lacks a Clear Statement of Extraterritorial Intent

In arguing the 2025 HEAR Act applies extraterritorially, the Government conflates whether some extraterritorial activity is contemplated within the Act, with whether Congress has expressed a clear intent to apply the Act and U.S. substantive law extraterritorially. Had Congress intended the Act (and U.S. substantive law) to apply extraterritorially, it knows exactly how to draft a statute that satisfies the

Supreme Court's clear-statement rule from *RJR Nabisco*. As just a few examples: (1) the Maritime Drug Law Enforcement Act, 46 U.S.C. § 70503(b) provides that it "applies even though the act is committed outside the territorial jurisdiction of the United States"; (2) the Antiterrorism Act, 18 U.S.C. § 2339B(d) provides "[t]here is extraterritorial Federal jurisdiction over an offense under this section"; and (3) the Military Extraterritorial Jurisdiction Act, 18 U.S.C. § 3261(a) criminalizes conduct by persons "employed by or accompanying the Armed Forces outside the United States."

The 2025 HEAR Act contains no clear statement of extraterritorial intent. It does not declare that it applies to property located outside the United States, to conduct occurring entirely in foreign territory, or to the displacement of foreign substantive property law. Moreover, as the Supreme Court has recognized, "[a]lthough 'a risk of conflict between the American statute and a foreign law' is not a prerequisite for applying the presumption against extraterritoriality where such a risk is evident, the need to enforce the presumption is at its apex." *RJR Nabisco*, 579 U.S. at 348 (internal citation omitted); *see also Abitron*, 600 U.S. at 427 (quoting *Morrison*, 561 U.S. at 269) (where "the 'probability of incompatibility with the applicable laws of other countries is so obvious that if Congress intended such foreign application "it would have addressed the subject of conflicts with foreign laws and procedures"'").

The Government's citation to "foreign law concepts" incorporated into the Act and the Act's "reference to 'all governments'" (U.S. Br. at 16-17) misstates (or misunderstands) the Supreme Court's extraterritoriality analysis, and reflects precisely the type of arguments the Court has consistently rejected. As the Supreme Court explained in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 126 (2013):

> Petitioners make much of the fact that the ATS provides jurisdiction over civil actions for "torts" in violation of the law of nations. They claim that in using that word, the First Congress "necessarily meant to

> provide for jurisdiction over extraterritorial transitory torts that could arise on foreign soil." [. . .]
>
> Under the transitory torts doctrine, however, "***the only justification for allowing a party to recover when the cause of action arose in another civilized jurisdiction is a well founded belief that it was a cause of action in that place***." *Cuba R. Co. v. Crosby*, 222 U.S. 473, 479, 32 S.Ct. 132, 56 L.Ed. 274 (1912) (majority opinion of Holmes, J.). The question under *Sosa* is not whether a federal court has jurisdiction to entertain a cause of action provided by foreign or even international law. ***The question is instead whether the court has authority to recognize a cause of action under U.S. law to enforce a norm of international law***. The reference to "tort" does not demonstrate that the First Congress "necessarily meant" for those causes of action to reach conduct in the territory of a foreign sovereign. In the end, nothing in the text of the ATS evinces the requisite clear indication of extraterritoriality.

*Kiobel*, 569 U.S. at 118-19 (emphasis added).

The Government's arguments fail to address this fundamental distinction the Supreme Court has repeatedly emphasized in applying the presumption against extraterritoriality: it is one thing "for a federal court ***[to provide] jurisdiction*** to entertain a cause of action provided by foreign or even international law", but it is entirely another question of "***whether the court has authority to recognize a cause of action under U.S. law to enforce a norm of international law***." *Id.* (emphasis added).

Like the ATS, "there is no indication that the [2025 HEAR Act] was passed to make the United States a uniquely hospitable forum for the enforcement of international norms. As Justice Story put it, '***No nation has ever yet pretended to be the custos morum of the whole world[.]' . . . Indeed, the parties offer no evidence that any nation, meek or mighty, presumed to do such a thing***." *Kiobel*, 569 U.S. at 123-24 (emphasis added) (holding "nothing" in the ATS "suggests that Congress also intended federal common law . . . to provide a cause of action for conduct occurring in the territory of another sovereign" and that "petitioners' case seeking

relief for violations of the law of nations occurring outside the United States is barred").

**B. The Fifth Amendment Limits Extraterritorial Application of Federal Substantive Law**

Not only does retroactively stripping vested property rights violate the Fifth Amendment's Due Process Clause, but that same clause limits the extraterritorial application of federal law. *Davis*, 905 F.2d at 248; *see also* Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 Harv. L. Rev. 1217, 1223 (1992) ("the Fifth Amendment Due Process Clause limits federal actions in much the same manner that the Fourteenth Amendment Due Process Clause limits state actions"); *Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, 808 F. Supp. 3d 609, 619 (S.D.N.Y. 2025) (applying the Second Circuit's "sufficient nexus" test to "'determine[] whether the extraterritorial application of federal criminal law comport[s] with constitutional due process' under the Fifth Amendment"). As the Supreme Court recognized in *Lauritzen v. Larsen*, 345 U.S. 571, 590-91 (1953): "We have held it a denial of due process of law when a state of the Union attempts to draw into control of its law otherwise foreign controversies, on slight connections, because it is a forum state." The same principle constrains federal extraterritorial legislation. *See*, *e.g.*, *Davis*, 905 F.2d at 248.

Due process requires, at a minimum, a sufficient nexus between the United States and the conduct, parties, or effects regulated by the proposed legislation. Retroactive application of the Act to strip a foreign sovereign's instrumentality of property rights acquired under its own domestic law and entirely within Spain's borders would violate the Fifth Amendment and the Foundation's due process rights. This is especially true, whereas here, "none of the relevant conduct occurred in California" or anywhere in the United States for that matter (*Cassirer*, 89 F.4th at 1243), the Painting is physically located in Spain, the Foundation's acquisition, possession and display of the Painting occurred entirely in Spain, and the

Foundation's title vested under Spanish law twenty-six years before the 2025 HEAR Act's passage. Applying the Act extraterritorially to strip the Foundation—an agency and/or instrumentality of the Spanish government—of its vested property rights is plainly a violation of due process.

Thus, regardless of whether or not the 2025 HEAR Act contained the requisite clear statement of extraterritorial intent (it does not), the Act cannot constitutionally be applied in this case without violating the Fifth Amendment's Due Process Clause.

**C. The Government Conflates the FSIA's Commercial-Activity Nexus Requirement with the Nexus Due Process Requires**

The Government contends that this Court's 2006 findings regarding the Foundation's commercial contacts with the United States are "more than sufficient to satisfy any requirement of a nexus." (U.S. Br. at 8–9.) In so arguing, the Government conflates the standards applicable to the exercise of personal jurisdiction versus the nexus required to permit extraterritorial application of forum law.

Moreover, while this Court previously found that the Foundation engaged in sufficient "commercial activities in the United States" to support a finding that the expropriation exception of the FSIA applied, the Ninth Circuit expressly noted that this finding was "not 'inextricably intertwined' with a decision that the exercise of personal jurisdiction comports with due process." *Cassirer*, 616 F.3d at 1025. And regardless, a finding that the Foundation engaged in commercial activity in the United States in no way establishes meaningful "conduct by a defendant within a state that is related to a plaintiff's alleged injuries" or that California otherwise has "significant contact or significant aggregation of contacts to the claims asserted . . . , contacts creating state interests, in order to ensure that the choice of law is not arbitrary or unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818–22 (1985).

The Government attempts to distinguish *United States v. Davis*, 905 F.2d 245 (9th Cir. 1990)—which held that "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a

sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair" (*id.* at 248-49)—as only involving a criminal statute, but that distinction does nothing to advance the Government's argument. Under the concept of "universal jurisdiction", certain criminal actions that amount to "offenses against all states may be punished by any state where the offender is found." *United States v. Shi*, 525 F.3d 709, 722 (9th Cir. 2008). Thus, "[d]ue process does not require a nexus between such an offender and the United States *because the universal condemnation of the offender's conduct puts him on notice that his acts will be prosecuted by any state where he is found.*" *Id.* at 723 (emphasis added). The fact that the "Act is not a criminal statute" (U.S. Br. at 8), arguably provides a higher standard (and thus a stronger nexus requirement to the United States) to justify the extraterritorial application of the 2025 HEAR Act.

More tellingly, the Government does not even mention the Supreme Court's binding authority from *Phillips*, 472 U.S. at 821 (cited in the Foundation's Supp. HEAR Act Br. at 28 (Dkt. 757)), despite the fact that case squarely addresses "the underlying theory of a choice of-law due process claim," which is the crux of the Foundation's extraterritorial argument. As the Supreme Court held, "***the underlying theory of a choice-of-law due process claim must be that the parties plan their conduct and contractual relations based upon their legitimate expectations concerning the subsequent legal consequences of their actions***." *Phillips*, 472 U.S. at 821 (emphasis added). "***The touchstone here is the reasonable expectation of the parties.***" *Allstate*, 449 U.S. at 333 (Powell, J., dissenting, adopted in *Phillips*, 472 U.S. at 821) (emphasis added).

Here, applying the 2025 HEAR Act to prevent application of Spanish substantive law and recognition of the Foundation's vested property rights "would mean that Spain could not provide any 'reasonable assurance[s]' to persons who possess property within Spain's borders that Article 1955 would ever protect them from replevin or damages actions by California [or any U.S.] claimants." *Cassirer*,

89 F.4th at 1243. Applying the Act to unwind the Foundation's property rights to the Painting—which vested under Spain's laws no later than 1999, where the Painting is physically located, was purchased, and has been displayed for decades—would give parties no ability to "plan their conduct and contractual relations based upon their legitimate expectations concerning the subsequent legal consequences of their actions" (*Phillips*, 472 U.S. at 821), as there would always be some risk that someone could later move to the United States (or any jurisdiction for that matter), file suit, secure a favorable amendment to the law, and disregard Spanish law and Spain's sovereignty over property disputes arising within its own borders.

These principles tell us the same thing about how this Court should interpret the 2025 HEAR Act: that the Act should be interpreted in a way that respects Spain's sovereignty and ability to regulate property disputes within its borders, that it should be interpreted consistent with the Constitution's Due Process Clause, and that it should be interpreted to not violate basic principles of international law. The Government, in its 2021 Amicus Brief to the Supreme Court filed by the United States Solicitor General, also recognized these same constitutional safeguards—including the Due Process Clause, Full Faith and Credit Clause, and Commerce Clause—apply in FSIA and HEAR Act cases to protect foreign sovereigns and their instrumentalities.[4]

Consistent with these principles, the Court should find the Act cannot constitutionally be applied in this case to unwind the Foundation's vested property rights in the Painting.

---

[4] See Brief for the United States as Amicus Curiae in Cassirer v. Thyssen-Bornemisza Collection Foundation (No. 20-1566) (2021), 2021 WL 5513717, at *21-22 (noting "there could be instances in which a State's choice-of-law rules were hostile to or improperly dismissive of a foreign state's interests-especially its interests in regulating certain matters within its own territory-that state law should not control. But those concerns are best addressed by applying limits on the application of state law derived from the Constitution[.]").

## IV. At a Minimum, the 2025 HEAR Act Should Be Construed to Avoid These Constitutional Limitations

The Government also does not address the *Charming Betsy* canon, which instructs that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains" (*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)), and which the Supreme Court applies to "construe [statutes] to avoid unreasonable interference with the sovereign authority of other nations." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164–65 (2004). Nor does the Government address the requirement that courts construe statutes to avoid "grave constitutional concerns." *See Jones v. United States*, 529 U.S. 848, 857 (2000) ("'where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter'").

The Government's silence on these points reflects an inability to reconcile a maximalist reading of the Act with fundamental principles of statutory construction, international law, and the constitutional limitations placed on Congress. Applying the Act to override Spain's substantive property law would constitute precisely the "legal imperialism" the Supreme Court has rejected under its *Charming Betsy* precedents. *F. Hoffmann-La Roche Ltd.*, 542 U.S. at 169; *see also Lauritzen*, 345 U.S. at 577 ("By usage as old as the Nation, . . . statutes have been construed to apply only to areas and transactions in which American law would be considered operative under prevalent doctrines of international law."); *The Apollon, Edon, Claim*, 22 U.S. 362, 370 (1824) ("The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens. They can have no force to control the sovereignty or rights of any other nation, within its own jurisdiction . . . [and] must always be restricted in construction to places and persons, upon whom the Legislature have authority and jurisdiction.").

In *F. Hoffmann-La Roche Ltd.*, 542 U.S. 155, a unanimous Supreme Court applied the *Charming Betsy* canon to narrow the reach of the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") in a foreign antitrust dispute, holding the Sherman Act does *not* reach claims arising out of foreign anticompetitive conduct. The Court reasoned that applying U.S. antitrust law in such circumstances would create serious friction with the regulatory choices of other sovereign nations—many of which have their own antitrust regimes—and would "threaten interference with a foreign nation's ability to maintain the integrity of its own antitrust enforcement system." *Id.* at 165. After citing *Charming Betsy*, the Court emphatically explained:

> No one denies that America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs. [. . .] [Then] why is it reasonable to apply those laws to foreign conduct *insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim?* Like the former case, application of those laws creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs.

*Id.* at 165 (emphasis original). Next, in holding the FTAIA did not apply to plaintiffs' claim based solely on foreign conduct, the Supreme Court concluded:

> Congress might have hoped that America's antitrust laws, so fundamental a component of our own economic system, would commend themselves to other nations as well. ***But, if America's [regulatory] policies could not win their own way in the international marketplace for such ideas, Congress, we must assume, would not have tried to impose them, in an act of legal imperialism, through legislative fiat***.

*Id.* at 169 (emphasis added).

The same is true here. Other jurisdictions, including Spain, have substantive property laws that are different from our own. The Washington Principles and Terezin Declaration, incorporated into the Act's Purpose, pointedly remind us to recognize such differing legal traditions in these types of disputes. This Court should construe the Act to operate within these bounds of established rules of statutory construction and international law, applying the Act's provisions which purport to eliminate substantive legal doctrines only when the Court's choice-of-law test results in American substantive law providing the rule of decision. *See also* *Cassirer*, 69

F.4th at 566 ("a court's task 'is not to determine whether the [foreign jurisdiction] rule or the California rule is the better or worthier rule, but rather to decide—in light of the legal question at issue and the relevant state interests at stake—which jurisdiction should be allocated the predominating lawmaking power under the circumstances of the present case").

Because an "'act of congress ought never to be construed to violate the law of nations ***if any other possible construction remains***'" (*F. Hoffmann-La Roche Ltd.*, 542 U.S. at 165) (emphasis added), and because any other interpretation of the Act would raise "grave and doubtful constitutional questions" by depriving the Foundation of its vested rights in the Painting (*Jones*, 529 U.S. at 857), this Court should adopt a limited construction of the 2025 HEAR Act. [5]

**CONCLUSION**

For the foregoing reasons, and those set forth in the Foundation's prior briefing, the 2025 HEAR Act—properly construed—does not alter the outcome of this case, and any contrary construction would render the Act unconstitutional as applied. The Court should reject the Government's reading, affirm its prior holdings recognizing the Foundation's vested property rights under Spanish substantive law, and grant summary judgment for the Foundation.

It is a bedrock canon of judicial restraint that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Jones*, 529 U.S. at 857. This Court need not — and should not — reach the ultimate constitutionality of the 2025 HEAR Act to resolve this motion. The Government concedes that the Due Process Clause applies to the Foundation. (U.S. Br. at 7.) The Government does not address, let alone contest, *Campbell v. Holt* or this Court's prior

[5] The Foundation otherwise incorporates its prior briefing addressing the constitutionality of the 2025 HEAR Act and Section 338 to the extent relevant to the Court's interpretation and construction of the Act. (*See* Dkt. 681-1; 691; 693; 725; 752; and 757.)

holding that retroactive legislation stripping the Foundation of its ownership of the Painting "violates the Foundation's due process rights." *Cassirer*, 153 F. Supp. 3d at 1167. On those uncontested points alone, the Foundation is entitled to summary judgment. Because the Court can resolve this motion by construing the Act consistently with the Due Process Clause, the Takings Clause, Article III, the presumption against extraterritoriality, and the Charming Betsy canon — and because the Government concedes the premises that make that construction dispositive — the Court can and should grant the Foundation's motion for summary judgment without the need for further briefing or oral argument, and without reaching the broader question of the 2025 HEAR Act's facial constitutionality.

The Court should accordingly reject Plaintiffs' proposed reading of the Act, affirm its prior holdings recognizing the Foundation's vested property rights under Spanish substantive law, and enter summary judgment for the Foundation based on a limited construction of the Act.

Dated: October 16, 2026

NIXON PEABODY LLP

By: */s/ Thaddeus J. Stauber*
Thaddeus J. Stauber
Aaron M. Brian
Zachary C. Osinski

Attorneys for Defendant
Thyssen-Bornemisza Collection
Foundation